**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., | No. 1:21-cv-410-DKC |
| *Plaintiffs*, | |
| *v.* | **AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| PETER FRANCHOT, | |
| *Defendant*. | |

Plaintiffs the Chamber of Commerce of the United States of America, Internet Association, NetChoice, and the Computer & Communications Industry Association (collectively, Plaintiffs), for their amended complaint against Peter Franchot, in his official capacity as the Comptroller of the Treasury of Maryland, allege by and through their attorneys as follows:

**INTRODUCTION**

1.       This lawsuit seeks a declaration and injunction against enforcement of Maryland House Bill 732, as amended by Senate Bill 787, (the Act) insofar as it imposes a "Digital Advertising Gross Revenues Tax" on sellers of digital advertising services. The Act is a punitive assault on digital, but not print, advertising. It is illegal in myriad ways and should be declared unlawful and enjoined.

2.       The background leading to the Act's passage is undeniable: Maryland lawmakers disapprove of large digital advertising companies and intended to punish them. A centerpiece of the Act's legislative history is an article, authored by a witness testifying in support of the Act, which accuses large digital advertising companies of "erod[ing]" the "shared values and norms" of American society. *See* Paul Romer, *A Tax That Could Fix Big Tech*, New York Times (May 6, 2019), perma.cc/MZ83-NF5Y; *see also* Testimony from Paul Romer to Budget & Taxation Committee (Jan. 29, 2020), perma.cc/EZ4M-ZEGY. Maryland lawmakers acted on the belief that

large digital advertising companies are "too big to trust" and have created "a haven for dangerous misinformation and hate speech." Romer, *A Tax That Could Fix Big Tech*. In the run-up to the Act's passage, that theme was repeated over and over again by the Act's most outspoken proponents, including Senate President Bill Ferguson, who proclaimed—ironically, over Facebook—that, with the Act, Maryland lawmakers had deliberately "targeted" companies "like Amazon, Facebook, and Google." *See* perma.cc/699U-4BQB.

3.      The premise of the law is deeply flawed. Taxing digital advertising revenue will have the opposite of the Act's intended effect, reducing resources to support the creation and availability of high-quality ad-supported content, leaving the online field overrun by low-quality "junk" content. Meanwhile, the Act will raise costs for consumers and make it more difficult for businesses to connect with potential customers. Simply put, the Act will harm Marylanders and small businesses and reduce the overall quality of internet content—all while doing nothing to stave off the dissemination of misinformation and hate speech.

4.      Recognizing the Act's many infirmities, Governor Hogan vetoed the Act on May 7, 2020, calling it "misguided" and "unconscionable." *See* Letter from Governor Lawrence J. Hogan, Jr. to Senator Bill Ferguson and Representative Adrienne A. Jones (May 7, 2020), perma.cc/HC8L-FTAY. But on February 12, 2021, the General Assembly voted to override Governor Hogan's veto.

5.      On February 18, 2021, Maryland lawmakers amended the Act with Senate Bill 787. The amendment further narrows the universe of companies that must pay, making its application even more precise and targeted. And the amendment adds a pass-through prohibition, which bars targets of the charge from passing it on to downstream market participants as a separate fee, surcharge, or line item. The pass-through prohibition is meant both to muzzle speech about the charge and to ensure that the targets of the charge, and they alone, bear its burden. Court have held such measures so inherently punitive that they violate the Bill of Attainder Clause. Courts also

have held that measures preventing the direct payers of a charge from including line-item statements about the charge on invoices violate the First Amendment.

6.      Although the Act is styled as a tax, several features confirm its punitive character, including its severity (up to 10% of *gross* revenues), its focus on extraterritorial conduct, the segregation of its proceeds from the State's general fund, its pass-through prohibition, the unusually narrow scope of payers, and the legislative history leading to its enactment.

7.      The Act is unlawful in several ways. First, it is preempted by the Internet Tax Freedom Act (ITFA), which prohibits States from imposing "multiple and discriminatory taxes on electronic commerce." 47 U.S.C. § 151 note. Second, the Act violates the Due Process Clause and Commerce Clause of the United States Constitution by burdening and penalizing purely out-of-state conduct and interfering with foreign affairs. Finally, the pass-through prohibition violates both the dormant Commerce Clause and First Amendment.

8.      The State is well aware of these defects. In a February 25, 2020 letter, the Office of the Attorney General of Maryland itself concluded that an earlier-introduced version of the Act "would likely be preempted by the ITFA" and requires revisions to avoid invalidation under the federal Commerce Clause. *See* Letter from Sandra Benson Brantley to Delegate Alonzo T. Washington (Feb. 25, 2020), perma.cc/9SNH-S3FU; *see also* Letter from Brian E. Frosh to Governor Lawrence J. Hogan, Jr. (April 22, 2020), perma.cc/Y8RD-KVDJ. The necessary revisions were never made.

9.      Plaintiffs accordingly seek a declaration that the Act is unlawful and an injunction against its enforcement.

## JURISDICTION AND VENUE

10.      Plaintiffs bring this suit under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 asserting violations of federal rights and seeking declaratory and injunctive relief. The Court's jurisdiction is invoked under 28 U.S.C. §§ 1331 and 2201.

11.     The Court is not deprived of jurisdiction by the Tax Injunction Act (TIA) because, for TIA purposes, the Act imposes a punitive fee rather than a tax. *See infra* ¶¶ 34-47, 51.

12.     This Court has personal jurisdiction over Defendant Peter Franchot because he resides within the District of Maryland and performs his official duties there.

13.     Venue is proper in this District because Franchot resides in the District and a substantial part of the events giving rise to the claims here occurred in the District.

**THE PARTIES AND STANDING**

14.     Plaintiff Chamber of Commerce of the United States of America (the Chamber) is the world's largest business federation. It represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. Among other things, the Chamber works with the federal, state, and foreign governments to achieve a multilateral consensus on the taxation of the digital economy. The Chamber is a 501(c)(6) nonprofit organization headquartered in Washington, D.C. The Act is at odds with the Chamber's policy objectives, and challenging the Act is germane to the Chamber's mission.

15.     Many of the Chamber's members will be liable to pay the charge imposed by the Act. The Act will therefore harm the Chamber's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

16.     Plaintiff Internet Association (IA) is the only trade association that exclusively represents leading global internet companies on matters of public policy. IA's mission is to foster innovation, promote economic growth, and empower people through the free and open internet. Its stated position is that state governments should not adopt taxation measures that discriminate against digital services and are not technologically neutral. IA is a 501(c)(6) nonprofit organization

4

headquartered in Washington, D.C. The Act is at odds with IA's policy objectives for technology companies, and challenging the Act is germane to IA's mission.

17.    A list of IA's members is available at https://internetassociation.org/our-members/. Many of IA's members will be liable to pay the charge imposed by the Act. The Act will therefore harm IA's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

18.    Plaintiff NetChoice works to make the internet safe for free enterprise and free expression. It engages at the local, state, national, and international levels to protect the interests of the internet and ensure a bright digital future. NetChoice opposes taxes that discriminate against e-commerce, which threaten the internet's benefits to consumers and small sellers online. NetChoice is a 501(c)(6) nonprofit organization headquartered in Washington, D.C. The Act is at odds with NetChoice's policy objectives, and challenging the Act is germane to NetChoice's mission.

19.    A list of NetChoice's members is available at https://netchoice.org/. Many of NetChoice's members will be liable to pay the charge imposed by the Act. The Act will therefore harm NetChoice's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

20.    Plaintiff the Computer & Communications Industry Association (CCIA) is a not-for-profit membership organization for a wide range of companies in the computer, internet, information technology, and telecommunications industries. Created over four decades ago, CCIA promotes open markets, open systems, open networks, and full, fair, and open competition. CCIA represents the interests of the world's leading providers of technology products and services before

governments and the courts. It opposes discriminatory taxes. The Act is at odds with CCIA's policy objectives, and challenging the Act is germane to CCIA's mission.

21.     A list of CCIA's members is available at https://www.ccianet.org/about/members/. Many of CCIA's members will be liable to pay the charge imposed by the Act. The Act will therefore harm CCIA's members by making them liable for the charge, interfering with their business models, and making it more difficult for them to provide high quality services to their clients and customers.

22.     Defendant Franchot is the Comptroller of the Treasury of Maryland. He is responsible for administering the Maryland digital advertising charge.

23.     Franchot is a resident of Maryland and is sued in his official capacity only.

24.     In enforcing, administering, and adhering to the Act, Franchot and those subject to his supervision, direction, or control will at all relevant times act under color of state law.

## FACTUAL ALLEGATIONS

### A.     The Act and its historical context

25.     The Act imposes a one-of-a-kind charge on the annual gross revenue of digital advertising services provided in Maryland. The charge applies only to digital advertising and does not apply to advertising of any kind through other means.

26.     Pursuant to Section 17 of Article II of the Maryland state constitution, the Act took effect March 14, 2021. Senate Bill 787's amendments will take effect May 12, 2021.

27.     Section 101(e)(1) of Title 7.5 of the Maryland Tax Article, as amended by the Act, defines "digital advertising services" as "advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services."

28.     Section 101(e)(2) of Title 7.5 of the Maryland Tax Article, as amended by the Act, exempts from the definition of "digital advertising services" "advertisement services on digital

interfaces owned or operated by or operated by or operated on behalf of a broadcast entity or news media entity."

29.     Section 101(f) of Title 7.5 of the Maryland Tax Article, as amended by the Act, defines "digital interface" as "any type of software, including a website, part of a website, or application, that a user is able to access."

30.     Section 101(h) of Title 7.5 of the Maryland Tax Article, as amended by the Act, defines "user" as "an individual or any other person who accesses a digital interface with a device."

31.     The Act "shall be applicable" to all taxable years after December 31, 2021. *See* Senate Bill 787 § 6. Accordingly, the Act will be enforced as to all covered transactions taking place on January 1, 2022 and later. Each company that "reasonably expects . . . annual gross revenues derived from digital advertising services in the state to exceed $1,000,000" in a given year must file "a declaration of estimated tax, on or before April 15 of that year." Md. Code, Tax-Gen. § 7.5-102(b)(1).

32.     The Act charges tiered rates on the "annual gross revenues derived from digital advertising services in the State." Md. Code, Tax-Gen. § 7.5-102(b)(1).

33.     The Act bars companies from passing on the cost of the charge. Section 102(c) of the Maryland Tax Article, as amended by the Act, provides that "[a] person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item."

34.     Under Sections 13-1001 and 13-1002 of the Tax Article, as amended by the Act, failure to file complete and accurate paperwork and pay the charge as required by the Act is a criminal offense.

35.     The Act sets tiered rates of assessment on annual gross revenues derived from digital advertising services in the State, based solely on a firm's global annual gross revenues:

    (a.)    For firms with global annual gross revenues of $100 million or more, the Act imposes a 2.5% assessment rate on all assessable revenues.

    (b.)    For firms with global annual gross revenues of $1 billion or more, the Act imposes a 5.0% assessment rate on all assessable revenues.

    (c.)    For firms with global annual gross revenues of $5 billion or more, the Act imposes a 7.5% assessment rate on all assessable revenues.

    (d.)    For firms with global annual gross revenues of $15 billion or more, the Act imposes a 10% assessment rate on all assessable revenues.

36.    The extent of a company's liability under the Act for revenues earned in Maryland depends in almost all cases on the company's out-of-state conduct. For example, a company that derives $10 million in annual revenues from digital advertising in Maryland will:

    (a.)    not be liable for any assessment under the Act if it earns less than $90 million in revenue outside of the State;

    (b.)    be liable for a $250,000 assessment if it earns between $90 million and $989 million in gross annual revenues outside of the State;

    (c.)    be liable for a $500,000 assessment if it earns between $990 million and $4.989 billion in gross annual revenues outside of the State;

    (d.)    be liable for a $750,000 assessment if it earns between $4.99 billion and $14.989 billion in gross annual revenues outside of the State;

    (e.)    be liable for a $1,000,000 assessment if it earns more than $14.99 billion in gross annual revenues outside of the State.

37.    The only differences among the scenarios described in the immediately prior paragraph are the amounts of revenue earned outside of Maryland, and in direct consequence, the size of the charge owed under the Act.

**B.** **The Act does not impose a "tax" within the meaning of the TIA**

38.     The exaction assessed by the Act is a punitive fee, penalty, or fine, and not a "tax" within the meaning of the Tax Injunction Act, 28 U.S.C. § 1341. Several features of the Act confirm this conclusion, including its extraterritoriality, narrow applicability, and assessment against gross revenue rather than net income.

39.     The Act targets a very small number of large companies, specifically including, according to Maryland lawmakers, "Amazon, Facebook, and Google." *See* perma.cc/699U-4BQB. The express exemption from liability for print, radio, and television outlets—and now also news and broadcast media companies—ensures the charge reaches only the Act's limited range of intended targets: "massive technology companies" with a predominantly internet-based presence. *See* perma.cc/N975-TAXK, at 7.

40.     This discrimination reflects a policy that the content conveyed by print, television, and radio outlets and online news and broadcast websites is acceptable, whereas the content conveyed by the narrow class of companies now subject to the exaction is harmful, and dangerous, and should be punished. That is to say, the Act disapproves of and disfavors the content conveyed by the narrow class of companies subject to the exaction.

41.     The rate of assessment under the Act is a massive share of each digital advertiser's gross—not *net*—receipts, which is a highly unusual and extraordinarily severe form of exaction. For most impacted companies, it will impose liability nearly 20 times greater than Maryland's standard corporate income tax, wiping out most digital advertisers' entire profits on services provided in Maryland. *See infra*, ¶¶ 53-55.

42.     The Act imposes progressively greater penalties on companies based on their extra-territorial conduct—the more significant a company's participation in extraterritorial markets for digital advertising, the greater the rate of assessment on revenue derived from digital advertising

in Maryland. There is no explanation for this design except a legislative purpose to punish large, out-of-state digital advertising companies for their extraterritorial activities.

43.    The legislative history indicates a punitive purpose. In the months leading up to the enactment of the Act, an op-ed appeared in the *New York Times* accusing Google and Facebook of "mak[ing] their profits using business models that erode" the "shared values and norms on which democracy depends." Paul Romer, *A Tax That Could Fix Big Tech*, New York Times (May 6, 2019), perma.cc/MZ83-NF5Y. The op-ed described large digital advertising companies as "too big to trust" and creating "a haven for dangerous misinformation and hate speech." *Id*. The op-ed called for States like Maryland to impose a "charge" or "penalty" on digital advertisers' business models, almost exactly in the form of the Act. *Id*. The Senate sponsors of the Act presented the op-ed's author, Professor Paul Romer, as a witness in support of the Act and included his op-ed in the legislative history. *See* Testimony from Paul Romer to Budget & Taxation Committee (Jan. 29, 2020), perma.cc/EZ4M-ZEGY.

44.    Professor Romer's testimony at the Senate hearing echoed his op-ed. He stated his opinion that "the market for digital services is broken and that a tax on digital advertising can help restore the conditions needed for the market to work." In his view, "the pervasive dishonesty of the people who have made hundreds of billions from targeting and tracking is the final proof that something is terribly wrong with the market for digital services." *See* Testimony from Paul Romer to Budget & Taxation Committee.[1]

---

[1]    The opinions expressed in Romer's op-ed are deeply flawed. *First*, Professor Romer does not explain why burdening digital advertising will improve the quality of content online. In fact, placing massive financial burdens on digital advertising will inhibit the primary funding source for high-quality internet content and do nothing to discourage low-quality content. They also will drive more quality content behind subscription-only paywalls, making it less accessible and encouraging an unhealthy "echo chamber" effect. *Second*, the Act will indirectly harm a wide range of other business and consumer interests, raising costs for consumers and making it harder for businesses to connect with potential consumers. The Act's design thus will not even accomplish the goal it is supposed to; indeed, it will undermine that goal.

45.     Senate President Ferguson, a sponsor of the Senate companion bill, explained that the growth of "[m]assive technology corporations . . . has resulted in negative externalities socialized and borne by the public. . . . [E]xternalities created by private actors' actions must be borne by that actor." *See* perma.cc/N975-TAXK, at 7. And he explained where the law came from: The "solution" that the Act implements "is based off a model originally built by Paul Romer . . . to levy a progressive tax on the currently untaxed revenues of companies' revenue from digital ad revenue." *Id*. Senator Ferguson then reiterated who should foot the bill—"large multinational corporations with at least $100 million in annual digital ad revenues each year"—and who should not—"Marylander[s]." *Id*. at 7-8.

46.     Under Sections 2-4A-01 and 2-4A-02 of the Tax Article, as amended by the Act, the proceeds of the Maryland digital advertising charge are used to pay for administration of the Act and otherwise deposited in the "Blueprint for Maryland's Future Fund." Proceeds deposited in the Blueprint for Maryland's Future Fund are kept segregated from the Maryland general fund and earmarked for specific educational purposes including, in part, to address through education the perceived "externalities" created by the companies targeted by the Act.

47.     The Act is akin to a penalty for perceived misconduct. In other words, it is a legislatively-mandated restitution payment as remediation for purported externalities.

48.     Delegate Alonzo Washington, the Vice Chair of the Ways and Means Committee, explained to lawmakers that "[a]s we all know, giant technology companies are increasingly collecting and utilizing our personal data" and questioned whether the conduct of such companies is "helping to build the future of democracy in our state." *See* perma.cc/QMJ7-6LJG. He also told lawmakers, "[i]t is clear that massive, multinational companies have made significant profits from targeted advertising. This bill specifically targets companies who have digital ad revenues of at least $100 million." *Id*.

49.     The pass-through prohibition expressly bars companies from "directly pass[ing] on the cost of the tax imposed under this section" to an advertising purchaser "by means of a separate fee, surcharge, or line-item." Its inclusion confirms that lawmakers want only the targets of the charge to pay. Court have held similar pass-through prohibitions so inherently punitive that they violate the Bill of Attainder Clause. *See Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338 (2d Cir. 2002). Moreover, the pass-through prohibition violates the First Amendment because it is a content-based regulation of speech. *See BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499 (6th Cir. 2008).

50.     Many of the transactions that are governed by the pass-through prohibition are negotiated and consummated entirely outside of Maryland's borders.

51.     In the months following the Governor's veto, the Act's sponsors have continued to describe the Act as "target[ing] the largest tech companies—those with more than $100 million in annual global revenues—who store and manipulate users' personal data." *See Debate Continues*. The Act thus narrowly targets large internet advertising companies.

### C.     The word "tax" as it appears in ITFA and the TIA has different meanings

52.     Although the charge imposed by the Act is not a "tax" for purposes of the TIA, it does constitute a "tax" for purposes of ITFA preemption. In the context of two "different statutes" serving different purposes like these, singular words appearing in both statutes may be given "different shades of meaning and consequently may be variously construed." *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). The meanings of words must "vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed." *Yates v. United States*, 574 U.S. 528, 538 (2015); *accord id.* at 537 ("We have several times affirmed that identical language may convey varying content when used in different statutes.").

53.     The TIA was enacted by the 75th Congress in 1937 (*see* Act of Aug. 21, 1937, ch. 726, 50 Stat. 738) and was modeled on the Anti-Injunction Act (AIA), which was enacted by the 39th Congress in 1867 (*see* Revenue Act of 1867, ch. 169, § 10, 14 Stat. 471, 475-476). ITFA, meanwhile, was enacted a generation later by the 105th Congress in 1999. And while the TIA was enacted for federalism purposes, ITFA was enacted for *federal* purposes—to prevent discriminatory state taxes that would harm the development of electronic commerce. Thus, what the 75th and 39th Congresses meant by the word "tax" in the TIA and AIA differs from the meaning ascribed to the word by the 105th Congress in ITFA, which serves a different purpose.

54.     This is made clear by the express definition that the 105th Congress gave to the word "tax" in ITFA. According to that definition, a "tax" within the meaning of ITFA includes any "charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes" other than use fees, *i.e.*, "fee[s] imposed for a specific privilege, service, or benefit conferred." 47 U.S.C. § 151 note § 1105(8)(A)(i). Thus, any governmental "charge" that is not a use fee is a "tax" within the meaning of ITFA.

55.     ITFA's definition of a prohibited "tax" is substantially broader than courts' interpretation of the word "tax" under the TIA. At the time the TIA was enacted in 1937, the Supreme Court had held expressly of the AIA that "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment," subject to challenge in court. *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922). Courts have carried that understanding forward in contemporary TIA cases, holding that government charges that have "regulatory or punitive purposes" are not "taxes" within the meaning of the TIA. *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007) (quoting *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000)). In the same vein, courts have recognized that charges collected "to defray the expense" of externalities are not "taxes" for TIA purposes. *San Juan Cellular Tel. Co.*

*v. Pub. Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J.) (quoting *Head Money Cases*, 112 U.S. 580, 590 (1884)).

56.    Government charges can "serve more than one purpose." *Austin v. United States*, 509 U.S. 602, 610 (1993). Generally speaking, "all charges raise revenue" and bear that purpose in addition to others. *Am. Council of Life Insurers v. D.C. Health Benefits Exch. Auth.*, 815 F.3d 17, 19 (D.C. Cir. 2016). Thus, even charges with regulatory or punitive purposes that would fall outside the TIA may also have revenue-generating purposes that bring them within the broad definition of "tax" included in ITFA.

### D.    The Act is extraordinarily burdensome

57.    Corporate income taxes are traditionally assessed against net income on a flat-rate basis. Maryland's corporate income tax rate is a flat 8.25% assessed against net income. Thus, a global company with $15 billion in revenue and $1 billion in profits, with 2% of its revenues and profits apportioned to Maryland, would pay a corporate income tax of $1.65 million on $20 million of Maryland-originated pre-tax profit.

58.    The Maryland digital advertising charge applies in addition to Maryland's standard corporate income tax. If all of the revenues of the company described in the immediately prior paragraph were derived from digital advertising, the company would be liable for an additional $30 million under the Act—10% of 2% of $15 billion. That is nearly 20 times the rate of the corporate income tax. And it would more than wipe out the $20 million in profits attributable to the company's economic activity in Maryland.

59.    Assessments against gross revenues apply even to unprofitable businesses.

60.    It is widely recognized that "gross revenue" is not "a usual [or] appropriate basis for taxation." U.S. Trade Rep., *Report on France's Digital Services Tax* 55 (Dec. 2, 2019), https://perma.cc/E7BG-6KJF (*USTR Report*). Assessments against gross revenue rather than net income are therefore highly unusual in American and international law.

61.     They also create a cascading (or pyramiding) effect that embeds taxes within taxes, through each stage of a production chain. For example, an advertising agency that brokers a particular sale of digital advertising will be liable under the Act. So too will be the digital advertising company whose services are brokered, meaning that the same digital advertising service will be subjected to a double penalty of two consecutive gross-receipts charges under the Act—each time at a rate that independently would often make earning a profit impossible.

62.     Several European countries, including Great Britain, France, Hungary, Italy, Spain, and Turkey, have proposed or implemented digital services charges (albeit at much lower rates) targeted at American digital platforms.

63.     The federal government has opposed these digital advertising charges as both protectionist and a form of double taxation at odds with sound principles of taxation across multiple jurisdictions. For example, federal authorities have objected to France's digital advertising charge because it, like the Act, has high revenue thresholds that effectively exclude French companies from the charge.

64.     The U.S. Trade Representative recently concluded that the French law, which bears close resemblance to the Act at issue here, was "highly unusual" as a tax, "unfair," "unusually burdensome," extraterritorial in scope, and discriminatory—together justifying imposing retaliatory tariffs. *See USTR Report* at 31, 49-50, 55, 65-67; *id*. at 1 (concluding that France's Digital Services Tax "discriminates against U.S. companies and is inconsistent with prevailing principles of tax policy and unusually burdensome for affected U.S. companies"). It found in particular that the French law reflects "a purpose of penalizing particular technology companies for their commercial success." *Id*. at 10 (citing *Initiation of a Section 301 Investigation of France's Digital Services Tax*, 84 Fed. Reg. 34,042, 34,043 (July 16, 2019)).

**E.      Nearly all relevant conduct takes place outside of Maryland**

65.      Nearly all online digital advertising services charge fees to advertising clients using either the "pay per click" model (the client pays each time a user clicks on the ad) or the "cost per thousand" model (the client pays for each 1,000 user impressions, regardless of clicks). Digital advertising companies responsible for paying the charge imposed by the Act are sometimes unable to determine where users are physically located when they click on or view an advertisement.

66.      Many online advertisements are viewed on mobile devices. Many Maryland residents commute on a daily basis to different jurisdictions, including Delaware, the District of Columbia, Pennsylvania, Virginia, and West Virginia. And Maryland residents sometimes use mobile devices to view advertisements while physically present in other jurisdictions.

67.      Large online digital advertising companies operating internationally have global gross annual revenues that meet the threshold for the Act's highest assessment rate, as intended by the General Assembly. The Act's high revenue thresholds exclude Maryland companies from their scope, and the highest rates apply exclusively to companies located outside Maryland.

68.      The vast majority of the global gross annual revenues of large online digital advertising companies are earned outside of Maryland.

69.      Advertising agencies broker ad sales for online digital advertising platforms. On information and belief, all Maryland-based companies that broker sales of digital advertising services have global gross annual revenues of less than $100 million.

**F.      Kinds of advertising affected by the Act**

70.      Many companies use websites to deliver digital advertising content to visitors.

71.      Online publishers include content aggregators along with search engines, social media websites, online shopping websites, streaming video websites, and more.

72.      When a user submits a query on an online search engine, the search engine typically returns several advertising results at the top of the results page. Search-engine marketing of this

kind allows advertisers to target a particular audience efficiently, based on factors like location and user interests, as expressed in their search terms.

73.     Other websites supplement their own content with third-party display ads. These websites often hire display-ad networks to select and deliver the display ads. Display ads are common on shopping websites and social media platforms, which deliver third-party advertisements tailored to their users' demographics and interest groupings.

74.     Online digital advertising has dramatically lowered merchants' cost of customer acquisition over the past 20 years, increasing return on companies' investments in advertising, and reducing the volume of irrelevant advertisements that consumers see.

75.     Online advertising is almost twice as efficient as traditional television advertising in converting advertising spend into sales revenue. And it is particularly valuable for small businesses that cannot afford expensive television, radio, or print ad campaigns. Digital advertising allows those merchants to start small, focus on the most relevant audience, and expand a campaign if it attracts new business.

## CLAIMS FOR RELIEF
### COUNT I
### VIOLATION OF THE INTERNET TAX FREEDOM ACT
### (CHALLENGE TO IMPOSITION OF THE CHARGE)

76.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

77.     The Act is unlawful under the Internet Tax Freedom Act, which prohibits States from imposing "[m]ultiple or discriminatory taxes on electronic commerce." 47 U.S.C. § 151 note. The Act imposes a "tax" within the meaning of ITFA because it is a governmental charge with revenue-generating purposes and is not a fee assessed for a specific privilege, service, or benefit conferred. The Act's charge is preempted because it is both a "discriminatory" tax and a "multiple" tax under ITFA.

78.     ITFA defines "discriminatory tax" (47 U.S.C. § 151 note § 1105(2)) as a state-imposed charge on transactions in electronic commerce that (i) "is not generally imposed and legally collectible by such State . . . on transactions involving similar property, goods, services, or information accomplished through other means"; (ii) "is not generally imposed and legally collectible at the same rate by such State . . . on transactions involving similar property, goods, services, or information accomplished through other means"; or (iii) "imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means."

79.     The Act imposes a charge on digital advertising delivered over the internet without applying a similar charge to non-digital advertising. Thus, the Act's charge is unlawfully "discriminatory" within the meaning of ITFA.

80.     ITFA defines "multiple tax" (47 U.S.C. § 151 note § 1105(6)(A)) as "any tax that is imposed by one State or political subdivision thereof on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State or political subdivision thereof (whether or not at the same rate or on the same basis), without a credit (for example, a resale exemption certificate) for taxes paid in other jurisdictions."

81.     The Act imposes a charge on digital advertising for extraterritorial commerce that is taxed by the States in which that commerce actually takes place, without a credit for those other taxes. Thus, the Act's charge is an unlawful "multiple" tax within the meaning of ITFA.

## COUNT II
## VIOLATION OF THE COMMERCE CLAUSE
## (CHALLENGE TO IMPOSITION OF THE CHARGE)

82.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

83.     The "negative" or "dormant" Commerce Clause prohibits States from regulating or burdening out-of-state commerce, penalizing extraterritorial conduct, or imposing charges that have the purpose or effect of discriminating against interstate commerce.

84.     The extent of a company's liability under the Act for each dollar earned from digital advertising in Maryland depends in almost all cases on the company's extraterritorial conduct. By imposing progressively greater liability on companies for the revenue they earn outside of Maryland, the Act regulates, punishes, and burdens extraterritorial conduct and the earning of revenues that are not fairly attributable to economic activity in Maryland.

85.     The Act favors in-state companies, exceedingly few of which will be subject to the charge imposed by the Act, even if they engage in the sale of some digital advertising. Liability imposed by the Act will be borne almost entirely by out-of-state companies based on their out-of-state conduct.

86.     The effects of the Act on interstate commerce are more than incidental. The Act will impose substantial costs on out-of-state and interstate transactions, in excess of all of a company's profits earned from digital advertising in Maryland. And the burdens on interstate commerce inflicted by the Act are excessive in relation to any putative local benefit.

87.     State laws are further unconstitutional under the Commerce Clause if they create a substantial risk of conflicts with foreign governments or otherwise undermine the ability of the federal government to speak with one voice with respect to foreign affairs.

88.     Maryland's imposition of a digital advertising charge exacerbates a foreign policy dispute with France and other European countries and makes it impossible for the federal government to speak with one voice on a matter of foreign policy.

**COUNT III**
**VIOLATION OF THE DUE PROCESS CLAUSE**
**(CHALLENGE TO IMPOSITION OF THE CHARGE AND**
**THE PASS-THROUGH PROHIBITION)**

89.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

90.     The Due Process Clause of the Fourteenth Amendment prohibits States from punishing or regulating extraterritorial conduct or activities.

19

91.     The extent of a company's liability under the Act for each dollar earned from digital advertising in Maryland depends in almost all cases on the company's extraterritorial conduct.

92.     By imposing progressively greater liability on companies for their extraterritorial conduct, the Act punishes conduct and the earning of revenues outside of Maryland. Liability imposed by the Act will be borne almost entirely by out-of-state companies based on their out-of-state conduct.

93.     The pass-through prohibition also directly regulates extraterritorial conduct by prohibiting regulated companies from passing on the cost of the charge imposed, including in transactions taking place wholly outside Maryland's geographic borders.

**COUNT IV**
**VIOLATION OF THE COMMERCE CLAUSE AND FIRST AMENDMENT**
**(CHALLENGE TO THE PASS-THROUGH PROHIBITION)**

94.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

95.     If the pass-through prohibition is interpreted to prohibit the targets of the Act from passing on the charge to downstream market participants at all, it regulates conduct. That is, it forbids the assessment and recoupment of the Act's charge in subsequent commercial transactions. Some such transactions take place outside the territorial limits of Maryland.

(a.)     If the range of subsequent transactions covered by the pass-through prohibition is interpreted to include those taking place wholly outside Maryland's geographic borders, the pass-through prohibition violates the dormant Commerce Clause because it regulates extraterritorial conduct.

(b.)     If the range of subsequent transactions covered by the pass-through prohibition is interpreted to include only those taking place within Maryland's geographic borders, the pass-through prohibition violates the dormant Commerce Clause by unjustifiably favoring in-state purchasers (as to whom the Act's charge cannot be passed on) and disfavoring out-of-state purchasers (as to whom the charge can be passed on).

96.     If the pass-through prohibition is interpreted to prohibit companies from including a separate fee, surcharge, or line-item on bills, invoices, receipts, or the like to pass on the Act's charge, it is also a content-based regulation of speech.

(a.)    The inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge is core political speech concerning who bears responsibility for the charge (lawmakers) and ultimately the burden of the charge (consumers). Forbidding the direct payers of the charge from including a separate fee, surcharge, or line-item—while at the same time permitting them to raise prices to accomplish the same practical effect—is a suppression of speech that insulates lawmakers from responsibility for the Act. As a regulation of core political speech, the pass-through prohibition is not narrowly tailored to serve a compelling state interest and is therefore unlawful.

(b.)    Alternatively, the inclusion on an invoice of a separate fee, surcharge, or line-item to recoup the Act's charge is commercial speech. If so, the pass-through prohibition violates the First Amendment because it does not regulate misleading or fraudulent speech; does not directly advance a substantial governmental interest; and is more extensive than necessary to serve any conceivable interests that it might further. It is therefore unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     declare the Act preempted and unconstitutional insofar as it imposes a "Digital Advertising Gross Revenues Tax";

2.     declare the Act unconstitutional insofar as it prohibits the assessment and recoupment of the Act's charge in subsequent commercial transactions and forbids the inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge;

3.     permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce the Act insofar as it imposes a "Digital Advertising Gross Revenues Tax," prohibits the assessment and recoupment of the Act's charge in subsequent commercial transactions, and forbids the inclusion of statements on an invoice of a separate fee, surcharge, or line-item to pass on the Act's charge;

4.     grant such additional or other relief as it deems just and proper.

Dated: April 30, 2021                                    Respectfully submitted,

                                                         */s/ Michael B. Kimberly*

                                                         Michael B. Kimberly (Bar No. 19086)
                                                         Paul W. Hughes (Bar No. 28967)
Tara S. Morrissey (*pro hac vice*)                       Stephen P. Kranz (*pro hac vice*)
Jennifer B. Dickey (*pro hac vice*)                      Sarah P. Hogarth (*pro hac vice*)

U.S. CHAMBER LITIGATION CENTER                           MCDERMOTT WILL & EMERY LLP
1615 H Street, N.W.                                      500 North Capitol Street NW
Washington, DC  20062                                    Washington, DC 20001
  tmorrissey@uschamber.com                               mkimberly@mwe.com
(202) 463-5337                                           (202) 756-8000

*Attorneys for the Chamber of Commerce*                  *Attorneys for All Plaintiffs*
*of the United States of America*

DM_US 179109874-4.096553.1630

22