# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs*,

      v.

PETER FRANCHOT,

        *Defendant*.

\*              No. 1:21-cv-00410-DKC

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

# MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

BRIAN E. FROSH
Attorney General of Maryland

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

BRIAN L. OLINER
Federal Bar No. 05780
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404
(410) 260-7808

June 15, 2021

Attorneys for Defendant

# TABLE OF CONTENTS

Page

MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS ............ 1

STATEMENT OF FACTS ............................................................................................... 2

    Maryland's Digital Ad Tax Act ............................................................................... 2

    Statutory Remedy for Contesting a Tax Liability ................................................ 3

    Allegations in the Amended Complaint ................................................................ 4

ARGUMENT ................................................................................................................... 5

I.      STANDARDS OF REVIEW ................................................................................. 5

    A.    Subject Matter Jurisdiction ....................................................................... 5

    B.    Failure to State a Claim ............................................................................. 6

II.    THE PLAINTIFFS' CLAIMS ARE NOT RIPE. ................................................ 6

    A.    The Plaintiffs' Challenge Is Not Yet Fit for Judicial Decision. ................... 8

    B.    The Plaintiffs Have Failed to Show That They Will Suffer Hardship
         If the Court Declines to Hear the Case Now. ............................................ 9

III.   THE TAX INJUNCTION ACT PRECLUDES FEDERAL COURT JURISDICTION
     OVER THIS PREEMPTIVE CHALLENGE TO MARYLAND'S DIGITAL
     ADVERTISING TAX. ....................................................................................... 10

    A.    This Action Is Barred Because It Seeks to Declare Invalid and Enjoin
         the Digital Advertising Tax, Which Is a "Tax" Within the Meaning of
         the Tax Injunction Act. ............................................................................ 12

         1.    The Latest Supreme Court Precedents Explain Why the Digital
             Advertising Tax Is A "Tax" Under the Tax Injunction Act. ............ 12

         2.    Plaintiffs' Denial that the Digital Advertising Tax is a "Tax"
             Under the Tax Injunction Act Conflicts with Supreme Court
             Guidance. ....................................................................................... 14

         3.    The Digital Advertising Tax Is a "Tax" Even Under the
             Superseded Valero Test. ................................................................ 19

B.     Maryland Law Provides a "Plain, Speedy and Efficient Remedy."............ 23

C.     This Suit Is Precisely the Type of Action Congress Meant to Prevent When It Enacted the Tax Injunction Act......................................................... 24

IV.   PRINCIPLES OF COMITY INDEPENDENTLY WARRANT DISMISSAL OF THE ACTION BECAUSE MARYLAND PROVIDES AN ADEQUATE REMEDY AT LAW FOR RESOLVING ALL CHALLENGES TO A MARYLAND TAX. .................................. 26

V.    THERE IS NO PRIVATE RIGHT OF ACTION TO ENFORCE THE INTERNET TAX FREEDOM ACT. ............................................................................................. 28

VI.   EVEN IF IT AUTHORIZES A PRIVATE RIGHT OF ACTION, THE INTERNET TAX FREEDOM ACT DOES NOT PREEMPT THE DIGITAL ADVERTISING TAX ACT. ......... 35

A.     The ITFA Does Not Satisfy the Requirements for Preemption. ................. 36

B.     The Act Does Not Conflict with the ITFA................................................... 37

VII.  THE DIGITAL ADVERTISING TAX ACT DOES NOT VIOLATE THE COMMERCE CLAUSE OR THE DUE PROCESS CLAUSE. .......................................................... 41

A.     The Amended Complaint Fails to State a Claim for Violation of the Commerce Clause.......................................................................................... 42

B.     The Amended Complaint Fails to State a Claim for Violation of the Due Process Clause. ...................................................................................... 46

VIII. THE PASS-THROUGH PROVISION OF THE ACT DOES NOT VIOLATE THE DUE PROCESS CLAUSE, COMMERCE CLAUSE, OR FIRST AMENDMENT. ....................... 46

A.     Supreme Court Precedent Confirms That States Have the Power to Impose a Pass-through Prohibition. ............................................................. 47

B.     The First Amendment Challenge Fails to State a Claim Because the Pass-Through Prohibition Regulates Conduct, Not Speech........................ 48

CONCLUSION ............................................................................................................. 50

APPENDIX:

Maryland Digital Advertising Gross Revenues Tax Act

    2021 Md. Laws Chapter 37 ................................................................ App. 1

    2021 Md. Laws Chapter 669 (Amending Chapter 37)....................... App. 35

Internet Tax Freedom Act ............................................................................ App. 60

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | * |
| | * |
| *Plaintiffs*, | * |
| | * |
| v. | No. 1:21-cv-00410-DKC |
| | * |
| PETER FRANCHOT, | * |
| *Defendant*. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

The plaintiffs, four non-profit entities representing the interests of various corporate taxpayers, bring this action against Comptroller of Maryland Peter Franchot, in his official capacity, under 42 U.S.C. § 1983 and 28 U.S.C. § 2201, seeking declaratory and injunctive relief against enforcement of Chapters 37 and 669 of the 2021 Laws of Maryland (H.B. 732, 2020 Reg. Legis. Sess.) ("Digital Ad Tax Act" or "Act").  Plaintiffs allege violations of the Internet Tax Freedom Act ("ITFA"), 47 U.S.C. § 151 note (Count I); Commerce Clause, U.S. Const. art. I, § 8, cl. 3 (Counts II, IV); Due Process Clause, U.S. Const. amend. XIV, § 1 (Count III); and First Amendment, U.S. Const. amend. I (Count IV).

The Court should decline to consider the merits of plaintiffs' claims in this action for two reasons:  (1) the plaintiffs' challenges are not ripe because they allege only that their members have an undetermined, future expectation of paying a tax; and

(2) established law precludes a federal civil action challenging a tax where state law provides a "plain, speedy, and efficient remedy," as Maryland law does.

If the Court nonetheless determines that it may address the merits, plaintiffs' challenges to Maryland's Digital Ad Tax Act fail because the enactment is not preempted by the ITFA, which does not authorize a private right of action, and the Act does not violate the Commerce Clause, the Due Process Clause, or the First Amendment.

## STATEMENT OF FACTS

### Maryland's Digital Ad Tax Act

Maryland's Digital Ad Tax Act, 2021 Md. Laws ch. 37, codified at Title 7.5 of the Tax-General Article, imposes a tax on a business's annual gross revenues derived from digital advertising services in the State, if the business has at least $100 million in global annual gross revenues, Md. Code Ann., Tax-Gen. §§ 7.5-102, 7.5-103.   "'Digital advertising services' includes advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services." *Id.* § 7.5-101(d).  Amendments adopted in 2021, among other things, exclude advertising services on digital interfaces owned or operated by a broadcast entity or news media entity, 2021 Md. Laws ch. 669, § 1 (S.B. 787) (amending Tax-Gen. § 7.5-101), and prohibit a covered taxpayer from directly passing on the cost of the digital ad tax to a purchaser of digital advertising services, *id.* (amending Tax-Gen. § 7.5-102).

2

The progressive tax rate is graduated in increments of 2.5%, from 2.5% to 10%, based on the global annual gross revenues of the business, Tax-Gen. § 7.5-103; the "assessable base" is the business's "annual gross revenues derived from digital advertising services in the State" of Maryland, *id.* § 7.5-101(c).  The assessable base is determined using an apportionment fraction based on the annual gross revenues of the business derived from digital advertising services in the State (the numerator) and in the United States (the denominator).  *Id.* § 7.5-102(b)(1).  "The Comptroller shall adopt regulations that determine the state from which revenues from digital advertising services are derived."  *Id.* § 7.5-102(b)(2).

After deducting the Comptroller's costs to administer the tax, Tax-Gen. § 2-4A-01, all remaining revenues from the digital advertising gross revenues tax are distributed to the Blueprint for Maryland's Future Fund, Tax-Gen. § 2-4A-02, for use in implementing the Blueprint for Maryland's Future, a comprehensive package of improvements based on the recommendations of the Maryland Commission on Innovation and Excellence in Education and intended to "transform Maryland's education system to world–class student achievement levels," Md. Code Ann., Educ. § 1-301(a).

**Statutory Remedy for Contesting a Tax Liability**

The Maryland Tax General Article contains an "extensive and comprehensive" remedial scheme, *Comptroller v. Zorzit*, 221 Md. App. 274, 293 (2015), that provides a taxpayer a choice between pre- and post-deprivation methods for contesting alleged tax

liabilities.[1]  Thus, any aggrieved member of the plaintiff organizations who wishes to assert that the tax is illegal or inapplicable has a choice of two methods to contest its tax liability: (1) decline to pay the tax and be assessed, or (2) pay the tax and seek a refund.  Either way, an aggrieved taxpayer is entitled to appeal the Comptroller's final determination to the Maryland Tax Court (an administrative agency of the State) and may seek judicial review of the Tax Court's decision.  Tax-Gen. §§ 13-510(a)(2), 13-532(a).

**Allegations in the Amended Complaint**

According to the amended complaint, the plaintiffs are membership organizations with members that "will be liable to pay the charge imposed by the Act."  ECF 25 ¶¶ 15, 14-21.  That charge, they allege, will assess a "massive share of each digital advertiser's gross—not *net*—receipts," which they term "highly unusual."  ECF 25 ¶¶ 41, 60.

Plaintiffs allege that the "vast majority of the global gross annual revenues of large online digital advertising companies are earned outside of Maryland." ECF 25 ¶ 68. And because the tax rate is based on an advertiser's global revenues, plaintiffs assert that it "punishes" them for their "extraterritorial activities," ECF 25 ¶ 42, "extraterritorial conduct," ECF 25 ¶ 84, and "earning of revenues outside of Maryland," ECF 25 ¶ 92.  In support of this claim, plaintiffs allege that the largest companies with the largest global revenues are taxed at the highest rate of assessment, and therefore the highest rates apply

---

[1] Under a pre-deprivation method, a tax authority assesses the taxpayer for the tax due and the taxpayer appeals that assessment before paying the tax.  *E.g.*, Tax-Gen. §§ 13-401, 13-402, 13-508, 13-510.  A post-deprivation method calls for the taxpayer to pay the tax due, seek a refund and, if the refund is denied, appeal that denial.  *E.g.*, Tax-Gen. §§ 13-901, 13-902, 13-904, 13-508, 13-510.

only to companies located outside Maryland. ECF 25 ¶ 67.  Plaintiffs assert that the General

Assembly's "punitive purpose" is confirmed by the legislative history, and they point to a

*New York Times* op-ed piece in May 2019 and the testimony of its author in support of

House Bill 732 at the Senate hearing on the proposed legislation.  ECF 25 ¶¶ 43-44.

Under Senate Bill 787, 2021 Md. Laws ch. 669, taxpayers may not directly pass the

cost of the tax to "downstream market participants." ECF 25 ¶ 5.

Applicable law does not require the filing of an estimated tax return and payment of

estimated taxes under the Act until April 15, 2022, and does not require the filing of an

original tax return until April 15, 2023.  Tax-Gen., §§ 7.5-201(a), 7.5-201(b)(1); 2021 Md.

Laws ch. 37, § 2.  As Senate Bill 787 clarifies, the Act "'shall be applicable' to all taxable

years after December 31, 2021."  ECF 25 ¶ 31.

## ARGUMENT

### I.   STANDARDS OF REVIEW

#### A.   Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of

subject matter jurisdiction, which is the basis for defendant's argument II (ripeness) and

argument III (Tax Injunction Act).  Under Rule 12(b)(1), "the plaintiff bears the burden of

proving, by a preponderance of the evidence, the existence of subject matter jurisdiction."

*Demetres v. East W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *see AGI Assocs., LLC

v. City of Hickory*, 773 F.3d 576, 578 (4th Cir. 2014) ("The burden of establishing subject

matter jurisdiction rests with the plaintiff as 'the party asserting jurisdiction.'") (quoting

*Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).  Where, as here, a defendant makes

a facial challenge to subject matter jurisdiction, a court accepts the "facts of the complaint as true as [the court] would in [the] context of a Rule 12(b)(6) challenge." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *Adams*, 697 F.2d at 1219).

### B.      Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) governs defendant's other arguments.

To survive a motion to dismiss for failure to state a claim on which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although the Court is required to "'take the facts in the light most favorable to the plaintiff,'" the Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (internal citation omitted)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

## II.      THE PLAINTIFFS' CLAIMS ARE NOT RIPE.

Each of the plaintiffs' claims hinges on whether any unnamed members of the plaintiff organizations will owe a tax under the Act.  That question will be unanswerable, and thus in the realm of speculation, at least until the Comptroller issues the regulations required by Tax-General § 7.5-102(b)(2) for determining "the state from which revenues from digital advertising services are derived," *id.*, which is the key to apportioning revenues as required by § 7.5-102(a).

Article III of the Constitution, through its "case or controversy" limitation, constrains federal courts to forgo hearing a lawsuit not yet ripe for judicial decision. *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 269 (4th Cir. 2013). Thus, "ripeness is a question of subject matter jurisdiction," *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 392 (2019), which turns upon whether the timing of judicial involvement in a dispute is premature. "'Analyzing ripeness is similar to determining whether a party has standing,'" and "'[a]lthough the phrasing makes the questions of *who* may sue and *when* they sue seem distinct, in practice there is an obvious overlap between the doctrines of standing and ripeness.'" *Id.* (citations omitted; emphasis added).

Under the ripeness doctrine, before a dispute can be heard, it must be in a "clean-cut and concrete form," *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting *Rescue Army v. Municipal Ct. of L.A.*, 331 U.S. 549, 584 (1947)), "not dependent on future uncertainties" or "contingent future events that may not occur as anticipated," *Scoggins*, 718 F.3d at 270 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). A court must dismiss a case that is not ripe to avoid "entangling [itself] in abstract disagreements over administrative policies, and also to protect the [administrative] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). Just as with other administrative policies and agencies, courts should not "interfere prematurely with state tax administration." *Alcan Aluminium Ltd. v. Department of Revenue*, 724 F.2d 1294, 1298 n.9 (7th Cir. 1984).

To determine if a claim is ripe, a court considers two factors:  (1) whether the case is fit for adjudication and (2) the hardship to the parties if the court withholds consideration. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (citation omitted).  Both factors confirm that this case is not ripe.

### A.     The Plaintiffs' Challenge Is Not Yet Fit for Judicial Decision.

"[A] case is 'fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties.'"  *Lansdowne on the Potomac Homeowners Ass'n v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (citation omitted).  "Allegations of possible future injury do not satisfy the requirements of Art[icle] III."  *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990).

For disputes involving state taxation, the Fourth Circuit has not delineated when a tax controversy becomes ripe.  Most circuits to consider the matter have required the taxing authority to first assess or collect the disputed tax; all require a plaintiff to have more than an undetermined, future expectation of paying the tax.  *See Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 115-16 (1st Cir. 2016) (controversy ripe but plaintiff had already paid estimated corporate taxes); *Birdman v. Office of the Governor*, 677 F.3d 167, 173-74 (3d Cir. 2012) (case is not ripe until a taxing authority has taken definitive action, by determining the amount owed or undertaking enforcement action); *Alcan Aluminium*, 724 F.2d at 1299 ("[A] mere request for information pursuant to a state tax audit to determine whether a taxation statute is applicable is not sufficient to make [a] case ripe."); *Shell Petroleum, N.V. v. Graves*, 709 F.2d 593, 596-97 (9th Cir. 1983) (even after assessment was issued, claim was not ripe as plaintiffs had plain, speedy, and efficient state

court remedy); *Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486, 491 (10th Cir. 1983) (constitutional attacks on taxes related to oil and gas leases deemed premature where taxes had not yet been collected and the record was insufficient for deciding issues).

As previously mentioned, the Act requires the Comptroller to promulgate regulations to determine the source of taxable revenues. Tax-Gen. § 7.5-102(b)(2). Plaintiffs have filed suit so prematurely that the Comptroller has yet to do so. Because there are no regulations extant, the amount of tax, if any, that plaintiffs' members will have to pay is unknowable, and therefore the issues are not concrete.

### B.   The Plaintiffs Have Failed to Show That They Will Suffer Hardship If the Court Declines to Hear the Case Now.

The court must also analyze the hardship the parties will suffer if the court declines to hear the case. *Abbott Labs.*, 387 U.S. at 152. That hardship must outweigh the benefits that deferring the case yields the agency and the Court. *West Va. Highlands Conservatory, Inc. v. Babbitt*, 161 F.3d 797, 801 (4th Cir. 1998) (citation omitted).

A plaintiff must show that the hardship is "immediate, direct, and significant" in light of the "totality of the circumstances." *Id.* at 801; *see Lansdowne on the Potomac Homeowners Ass'n*, 713 F.3d at 199 (explaining that a court looks to "the immediacy of the threat and the burden imposed on the [plaintiff]"). This necessary showing cannot be satisfied by plaintiffs' "[m]ere uncertainty as to the validity of a legal rule," which does not "constitute[] a hardship for purposes of the ripeness analysis." *National Park Hospitality Ass'n v. Department of Interior*, 538 U.S. 803, 811 (2003).

Plaintiffs have failed to show that immediate, direct, and significant hardship will result if the Court declines to hear this suit. Instead, they offer allegations of future injury, by describing an unnamed and hypothetical "global company." ECF 25 ¶¶ 57-58. Plaintiffs allege that the Act will "mak[e their members] liable for the charge, interfere[] with their business models, and mak[e] it more difficult for them to provide high quality services to their clients and customers." ECF 25 ¶¶ 14, 16, 18, 20.

At most, plaintiffs allege that some of their members, whose identities are not presently known, might confront a need to comply with the Act by making estimated payments in 2022 and filing an original return in 2023, at which time an assessment could be entered. But worrying about some future need to comply with a state law does not constitute a hardship. *National Park Hospitality Ass'n*, 538 U.S. at 811 (explaining that accepting uncertainty about a law's legitimacy or applicability as a "hardship" would soon "overwhelm[]" courts "with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved").

Given the current lack of (1) statutorily required regulations, (2) ability to determine the tax owed, (3) obligation to pay estimated taxes, and (4) authority to assess or collect the tax, the case is not yet fit for judicial decision.

## III.  THE TAX INJUNCTION ACT PRECLUDES FEDERAL COURT JURISDICTION OVER THIS PREEMPTIVE CHALLENGE TO MARYLAND'S DIGITAL ADVERTISING TAX.

The Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, bars this suit, because it "removes the jurisdiction of federal courts over any action that would 'enjoin, suspend or

restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.'" *Gwozdz v. HealthPort Techs., LLC*, 846 F.3d 738, 742 (4th Cir. 2017) (quoting 28 U.S.C. § 1341). The TIA imposes a "broad jurisdictional barrier," *Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470 (1976), and its "broad prophylactic terms" apply to "declaratory as well as injunctive relief," including "injunctive or declaratory relief under [42 U.S.C.] § 1983," *Folio v. City of Clarksburg*, 134 F.3d 1211, 1214 (4th Cir. 1998) (citing *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982), and *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503 (1981)).

The test for whether the TIA bars a suit involves two questions: (1) "whether the relief sought here would 'enjoin, suspend or restrain the assessment, levy or collection of any tax under State law,'" and, if so, then (2) "whether 'a plain, speedy and efficient remedy may be had in the courts of' [such State]." *Direct Mktg. Ass'n v. Brohl*, 575 U.S. 1, 7 (2015). As explained below, plaintiffs' suit is the very sort of action Congress sought to prevent, because their amended complaint seeks to declare invalid and "permanently enjoin" imposition of "a 'Digital Advertising Gross Revenues Tax,'" ECF 25 at 22, and Maryland law unquestionably provides "a plain, speedy and efficient remedy." Under recent guidance issued by the Supreme Court, which supersedes the older authorities cited by plaintiffs, *see* ECF 25 at 13-14 ¶ 55, the relief sought in the amended complaint unquestionably would "enjoin . . . the assessment, levy or collection of" a "tax." The second part of the TIA inquiry already has been answered definitively in a binding Fourth

Circuit decision holding that Maryland law provides "a plain, speedy and efficient remedy" that satisfies the TIA.  Therefore, the TIA requires dismissal of this suit.

> **A.    This Action Is Barred Because It Seeks to Declare Invalid and Enjoin the Digital Advertising Tax, Which Is a "Tax" Within the Meaning of the Tax Injunction Act.**
>
> > **1.    The Latest Supreme Court Precedents Explain Why the Digital Advertising Tax Is A "Tax" Under the Tax Injunction Act.**

Recently, the Supreme Court has clarified the law governing whether a suit seeks relief that is barred by either the Anti-Injunction Act, 26 U. S. C. § 7421(a) (for challenges to federal tax legislation), or the TIA (for challenges to state tax legislation).  The same principles tend to apply under both statutes because the TIA "was modeled on the Anti-Injunction Act (AIA)"; the Supreme Court "assume[s] that words used in both Acts are generally used in the same way," *Direct Mktg.*, 575 U.S. at 8 (interpreting the TIA in light of AIA case law); and the AIA contains key words that also appear in the TIA, including "assessment," "collection," and—most significantly for purposes of this case—"tax."[2]  *See CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1589 and n.1 (2021) (following *Direct Mktg.* in interpreting AIA).  Moreover, both statutes share the same essential legislative purpose:  "In both 26 U.S.C. § 7421(a) and 28 U.S.C. § 1341, Congress directed taxpayers to pursue refund suits instead of attempting to restrain collections."  *Hibbs v. Winn*, 542 U.S. 88, 104 (2004); *see Direct Mktg.*, 575 U.S. at 19 ("'[I]n enacting the [TIA],

---

[2] The AIA provides that, except as authorized by certain enumerated sections of the Internal Revenue Code, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a).

Congress trained its attention on taxpayers who sought to avoid paying their tax bill by pursuing a challenge route other than the one specified by the taxing authority.'") (quoting *Hibbs*, 542 U.S. at 104-05).

In its May 2021 decision in *CIC Services*, a unanimous Supreme Court explained the correct analysis whenever a federal court considers a challenge to tax legislation. First, a court "look[s] to the face of the . . . complaint" to "determine the suit's object," that is, "the 'relief requested'—the thing sought to be enjoined." 141 S. Ct. at 1589-90 (citations omitted); *see Hibbs*, 542 U.S. at 99 ("To determine whether this litigation falls within the TIA's prohibition, it is appropriate, first, to identify the relief sought."). The pertinent statutory bar, whether it be the AIA or the TIA, "kicks in when the target of a requested injunction is a tax obligation." *CIC Servs.*, 141 S. Ct. at 1590.

Second, when, as here, the requested relief targets the obligation to pay a "tax [that] imposes a cost on perfectly legal behavior"—as opposed to a "penalt[y]" or "sanction" for "violation" of a "legal mandate"—then the TIA, like the AIA, "bars pre-enforcement review, prohibiting a taxpayer from bringing . . . a 'preemptive[]' suit to foreclose tax liability. . . . And it does so always—whatever the taxpayer's subjective reason for contesting the tax at issue." *Id.* at 1593 (brackets in original). That is, "[i]f the dispute is about a tax rule," then "the sole recourse is to pay the tax and seek a refund." *Id.* This statutory imperative "is just as true when the tax in question is a so-called regulatory tax— that is, a tax designed mainly to influence private conduct, rather than to raise revenue." *Id.* The TIA, like the AIA, "draws no distinction between regulatory and revenue-raising

tax rules," meaning "[i]t applies whenever a suit calls for enjoining the . . . assessment and collection of taxes—of whatever kind." *Id.* at 1594.

In *CIC Services*, as in *Direct Marketing*, the complaint could not be considered an attempt to "restrain" the "assessment," "levy," or "collection" of a tax, and the Court thus concluded that the statutory bar did not apply, because the asserted claims for relief challenged only a reporting requirement, without contesting an underlying tax obligation. *CIC Servs.*, 141 S. Ct. at 1592; *Direct Mktg.*, 575 U.S. at 7-8, 11.   When applied to plaintiffs' amended complaint, however, *CIC Services*' analysis compels the conclusion that the TIA bars this suit.   From the very first paragraph to the "Prayer for Relief" on the last page, the amended complaint makes clear that "the target of [its] requested injunction is a tax obligation," *CIC Servs.*, 141 S. Ct. at 1590.   *See* ECF 25 at 1 ¶1 ("This lawsuit seeks a declaration and injunction against enforcement of . . . a 'Digital Advertising Gross Revenues Tax' on sellers of digital advertising services."); *id.* at 22 ("Plaintiffs respectfully request that the Court . . . 3. permanently enjoin Defendant and his agents, employees, and all persons acting under his direction or control from taking any action to enforce the Act insofar as it imposes a 'Digital Advertising Gross Revenues Tax' . . . .").   Accordingly, the TIA "kicks in," due to what the face of the amended complaint reveals.   *CIC Servs.*, 141 S. Ct. at 1590.

### 2. Plaintiffs' Denial that the Digital Advertising Tax is a "Tax" Under the Tax Injunction Act Conflicts with Supreme Court Guidance.

As their only proffered reason why the TIA's jurisdictional bar should not apply, plaintiffs insist that the digital advertising tax is not a "tax" within the meaning of the TIA,

ECF 25 at 9 ¶ 38, though they also insist, with equal vigor, that it *is* a "tax," under the definition Congress adopted in the ITFA, as invoked in Count I of the amended complaint, *id.* at 13 ¶ 55; 17 ¶ 77. The "not-a-tax" half of plaintiffs' conflicting interpretations must be rejected, however, because their arguments in support of it contradict the Supreme Court's guidance in *CIC Services*.[3]

Plaintiffs assert that "[t]he exaction assessed by the Act is a punitive fee, penalty, or fine, and not a 'tax' within the meaning of the Tax Injunction Act, 28 U.S.C. § 1341," ECF 25 at 9 ¶ 38, for various reasons[4] that boil down to the following:  "the Act disapproves of and disfavors" certain practices of companies taxed, *id.* at 9 ¶ 40; it imposes a cost for engaging in those practices, a cost plaintiffs deem unacceptably high, *id.* ¶ 41; and, therefore, "[t]he Act is akin to a penalty for perceived misconduct," *id.* at 11 ¶ 47.  The Supreme Court has expressly rejected that line of thinking.

---

[3] The plaintiffs' insistence that the digital advertising tax is a "tax" under the ITFA actually helps to confirm that it is also a "tax" under the TIA.  Because both the ITFA and the TIA "are creatures of Congress's own creation[, h]ow they relate to each other is up to Congress, and the best evidence of Congress's intent is the statutory text."  *National Fed'n of Indep. Bus.* ["*NFIB*"] *v. Sebelius*, 567 U.S. 519, 544 (2012).  For this reason, the Supreme Court has "applied the [AIA] to statutorily described 'taxes' even where that label was inaccurate."  *Id.* (citing "*Bailey v. George*, 259 U.S. 16 [] (1922) ([AIA] applies to 'Child Labor Tax' struck down as exceeding Congress's taxing power in [*Bailey v.*] *Drexel Furniture* [*Co.*, 259 U.S. 20 (1922)])").  Therefore, under *NFIB*, since Congress in the ITFA defined a "tax" to include "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes" that "is not a fee imposed for a specific privilege, service, or benefit conferred," ITFA § 1105(8)(A)(i), absent a contrary instruction from Congress, the Supreme Court will treat any such charge as a tax under the TIA.

[4] Among the features of the Act that indicate its punitive nature, according to the amended complaint, are its alleged "extraterritoriality, narrow applicability, and assessment against gross revenue rather than net income."  ECF 25 at 9 ¶ 38.

In *CIC Services*, the Court repudiated, for purposes of the AIA and, therefore, the TIA, any "distinction between regulatory and revenue-raising tax rules"—that is, between "a tax designed mainly to influence private conduct" and one expected "to raise revenue." 141 S. Ct. at 1594, 1593.  The Court cited examples of cases where it had held that the AIA barred pre-enforcement challenges to exactions assessed upon "conduct that was legal but disfavored for tax purposes," *id.* at 1593, including *Bailey v. George*, 259 U. S. 16 (1922), which concerned the same Child Labor Tax addressed in a case cited in paragraph 55 of the amended complaint, *Bailey v. Drexel Furniture Co.*, 259 U.S. at 38.[5]

*CIC Services* further contrasted that type of conduct-influencing imposition, which the Court deemed a "tax" for purposes of the AIA, with what the Court considered a "penalty," described in terms of a "sanction" for "violation" of a "legal mandate." 141 S. Ct. at 1593.  Thus, in the Court's view, "'if the concept of penalty means anything, it means punishment for an unlawful act or omission.'"   *NFIB*, 567 U.S. at 567 (citation omitted).  If, as in this case, applicable law permits the taxpayer to continue engaging in the activity that renders it liable for the tax, and neither the challenged legislation "nor any other law attaches negative legal consequences" to that activity "beyond requiring a

---

[5] Contrary to the amended complaint's characterization, *Drexel Furniture* did not say anything "expressly of the AIA," ECF 25 at 13 ¶ 55; the AIA played no part in *Drexel Furniture* because it was a refund case, where the taxpayer "paid the [Child Labor] tax under protest, and, after rejection of its claim for a refund, brought this suit," 259 U.S. at 34, thus pursuing available remedies before filing suit, as Congress intended when it enacted the AIA.  In *George*, the plaintiff did not pay the Child Labor tax but filed a claim for abatement of the assessment before filing suit, 259 U.S. at 19; the district court granted the plaintiff relief, but the Supreme Court reversed and remanded with instructions to dismiss pursuant to the AIA, *id.* at 20.

payment to the [taxing authority]," then the charge is not imposed as "punishment for an unlawful act or omission," and the legislation at issue "merely imposes a tax" and not a "penalty."[6]  *Id.* at 568.  Or, as *CIC Services* explains more succinctly, "the legal rule at issue is a tax provision" when "[t]he tax does not backstop the violation of another law that independently prohibits or commands an action" and, "[i]nstead, the tax imposes a cost on perfectly legal behavior." 141 S. Ct. 1593.  Thus, the Act "imposes a tax" and not a "penalty," *NFIB*, 567 U.S. at 567, because neither this legislation nor any other provision of Maryland law purports to render digital advertising services unlawful or subject to "negative legal consequences," *id.* at 568, other than the obligation to pay the tax.

In this analysis, the "plaintiffs' reasons for suing," including digital advertising companies' "subjective reason" for believing they are being targeted unfairly, are "irrelevant" to the determination of whether the challenged legislation imposes a "tax" that triggers the statutory prohibition against pre-enforcement litigation.  *CIC Servs.*, 141 S. Ct. at 1593.  "Americans have never had much enthusiasm for paying taxes," *id.* at 1586, and anyone subject to a tax obligation might have "subjective reason," *id.* at 1593, to believe the obligation onerous and, therefore, punitive.  Therefore, regardless of why plaintiffs

---

[6] As pointed out in *NFIB*, a departure from this formula may arise if Congress exercises its authority to "describe something as a penalty but direct that it nonetheless be treated as a tax for purposes of the Anti-Injunction Act."  567 U.S. at 544 (citing the example of 26 U.S.C. § 6671(a) ("any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by" Subchapter 68B of the Internal Revenue Code)).

object to the digital advertising tax, their suit seeking "to prevent the levying of taxes . . . could not go forward."  *Id.*

Plaintiffs' assertion that the digital advertising tax is not a tax for TIA purposes relies on pre-2010 opinions that are now superseded to the extent they suggested, contrary to *CIC Services*, "that government charges that have 'regulatory or punitive purposes' are not 'taxes' within the meaning of the TIA."  ECF 25 ¶ 55 (citing *Retail Indus. Leaders Ass'n* ["*RILA*"] *v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007) (quoting *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000))).  The analysis in *Valero* and *RILA* does not comport with *CIC Services* for at least three reasons.

First, the Supreme Court has rejected the "revenue-raising" versus "regulatory" distinction that is central to the analysis used in *Valero* and *RILA* to determine whether a charge is a "tax."  *Compare CIC Servs.*, 141 S. Ct. 1593-94 ("The [AIA] . . . draws no distinction between regulatory and revenue-raising tax rules."), *with Valero*, 205 F.3d at 134 ("[T]he general inquiry is to assess whether the charge is for revenue raising purposes, making it a 'tax,' or for regulatory or punitive purposes, making it a 'fee.'") *and RILA*, 475 F.3d at 189 ("[T]he [TIA's] . . . applicability depends primarily on whether a given measure serves 'revenue raising purposes' rather than 'regulatory or punitive purposes.'").  Second, the *Valero* approach calls for weighing three factors with the aim of locating a challenged exaction somewhere on an imagined continuum ranging between the Platonic ideal of a "classic tax" at one end and a "classic fee" at the other, 205 F.3d at 134, a process that can be "inconclusive as to whether the charge is a tax or a fee" even "after considering the . . . three factors," *Clear Channel Outdoor, Inc. v. Baltimore*, 22 F. Supp. 3d 519, 525 (D. Md.

2014).   Given its inherent uncertainty and variability of potential outcome, *see*, *e.g.*, *Norfolk S. Ry. Co. v. City of Roanoke*, 916 F.3d 315, 321 (4th Cir. 2019) ("Courts have reached different results in applying the third factor to stormwater management charges."), the *Valero* test illustrates the lack of any "'bright-line distinctions . . . between regulatory and revenue-raising taxes,'" since "'[e]very tax is in some measure regulatory'"—a reality that caused the Supreme Court to conclude there is no such distinction, *CIC Servs.*, 141 S. Ct. at 1593 (citations omitted).   Third, *Valero*'s multifactor weighing does not even purport to satisfy the Supreme Court's "rule favoring clear boundaries in the interpretation of jurisdictional statutes."   *Direct Mktg.*, 575 U.S. at 11 (citation omitted); *see*, *e.g.*, *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir. 1997) (acknowledging that applying the multipart test "requires careful analysis because the line between 'tax' and 'fee' can be a blurry one").   In stark contrast, the Supreme Court's idea of a "clear boundary" is exemplified by *CIC Services*' instruction that the statutory bar "applies whenever a suit calls for enjoining . . . assessment and collection of taxes—of whatever kind." 141 S. Ct. at 1594.

### 3.      The Digital Advertising Tax Is a "Tax" Even Under the Superseded *Valero* Test.

Even if, contrary to the Supreme Court's guidance, this Court were to apply *Valero*'s analysis, it would confirm that the digital advertising tax is a "tax" for TIA purposes.   That test insists the term "tax" must be given a "'broader' interpretation" than might apply in other contexts and looks to three factors:   "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the

monies obtained by the charge." *Valero*, 205 F.3d at 134. The third factor is both "the most important," *id.*, and "the heart of the inquiry," *Collins Holding*, 123 F.3d at 800.

The first factor points to "tax" because the digital advertising tax was enacted by the General Assembly, 2021 Md. Laws ch. 37, and will be administered by the State's general assessor and collector of taxes, the Comptroller, *id.* § 2, p. 21 (amending Tax-Gen. § 2-102(a)); *see* Md. Const. art. VI, § 2. *Collins Holding*, 123 F.3d at 800 ("An assessment" is "more likely to be a tax" if "imposed directly by a legislature" and where "responsibility for administering and collecting the assessment lies with the general tax assessor," as opposed to "a regulatory agency.").

The second factor—what population is subject to the charge—has been described as a "relatively minor" consideration, *Club Ass'n v. Wise*, 293 F.3d 723, 726 (4th Cir. 2002), and one that "counts for too little to weigh against the strength of the other factors . . .," since "[m]any revenue measures that are indisputably taxes . . . fall on a limited portion of the population," *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 737 F.3d 228, 233 (2d Cir. 2013). The Fourth Circuit has treated the size of the assessed population as decisive only where the charge was imposed on a single taxpayer, and no one else, as was the case in *GenOn Mid-Atl., LLC v. Montgomery County*, 650 F.3d 1021, 1024 (4th Cir. 2011) ("The chief problem with Montgomery County's carbon charge is that the burden falls on GenOn alone[.]"). Here, the exact number of entities potentially subject to the digital advertising tax is not yet known, but the amended complaint itself alleges that

"many" entities will be subject to the tax.[7]  Therefore, the number of taxpayers assessed easily satisfies *GenOn*'s criterion:  that the tax "apply to at least more than one entity."  *Id.*

Even if the Court were to conclude that the second factor does not point toward "tax," the digital advertising tax is nonetheless a tax under *Valero* because it satisfies "the most important factor," which is "the purpose behind the statute" as determined by "the ultimate use of the revenue" generated.  *Valero*, 205 F.3d at 134.  That is, "if the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax.'"  *Id.*  Here, the challenged statute unquestionably benefits the general public, because Maryland is depending on the digital advertising tax to generate as much as $250 million in annual revenues[8] to fund the Blueprint for Maryland's Future, 2021 Md. Laws chs. 36, 55, the most significant set of educational improvements and reforms the State has undertaken in a generation.  *See* Md. Code Ann., Educ. § 1-302(a)(1) (The Blueprint aims to provide "students with instruction and skills set to international standards that will enable them to be successful in the 21st-century economy and productive citizens of the State.").  Thus,

---

[7] *See* ECF 25 at 4 ¶ 15 ("*Many* of the Chamber's members will be liable to pay the charge imposed by the Act." (emphasis added)); *id.* at 5 ¶ 17 ("*Many* of IA's members will be liable to pay the charge imposed by the Act." (emphasis added)); *id.* ¶ 19 ("*Many* of NetChoice's members will be liable to pay the charge imposed by the Act.") (emphasis added)); *id.* at 6 ¶ 21 ("*Many* of CCIA's members will be liable to pay the charge imposed by the Act." (emphasis added)).

[8] H.B. 732 (2020 Reg. Legis. Sess.) Fiscal and Policy Note – Enrolled, Revised at 9; *but see* S.B. 787 (2021 Reg. Legis. Sess.) Fiscal and Policy Note – Third Reader – Revised at 4 (explaining that exemptions created by S.B. 787 "may reduce the overall revenue impact of the digital advertising tax provisions of Chapter 37; however, the amount of the revenue decrease cannot be reliably estimated" at this time).

every public school district in the State will benefit from funding supplied by the digital advertising tax.

As prescribed by H.B. 732, and as acknowledged in the amended complaint, ECF 25 ¶ 46, the revenue produced by the digital advertising tax can be used for only two purposes:  (1) to fund "the Blueprint for Maryland's Future Fund established under Education § 5-219, Tax-Gen. § 2-4A-02, and (2) to cover "the amount necessary to administer" the tax, Tax-Gen. § 2-4A-01.  "[T]hat revenue is placed in a special fund" does not "warrant characterizing a charge as a 'fee'" if "the revenue of the special fund is used to benefit the population at large[.]"  *Valero*, 205 F.3d at 135.  Unlike charges that have been deemed "fees," no part of digital advertising tax revenue will be used "to benefit regulated entities or defray the cost of regulation" of digital advertising services.  *Collins Holding*, 123 F.3d at 800.  As was true in *Clear Channel Outdoor, Inc. v. Baltimore*, 153 F. Supp. 3d 865 (D. Md. 2015) (TIA barred suit challenging city's billboard ordinance), the digital advertising tax is a tax, not a fee, because the State is using the "revenue to benefit the general public by funding programming at public schools," *id.* at 874, and not using revenue "to provide narrow benefits to entities owning or operating" digital advertising firms or "to defray the costs of regulating [digital] advertising" services, *id.* at 873.  Nor does the tax "form[] part of a comprehensive regulatory scheme" governing digital advertising services.  *Norfolk S. Ry.*, 916 F.3d at 321.  Therefore, whether viewed according to *CIC Services* or under the *Valero* test, the digital advertising tax is a "tax" within the meaning of the TIA.

### B.     Maryland Law Provides a "Plain, Speedy and Efficient Remedy."

The second question regarding the TIA's applicability already has been answered by the Fourth Circuit, which has held that "Maryland has established just such a remedy" that is "'plain, speedy and efficient'" within the meaning of the TIA.  *Gwozdz*, 846 F.3d at 740 (quoting 28 U.S.C. § 1341).   The Court in *Gwozdz* reviewed Maryland's "'comprehensive remedial scheme for the refund of taxes erroneously paid,'" *id.* at 740 (citation omitted), including an "administrative remedy [that] encompasses 'every type of tax, fee, or charge improperly collected by a Maryland governmental entity,'" *id.* at 741 (citation omitted).  Under this scheme, "[a] taxpayer begins by requesting reimbursement from the Comptroller"; "[t]he taxpayer may request an informal hearing," and "may appeal the Comptroller's final determination to the Maryland Tax Court" (an administrative agency not part of the judiciary), and if dissatisfied with the result, "may appeal the Tax Court's decision to the Maryland circuit court."  *Id.* at 740-41 (citing Tax–Gen. §§ 13-901(a)(2), 13-508(a)(2), 13-904(a)(2), 13-510(a)(2), 13-532(a)(2)).  This administrative remedy has been held to be "a taxpayer's sole route to relief," and "[b]eyond the administrative scheme, 'no action lies to challenge the validity of a tax paid under a mistake of law . . . regardless of the nature of the legal attack mounted.'" *Id.* at 741 (citations omitted).  "[T]hat [the] initial remedy is an administrative one (followed by judicial review) does not place it outside the TIA's purview.  Nor does the provision of initial administrative exclusivity remove the state's collection procedures from the protection of the Act."  *Id.*

The statutory provisions governing Maryland's administrative remedy have not changed materially since *Gwozdz* was decided in 2017.  The scope of this administrative

remedy is more than broad enough to redress all of the claims in the amended complaint, because the Maryland Tax Court is "'fully competent to resolve issues of constitutionality and the validity of statutes . . . subject to judicial review,'" *Holzheid v. Comptroller*, 240 Md. App. 371, 388 (2019) (quoting *Prince George's County v. Ray's Used Cars*, 398 Md. 632, 651 (2007) (other citation omitted)), and the Tax Court has jurisdiction to resolve not just "whether a refund was denied properly," but also any question having a "direct relationship" to that inquiry, *Comptroller v. Science Applications Int'l Corp.*, 405 Md. 185, 195, 192 (2008).  Because Maryland's statutory scheme "provides taxpayers with a forum in which to challenge the validity of tax assessments and therefore constitutes the kind of state remedy envisioned by the [TIA, t]hat Act, in turn, 'insulates' Maryland's system of taxation from interference by the federal courts."  *International Lotto Fund v. Virginia State Lottery Dep't*, 20 F.3d 589, 593 (4th Cir. 1994) (citation omitted).

### C.   This Suit Is Precisely the Type of Action Congress Meant to Prevent When It Enacted the Tax Injunction Act.

The TIA seeks to free States' tax collection procedures "from interference by the federal courts[.]"  *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 301 (1943). Even before the TIA's enactment, the Supreme Court had counseled against entertaining federal suits "to enjoin the collection of a state tax," because "scrupulous regard for the rightful independence of state governments" and "a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it."  *Matthews v. Rodgers*, 284 U.S. 521, 525 (1932).  Nevertheless, in "[p]urporting to construe these equitable

principles . . ., the federal courts had become 'free and easy with injunctions,'" so much so "that the federal court became the preferred forum" for "large out-of-state corporations." *Fair Assessment in Real Est. Ass'n, Inc. v. McNary*, 454 U.S. 100, 129 (1981) (Brennan, J., concurring in the judgment). The "drafters of the [TIA] were particularly concerned with this practice of out-of-state corporations," which involved "delaying payment of state taxes during the pendency of federal litigation." *Rosewell*, 450 U.S. at 522 n.29 (citing Sen. Rep. No. 1035, 75th Cong., 1st Sess. at 1-2; 81 Cong. Rec. 1416 (1937) (remarks of Sen. Bone)). The drafters also sought to achieve fairness by "eliminat[ing] disparities between taxpayers who could seek injunctive relief in federal court—usually out-of-state corporations . . . —and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later." *Hibbs*, 542 U.S. at 104 (citing S. Rep. No. 1035 at 1-2).

This case implicates similar concerns. The plaintiff organizations purport to represent the interests of large out-of-state corporations; they seek to enjoin the State's effort to raise revenue needed for public education; and by filing this federal suit, they hope to gain an advantage that is generally unavailable to other Maryland taxpayers, who are required by law to pursue objections to tax assessments through the State's administrative appeal process. For the very reasons that motivated Congress to enact it, the TIA requires dismissal of this action.

## IV.  PRINCIPLES OF COMITY INDEPENDENTLY WARRANT DISMISSAL OF THE ACTION BECAUSE MARYLAND PROVIDES AN ADEQUATE REMEDY AT LAW FOR RESOLVING ALL CHALLENGES TO A MARYLAND TAX.

The TIA is only "a partial codification of the federal reluctance to interfere with state taxation." *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 590 (1995).  Though the TIA acts as a "broad jurisdictional barrier," *Moe*, 425 U.S. at 470, its vital forerunner, the comity doctrine, is even "more embracive," *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 417, 424 (2010).  Comity "counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction," a "constraint" that "has particular force when lower federal courts are asked to pass on the constitutionality of state taxation of commercial activity." *Id.* at 421.  This constraint "predated" the TIA, "'was not restricted by [the TIA's] passage,'" and has "continuing sway . . ., independent of the [TIA]." *Id.* at 423, 424 (quoting *McNary*, 454 U.S. at 110).  Thus, even where the TIA does not preclude jurisdiction, "principles of federalism and comity generally counsel that courts should adopt a hands-off approach with respect to state tax administration." *National Private Truck Council*, 515 U.S. at 586; *see*, *e.g.*, *Direct Mktg.*, 575 U.S. at 15 (holding that TIA did not bar suit challenging State's notice and reporting requirements imposed on retailers, but remanding comity issue for lower court consideration).[9]

---

[9] On remand to the Tenth Circuit in *Direct Marketing*, Colorado's taxing authority "'affirmatively waived reliance on the comity doctrine,'" *Direct Mktg. Ass'n v. Brohl*, 814 F.3d 1129, 1134 n.7 (10th Cir. 2016) (citation omitted), because the damage comity seeks to avoid had been done:  the case already had "been pending for five years in federal court," the State already had "lost significant tax revenue while the federal injunction ha[d] been in place," and "[r]equiring the parties to re-litigate in state . . . court . . . would entail years

For these reasons, if the Court has reservations about whether the TIA bars this action, or if the Court simply prefers to avoid resolving that issue, then the comity doctrine still calls for the case to be dismissed. *See Levin*, 560 U.S. at 432 ("Because we conclude that the comity doctrine justifies dismissal of respondents' federal-court action, we need not decide whether the TIA would itself block the suit."); *see also id.* (noting that a "federal court has flexibility to choose among threshold grounds for dismissal" (citation omitted)). Under the comity doctrine, "federal courts refrain from 'interfer[ing] . . . with the fiscal operations of the state governments . . . in *all* cases where the Federal rights of the persons could otherwise be preserved unimpaired'" through remedies available under state law. *Direct Mktg.*, 575 U.S. at 15 (quoting *Levin*, 560 U.S. at 422 (brackets and ellipses in original; emphasis added)).

Because this "background presumption" of noninterference preexisted the enactment of 42 U.S.C. § 1983, the Supreme Court has held "that Congress did not authorize injunctive or declaratory relief under § 1983 in state tax cases when there is an adequate remedy at law" provided by the State. *National Private Truck Council*, 515 U.S. at 588; *McNary*, 454 U.S. at 116 (holding that "taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts"). Nowhere has the Supreme Court suggested that a federal court might evade this limitation on § 1983 relief merely by opining that a challenged state tax is something other

---

of additional delay and concomitant revenue loss," Appellants' Supp. Br., No. 12-1175, 2015 WL 2337625 *74-*75 (10th Cir. May 13, 2015) (emphasis omitted).

than a tax, in the manner that plaintiffs advocate with respect to the TIA.  For example, in its most recent holding on comity in state tax cases, the Supreme Court concluded that comity barred a challenge to a State's scheme imposing various types of charges on gross receipts, where the State provided an adequate remedy, *Levin*, 560 U.S. at 426, but the Court's analysis did not question whether the charges were taxes or fees or any other sort of charge, nor did the Court so much as hint that such a question could be germane to the application of comity.[10]  Thus, the only question that need be answered is whether applicable state laws provide an adequate remedy, a question the Fourth Circuit has already answered in the affirmative with respect to Maryland.   *Gwozdz*, 846 F.3d at 740.  Consequently, comity counsels dismissal.

## V.   THERE IS NO PRIVATE RIGHT OF ACTION TO ENFORCE THE INTERNET TAX FREEDOM ACT.

No private right of action to enforce a federal statute can exist unless "Congress intended to create [such] a federal right."  *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  Absent the requisite congressional authorization, a private plaintiff cannot rely on the Supremacy Clause as the basis of its action, even in a preemption challenge, because the Supreme Court has held that "the Supremacy Clause is not the 'source of any federal

---

[10] In a case decided before the Supreme Court's decision in *Levin*, *DIRECTV, Inc. v. Tolson*, 513 F.3d 119 (4th Cir. 2008) (holding comity required dismissal of suit challenging state's gross receipts tax on cable and satellite television providers), the opinion responded to plaintiff's argument by discussing whether the challenged charge was a tax or a fee and concluding that it was a tax, *id.* at 125-26.  But the sole authority *DIRECTTV* cited for its tax vs. fee analysis was *Valero*, 205 F.3d at 134, a TIA case that contains no mention of comity.  In any case, as explained above, *Valero*'s test has been superseded by the Supreme Court's recent decision in *CIC Services*.

rights,' and certainly does not create a cause of action"; rather, the Clause "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong v. Exceptional Child Ctr., Inc*., 575 U.S. 320, 324-25 (2015) (citations omitted).  In this case, Congress clearly did not, either expressly or implicitly, establish a private right of action to enforce the ITFA.

"Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress," and a court may not entertain a private suit to enforce a federal statute unless its text "displays an intent to create not just a private right but also a private remedy."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) (citations omitted). These requirements apply irrespective of whether the relief sought by plaintiffs is monetary or equitable.  *See id.* at 293 (holding that private plaintiffs had no right of action to seek injunction to remedy violation of disparate impact regulations pursuant to Title VI, § 602).

First, the text of the ITFA contains neither an express grant of a private right of action nor any express authorization of a private remedy.  Where Congress has expressly conferred private rights of action with the availability of private remedies, the language tends to convey those rights straightforwardly.  For example, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x, expressly establishes the  right of "any person" to sue for damages to remedy a failure to comply with the FCRA's requirements, whether

that failure is willful, *id.* § 1681n(a),[11] or merely negligent, *id.* § 1681o(a).[12] *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) ("FCRA provides a private right of action against businesses that use consumer reports but fail to comply.").  No express language of that sort appears in the text of ITFA.  Therefore, the Act does not expressly authorize any private enforcement action or private remedy.

As for whether the statute confers an *implied* right of action, in recent decisions the Supreme Court has "expressed doubt about" the federal judiciary's "authority to recognize any causes of action not expressly created by Congress."  *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020) (citing *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1391-1403 (2018)); *see Jesner*, 138 S. Ct. at 1402 ("The Court's recent precedents cast doubt on the authority of courts to extend or create private causes of action[.]") (citations omitted); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ("If the statute does not itself so provide, a private

---

[11] 15 U.S.C. § 1681n(a) provides

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—(1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater; (2) such amount of punitive damages as the court may allow; and (3) . . . the costs of the action together with reasonable attorney's fees as determined by the court.

[12] 15 U.S.C. § 1681o(a) provides

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—(1) any actual damages sustained by the consumer as a result of the failure; and (2) . . . the costs of the action together with reasonable attorney's fees as determined by the court.

cause of action will not be created through judicial mandate."); *Iqbal*, 556 U.S. at 675 ("[I]mplied causes of action are disfavored[.]").

If and to the extent federal courts retain the ability to find a right of action to be implied in the language of a statute, the test for doing so is not easily satisfied, and cannot be satisfied here.  In evaluating whether a statute can be construed to confer a private right of action, "[s]tatutory intent . . . is determinative," for "[w]ithout it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Sandoval*, 532 U.S. at 286-87 (citations omitted).  "To create a private right of action, Congress must 'speak[ ] with a clear voice,' and the statute must 'unambiguously' express the intent 'to create not just a private *right* but also a private *remedy*.'" *Clear Sky Car Wash LLC v. Chesapeake*, 743 F.3d 438, 444 (4th Cir. 2014) (quoting *Gonzaga*, 536 U.S. at 280, 283, and *Sandoval*, 532 U.S. at 286) (emphasis in original).  The Fourth Circuit has also instructed that the same analysis applies irrespective of whether the plaintiff asserts a claim based directly on a statute or seeks to enforce that statute via 42 U.S.C. § 1983. *Clear Sky Car Wash*, 743 F.3d at 444 ("[D]etermining whether another statute . . . confers rights for enforcement under § 1983 'is no different from the initial inquiry in an implied right of action case.'" (quoting *Gonzaga*, 536 U.S. at 285)).

A key indicator of whether Congress intended to "create new rights" is the entity or person directly addressed by the statute. *Sandoval*, 532 U.S. at 289.  For language to be arguably "rights-creating," *id.* at 288, the statute's "text must be phrased in terms of the persons benefited," *Gonzaga*, 536 U.S. at 284.  For example, § 601 of Title VI of the Civil

Rights Act of 1964, 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin . . . be subjected to discrimination"), speaks in terms of the "person" who is to be protected by the statute and, therefore, "reveals congressional intent to create new rights." *Sandoval*, 532 U.S. at 289.  On the other hand, "[s]tatutes that focus on the person regulated rather than [persons] protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Id.* (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)).

Here, the ITFA's operative language, found in § 1101(a), focuses on the States and political subdivisions whose tax laws are "regulated" by the statute, i.e. those entities the statute directs to observe a tax moratorium:

> Moratorium.—No State or political subdivision thereof shall impose any of the following taxes during the period beginning on October 1, 1998, and ending 3 years after the date of the enactment of this Act—
>
>> (1) taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and
>>
>> (2) multiple or discriminatory taxes on electronic commerce.

ITFA § 1101(a).  This subsection, which constitutes the meat of the statute, addresses itself to a "State or political subdivision" and does not mention private persons at all.  *Id.*

In fact, the statute does not mention any private actors until it reaches subsections (d) and (e) of § 1101, each of which addresses and elaborates upon an *exception* to the moratorium requirement, and thus each of these subsections describes circumstances in which ITFA's prohibition regarding state and local taxation *does not apply*.  The exception in subsection (d)(1) mentions "any person or entity" involved "in interstate or foreign

commerce by means of the World Wide Web," not to protect those "persons or entities," but to discourage them from engaging in practices that threaten the safety of minors.  Thus, subparagraph (d)(1) provides that the moratorium shall "not apply in the case of any person or entity who knowingly" and "for commercial purposes" makes "any communication" via the Internet "that is available to any minor and that includes any material that is harmful to minors unless such person or entity has restricted access by minors" through methods authorized by the ITFA.  Similarly, the exception in § 1101(e)(1) is also designed to protect minors and prevent them from being victimized by material communicated via the Internet. Subparagraph (e)(1) renders the moratorium inapplicable to "an Internet access provider" unless the provider offers customers "screening software that is designed to permit the customer to limit access to material . . . harmful to minors."

The language in these exceptions, explaining circumstances where the moratorium *does not* apply, cannot be construed to confer a private right to enforce the moratorium when it arguably *does* apply.  Instead, subsections (d) and (e) are patently intended to protect or benefit persons other than the commercial entities the subsections render taxable.[13]

Other sections of the ITFA offer no support for the notion of a private right of action. Section 1102(a) established an Advisory Commission on Electronic Commerce to conduct a "study of Federal, State and local, and international taxation and tariff treatment of

---

[13] Similarly, an exception in § 1106(a) renders "charges for Internet access . . . subject to taxation" if an "Internet access provider" cannot "reasonably identify the charges . . . from its books and records kept in the regular course of business."

transactions using the Internet and Internet access and other comparable intrastate, interstate or international sales activities."   § 1102(g)(1); *see* § 1103 (requiring the Commission to report to Congress within 18 months after ITFA's enactment).   Section § 1105 consists of various definitions, some of which mention private persons or entities, but where, as here, the "focus" of the legislation is a prohibition directed at the "persons regulated," *Sandoval*, 532 U.S. at 289—in this case States and political subdivisions—the mere mention of a statute's private beneficiaries does not suffice to convey an intent to grant a private right of action.

For example, in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the Court considered the program created by § 340B of the Public Health Services Act, 42 U.S.C. § 256b, under which "manufacturers participating in Medicaid must offer discounted drugs to covered entities," including mostly "local facilities that provide medical care for the poor." *Astra USA*, 563 U.S. at 115.   Even though the program was intended to benefit those "covered entities" by lowering their costs, and the text of § 340B contained multiple mentions of those covered entities,[14] the Court ruled 8-0 that Congress did not intend for those entities to have a right of action to enforce the manufacturers' obligations, either under the statute itself, *id.* at 117 (the statute "assigned no auxiliary enforcement role to covered entities"), or as third-party beneficiaries of implementing agreements between manufacturers and the Department of Health and Human Services, *id.*

---

[14] *See*, *e.g.*, 42 U.S.C. § 256b(a), subparagraphs (1), (4)-(9); § 256b(d)(1)(B)(ii) (requiring manufacturers to establish procedures for refunds to covered entities).

at 118 (third-party suit to enforce agreement would "in essence" be "a suit to enforce the statute itself" and "'would be inconsistent with . . . the legislative scheme . . . to the same extent as would a cause of action directly under the statute'").

Nothing in the text or structure of ITFA "'unambiguously' express[es] the intent 'to create not just a private *right* but also a private *remedy*,'" as is required to warrant the conclusion that the plaintiffs here have a right of action to enforce the statute. *Clear Sky Car Wash*, 743 F.3d at 444. For this reason, it is not surprising that the only court to address the question directly has concluded that there is no private right of action to enforce the ITFA.[15] *Cabral v. Caesars Entm't Corp.*, No. 78580, 467 P.3d 638 (Table), 2020 WL 4353616, at *1-*2 (Nev. Sup. Ct. July 29, 2020) (unpublished disposition).

## VI.   EVEN IF IT AUTHORIZES A PRIVATE RIGHT OF ACTION, THE INTERNET TAX FREEDOM ACT DOES NOT PREEMPT THE DIGITAL ADVERTISING TAX ACT.

If, despite the significant obstacles to review, the Court were to consider the merits of plaintiffs' ITFA claim, it should conclude that the ITFA does not preempt the Digital Advertising Tax Act, because (1) the ITFA lacks a key attribute the Supreme Court has

---

[15] In what appears to be, according to a Westlaw search, the only instance where a court has granted relief to a plaintiff on ITFA grounds, the majority opinion in *Performance Mktg. Ass'n v. Hamer*, 998 N.E.2d 54 (Ill. 2013), did not consider whether plaintiff had a right of action under the ITFA; instead, the court apparently proceeded as if the Supremacy Clause itself authorized the plaintiff's ITFA preemption challenge to an Illinois law that required out-of-state Internet retailers to collect state use tax, *see id*., 998 N.E.2d at 58; *see also id.* at 69 (Karmeier, J., dissenting) ("Today's decision by the majority marks the first time a court of review in the United States has determined that the [ITFA] preempts a state from enacting an internet affiliate tax law to facilitate the collection of existing use taxes to which the state is legally entitled."). The Supreme Court has since rejected the notion that the Supremacy Clause can serve as the "'source of any federal rights,'" or "create a cause of action." *Armstrong*, 575 U.S. at 324-25.

held necessary for preemption, and (2) even if the ITFA could somehow be read to satisfy that requirement, the digital ad tax is neither a "discriminatory tax" nor a "multiple tax," as those terms are defined in the ITFA, since, as plaintiffs themselves allege, digital advertising services taxed by the Act are not similar to other forms of advertising and Maryland's tax is unique and not duplicative of other states' taxes.  As in "*all* pre-emption cases," the analysis must start with a presumption against preemption:  "'the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (citations omitted; emphasis added); *see New York, LE & WR Co. v. Pennsylvania*, 153 U.S. 628, 643 (1894) (referring to taxation as a State's "exercise of its police powers").

### A.     The ITFA Does Not Satisfy the Requirements for Preemption.

The Supreme Court explained the applicable principles of preemption in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1475 (2018) (holding Congress exceeded its powers in enacting statute prohibiting states from enacting laws legalizing sports gambling).  Before the ITFA or any other federal statute can be deemed to preempt state law, "it must satisfy two requirements":  "First, it must represent the exercise of a power conferred on Congress by the Constitution," and "[s]econd, since the Constitution 'confers upon Congress the power to regulate individuals, not States,'" the federal statute must be "one that regulates private actors."  *Id.* at 1479 (citation omitted).  The ITFA might satisfy the first requirement, based on Congress's express powers regarding taxation, U.S. Const. art. I, § 8 cl. 1, and interstate commerce, *id.* cl. 3, but the text of the ITFA cannot

satisfy the second requirement.  As explained above, the statute's operative provision imposing the tax moratorium, § 1101(a), addresses only a "state or political subdivision," and does not purport to "regulate[] private actors," or even mention them.  *Murphy*, 138 S. Ct. at 1479 (citation omitted).

The importance of this second requirement for preemption was explained in *Murphy*, which struck down a federal statute that, like the ITFA, prohibited states and local government entities from enacting certain laws, 28 U.S.C. § 3702, and contained grandfather clauses exempting from the prohibition already extant laws, 28 U.S.C. § 3704. The second *Murphy* requirement's insistence that the federal statute must regulate individuals, and not States, derives from "a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States."  *Murphy*, 138 S. Ct. at 1475.  The Constitutional Convention instead opted for "a plan under which 'Congress would exercise its legislative authority directly over individuals rather than over States.'"  *Id.* at 1476 (citation omitted).  As a result, Congress has "'the power to regulate individuals, not States.'"  *Id.* (citation omitted).

Because the ITFA's tax moratorium, like the statute in *Murphy*, expressly attempts to regulate States' ability to enact legislation, and does not purport to regulate individuals, the ITFA departs from the Constitution's plan and cannot be deemed to preempt the Act.

## B.    The Act Does Not Conflict with the ITFA.

In any case, if the provisions of the ITFA invoked by plaintiffs could be applied here, Maryland's Act does not impose a "discriminatory tax" or "multiple tax" as defined in the ITFA.  The Act is not discriminatory because, as the amended complaint

acknowledges, ECF 25 ¶¶ 71-75, digital advertising services are not "similar," ITFA § 1105(2)(A), to traditional mass marketing advertising, which does not share digital advertising services' ability to provide instantaneous and precise targeting, user interaction, and tracking services. The Act does not impose a "multiple tax" because, according to the amended complaint, it is unique, ECF 25 ¶ 25, and because it taxes only revenues derived from services in Maryland.

As pertinent to Count I of the amended complaint, a "discriminatory tax" under the ITFA is "any tax imposed by a State . . . on electronic commerce that– (i) is not generally imposed and legally collectible by such State . . . on transactions involving similar property, goods, services, or information accomplished through other means" or "(ii) is not generally imposed and legally collectible at the same rate by such State . . . on transactions involving similar property, goods, services, or information accomplished through other means . . . ." ITFA § 1105(2)(A).

The digital ad tax does not come within this definition of "discriminatory tax," first, because the Act does not tax seller-purchaser "transactions" as such, *id.*, or at least, not on a per transaction basis, but instead imposes a tax on "annual gross revenues," Tax-Gen. § 7.5-102(a).

Second, the digital ad tax is not discriminatory under the ITFA because the Act does "generally impose" the same digital ad tax on all gross revenues derived from "services" that are "similar," ITFA § 1105(2), in that they involve "advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services." Tax-Gen.

38

§ 7.5-101(d).   As the amended complaint acknowledges, digital advertising services materially differ from and, therefore, are not "similar" to advertising services "accomplished through other means."  ITFA § 1105(2).  Paragraphs 71-75 of the amended complaint describe only some of the techniques and advantages that make digital advertising services qualitatively and quantitatively more effective than non-digital advertising, including the use of "content aggregators along with search engines, social media websites, online shopping websites, streaming video websites, and more," ECF 25 ¶ 71, all of which are ready and able to be deployed within seconds, or even nanoseconds, with each "click" of a user's keyboard or touchpad, *id.* ¶ 65.

Unlike digital advertising, non-digital advertising services do not offer the ability, through "[s]earch-engine marketing," to instantaneously and continuously "target a particular audience efficiently, based on factors like location and user interests, as expressed in their search terms."  *Id.*  ¶ 72.  Because of these advantages, plaintiffs allege, "[o]nline advertising is almost twice as efficient as traditional television advertising in converting advertising spend into sales revenue."  *Id.* ¶ 75.  As these allegations show, plaintiffs and their digital advertising service-provider members evidently do not themselves believe that the services they offer are "similar" to non-digital modes of advertising.

State "Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes," *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 547 (1983), and "[t]he State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products," *Allied Stores of Ohio,*

*Inc. v. Bowers*, 358 U.S. 522, 526–27 (1959).  Congress in the ITFA did not purport to repeal these established principles.  *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("[I]f Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'") (citation omitted).  Therefore, because it imposes a tax on gross revenues derived from what, according to plaintiffs, is the uniquely sophisticated and "efficient," ECF 25 ¶ 75, field of digital advertising services, the Act does not constitute a "discriminatory tax" under the ITFA.

Neither does the Act impose a "multiple tax," as defined by the ITFA to mean "any tax that is imposed by one State . . . on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State . . . (whether or not at the same rate or on the same basis), without a credit . . . for taxes paid in other jurisdictions."  § 1105(6)(A).  First, Maryland's digital ad tax is not a "multiple tax" because it is not duplicative of taxes imposed by other States.  One of the amended complaint's themes is that Maryland's Act is unique and not the same as taxes imposed in other jurisdictions:  "The Act imposes a one-of-a-kind charge . . ."  ECF 25 ¶ 25; *see also id.* ¶ 62 (identifying only "[s]everal European countries, including Great Britain, France, Hungary, Italy, Spain, and Turkey" as "hav[ing] proposed or implemented digital services charges"); *id.* ¶ 64 (describing a similar French tax as "highly unusual").  Second, because the Act taxes only gross revenues "derived from digital advertising services in the State" of Maryland, Tax-Gen § 7.5-102(a), and is to be properly sourced and fairly apportioned vis-à-vis other States under future regulations, *id.* subsections (b) and (c), the digital ad tax

40

will not constitute a tax "on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State," ITFA § 1105(6)(A).

## VII. THE DIGITAL ADVERTISING TAX ACT DOES NOT VIOLATE THE COMMERCE CLAUSE OR THE DUE PROCESS CLAUSE.

"The Commerce Clause and the Due Process Clause impose distinct but parallel limitations on a State's power to tax out-of-state activities." *MeadWestvaco Corp. ex rel. Mead Corp. v. Illinois Dep't of Revenue*, 553 U.S. 16, 24 (2008). The Commerce Clause "forbids the States to levy taxes that discriminate against interstate commerce or that burden it by subjecting activities to multiple or unfairly apportioned taxation." *Id.* The Due Process Clause requires "'some minimum connection'" between the State "'and the person, property or transaction it seeks to tax,'" and a "rational relationship between the tax and the 'values connected with the taxing State.'" *Id.* (citations omitted). "Where, as here, there is no dispute that the taxpayer has done some business in the taxing State, the inquiry shifts from whether the State may tax to what it may tax," a question that is answered via "the unitary business principle." *Id.* at 25 (citation omitted). "Under that principle, a State need not 'isolate the intrastate income-producing activities from the rest of the business' but 'may tax an apportioned sum of the corporation's multistate business if the business is unitary.'" *Id.* (citations omitted).

The Supreme Court has explained the "'broad inquiry' subsumed in both constitutional requirements": "'whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state'—that is, 'whether the state has given anything for which it can ask return.'" *Id.* at 24-25 (citations omitted).

A. **The Amended Complaint Fails to State a Claim for Violation of the Commerce Clause.**

A state tax survives a challenge under the Commerce Clause if the "'tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Comptroller of Md. v. Wynne*, 575 U.S. 542, 547 (2015) (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S 274, 279 (1977)). This analysis applies the same way to both taxes on gross revenues and taxes on net income. *See Complete Auto*, 430 U.S. at 275, 289 (upholding a State's taxes on "gross proceeds of sales or gross income or values, as the case may be"). Though plaintiffs suggest that a tax on "gross—not *net*—receipts" is "a highly unusual and extraordinarily severe form of exaction," ECF 25 ¶ 41, the Supreme Court does not agree, and has "squarely rejected the argument that the Commerce Clause distinguishes between taxes on net and gross income," *Wynne*, 575 U.S. at 552.

A business need not have a physical presence within the State to satisfy the nexus requirement, so long as it has "availed itself of the substantial privilege of carrying on business in [the State]." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2099 (2018). Likewise, "'the mere act of carrying on business in interstate commerce does not exempt a corporation from state taxation.'" *Complete Auto*, 430 U.S. at 288 (citations omitted). The Commerce Clause was not intended "'to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business.'" *Id.* (citation omitted); *see id.* at 276-78, 288 (upholding state tax on gross revenues earned doing business in State).

Plaintiffs do not dispute that, in engaging in interstate commerce, their members do substantial business in the State. ECF 25 ¶¶ 15, 17, 19, 21 (conceding that "many" member companies conduct sufficient digital advertising business in Maryland to render them "liable to pay the charge imposed by the Act"); *id.* ¶ 57 (hypothesizing one such company "with 2% of its revenues and profits apportioned to Maryland," representing $150 million in Maryland revenue). This establishes that the tax meets prong one of the *Complete Auto* test: substantial nexus with the State.

To determine whether a tax is fairly apportioned, a court examines whether the tax is both "internally consistent" and "externally consistent." The internal consistency test "'looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate.'" *Wynne*, 575 U.S. at 562 (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995)). The external consistency test examines whether "the [taxpayer's] income attributed to the State is in fact 'out of all appropriate proportions to the business transacted . . . in that State,' or has 'led to a grossly distorted result.'" *Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 380 (1991) (citations omitted).

On its face, Maryland's digital ad tax passes both the internal consistency and external consistency tests because the Act's plain language expresses legislative intent that the State's scheme reach only revenue earned from digital advertising services "in the State" of Maryland, Tax-Gen § 7.5-102(a), and do so in fair proportion to a taxpayer's economic activity in the State, *id.* § 7.5-102(b)(1) (providing for "an apportionment

fraction" with a "numerator" of in-State revenue and a "denominator" including revenue earned "in the United States"). *See Wynne*, 575 U.S. at 562; *Trinova Corp.*, 498 U.S. at 380. The Act further requires the Comptroller to promulgate regulations that will "determine the state from which revenues from digital advertising services are derived," Tax-Gen. § 7.5-102(b)(2), thereby ensuring that assessable revenues are fairly apportioned to in-state activity; there is no reason to believe that those regulations will fail to fulfill the General Assembly's expectation of fair attribution and apportionment.

The Act passes the internal consistency test, because given the Act's design to reach only in-state revenues, if each State imposed the same taxing scheme on digital advertising services, each State's tax would reach only in-state revenue from digital advertising services in that State; this design eliminates any possibility of more than one State taxing the same digital ad revenue. Thus, on its face, the Act's taxing scheme passes the internal consistency test.

For much the same reasons, the tax passes the external consistency test: the tax is designed to reach only that revenue fairly attributable to economic activity in the State, and the taxing formula is designed to ensure that a taxpayer is taxed only in proportion to its activity in Maryland. "States have wide latitude in the selection of apportionment formulas[.]" *Moorman Mfg. Co., v. G.D. Bair*, 437 U.S. 267, 274 (1978). Hence, a court may invalidate a "formula-produced assessment" only "when the taxpayer has proved by 'clear and cogent evidence' that the income attributed to the State is in fact 'out of all appropriate proportion to the business transacted . . . in that State' or has 'led to a grossly distorted result.'" *Id.* (citations omitted). Plaintiffs, in their facial challenge on behalf of

44

anonymous members with only unspecified or hypothetical activities and revenues, have not alleged facts that could plausibly meet this burden.

Nor can plaintiffs show that Maryland's digital ad tax discriminates against interstate commerce facially by providing "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality of Or.*, 511 U.S. 93, 99 (1994). To the contrary, the Act applies equally to Maryland-based and out-of-state businesses and is, therefore, nondiscriminatory on its face. "[N]ondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Id.* at 99 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)); *see Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 619 (1981) (upholding generally applicable Montana severance tax on coal extracted from in-state mines against challenge that it discriminated against interstate commerce because 90 percent of the coal was shipped to out-of-state users; noting that "there is no real discrimination in this case; the tax burden is borne according to the amount of coal consumed and not according to any distinction between in-state and out-of-state consumers").

Finally, the tax is "fairly related to the services provided by the State." *Wynne*, 575 U.S. at 547 (quoting *Complete Auto*, 430 U.S. at 279). "The fair relation prong of *Complete Auto* requires no detailed accounting of the services provided to the taxpayer on account of the activity being taxed, nor, indeed, is a State limited to offsetting the public costs created by the taxed activity." *Jefferson Lines*, 514 U.S. at 199. Rather, the question is merely

45

whether "the *measure* of the tax" is "reasonably related to the extent of the contact" with the taxing State. *Commonwealth Edison*, 453 U.S. at 626 (emphasis in original). Maryland's digital ad tax applies only to revenue earned from a taxpayer's digital advertising services provided in the State. In conducting these services in the State, businesses use the State's telecommunications and digital infrastructure. Thus, this requirement is satisfied.

### B. The Amended Complaint Fails to State a Claim for Violation of the Due Process Clause.

Plaintiffs concede that their members do business in the State; that fact satisfies the nexus requirement of the Due Process Clause. *MeadWestvaco*, 553 U.S. at 25. Thus, to make a successful due process challenge, plaintiffs must establish that there is no "rational relationship between the tax and the values connected with the taxing State." *Id.* at 24. Plaintiffs cannot meet that burden, for the same reasons they fail under prong four of the *Complete Auto* test.

### VIII. THE PASS-THROUGH PROVISION OF THE ACT DOES NOT VIOLATE THE DUE PROCESS CLAUSE, COMMERCE CLAUSE, OR FIRST AMENDMENT.

Finally, plaintiffs assert that the direct pass-through prohibition added to the Act by Senate Bill 787, Tax-Gen. § 7.5-102(c), (1) violates the Due Process Clause and Commerce Clause because of its alleged extraterritorial and discriminatory implications[16] and

---

[16]*See* Count III, ¶ 93 (alleging the provision affects 'transactions taking place wholly outside Maryland's geographic borders"); Count IV, ¶ 95 ("Some such transactions take place outside the territorial limits of Maryland."); ¶ 95(b) (positing that under one alternative interpretation, the provision "unjustifiably favor[s] instate purchasers" and "disfavor[s] out-of-state purchasers").

(2) offends the First Amendment if viewed as a regulation of speech, rather than conduct (Count IV, ¶ 96).  The Due Process Clause/Commerce Clause challenge fails to state a claim for much the same reasons just explained:  for provisions regarding state taxes, apportionment that satisfies the *MeadWestvaco* and *Complete Auto* analysis effectively resolves any extraterritoriality and discrimination concerns under the Due Process and Commerce Clauses, notwithstanding a state tax's application to, or impact on, a taxpayer's "out-of-state activities." *MeadWestvaco*, 553 U.S. at 24.  The freedom of speech challenge fails to state a claim because the direct pass-through prohibition regulates conduct, not speech, and plaintiffs acknowledge this to be a plausible interpretation of the statute.  ECF 25 ¶ 95 ("If the pass-through prohibition is interpreted to prohibit the targets of the Act from passing on the charge to downstream market participants at all, it regulates conduct.").  None of these facial challenges, whether under the Due Process and Commerce Clauses or the First Amendment, even purports to satisfy the standard for a facial attack on legislation, which requires plaintiffs to establish that the Act "is unconstitutional in *all* of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added).

### A.  Supreme Court Precedent Confirms That States Have the Power to Impose a Pass-through Prohibition.

The State unquestionably has the authority to enact a provision determining who will bear the cost of a tax and who will not, sometimes referred to as "tax incidence."  The Supreme Court has long recognized that the ability to regulate tax incidence is an "incidental power" inherent in the power to tax. *Helvering v. National Grocery Co.*, 304

U.S. 282, 286-87 (1938) ("'Congress in raising revenue has incidental power to defeat obstructions to that incidence of taxes which it chooses to impose.'" (citation omitted)); *id.* at 286-90 (rejecting various constitutional challenges to imposition of 50% tax rate on corporations' accumulated gains to discourage corporate attempts to shield shareholders from liability for federal surtax). The Supreme Court has also recognized that a State may lawfully impose a pass-through prohibition to prevent a taxpayer from passing on the cost of the tax to customers, except to the extent the prohibition would interfere with a comprehensive regulatory scheme through which Congress has preempted the field of regulating such entities' prices and costs. *Exxon Corp. v. Eagerton*, 462 U.S. 176 (1983). Thus, absent a congressional decision to "occupy the field" of regulating digital advertising service-providers' prices and costs, *id.* at 184, which has not occurred, *Eagerton* "confirm[s]" the State's "power to prohibit" taxed entities "from passing" a "tax on to their purchasers." *Id.* at 192.

### B.    The First Amendment Challenge Fails to State a Claim Because the Pass-Through Prohibition Regulates Conduct, Not Speech.

The amended complaint expresses some doubt over whether the Act's pass-through prohibition is meant to cover speech rather than conduct. ECF 25 ¶¶ 95-96 (proposing alternative conduct restriction and speech restriction interpretations). Whether or not plaintiffs' uncertainty is warranted, under applicable precedent the provision must be read to render it constitutional if reasonably possible. *Gonzales v. Carhart*, 550 U.S. 124, 153 (2007) ("'[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" (citations omitted)).

48

Using plain language, the Act prohibits a covered taxpayer from "directly pass[ing] on the cost of the tax . . . to a customer . . . by means of a separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c). Thus, it regulates the taxpayer's ability to engage in *conduct* that directly imposes on a customer the cost of the digital ad tax paid by the taxpayer, but it does not purport to regulate the taxpayer's speech. That is, under the Supreme Court's analysis, the pass-through prohibition regulates what a digital advertising firm "could collect," i.e. the digital ad tax paid, and, therefore, "regulate[s] the [firm's] conduct." *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150 (2017). Though a digital advertising services firm uses "written or oral communications" with customers to convey an amount charged for services, First Amendment protection is not implicated by the fact that the pass-through prohibition "would indirectly dictate the content of that speech" by "determining the amount [of the digital ad tax] charged" to the customer (and limiting that amount to zero). *Id.* at 1150-51. In that billing scenario, "the law's effect on speech would be only incidental to its primary effect on conduct, and 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Id.* at 1151 (citation omitted). Because the pass-through prohibition does not regulate speech, other than "incidental[ly]," *id.*, it does not implicate the First Amendment.

In *BellSouth Telecomm., Inc. v. Farris*, 542 F.3d 499 (6th Cir. 2008), cited in ¶ 49 of the amended complaint, the Sixth Circuit explained the difference between a pass-through prohibition's regulation of conduct versus another law's regulation of speech, as

illustrated by two provisions of a Kentucky statute that imposed a 1.3% tax on gross revenues of telecommunications providers.   That statute "banned providers from 'collect[ing] the tax directly' from consumers and from 'separately stat[ing] the tax on the bill.'"  *Id.* at 500.  The court dubbed the first provision "the no-direct-collection clause" and the second "the no-stating-the-tax clause."  *Id.* at 504.  The Sixth Circuit held that the "no-stating-the-tax clause" "regulated speech, not conduct," *id.* at 506, whereas "the no-direct-collection clause" "refer[red] to non-expressive conduct, not speech, and as a result [was] beyond the protection of the First Amendment," *id.* at 510.  Because the pass-through prohibition, or "no-direct-collection clause," was "[r]egulating only conduct," it was deemed "not unconstitutional on its face, which is to say in all or virtually all of its applications."  *Id.* at 511 (citing *Wash. State Grange*, 552 U.S. at 449).  Therefore, the Sixth Circuit upheld Kentucky's pass-through prohibition against a First Amendment challenge, though it struck down the "no-stating-the-tax clause" as a restriction on speech.

The Maryland Act lacks the "no-stating-the-tax" feature of the Kentucky statute that restricted speech in violation of the First Amendment.  Instead, the Act contains a pass-through prohibition that regulates economic activity, not speech, similar to the "no-direct-collection clause" upheld in *BellSouth*.  Consequently, the amended complaint fails to state a claim under the First Amendment.

## CONCLUSION

The motion to dismiss should be granted.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt

_____
JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us

/s/ Steven M. Sullivan

_____
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

/s/ Brian L. Oliner

_____
BRIAN L. OLINER
Federal Bar No. 05780
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404
(410) 260-7808

Attorneys for Defendant

**APPENDIX**

Chapter 37

**(House Bill 732 of the 2020 Regular Session)**

AN ACT concerning

~~**Electronic Smoking Devices, Other Tobacco Products, and Cigarettes –**~~
**Taxation** ~~**and Regulation**~~ – *Tobacco Tax, Sales and Use Tax, and Digital*
*Advertising Gross Revenues Tax*

FOR the purpose of ~~applying certain provisions of tax law regulating the sale, manufacture, distribution, possession, and use of cigarettes and other tobacco products to certain electronic smoking devices;~~ altering the definition of "other tobacco products" to include certain consumable products and the components or parts of those products and to exclude certain other products; requiring the Governor, for ~~a~~ certain fiscal ~~year and for each fiscal year thereafter, to include at least a certain appropriation in the annual budget~~ *years, to include in the annual budget bill an appropriation* for certain activities; ~~establishing a certain sales and use tax rate for open electronic smoking devices;~~ altering the definition of "electronic smoking device" to exclude certain batteries or battery chargers; ~~imposing the tobacco tax on certain electronic smoking devices; repealing the prohibition on a county, a municipal corporation, a special taxing district, or any other political subdivision from imposing a tax on cigarettes or tobacco products; establishing a presumption that an electronic smoking device is subject to the tobacco tax; establishing that certain electronic smoking devices are contraband products; establishing the burden of proving that an electronic smoking device is not subject to the tobacco tax; providing exemptions from the tobacco tax for certain electronic smoking devices; altering the tobacco tax rate for certain cigarettes and other tobacco products; setting the tobacco tax rate for electronic smoking devices; requiring certain persons to pay the tobacco tax on certain electronic smoking devices and to file certain returns; requiring certain wholesalers to keep and allow inspection of certain records for certain sales of electronic smoking devices; altering the definition of "out-of-state sellers" to include certain persons who sell, ship, or deliver cigarettes, cigarettes or other tobacco products, and electronic smoking devices; requiring out-of-state sellers to pay the tobacco tax on cigarettes, cigarettes or other tobacco products, and electronic smoking devices on which the tobacco tax has not been paid; making certain electronic smoking devices subject to certain enforcement provisions applicable to cigarettes and other tobacco products; prohibiting certain acts relating to electronic smoking devices; authorizing the Comptroller to require an electronic smoking devices wholesaler to post security in a certain amount; imposing certain requirements relating to certain transportation of other tobacco products; clarifying that all electronic smoking devices used, possessed, or held in the State on or after a certain date providing that all cigarettes or other tobacco products used, possessed, or held in the State on or after certain dates are subject to the tax enacted under this Act; authorizing the Comptroller to determine the method of assessing and collecting certain additional taxes; requiring certain additional taxes to be remitted to the~~

App. 1

~~Comptroller by a certain date; requiring the Comptroller to distribute certain revenue attributable to certain taxes to The Blueprint for Maryland's Future Fund; making conforming changes; defining certain terms; altering certain definitions; repealing certain obsolete provisions; making stylistic changes; providing for the termination of certain provisions of this Act; providing for a delayed effective date for certain provisions of this Act; and generally relating to the taxation and regulation of electronic smoking devices, other tobacco products, and cigarettes~~ _altering the sales and use tax rate imposed on sales of certain electronic smoking devices and vaping liquid; prohibiting a county, a municipal corporation, a special taxing district, or any other political subdivision, subject to a certain exception, from imposing a tax on electronic smoking devices; altering the tobacco tax rate for certain cigarettes and other tobacco products; imposing a tax on certain annual gross revenues derived from certain digital advertising services in the State; providing for the calculation of the part of the annual gross revenues of a person derived from digital advertising services in the State; providing for the calculation of the tax; requiring certain persons that have certain annual gross revenues derived from digital advertising services in the State to complete and file with the Comptroller a certain return in a certain manner; requiring certain persons that reasonably expect the person's annual gross revenues derived from digital advertising services to exceed a certain amount to complete and file with the Comptroller a certain declaration of estimated tax in a certain manner; requiring a person required to file a certain return to maintain certain records; requiring a person to pay the digital advertising gross revenues tax in a certain manner; requiring the Comptroller to distribute digital advertising gross revenues tax revenue in a certain manner; requiring the Comptroller to make an assessment of certain digital advertising gross revenues tax due under certain circumstances; requiring the Comptroller to assess interest on unpaid digital advertising gross revenues taxes in a certain manner; providing certain criminal penalties for failing to file a certain return or filing a certain false return; requiring that the Comptroller administer the laws that relate to the digital advertising gross revenues tax; requiring that all cigarettes and other tobacco products used, possessed, or held in the State on or after a certain date are subject to the tax enacted under certain sections of this Act; authorizing the Comptroller to determine the method of assessing and collecting certain additional taxes; requiring certain additional taxes to be remitted to the Comptroller by a certain date; requiring the Comptroller to report to certain committees of the General Assembly on or before a certain date; requiring the Governor, for certain fiscal years, to include in the annual budget bill certain appropriations; declaring the intent of the General Assembly; defining certain terms; altering the definition of certain terms; making certain conforming changes; providing for the application of this Act; and generally relating to the tobacco tax, sales and use tax, and a digital advertising gross revenues tax._

BY repealing and reenacting, without amendments,
    Article – Business Regulation
    Section 16.5–101(a) and 16.7–101(a), (d) through (g), and (j)
    Annotated Code of Maryland
    (2015 Replacement Volume and 2019 Supplement)

BY repealing and reenacting, with amendments,
    Article – Business Regulation
    Section 16.5–101(i) and 16.7–101(c)
    Annotated Code of Maryland
    (2015 Replacement Volume and 2019 Supplement)

*BY repealing and reenacting, with amendments,*
    *Article – Health – General*
    *Section 13–1015*
    *Annotated Code of Maryland*
    *(2019 Replacement Volume)*

*BY repealing and reenacting, without amendments,*
    *Article – Tax – General*
    *Section 1–101(a) and (p), 11–104(a), and 12–101(a)*
    *Annotated Code of Maryland*
    *(2016 Replacement Volume and 2019 Supplement)*

*BY adding to*
    *Article – Tax – General*
    *Section 1–101(g–1); 2–4A–01 and 2–4A–02 to be under the new subtitle "Subtitle 4A. Digital Advertising Gross Revenues Tax Revenue Distribution"; 7.5–101 through 7.5–301 to be under the new title "Title 7.5. Digital Advertising Gross Revenues Tax"; and 11–104(j), 13–402(a)(6), and 13–1001(g)*
    *Annotated Code of Maryland*
    *(2016 Replacement Volume and 2019 Supplement)*

*BY repealing and reenacting, with amendments,*
    *Article – Tax – General*
    *Section 2–102, 12–101(d), 12–102, 12–105, 13–402(a)(4) and (5), 13–602(a), 13–702(a), 13–1002(b) and (c), and 13–1101(b) and (c)*
    *Annotated Code of Maryland*
    *(2016 Replacement Volume and 2019 Supplement)*

BY repealing and reenacting, without amendments,
    Article – Education
    Section 5–219(b)
    Annotated Code of Maryland
    (2018 Replacement Volume and 2019 Supplement)

BY repealing and reenacting, with amendments,
    Article – Education
    Section 5–219(f)
    Annotated Code of Maryland
    (2018 Replacement Volume and 2019 Supplement)

BY repealing and reenacting, with amendments,
        Article – Health – General
        Section 13–1015
        Annotated Code of Maryland
        (2019 Replacement Volume)

BY repealing and reenacting, with amendments,
        Article – Tax – General
        Section 12–101 through 12–302, 13–408, 13–825(h), 13–834(c), 13–836(b)(2), 13–837,
                13–839, 13–1014, and 13–1015 2–1303(a), 12–101, 12–102, 12–105, 12–201,
                and 12–302
        Annotated Code of Maryland
        (2016 Replacement Volume and 2019 Supplement)

BY adding to
        Article – Tax – General
        Section 2–1602.1 and 11–104(j)
        Annotated Code of Maryland
        (2016 Replacement Volume and 2019 Supplement)

BY repealing and reenacting, without amendments,
        Article – Tax – General
        Section 13–834(a) and 13–836(a)(1) 12–102
        Annotated Code of Maryland
        (2016 Replacement Volume and 2019 Supplement)

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND,
That the Laws of Maryland read as follows:

## Article – Business Regulation

16.5–101.

(a)        In this title the following words have the meanings indicated.

(i)        **(1)**        "Other tobacco products" means**, EXCEPT AS PROVIDED IN
PARAGRAPH (3) OF THIS SUBSECTION, A PRODUCT THAT IS**:

        [(1)        any cigar or roll for smoking, other than a cigarette, made in whole or
in part of tobacco; or

        (2)        any other tobacco or product made primarily from tobacco, other than a
cigarette, that is intended for consumption by smoking or chewing or as snuff]

   **(I)** **INTENDED FOR HUMAN CONSUMPTION OR LIKELY TO BE CONSUMED, WHETHER SMOKED, HEATED, CHEWED, ABSORBED, DISSOLVED, INHALED, OR INGESTED IN ANY OTHER MANNER, AND THAT IS MADE OF OR DERIVED FROM, OR THAT CONTAINS:**

     **1.** **TOBACCO; OR**

     **2.** **NICOTINE; OR**

   **(II)** **A COMPONENT OR PART USED IN A CONSUMABLE PRODUCT DESCRIBED UNDER ITEM (I) OF THIS PARAGRAPH.**

  **(2)** **"OTHER TOBACCO PRODUCTS" INCLUDES:**

   **(I)** **CIGARS, PREMIUM CIGARS, PIPE TOBACCO, CHEWING TOBACCO, SNUFF, AND SNUS; AND**

   **(II)** **FILTERS, ROLLING PAPERS, PIPES, AND HOOKAHS.**

  **(3)** **"OTHER TOBACCO PRODUCTS" DOES NOT INCLUDE:**

   **(I)** **CIGARETTES;**

   **(II)** **ELECTRONIC SMOKING DEVICES; OR**

   **(III)** **DRUGS, DEVICES, OR COMBINATION PRODUCTS AUTHORIZED FOR SALE BY THE U.S. FOOD AND DRUG ADMINISTRATION UNDER THE FEDERAL FOOD, DRUG, AND COSMETIC ACT.**

16.7–101.

  (a) In this title the following words have the meanings indicated.

  (c) (1) "Electronic smoking device" means a device that can be used to deliver aerosolized or vaporized nicotine to an individual inhaling from the device.

   (2) "Electronic smoking device" includes:

    (i) an electronic cigarette, an electronic cigar, an electronic cigarillo, an electronic pipe, an electronic hookah, a vape pen, and vaping liquid; and

    (ii) **EXCEPT AS PROVIDED IN PARAGRAPH (3) OF THIS SUBSECTION,** any component, part, or accessory of such a device regardless of whether or not it is sold separately, including any substance intended to be aerosolized or vaporized during use of the device.

(3)    "Electronic smoking device" does not include**:**

**(I)**    a drug, device, or combination product authorized for sale by the U.S. Food and Drug Administration under the Federal Food, Drug, and Cosmetic Act**; OR**

**(II)    A BATTERY OR BATTERY CHARGER WHEN SOLD SEPARATELY**.

(d)    "Electronic smoking devices manufacturer" means a person that:

(1)    manufactures, mixes, or otherwise produces electronic smoking devices intended for sale in the State, including electronic smoking devices intended for sale in the United States through an importer; and

(2)    (i)    sells electronic smoking devices to a consumer, if the consumer purchases or orders the devices through the mail, a computer network, a telephonic network, or another electronic network, a licensed electronic smoking devices wholesaler distributor, or a licensed electronic smoking devices wholesaler importer in the State;

(ii)    if the electronic smoking devices manufacturer also holds a license to act as an electronic smoking devices retailer or a vape shop vendor, sells electronic smoking devices to consumers located in the State; or

(iii)    unless otherwise prohibited or restricted under local law, this article, or the Criminal Law Article, distributes sample electronic smoking devices to a licensed electronic smoking devices retailer or vape shop vendor.

(e)    "Electronic smoking devices retailer" means a person that:

(1)    sells electronic smoking devices to consumers;

(2)    holds electronic smoking devices for sale to consumers; or

(3)    unless otherwise prohibited or restricted under local law, this article, the Criminal Law Article, or § 24–305 of the Health – General Article, distributes sample electronic smoking devices to consumers in the State.

(f)    "Electronic smoking devices wholesaler distributor" means a person that:

(1)    obtains at least 70% of its electronic smoking devices from a holder of an electronic smoking devices manufacturer license under this subtitle or a business entity located in the United States; and

(2)    (i)    holds electronic smoking devices for sale to another person for resale; or

(ii)    sells electronic smoking devices to another person for resale.

(g)    "Electronic smoking devices wholesaler importer" means a person that:

(1)    obtains at least 70% of its electronic smoking devices from a business entity located in a foreign country; and

(2)    (i)    holds electronic smoking devices for sale to another person for resale; or

(ii)    sells electronic smoking devices to another person for resale.

(j)    "Vape shop vendor" means an electronic smoking devices business that derives at least 70% of its revenues, measured by average daily receipts, from the sale of electronic smoking devices and related accessories.

## ~~Article – Education~~

~~5–219.~~

~~(b)    There is The Blueprint for Maryland's Future Fund.~~

~~(f)    The Fund consists of:~~

~~(1)    Revenue distributed to the Fund under §§ 2–605.1, 2–1303, AND 2–1602.1 of the Tax – General Article;~~

~~(2)    Money appropriated in the State budget for the Fund; and~~

~~(3)    Any other money from any other source accepted for the benefit of the Fund.~~

## Article – Health – General

13–1015.

(a)    For fiscal year 2011 and fiscal year 2012, the Governor shall include at least $6,000,000 in the annual budget in appropriations for activities aimed at reducing tobacco use in Maryland as recommended by the Centers for Disease Control and Prevention, including:

(1)    Media campaigns aimed at reducing smoking initiation and encouraging smokers to quit smoking;

App. 7

(2)     Media campaigns educating the public about the dangers of secondhand smoke exposure;

(3)     Enforcement of existing laws banning the sale or distribution of tobacco products to individuals under the age of 21 years;

(4)     Promotion and implementation of smoking cessation programs; and

(5)     Implementation of school–based tobacco education programs.

(b)     **(1)**     For fiscal [year 2013 and each fiscal year thereafter,] YEARS 2013 THROUGH 2021, the Governor shall include at least $10,000,000 in the annual budget in appropriations for the purposes described in subsection (a) of this section.

**(2)     FOR FISCAL YEAR 2022 AND EACH FISCAL YEAR THEREAFTER, THE GOVERNOR SHALL INCLUDE AT LEAST ~~$21,000,000~~ ~~$12,500,000~~ *$18,250,000* IN THE ANNUAL BUDGET IN APPROPRIATIONS FOR THE PURPOSES DESCRIBED IN SUBSECTION (A) OF THIS SECTION.**

## Article – Tax – General

~~2–1303.~~

~~(a)     After making the distributions required under §§ 2–1301 through 2–1302.1 of this subtitle, the Comptroller shall pay:~~

~~(1)     revenues from the hotel surcharge into the Dorchester County Economic Development Fund established under § 10–130 of the Economic Development Article;~~

~~**(2)     REVENUES FROM THE SALES AND USE TAX ON OPEN ELECTRONIC SMOKING DEVICES UNDER § 11–104(J) OF THIS ARTICLE TO THE BLUEPRINT FOR MARYLAND'S FUTURE FUND ESTABLISHED UNDER § 5–219 OF THE EDUCATION ARTICLE;**~~

~~[(2)] (3)     subject to subsection (b) of this section, to The Blueprint for Maryland's Future Fund established under § 5–219 of the Education Article, revenues collected and remitted by:~~

~~(i)     a marketplace facilitator; or~~

~~(ii)     a person that engages in the business of an out–of–state vendor and that is required to collect and remit sales and use tax as specified in COMAR 03.06.01.33B(5); and~~

~~**[**(2)**] (4)**      the remaining sales and use tax revenue into the General Fund of the State.~~

~~**2–1602.1.**~~

~~**AFTER MAKING THE DISTRIBUTIONS REQUIRED UNDER §§ 2–1601 AND 2–1602 OF THIS SUBTITLE, THE COMPTROLLER SHALL DISTRIBUTE THE NET INCREASE IN TOBACCO TAX REVENUE ATTRIBUTABLE TO TOBACCO TAX RATES IN EXCESS OF THE RATES IN EFFECT ON JUNE 30, 2020, TO THE BLUEPRINT FOR MARYLAND'S FUTURE FUND ESTABLISHED UNDER § 5–219 OF THE EDUCATION ARTICLE.~~**

11–104.

~~**(J) (1) (I)      IN THIS SUBSECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.**~~

~~**(II)      "ELECTRONIC SMOKING DEVICE" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.**~~

~~**(III)      "OPEN ELECTRONIC SMOKING DEVICE" MEANS AN ELECTRONIC SMOKING DEVICE THAT HAS A TANK, RESERVOIR, OR OTHER CONTAINER FOR VAPING LIQUID THAT CAN BE MANUALLY FILLED AND REFILLED WITH VAPING LIQUID.**~~

~~**(IV)      "VAPING LIQUID" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.**~~

~~**(2)      THE SALES AND USE TAX RATE FOR OPEN ELECTRONIC SMOKING DEVICES IS 12%.**~~

*(a)      Except as otherwise provided in this section, the sales and use tax rate is:*

*(1)      for a taxable price of less than $1:*

*(i)      1 cent if the taxable price is 20 cents;*

*(ii)      2 cents if the taxable price is at least 21 cents but less than 34 cents;*

*(iii)      3 cents if the taxable price is at least 34 cents but less than 51 cents;*

*(iv)      4 cents if the taxable price is at least 51 cents but less than 67 cents;*

   *(v)* *5 cents if the taxable price is at least 67 cents but less than 84 cents; and*

   *(vi)* *6 cents if the taxable price is at least 84 cents; and*

  *(2)* *for a taxable price of $1 or more:*

   *(i)* *6 cents for each exact dollar; and*

   *(ii)* *for that part of a dollar in excess of an exact dollar:*

    *1.* *1 cent if the excess over an exact dollar is at least 1 cent but less than 17 cents;*

    *2.* *2 cents if the excess over an exact dollar is at least 17 cents but less than 34 cents;*

    *3.* *3 cents if the excess over an exact dollar is at least 34 cents but less than 51 cents;*

    *4.* *4 cents if the excess over an exact dollar is at least 51 cents but less than 67 cents;*

    *5.* *5 cents if the excess over an exact dollar is at least 67 cents but less than 84 cents; and*

    *6.* *6 cents if the excess over an exact dollar is at least 84 cents.*

 *(J)* *(1)* *(I)* *IN THIS SUBSECTION, THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.*

   *(II)* *"ELECTRONIC SMOKING DEVICE" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.*

   *(III)* *"VAPING LIQUID" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.*

  *(2)* *EXCEPT AS PROVIDED IN PARAGRAPH (3) OF THIS SUBSECTION, THE SALES AND USE TAX RATE FOR ELECTRONIC SMOKING DEVICES IS 12% OF THE TAXABLE PRICE.*

  *(3)* *THE SALES AND USE TAX FOR VAPING LIQUID SOLD IN A CONTAINER THAT CONTAINS 5 MILLILITERS OR LESS OF VAPING LIQUID IS 60% OF THE TAXABLE PRICE.*

12–101.

    (a)    ~~In this title the following words have the meanings indicated.~~

    (b)    ~~"Cigarette" means any size or shaped roll for smoking that is made of tobacco or tobacco mixed with another ingredient and wrapped in paper or in any other material except tobacco.~~

    **(C)**    ~~**"ELECTRONIC SMOKING DEVICE" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.**~~

    **(D)**    ~~**"ELECTRONIC SMOKING DEVICES RETAILER" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.**~~

    **[(c)] (E)**    ~~"Manufacturer" means a person who acts as:~~

    **(1)**    ~~a manufacturer as defined in § 16–201 of the Business Regulation Article **[**or as**]**;~~

    **(2)**    ~~an other tobacco products manufacturer as defined in § 16.5–101 of the Business Regulation Article; **OR**~~

    **(3)**    ~~**AN ELECTRONIC SMOKING DEVICES MANUFACTURER AS DEFINED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.**~~

    **[(d)] (F) (D)**    ~~"Other tobacco **[**product" means:~~

    **(1)**    ~~any cigar or roll for smoking, other than a cigarette, made in whole or in part of tobacco; or~~

    **(2)**    ~~any other tobacco or product made primarily from tobacco, other than a cigarette, that is intended for consumption by smoking or chewing or as snuff**] PRODUCTS" HAS THE MEANING STATED IN § 16.5–101 OF THE BUSINESS REGULATION ARTICLE.**~~

    **[(e)] (G)**    ~~"Other tobacco products retailer" means a person authorized under § 16.5–205(b) of the Business Regulation Article to purchase other tobacco products on which the tobacco tax has not been paid.~~

    **[(f)] (H)**    ~~"Out-of-state seller" means a person located outside the State that sells, holds for sale, ships, or delivers **[**premium cigars or pipe tobacco**] CIGARETTES, OTHER TOBACCO PRODUCTS, OR ELECTRONIC SMOKING DEVICES CIGARETTES OR OTHER TOBACCO PRODUCTS** to consumers in the State if, during the previous calendar year or the current calendar year:~~

(1)   the person's gross revenue from the sale of **[**premium cigars or pipe tobacco**]** **CIGARETTES, OTHER TOBACCO PRODUCTS, OR ELECTRONIC SMOKING DEVICES** ~~CIGARETTES OR OTHER TOBACCO PRODUCTS~~ in the State exceeds $100,000; or

(2)   the person sold **[**premium cigars or pipe tobacco**]** **CIGARETTES, OTHER TOBACCO PRODUCTS, OR ELECTRONIC SMOKING DEVICES** ~~CIGARETTES OR OTHER TOBACCO PRODUCTS~~ into the State in 200 or more separate transactions.

**[**(g)   "Pipe tobacco" has the meaning stated in § 16.5–101 of the Business Regulation Article.

(h)   "Premium cigars" has the meaning stated in § 16.5–101 of the Business Regulation Article.**]**

(i) **(G)** "Sell" means to exchange or transfer, or to make an agreement to exchange or transfer, title or possession of property, in any manner or by any means, for consideration.

(j) **(H)** "Tax stamp" means a device in the design and denomination that the Comptroller authorizes by regulation for the purpose of being affixed to a package of cigarettes as evidence that the tobacco tax is paid.

(k) **(I)** "Tobacconist" means a person authorized under § 16.5–205(e) of the Business Regulation Article to purchase other tobacco products on which the tobacco tax has not been paid.

(l) **(J)** "Unstamped cigarettes" means a package of cigarettes to which tax stamps are not affixed in the amount and manner required in § 12–304 of this title.

**(M)   "VAPE SHOP VENDOR" HAS THE MEANING STATED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.**

**[**(m)**]** **(N)** **(K)**      "Wholesale price" means the price for which a wholesaler buys other tobacco products, exclusive of any discount, trade allowance, rebate, or other reduction.

**[**(n)**]** **(O)** **(L)** "Wholesaler" means, unless the context requires otherwise, a person who acts as:

(1)   a wholesaler as defined in § 16–201 of the Business Regulation Article **[**or as**]**;

(2)   an other tobacco products wholesaler as defined in § 16.5–101 of the Business Regulation Article;

~~(3)     AN ELECTRONIC SMOKING DEVICES WHOLESALER DISTRIBUTOR, AS DEFINED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE; OR~~

~~(4)     AN ELECTRONIC SMOKING DEVICES WHOLESALER IMPORTER, AS DEFINED IN § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.~~

*(a)     In this title the following words have the meanings indicated.*

*(d)     "Other tobacco product" [means:*

*(1)     any cigar or roll for smoking, other than a cigarette, made in whole or in part of tobacco; or*

*(2)     any other tobacco or product made primarily from tobacco, other than a cigarette, that is intended for consumption by smoking or chewing or as snuff] HAS THE MEANING STATED FOR "OTHER TOBACCO PRODUCTS" IN § 16.5–101 OF THE BUSINESS REGULATION ARTICLE.*

12–102.

~~[(a)     Except as provided in § 12–104 of this subtitle, a tax is imposed on cigarettes [and], other tobacco products, AND ELECTRONIC SMOKING DEVICES in the State.~~

~~[(b)     A county, municipal corporation, special taxing district, or other political subdivision of the State may not impose a tax on cigarettes or, other tobacco products.]~~

*(a)     Except as provided in § 12–104 of this subtitle, a tax is imposed on cigarettes and other tobacco products in the State.*

*(b)     (1)     [A] EXCEPT AS PROVIDED IN PARAGRAPH (2) OF THIS SUBSECTION, A county, municipal corporation, special taxing district, or other political subdivision of the State may not impose a tax on cigarettes [or], other tobacco products, OR ELECTRONIC SMOKING DEVICES AS DEFINED UNDER § 16.7–101 OF THE BUSINESS REGULATION ARTICLE.*

*(2)     IF A COUNTY IMPOSED A TAX ON ELECTRONIC SMOKING DEVICES ON JANUARY 1, 2020, THE COUNTY MAY CONTINUE TO IMPOSE A TAX ON ELECTRONIC SMOKING DEVICES AT THE SAME RATE THAT WAS IN EFFECT ON JANUARY 1, 2020.*

*12–105.*

*(a)     The tobacco tax rate for cigarettes is:*

*(1)     [$1.00 for each package of 10 or fewer cigarettes;*

(2)      $2.00]* *$3.75* *for each package of [at least 11 and not more than]* *20 cigarettes; AND*

[(3)] *(2)*      *[10.0]* *17.5* *cents for each cigarette in a package of more than 20 cigarettes[; and*

(4)      *10.0 cents for each cigarette in a package of free sample cigarettes].*

~~(b)      (1)      Except as provided in paragraph (2) of this subsection, the tobacco tax rate for other tobacco products is [30%] 52% of the wholesale price of the tobacco products.~~

~~(2)      (i)      In this paragraph, "premium cigars" has the meaning stated in § 16.5–101 of the Business Regulation Article.~~

~~(ii)      Except as provided in subparagraph (iii) of this paragraph, the tobacco tax rate for cigars is 70% of the wholesale price of the cigars.~~

~~(iii)      The tobacco tax rate for premium cigars is 15% of the wholesale price of the premium cigars.~~

*(b)      (1)      Except as provided in paragraph (2) of this subsection, the tobacco tax rate for other tobacco products is [30%]* *53%* *of the wholesale price of the tobacco products.*

*(2)      (i)      In this paragraph,* ***"PIPE TOBACCO" AND*** *"premium cigars" [has]* ***HAVE*** *the [meaning]* ***MEANINGS*** *stated in § 16.5–101 of the Business Regulation Article.*

*(ii)      1.      Except as provided in [subparagraph (iii)]* ***SUBSUBPARAGRAPH 2*** *of this [paragraph]* ***SUBPARAGRAPH****, the tobacco tax rate for cigars is 70% of the wholesale price of the cigars.*

*[(iii)]* *2.      The tobacco tax rate for premium cigars is 15% of the wholesale price of the premium cigars.*

*(III)      THE TOBACCO TAX RATE FOR PIPE TOBACCO IS 30% OF THE WHOLESALE PRICE OF THE PIPE TOBACCO.*

~~12–103.~~

~~(a)      A rebuttable presumption exists that any cigarette [or], other tobacco product, OR ELECTRONIC SMOKING DEVICE in the State is subject to the tobacco tax.~~

~~(b)      Cigarettes [or], other tobacco products, OR ELECTRONIC SMOKING DEVICES are contraband tobacco products if they:~~

(1) are possessed or sold in the State in a manner that is not authorized under this title or under Title 16 [or]**,** Title 16.5**, OR TITLE 16.7** of the Business Regulation Article; or

(2) are transported by vehicle in the State by a person who does not have, in the vehicle, the records required by § 16–219 or § 16.5–215 of the Business Regulation Article for the transportation of cigarettes or other tobacco products.

(c) A person who possesses cigarettes [or]**,** other tobacco products**, OR ELECTRONIC SMOKING DEVICES** has the burden of proving that the cigarettes [or]**,** other tobacco products**, OR ELECTRONIC SMOKING DEVICES** are not subject to the tobacco tax.

12–104.

(a) "Consumer" means a person who possesses cigarettes [or]**,** other tobacco products**, OR ELECTRONIC SMOKING DEVICES** for a purpose other than selling or transporting the cigarettes [or]**,** other tobacco products**, OR ELECTRONIC SMOKING DEVICES.**

(b) The tobacco tax does not apply to:

(1) cigarettes that a licensed wholesaler under Title 16 of the Business Regulation Article is holding for sale outside the State or to a United States armed forces exchange or commissary;

(2) other tobacco products that an other tobacco products wholesaler licensed under Title 16.5 of the Business Regulation Article is holding for sale outside the State or to a United States armed forces exchange or commissary; [or]

**(3) ELECTRONIC SMOKING DEVICES THAT AN ELECTRONIC SMOKING DEVICES WHOLESALER LICENSED UNDER TITLE 16.7 OF THE BUSINESS REGULATION ARTICLE IS HOLDING FOR SALE OUTSIDE THE STATE OR TO A UNITED STATES ARMED FORCES EXCHANGE OR COMMISSARY; OR**

[(3)] **(4)** cigarettes [or]**,** other tobacco products**, OR ELECTRONIC SMOKING DEVICES** that:

(i) a consumer brings into the State:

1. if the quantity brought from another state does not exceed [other tobacco products having] a retail value of $100 **FOR OTHER TOBACCO PRODUCTS AND ELECTRONIC SMOKING DEVICES** or 5 cartons of cigarettes; or

2.       if the quantity brought from a United States armed forces installation or reservation does not exceed **[**other tobacco products having**]** a retail value of $100 **FOR OTHER TOBACCO PRODUCTS AND ELECTRONIC SMOKING DEVICES** or 5 cartons of cigarettes;

(ii)      a person is transporting by vehicle in the State if the person has, in the vehicle, the records required by § 16–219 or § 16.5–215 of the Business Regulation Article for the transportation of cigarettes or other tobacco products; or

(iii)     are held in storage in a licensed storage warehouse on behalf of a licensed cigarette manufacturer **[**or**]**, an other tobacco products manufacturer, **OR AN ELECTRONIC SMOKING DEVICES MANUFACTURER**.

SECTION 2. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:

**Article – Tax – General**

12–105.

(a)      The tobacco tax rate for cigarettes is:

(1)      **[**$1.00 for each package of 10 or fewer cigarettes;

(2)      $2.00**] $4.00 $3.00** for each package of **[**at least 11 and not more than**]** 20 cigarettes; **AND**

**[**(3)**] (2)        [**10.0**] 20.0 15.0** cents for each cigarette in a package of more than 20 cigarettes**[**; and

(4)      10.0 cents for each cigarette in a package of free sample cigarettes**]**.

(b)      **[**(1)      Except as provided in paragraph (2) of this subsection, the**] THE** tobacco tax rate for other tobacco products is **[**30%**] 86% 50%** of the wholesale price of the tobacco products.

**[**(2)      (i)        In this paragraph, "premium cigars" has the meaning stated in § 16.5–101 of the Business Regulation Article.

(ii)      Except as provided in subparagraph (iii) of this paragraph, the tobacco tax rate for cigars is 70% of the wholesale price of the cigars.

(iii)     The tobacco tax rate for premium cigars is 15% of the wholesale price of the premium cigars.**]**

App. 16

(C)   THE TOBACCO TAX RATE FOR ELECTRONIC SMOKING DEVICES IS 86% OF THE WHOLESALE PRICE OF THE ELECTRONIC SMOKING DEVICES.

SECTION 3. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:

**Article – Tax – General**

12–105.

(a)   The tobacco tax rate for cigarettes is:

(1)   [$1.00 for each package of 10 or fewer cigarettes;

(2)   $2.00]  **$4.00** for each package of [at least 11 and not more than] 20 cigarettes; **AND**

(3)   [10.0]  **20.0** cents for each cigarette in a package of more than 20 cigarettes[; and

(4)   10.0 cents for each cigarette in a package of free sample cigarettes].

(b)   (1)   Except as provided in paragraph (2) of this subsection, the tobacco tax rate for other tobacco products is [30%] **70%** of the wholesale price of the tobacco products.

(2)   (i)   In this paragraph, "premium cigars" has the meaning stated in § 16.5–101 of the Business Regulation Article.

(ii)   Except as provided in subparagraph (iii) of this paragraph, the tobacco tax rate for cigars is 70% of the wholesale price of the cigars.

(iii)   The tobacco tax rate for premium cigars is 15% of the wholesale price of the premium cigars.

SECTION 4. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:

**Article – Tax – General**

12–201.

(a)   A manufacturer shall complete and file with the Comptroller a tobacco tax return[:

(1)   on or before the 15th day of the month that follows the month in which the manufacturer distributes in the State free sample cigarettes of the manufacturer; and

(2)**]**   ~~ON A DATE if the Comptroller so specifies, by regulation**[**, on other dates for each month in which the manufacturer does not distribute any sample cigarettes**]**.~~

~~(b)   A licensed other tobacco products manufacturer **AND A LICENSED ELECTRONIC SMOKING DEVICES MANUFACTURER** shall file the information return that the Comptroller requires.~~

~~(c)   A licensed storage warehouse operator and a licensed other tobacco products storage warehouse operator shall file the information return that the Comptroller requires.~~

~~12–202.~~

~~(a)   A wholesaler shall complete and file with the Comptroller a tobacco tax return:~~

~~(1)   for cigarettes:~~

~~(i)   on or before the 21st day of the month that follows the month in which the wholesaler has the first possession, in the State, of unstamped cigarettes for which tax stamps are required; and~~

~~(ii)   if the Comptroller so specifies, by regulation, on other dates for each month in which the wholesaler does not have the first possession of any unstamped cigarettes in the State; **[**and**]**~~

~~(2)   for other tobacco products, on or before the 21st day of the month that follows the month in which the wholesaler has possession of other tobacco products on which the tobacco tax has not been paid; **AND**~~

~~**(3)   FOR ELECTRONIC SMOKING DEVICES, ON OR BEFORE THE 21ST DAY OF THE MONTH THAT FOLLOWS THE MONTH IN WHICH THE WHOLESALER HAS POSSESSION OF ELECTRONIC SMOKING DEVICES ON WHICH THE TOBACCO TAX HAS NOT BEEN PAID.**~~

~~(b)   Each return shall state the quantity of cigarettes or the wholesale price of other tobacco products sold during the period that the return covers.~~

~~12–203.~~

~~(a)   Each wholesaler shall:~~

~~(1)   keep an invoice for each purchase of tax stamps;~~

~~(2)   maintain a daily record of the tax stamps affixed to cigarette packages; and~~

~~(3)     maintain a complete and accurate record of each sale of cigarettes **[**or**]**, other tobacco products**, OR ELECTRONIC SMOKING DEVICES** for resale outside of the State.~~

~~(b)     A wholesaler shall:~~

~~(1)     keep the records required under subsection (a) of this section for a period of 6 years or for a shorter period that the Comptroller authorizes; and~~

~~(2)     allow the Comptroller to examine the records.~~

~~12–301.~~

~~In this subtitle, "licensed wholesaler" means a wholesaler who is licensed under:~~

~~**(1)**     Title 16, Subtitle 2 of the Business Regulation Article to act as a wholesaler **[**or under**]**;~~

~~**(2)**     Title 16.5, Subtitle 2 of the Business Regulation Article to act as an other tobacco products wholesaler;~~

~~**(3)     TITLE 16.7, SUBTITLE 2 OF THE BUSINESS REGULATION ARTICLE AS AN ELECTRONIC SMOKING DEVICES WHOLESALER DISTRIBUTOR; OR**~~

~~**(4)     TITLE 16.7, SUBTITLE 2 OF THE BUSINESS REGULATION ARTICLE AS AN ELECTRONIC SMOKING DEVICES WHOLESALER IMPORTER.**~~

~~12–302.~~

~~(a)     A manufacturer of sample cigarettes shall pay the tobacco tax on those cigarettes distributed in the State without charge, in the manner that the Comptroller requires by regulation, with the return that covers the period in which the manufacturer distributed those cigarettes.~~

~~(b)     The wholesaler who first possesses in the State unstamped cigarettes for which tax stamps are required shall pay the tobacco tax on those cigarettes by buying and affixing tax stamps.~~

~~(c)     The tobacco tax on other tobacco products shall be paid by the wholesaler who sells the other tobacco products to a retailer in the State.~~

~~(d)     (1)     A licensed other tobacco products retailer or a licensed tobacconist shall pay the tobacco tax on other tobacco products on which the tobacco tax has not been paid by filing a quarterly tax return, with any supporting schedules, on forms provided by the Comptroller on the following dates covering tax liabilities in the preceding quarter:~~

App. 19

(i) ~~January 21;~~

(ii) ~~April 21;~~

(iii) ~~July 21; and~~

(iv) ~~October 21.~~

~~(2)   A licensed other tobacco products retailer or a licensed tobacconist required to file a tax return under paragraph (1) of this subsection shall pay a tobacco tax at the rate provided in § 12–105(b) of this title based on the invoice amount charged by the licensed other tobacco products manufacturer, exclusive of any discount, trade allowance, rebate, or other reduction.~~

~~(e)~~   ~~An out–of–state seller shall pay the tobacco tax on [pipe tobacco or premium cigars]~~ **CIGARETTES, OTHER TOBACCO PRODUCTS, AND ELECTRONIC SMOKING DEVICES** ~~CIGARETTES OR OTHER TOBACCO PRODUCTS~~ ~~on which the tobacco tax has not been paid.~~

### *Article – Education*

*5–219.*

*(b)      There is The Blueprint for Maryland's Future Fund.*

*(f)      The Fund consists of:*

*(1)      Revenue distributed to the Fund under §§ **2–4A–02**, 2–605.1, and 2–1303 of the Tax – General Article;*

*(2)      Money appropriated in the State budget for the Fund; and*

*(3)      Any other money from any other source accepted for the benefit of the Fund.*

### *Article – Tax – General*

*1–101.*

*(a)      In this article the following words have the meanings indicated.*

*(G–1) "DIGITAL ADVERTISING GROSS REVENUES TAX" MEANS THE TAX IMPOSED UNDER TITLE 7.5 OF THIS ARTICLE.*

    *(p)*   *(1)*   *"Person" means an individual, receiver, trustee, guardian, personal representative, fiduciary, or representative of any kind and any partnership, firm, association, corporation, or other entity.*

    *(2)*   *"Person", unless expressly provided otherwise, does not include a governmental entity or a unit or instrumentality of a governmental entity.*

*2–102.*

    *In addition to the duties set forth elsewhere in this article and in other articles of the Code, the Comptroller shall administer the laws that relate to:*

    *(1)*   *the admissions and amusement tax;*

    *(2)*   *the alcoholic beverage tax;*

    *(3)*   *the boxing and wrestling tax;*

    *(4)*   ***THE DIGITAL ADVERTISING GROSS REVENUES TAX;***

    ***(5)***   *the income tax;*

    *[(5)]* ***(6)***   *the Maryland estate tax;*

    *[(6)]* ***(7)***   *the Maryland generation–skipping transfer tax;*

    *[(7)]* ***(8)***   *the motor carrier tax;*

    *[(8)]* ***(9)***   *the motor fuel tax;*

    *[(9)]* ***(10)***   *the sales and use tax;*

    *[(10)]* ***(11)***   *the savings and loan association franchise tax; and*

    *[(11)]* ***(12)***   *the tobacco tax.*

### *Subtitle 4A. Digital Advertising Gross Revenues Tax Revenue Distribution.*

*2–4A–01.*

    ***From the digital advertising gross revenues tax revenue, the Comptroller shall distribute each quarter the amount necessary to administer the digital advertising gross revenues tax laws in the previous quarter to an administrative cost account.***

App. 21

*2–4A–02.*

*AFTER MAKING THE DISTRIBUTION REQUIRED UNDER § 2–4A–01 OF THIS SUBTITLE, THE COMPTROLLER SHALL DISTRIBUTE THE REMAINING DIGITAL ADVERTISING GROSS REVENUES TAX REVENUE TO THE BLUEPRINT FOR MARYLAND'S FUTURE FUND ESTABLISHED UNDER § 5–219 OF THE EDUCATION ARTICLE.*

### TITLE 7.5. DIGITAL ADVERTISING GROSS REVENUES TAX.
### SUBTITLE 1. DEFINITIONS; GENERAL PROVISIONS.

*7.5–101.*

*(A)   IN THIS TITLE THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.*

*(B)   "ANNUAL GROSS REVENUES" MEANS INCOME OR REVENUE FROM ALL SOURCES, BEFORE ANY EXPENSES OR TAXES, COMPUTED ACCORDING TO GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.*

*(C)   "ASSESSABLE BASE" MEANS THE ANNUAL GROSS REVENUES DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE.*

*(D)   "DIGITAL ADVERTISING SERVICES" INCLUDES ADVERTISEMENT SERVICES ON A DIGITAL INTERFACE, INCLUDING ADVERTISEMENTS IN THE FORM OF BANNER ADVERTISING, SEARCH ENGINE ADVERTISING, INTERSTITIAL ADVERTISING, AND OTHER COMPARABLE ADVERTISING SERVICES.*

*(E)   "DIGITAL INTERFACE" MEANS ANY TYPE OF SOFTWARE, INCLUDING A WEBSITE, PART OF A WEBSITE, OR APPLICATION, THAT A USER IS ABLE TO ACCESS.*

*(F)   "USER" MEANS AN INDIVIDUAL OR ANY OTHER PERSON WHO ACCESSES A DIGITAL INTERFACE WITH A DEVICE.*

*7.5–102.*

*(A)   A TAX IS IMPOSED ON ANNUAL GROSS REVENUES OF A PERSON DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE.*

*(B)   (1)   FOR PURPOSES OF THIS TITLE, THE PART OF THE ANNUAL GROSS REVENUES OF A PERSON DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE SHALL BE DETERMINED USING AN APPORTIONMENT FRACTION:*

*(I)     THE NUMERATOR OF WHICH IS THE ANNUAL GROSS REVENUES OF A PERSON DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE; AND*

*(II)    THE DENOMINATOR OF WHICH IS THE ANNUAL GROSS REVENUES OF A PERSON DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE UNITED STATES.*

*(2)     THE COMPTROLLER SHALL ADOPT REGULATIONS THAT DETERMINE THE STATE FROM WHICH REVENUES FROM DIGITAL ADVERTISING SERVICES ARE DERIVED.*

*7.5–103.*

*THE DIGITAL ADVERTISING GROSS REVENUES TAX RATE IS:*

*(1)     2.5% OF THE ASSESSABLE BASE FOR A PERSON WITH GLOBAL ANNUAL GROSS REVENUES OF $100,000,000 THROUGH $1,000,000,000;*

*(2)     5% OF THE ASSESSABLE BASE FOR A PERSON WITH GLOBAL ANNUAL GROSS REVENUES OF $1,000,000,001 THROUGH $5,000,000,000;*

*(3)     7.5% OF THE ASSESSABLE BASE FOR A PERSON WITH GLOBAL ANNUAL GROSS REVENUES OF $5,000,000,001 THROUGH $15,000,000,000; AND*

*(4)     10% OF THE ASSESSABLE BASE FOR A PERSON WITH GLOBAL ANNUAL GROSS REVENUES EXCEEDING $15,000,000,000.*

*SUBTITLE 2. RETURNS.*

*7.5–201.*

*(A)     EACH PERSON THAT, IN A CALENDAR YEAR, HAS ANNUAL GROSS REVENUES DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE OF AT LEAST $1,000,000 SHALL COMPLETE, UNDER OATH, AND FILE WITH THE COMPTROLLER A RETURN, ON OR BEFORE APRIL 15 THE NEXT YEAR.*

*(B)     (1)     EACH PERSON THAT REASONABLY EXPECTS THE PERSON'S ANNUAL GROSS REVENUES DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE TO EXCEED $1,000,000 SHALL COMPLETE, UNDER OATH, AND FILE WITH THE COMPTROLLER A DECLARATION OF ESTIMATED TAX, ON OR BEFORE APRIL 15 OF THAT YEAR.*

*(2)    A   PERSON   REQUIRED   UNDER   PARAGRAPH   (1)   OF   THIS SUBSECTION TO FILE A DECLARATION OF ESTIMATED TAX FOR A TAXABLE YEAR SHALL COMPLETE AND FILE WITH THE COMPTROLLER A QUARTERLY ESTIMATED TAX RETURN ON OR BEFORE JUNE 15, SEPTEMBER 15, AND DECEMBER 15 OF THAT YEAR.*

*(C)    A PERSON REQUIRED TO FILE A RETURN UNDER THIS SECTION SHALL FILE WITH THE RETURN AN ATTACHMENT THAT STATES ANY INFORMATION THAT THE COMPTROLLER   REQUIRES   TO   DETERMINE   ANNUAL   GROSS   REVENUES   DERIVED FROM DIGITAL ADVERTISING SERVICES IN THE STATE.*

*7.5–202.*

*A PERSON REQUIRED TO FILE A RETURN UNDER § 7.5–201 OF THIS SUBTITLE SHALL MAINTAIN RECORDS OF DIGITAL ADVERTISING SERVICES PROVIDED IN THE STATE AND THE BASIS FOR THE CALCULATION OF THE DIGITAL ADVERTISING GROSS REVENUES TAX OWED.*

*SUBTITLE 3. TAX PAYMENT.*

*7.5–301.*

*(A)    EXCEPT   AS   PROVIDED   IN   SUBSECTION   (B)   OF   THIS   SECTION,   EACH PERSON REQUIRED TO FILE A RETURN UNDER § 7.5–201 OF THIS TITLE SHALL PAY THE DIGITAL ADVERTISING GROSS REVENUES TAX WITH THE RETURN THAT COVERS THE PERIOD FOR WHICH THE TAX IS DUE.*

*(B)    A PERSON REQUIRED TO FILE ESTIMATED DIGITAL ADVERTISING GROSS REVENUES TAX RETURNS UNDER § 7.5–201(B) OF THIS TITLE SHALL PAY:*

*(1)    AT LEAST 25% OF THE ESTIMATED DIGITAL ADVERTISING GROSS REVENUES TAX SHOWN ON THE DECLARATION OR AMENDED DECLARATION FOR A TAXABLE YEAR:*

*(I)    WITH THE DECLARATION OR AMENDED DECLARATION THAT COVERS THE YEAR; AND*

*(II)    WITH EACH QUARTERLY RETURN FOR THAT YEAR; AND*

*(2)    ANY UNPAID DIGITAL ADVERTISING GROSS REVENUES TAX FOR THE YEAR SHOWN ON THE PERSON'S RETURN THAT COVERS THAT YEAR WITH THE RETURN.*

*13–402.*

   *(a)  If a notice and demand for a return is made under § 13–303 of this title and the person or governmental unit fails to file the return, the tax collector shall:*

     *(4)  for motor carrier tax:*

       *(i)  compute the tax by using a miles per gallon factor based on the use, in the State, of 40 gallons of motor fuel for each commercial motor vehicle in the person's fleet on each day during the period for which the return is not filed; and*

       *(ii)  assess the tax due; [and]*

     *(5)  for public service company franchise tax:*

       *(i)  estimate gross receipts from the best information in the possession of the tax collector; and*

       *(ii)  assess the tax due on the estimated gross receipts; AND*

     **_(6)  FOR DIGITAL ADVERTISING GROSS REVENUES TAX:_**

       **_(I)  ESTIMATE GROSS REVENUES FROM THE BEST INFORMATION IN POSSESSION OF THE TAX COLLECTOR; AND_**

       **_(II)  ASSESS THE TAX DUE ON THE ESTIMATED ASSESSABLE BASE._**

*13–602.*

   *(a)  Except as provided in subsections (b) and (c) of this section, a tax collector shall assess interest on unpaid tax from the due date to the date on which the tax is paid if a person who is required to estimate and pay **DIGITAL ADVERTISING GROSS REVENUES TAX,** financial institution franchise tax, public service company franchise tax, or income tax under **§ 7.5–301,** § 8–210(b), § 8–405(b), or § 10–902 of this article:*

     *(1)  fails to pay an installment when due; or*

     *(2)  estimates a tax that is:*

       *(i)  less than 90% of the tax required to be shown on the return for the current taxable year; and*

       *(ii)  less than 110% of the tax paid for the prior taxable year, reduced by the credit allowed under § 10–703 of this article.*

*13–702.*

*(a)* *Except as provided in subsections (b) and (c) of this section, a tax collector shall assess a penalty not exceeding 25% of the amount underestimated, if a person who is required to estimate and pay **DIGITAL ADVERTISING GROSS REVENUES TAX,** financial institution franchise tax, public service company franchise tax, or income tax under **§ 7.5–301,** § 8–210(b), § 8–405(b), or § 10–902 of this article:*

*(1)* *fails to pay an installment when due; or*

*(2)* *estimates a tax that is:*

*(i)* *less than 90% of the tax required to be shown on the return for the current taxable year; and*

*(ii)* *less than 110% of the tax paid for the prior taxable year, reduced by the credit allowed under § 10–703 of this article.*

*13–1001.*

**(G)   A PERSON WHO IS REQUIRED TO FILE A DIGITAL ADVERTISING GROSS REVENUES TAX RETURN AND WHO WILLFULLY FAILS TO FILE THE RETURN AS REQUIRED UNDER TITLE 7.5 OF THIS ARTICLE IS GUILTY OF A MISDEMEANOR AND, ON CONVICTION, IS SUBJECT TO A FINE NOT EXCEEDING $5,000 OR IMPRISONMENT NOT EXCEEDING 5 YEARS OR BOTH.**

*13–1002.*

*(b)* *A person, including an officer of a corporation, who willfully files **A FALSE DIGITAL ADVERTISING GROSS REVENUES TAX RETURN,** a false financial institution franchise tax return, a false public service company franchise tax return, or a false income tax return with the intent to evade the payment of tax due under this article is guilty of perjury and, on conviction, is subject to the penalty for perjury.*

*(c)* *Subsections (a) and (b) of this section apply to the alcoholic beverage, **DIGITAL ADVERTISING GROSS REVENUES,** financial institution franchise, public service company franchise, and income taxes.*

*13–1101.*

*(b)* *An assessment of **DIGITAL ADVERTISING GROSS REVENUES TAX,** financial institution franchise tax, public service company franchise tax, income tax, or estate tax may be made at any time if:*

*(1)* *a false return is filed with the intent to evade the tax;*

*(2)* *a willful attempt is made to evade the tax;*

(3)     *a return is not filed as required under Title 7,* **TITLE 7.5,** *Title 8, or Title 10 of this article;*

(4)     *an amended estate tax return is not filed as required under Title 7 of this article;*

(5)     *an incomplete return is filed; or*

(6)     *a report of federal adjustment is not filed within the period required under § 13–409 of this title.*

(c)     *If a report of federal adjustment is filed within the time required under § 13–409 of this title, the tax collector shall assess the* **DIGITAL ADVERTISING GROSS REVENUES TAX,** *financial institution franchise tax, public service company franchise tax, income tax, or estate tax within 1 year after the date on which the tax collector receives the report.*

~~(F)     THE TOBACCO TAX ON ELECTRONIC SMOKING DEVICES SHALL BE PAID BY THE WHOLESALER THAT SELLS ELECTRONIC SMOKING DEVICES TO A RETAILER OR VAPE SHOP VENDOR IN THE STATE.~~

~~(G)     (1)     A LICENSED ELECTRONIC SMOKING DEVICES RETAILER OR A LICENSED VAPE SHOP VENDOR SHALL PAY THE TOBACCO TAX ON ELECTRONIC SMOKING DEVICES ON WHICH THE TOBACCO TAX HAS NOT BEEN PAID BY FILING A QUARTERLY TAX RETURN, WITH ANY SUPPORTING SCHEDULES, ON FORMS PROVIDED BY THE COMPTROLLER ON THE FOLLOWING DATES COVERING TAX LIABILITIES IN THE PRECEDING QUARTER:~~

~~(I)     JANUARY 21;~~

~~(II)     APRIL 21;~~

~~(III)     JULY 21; AND~~

~~(IV)     OCTOBER 21.~~

~~(2)     A LICENSED ELECTRONIC SMOKING DEVICES RETAILER OR A LICENSED VAPE SHOP VENDOR REQUIRED TO FILE A TAX RETURN UNDER PARAGRAPH (1) OF THIS SUBSECTION SHALL PAY A TOBACCO TAX AT THE RATE PROVIDED IN § 12–105(C) OF THIS TITLE BASED ON THE INVOICE AMOUNT CHARGED BY THE LICENSED ELECTRONIC SMOKING DEVICES MANUFACTURER, EXCLUSIVE OF ANY DISCOUNT, TRADE ALLOWANCE, REBATE, OR OTHER REDUCTION.~~

~~13–408.~~

(a)     If the Comptroller determines that a person has failed to keep the records of out-of-state cigarette **[**or**]**, other tobacco product, **OR ELECTRONIC SMOKING DEVICE** sales required under § 12-203 of this article, the Comptroller shall:

(1)     compute the tobacco tax as if the cigarettes **[**or**]**, other tobacco products, **OR ELECTRONIC SMOKING DEVICES** were sold in the State; and

(2)     assess the tax due.

(b)     If the Comptroller determines that a person has possessed or transported cigarettes **[**or**]**, other tobacco products, **OR ELECTRONIC SMOKING DEVICES** on which the tobacco tax has not been paid as required under Title 12 of this article, the Comptroller shall assess the tobacco tax due.

13-825.

(h)     (1)     The Comptroller may require a person subject to the tobacco tax to post security for the tax in the following amounts:

(i)     for a manufacturer or wholesaler:

1.     $10,000**[.]**; plus

2.     the amount, if any, by which the tobacco tax due for any 1 month exceeds $10,000;

(ii)     for a subwholesaler or vending machine operator:

1.     $1,000**[.]**; plus

2.     the amount, if any, by which the tobacco tax due for any 1 month exceeds $1,000; **[**and**]**

(iii)     for an other tobacco products wholesaler:

1.     $5,000**[.]**; plus

2.     the amount, if any, by which the tobacco tax due for any 1 month exceeds $5,000; **AND**

**(IV)     FOR AN ELECTRONIC SMOKING DEVICES WHOLESALER DISTRIBUTOR OR AN ELECTRONIC SMOKING DEVICES WHOLESALER IMPORTER:**

**1.     $5,000; PLUS**

~~**2.** THE AMOUNT, IF ANY, BY WHICH THE TOBACCO TAX DUE FOR ANY 1 MONTH EXCEEDS $5,000.~~

~~(2) Except as provided in paragraph (5) of this subsection, the Comptroller may exempt a person from posting security for the tobacco tax if the person is and has been for the past 5 years:~~

~~(i) licensed as required under § 16–202 of the Business Regulation Article to act as a wholesaler **[**or**]**, § 16.5–201 to act as an other tobacco products wholesaler, **§ 16.7–201 TO ACT AS AN ELECTRONIC SMOKING DEVICES WHOLESALER DISTRIBUTOR, OR § 16.7–201 TO ACT AS AN ELECTRONIC SMOKING DEVICES WHOLESALER IMPORTER**; and~~

~~(ii) 1. in continuous compliance with the tobacco tax laws, as determined under paragraph (3) of this subsection; and~~

~~2. in continuous compliance with the conditions of the person's security posted under this subsection.~~

~~(3) For purposes of paragraph (2) of this subsection, a person is in continuous compliance with the tobacco tax laws for a period if the person has not, at any time during that period:~~

~~(i) failed to pay any tobacco tax or any tobacco tax assessment when due;~~

~~(ii) failed to file a tobacco tax return when due; or~~

~~(iii) otherwise violated any of the provisions of this title, Title 12 of this article, or Title 16 **[**or**]**, Title 16.5, **OR TITLE 16.7** of the Business Regulation Article.~~

~~(4) (i) An exemption granted under paragraph (2) of this subsection is effective only to the extent that a person's potential tobacco tax liability does not exceed an amount determined by the Comptroller based on the person's experience during the 5–year compliance period under paragraph (2) of this subsection.~~

~~(ii) The Comptroller may revoke an exemption granted to a person under paragraph (2) of this subsection if the person at any time fails to be in continuous compliance with the tobacco tax laws, as described in paragraph (3) of this subsection.~~

~~(iii) The Comptroller may reinstate an exemption revoked under subparagraph (ii) of this paragraph if the person meets the requirements of paragraph (2)(i) and (ii) of this subsection for a period of 2 years following the revocation.~~

~~(5)     The Comptroller may not exempt a person from posting a bond or other security for the tobacco tax unless the Comptroller determines that the person is solvent and financially able to pay the person's potential tobacco tax liability.~~

~~(6)     If a corporation is granted an exemption from posting a bond or other security for the tobacco tax, any officer of the corporation who exercises direct control over its fiscal management is personally liable for any tobacco tax, interest and penalties owed by the corporation.~~

~~13–834.~~

~~(a)     In this Part VI of this subtitle the following words have the meanings indicated.~~

~~(c)     "Contraband tobacco products" means cigarettes **[or]**, other tobacco products, **OR ELECTRONIC SMOKING DEVICES**, as defined in § 12–101 of this article:~~

~~(1)     on which tobacco tax is not paid; and~~

~~(2)     that are delivered, possessed, sold, or transported in the State in a manner not authorized under Title 12 of this article or Title 16, **TITLE 16.5, OR TITLE 16.7** of the Business Regulation Article.~~

~~13–836.~~

~~(a)     (1)     If contraband alcoholic beverages or contraband tobacco products are seized:~~

~~(i)     the Comptroller or police officer shall give a notice of seizure to the person from whom the property is seized at the time of the seizure; and~~

~~(ii)     the Comptroller shall:~~

~~1.     where possible, give a notice of seizure to the registered owner of a seized conveyance; and~~

~~2.     publish a notice of seizure of the conveyance in a newspaper of general circulation in the county where the seizure occurred.~~

~~(b)     (2)     A police officer who seizes any contraband tobacco products or conveyance used to transport contraband tobacco products shall deliver the seized cigarettes **[or]**, other tobacco products, **OR ELECTRONIC SMOKING DEVICES** and conveyance to the Comptroller.~~

~~13–837.~~

App. 30

~~The owner or another person with an interest in seized property may file a claim for the return of the property with the Comptroller within 30 days after:~~

~~(1)      the seizure of alcoholic beverages, cigarettes, other tobacco products,~~ **ELECTRONIC SMOKING DEVICES, OR** ~~motor fuel or conveyances used to transport motor fuel; or~~

~~(2)      a notice of seizure of a conveyance used to transport alcoholic beverages, cigarettes,~~ **[or]** ~~other tobacco products,~~ **OR ELECTRONIC SMOKING DEVICES** ~~is published.~~

~~13–839.~~

~~(a)      If a person files a claim for return of seized alcoholic beverages, cigarettes, other tobacco products,~~ **ELECTRONIC SMOKING DEVICES,** ~~or a conveyance used for their transportation under § 13–837 of this subtitle, the Comptroller or the Comptroller's designee shall:~~

~~(1)      promptly act on the request and hold an informal hearing;~~

~~(2)      direct the return of alcoholic beverages, cigarettes,~~ **[or]** ~~other tobacco products,~~ **OR ELECTRONIC SMOKING DEVICES** ~~unless the Comptroller or Comptroller's designee has satisfactory proof that the person was not in compliance with any provisions of Title 5 or Title 12 of this article at the time of seizure; and~~

~~(3)      direct the return of the conveyance if the Comptroller or Comptroller's designee has satisfactory proof that the owner of the conveyance was not willfully evading any provisions of Title 5 or Title 12 of this article at the time of seizure.~~

~~(b)      The Comptroller or Comptroller's designee shall grant or deny the application for return of seized alcoholic beverages, cigarettes, other tobacco products,~~ **ELECTRONIC SMOKING DEVICES,** ~~or a conveyance in accordance with subsection (a) of this section by mailing the person a notice of final determination.~~

~~13–1014.~~

~~(a)      (1)      A person who willfully possesses, sells, or attempts to sell unstamped or improperly stamped cigarettes in the State in violation of Title 12 of this article is guilty of a misdemeanor.~~

~~(2)      If the number of unstamped or improperly stamped cigarettes that a person possesses, sells, or attempts to sell is 30 cartons or less, the person on conviction is subject to a fine not exceeding $500 or imprisonment not exceeding 3 months or both.~~

~~(3)      If the number of unstamped or improperly stamped cigarettes that a person possesses, sells, or attempts to sell is more than 30 cartons, the person on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding 1 year or both.~~

(b) A person who willfully possesses, sells, or attempts to sell other tobacco products on which the tobacco tax has not been paid in the State in violation of Title 12 of this article is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $500 or imprisonment not exceeding 3 months or both.

(C) A PERSON WHO WILLFULLY POSSESSES, SELLS, OR ATTEMPTS TO SELL ELECTRONIC SMOKING DEVICES ON WHICH THE TOBACCO TAX HAS NOT BEEN PAID IN THE STATE IN VIOLATION OF TITLE 12 OF THIS ARTICLE IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO A FINE NOT EXCEEDING $500 OR IMPRISONMENT NOT EXCEEDING 3 MONTHS OR BOTH.

[(c)] (D) Each day that a violation under this section continues constitutes a separate offense.

13–1015.

(a) A person who willfully ships, imports, sells into or within, or transports within, this State cigarettes [or], other tobacco products, OR ELECTRONIC SMOKING DEVICES on which the tobacco tax has not been paid in violation of Title 12 of this article or § 16–219, § 16–222, § 16.5–215, or § 16.5–216 of the Business Regulation Article is guilty of a felony and, on conviction, is subject to the penalties set forth in subsections (b) and (c) of this section.

(b) (1) For a first violation, a person is subject to a mandatory fine of $150 for each carton of cigarettes [or], each package of other tobacco products, OR EACH PACKAGE OF ELECTRONIC SMOKING DEVICES transported.

(2) For each subsequent violation, a person is subject to a mandatory fine of $300 for each carton of cigarettes [or], each package of other tobacco products, OR EACH PACKAGE OF ELECTRONIC SMOKING DEVICES transported.

(c) In addition to the mandatory fine set forth in subsection (b) of this section, for a first or subsequent violation, a person may be subject to imprisonment not exceeding 2 years.

SECTION 2. AND BE IT FURTHER ENACTED, That:

(a) As provided in § 12–105 of the Tax – General Article, as enacted by Section 1 of this Act, all electronic smoking devices used, possessed, or held in the State on or after July 1, 2020, by any person for sale or use in the State shall be subject to the tax on electronic smoking devices, as enacted by this Act.

(b) The Comptroller may provide an alternative method of assessing and collecting the additional tax.

(c) ~~The revenue attributable to this requirement shall be remitted to the Comptroller no later than September 30, 2020.~~

~~SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 2020.~~

~~SECTION 5. AND BE IT FURTHER ENACTED, That:~~

~~(a)     As provided in § 12–105 of the Tax – General Article, as enacted by Section 2 of this Act, all cigarettes and other tobacco products used, possessed, or held in the State on or after July 1, 2020, by a wholesaler for sale in the State shall be subject to the tax on cigarettes and other tobacco products as enacted by Section 2 of this Act. The revenue attributable to this requirement shall be remitted to the Comptroller not later than September 30, 2020.~~

~~(b)     As provided in § 12–105 of the Tax – General Article, as enacted by Section 3 of this Act, all cigarettes and other tobacco products used, possessed, or held in the State on or after July 1, 2021, by a wholesaler for sale in the State shall be subject to the tax on cigarettes and other tobacco products as enacted by Section 3 of this Act. The revenue attributable to this requirement shall be remitted to the Comptroller not later than September 30, 2021.~~

~~(c)     The Comptroller may provide an alternative method of assessing and collecting the additional tax due under this section.~~

~~SECTION 6. AND BE IT FURTHER ENACTED, That Section 3 of this Act shall take effect July 1, 2021.~~

~~SECTION 7. AND BE IT FURTHER ENACTED, That, except as provided in Section 6 of this Act, this Act shall take effect July 1, 2020. Section 2 of this Act shall remain effective for a period of 1 year and, at the end of June 30, 2021, Section 2 of this Act shall be abrogated and of no further force and effect.~~

*SECTION 3. AND BE IT FURTHER ENACTED, That:*

*(1)     as provided in § 12–105 of the Tax – General Article, as enacted by Section 1 of this Act, all cigarettes and other tobacco products used, possessed, or held in the State on or after July 1, 2020, by any person for sale or use in the State shall be subject to the tax on cigarettes and other tobacco products as enacted under Section 1 of this Act;*

*(2)     the Comptroller may provide an alternative method of assessing and collecting the additional tax; and*

*(3)     the revenue attributable to this requirement shall be remitted to the Comptroller no later than September 30, 2020.*

App. 33

*SECTION 4. AND BE IT FURTHER ENACTED, That on or before December 31, 2020, the Comptroller's Office shall report to the Senate Budget and Taxation Committee and the House Committee on Ways and Means, in accordance with § 2–1257 of the State Government Article, on the change in consumption of cigarettes, other tobacco products, and electronic smoking devices in the State over the immediately preceding 12 months.*

*SECTION 5. AND BE IT FURTHER ENACTED, That it is the intent of the General Assembly that the Comptroller distribute, as necessary, the sales and use tax and tobacco tax collected in fiscal year 2021 under Section 1 of this Act to:*

*(1)     the expenditure accounts of the appropriate units of State government to fund costs associated with the Coronavirus Disease 2019 (COVID–19); and*

*(2)     the Revenue Stabilization Account established under § 7–311 of the State Finance and Procurement Article.*

*SECTION 6. AND BE IT FURTHER ENACTED, That Section 2 of this Act ~~shall take effect July 1, 2021, and~~ shall be applicable to all taxable years beginning after December 31, 2020.*

*SECTION 7. AND BE IT FURTHER ENACTED, That~~, except as provided in Section 6 of this Act,~~ this Act shall take effect July 1, 2020.*

**Gubernatorial Veto Override, February 12, 2021.**

Chapter 669

**(Senate Bill 787)**

AN ACT concerning

**Digital Advertising Gross Revenues ~~Tax~~, *Income, Sales and Use*, ~~Exemption and Restriction~~ and Tobacco ~~Tax~~ *Taxes* – Alterations and Implementation**

FOR the purpose of exempting, from a certain tax on certain annual gross revenues derived from certain digital advertising services in the State, certain advertisement services on certain digital interfaces; prohibiting a person who derives gross revenues from digital advertising services in the State from passing on the cost of the tax to a certain customer in a certain manner; *allowing, for a certain taxable year, a subtraction under the Maryland income tax for certain utility arrearages forgiven during that taxable year; altering certain terms governing the application of the sales and use tax to certain digital codes and certain digital products; requiring a certain marketplace facilitator, under certain circumstances, to collect the sales and use tax on certain sales of digital codes and digital products; exempting the sale or use of digital codes and digital products from the sales and use tax under certain circumstances; clarifying the application of certain provisions of law governing administration of the sales and use tax to certain sales of digital codes and digital products; altering the definition of "pass–through entity's taxable income" for purposes of certain provisions of law concerning the State income tax imposed on certain pass–through entities;* altering the date on which certain cigarettes and other tobacco products are required to be subject to a certain tax; altering the date by which certain revenue is required to be remitted to the Comptroller; altering the date by which the Comptroller's Office must submit a certain report to certain committees of the General Assembly; repealing a certain statement of the intent of the General Assembly; altering the taxable years to which a certain tax on certain annual gross revenues derived from digital advertising services in the State applies; *declaring the intent of the General Assembly;* defining certain terms; *making conforming changes; making technical corrections; providing for the application of certain provisions of this Act;* ~~providing for the application of this Act;~~ making this Act ~~subject to a certain contingency;~~ an emergency measure; and generally relating to a tax on digital advertising gross revenues, *the income tax, the sales and use tax,* and the tobacco tax.

*BY repealing and reenacting, with amendments,*
  *Article – Tax – General*
  *Section 2–1302.1, 11–101(b), (c–1), (c–3) through (c–5), (c–6)(1), (e–1), (h), (i), (j), (l)(1) and (2), (n), and (o), 11–102(a), and 11–217(b)*
  *Annotated Code of Maryland*
  *(2016 Replacement Volume and 2020 Supplement)*
  *(As enacted by Chapter 38 of the Acts of the General Assembly of 2021)*

BY repealing and reenacting, with amendments,
  Article – Tax – General

App. 35

Section 7.5–101
Annotated Code of Maryland
(2016 Replacement Volume and 2020 Supplement)
(As enacted by Chapter ~~(H.B. 732 of the 2020 Regular Session)~~ <u>37</u> of the Acts of
the General Assembly of 2021)

BY repealing and reenacting, without amendments,
Article – Tax – General
Section 7.5–102(a)
Annotated Code of Maryland
(2016 Replacement Volume and 2020 Supplement)
(As enacted by Chapter ~~(H.B. 732 of the 2020 Regular Session)~~ <u>37</u> of the Acts of
the General Assembly of 2021)

BY adding to
Article – Tax – General
Section 7.5–102(c)
Annotated Code of Maryland
(2016 Replacement Volume and 2020 Supplement)
(As enacted by Chapter ~~(H.B. 732 of the 2020 Regular Session)~~ <u>37</u> of the Acts of
the General Assembly of 2021)

*BY repealing and reenacting, without amendments,*
*Article – Tax – General*
*Section 10–207(a)*
*Annotated Code of Maryland*
*(2016 Replacement Volume and 2020 Supplement)*

*BY adding to*
*Article – Tax – General*
*Section 10–207(ll)*
*Annotated Code of Maryland*
*(2016 Replacement Volume and 2020 Supplement)*

*BY repealing and reenacting, without amendments,*
*Article – Tax – General*
*Section 11–101(a)*
*Annotated Code of Maryland*
*(2016 Replacement Volume and 2020 Supplement)*
*(As enacted by Chapter 38 of the Acts of the General Assembly of 2021)*

*BY repealing and reenacting, with amendments,*
*Article – Tax – General*
*Section 11–204(a)(6), 11–208(b) and (c), 11–209, 11–210(b)(1), 11–214, 11–216(a),*
*11–219(b), 11–220, 11–221(b) and (c), 11–227, 11–303, 11–401, 11–405, 11–408,*
*11–501, 11–502.1, 11–701, 11–703, and 11–707*

*Annotated Code of Maryland*
*(2016 Replacement Volume and 2020 Supplement)*

*BY repealing and reenacting, without amendments,*
  *Article – Tax – General*
  *Section 10–102.1(a)(1)*
  *Annotated Code of Maryland*
  *(2016 Replacement Volume and 2020 Supplement)*
  *(As enacted by Chapter 39 of the Acts of the General Assembly of 2021)*

*BY repealing and reenacting, with amendments,*
  *Article – Tax – General*
  *Section 10–102.1(a)(8)*
  *Annotated Code of Maryland*
  *(2016 Replacement Volume and 2020 Supplement)*
  *(As enacted by Chapter 39 of the Acts of the General Assembly of 2021)*

BY repealing and reenacting, with amendments,
  Chapter 37 of the Acts of the General Assembly of 2021
  Section 3, 4, and 6

BY repealing
  Chapter 37 of the Acts of the General Assembly of 2021
  Section 5

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

### Article – Tax – General

*2–1302.1.*

  *After making the distributions required under §§ 2–1301 and 2–1302 of this subtitle, of the sales and use tax collected:*

    *(1)   on short–term vehicle rentals under § 11–104(c) of this article the Comptroller shall distribute:*

      *(i)   45% to the Transportation Trust Fund established under § 3–216 of the Transportation Article; and*

      *(ii)   the remainder to the Chesapeake and Atlantic Coastal Bays 2010 Trust Fund; and*

*(2)      on the sale or use of a digital product or **DIGITAL** code under Title 11 of this article the Comptroller shall distribute 100% to The Blueprint for Maryland's Future Fund established under [§ 5–219] § 5–206 of the Education Article.*

7.5–101.

    (a)      In this title the following words have the meanings indicated.

    (b)      "Annual gross revenues" means income or revenue from all sources, before any expenses or taxes, computed according to generally accepted accounting principles.

    (c)      "Assessable base" means the annual gross revenues derived from digital advertising services in the State.

    **(D)      "BROADCAST ENTITY" MEANS AN ENTITY THAT IS PRIMARILY ENGAGED IN THE BUSINESS OF OPERATING A BROADCAST TELEVISION OR RADIO STATION.**

    **[**(d)**] (E)      (1)**      "Digital advertising services" includes advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services.

    **(2)      "DIGITAL ADVERTISING SERVICES" DOES NOT INCLUDE ADVERTISEMENT SERVICES ON DIGITAL INTERFACES OWNED OR OPERATED BY OR OPERATED ON BEHALF OF A BROADCAST ENTITY OR NEWS MEDIA ENTITY.**

    **[**(e)**] (F)**      "Digital interface" means any type of software, including a website, part of a website, or application, that a user is able to access.

    **(G)      (1)      "NEWS MEDIA ENTITY" MEANS AN ENTITY ENGAGED PRIMARILY IN THE BUSINESS OF NEWSGATHERING, REPORTING, OR PUBLISHING ARTICLES OR COMMENTARY ABOUT NEWS, CURRENT EVENTS, CULTURE, OR OTHER MATTERS OF PUBLIC INTEREST.**

    **(2)      "NEWS MEDIA ENTITY" DOES NOT INCLUDE AN ENTITY THAT IS PRIMARILY AN AGGREGATOR OR REPUBLISHER OF THIRD–PARTY CONTENT.**

    **[**(f)**] (H)**      "User" means an individual or any other person who accesses a digital interface with a device.

7.5–102.

    (a)      A tax is imposed on annual gross revenues of a person derived from digital advertising services in the State.

(C)   A PERSON WHO DERIVES GROSS REVENUES FROM DIGITAL ADVERTISING SERVICES IN THE STATE MAY NOT DIRECTLY PASS ON THE COST OF THE TAX IMPOSED UNDER THIS SECTION TO A CUSTOMER WHO PURCHASES THE DIGITAL ADVERTISING SERVICES BY MEANS OF A SEPARATE FEE, SURCHARGE, OR LINE–ITEM.

*10–207.*

   *(a)      To the extent included in federal adjusted gross income, the amounts under this section are subtracted from the federal adjusted gross income of a resident to determine Maryland adjusted gross income.*

   *(LL)*   *FOR A TAXABLE YEAR BEGINNING AFTER DECEMBER 31, 2020, BUT BEFORE JANUARY 1, 2022, THE SUBTRACTION UNDER SUBSECTION (A) OF THIS SECTION INCLUDES THE AMOUNT OF UTILITY ARREARAGES FORGIVEN DURING THE TAXABLE YEAR, IF THE FORGIVENESS OF THE UTILITY ARREARAGES WAS OFFERED THROUGH GRANTS PROVIDED TO UTILITIES IN ACCORDANCE WITH SECTIONS 9 AND 10 OF CHAPTER 39 OF THE ACTS OF THE GENERAL ASSEMBLY OF 2021.*

*11–101.*

   *(a)      In this title the following words have the meanings indicated.*

   *(b)      "Buyer" means a person who:*

      *(1)      acquires tangible personal property in a sale;*

      *(2)      obtains a taxable service in a sale; or*

      *(3)      acquires a **DIGITAL CODE OR** digital product in a sale.*

   *(c–1)   "Customer tax address" means, with respect to a sale of a **DIGITAL CODE OR** digital product:*

      *(1)      for a **DIGITAL CODE OR** digital product that is received by a buyer at the business location of the vendor, the address of that business location;*

      *(2)      if item (1) of this subsection is not applicable and the primary use location of the **DIGITAL CODE OR** digital product is known by the vendor, that primary use location;*

      *(3)      if items (1) and (2) of this subsection are not applicable, the location where the **DIGITAL CODE OR** digital product is received by the buyer, or by a donee of the buyer that is identified by the buyer, if known to the vendor and maintained in the ordinary course of the vendor's business;*

*(4)   if items (1) through (3) of this subsection are not applicable, the location indicated by an address for the buyer that is available from the business records of the vendor that are maintained in the ordinary course of business of the vendor's business, when use of the address does not constitute bad faith;*

*(5)   if items (1) through (4) of this subsection are not applicable, the location indicated by an address for the buyer obtained during the consummation of the sale, including the address of the buyer's payment instrument, when use of the address does not constitute bad faith; or*

*(6)   if items (1) through (5) of this subsection are not applicable, including a circumstance in which a vendor is without sufficient information to apply those items, one of the following locations, as selected by the vendor, provided that the location is consistently used by the vendor for all sales to which this item applies:*

*(i)   the location in the United States of the headquarters of the vendor's business;*

*(ii)   the location in the United States where the vendor has the greatest number of employees; or*

*(iii)   the location in the United States from which the vendor makes digital products available for electronic transfer.*

*(c–3)   (1)   "Digital code" means a **NUMBER, SYMBOL, ALPHANUMERIC SEQUENCE, BARCODE, OR SIMILAR** code that:*

*(i)   may be obtained by any means, including:*

*1.   in a tangible form, such as a card; or*

*2.   through e–mail; and*

*(ii)   provides a buyer with a right to obtain one or more digital products.*

*(2)   "Digital code" does not include a gift certificate or gift card with a monetary value that may be redeemable for an item other than a digital product.*

*(c–4)   (1)   "Digital product" means a product that is obtained electronically by the buyer or delivered by means other than tangible storage media through the use of technology having electrical, digital, magnetic, wireless, optical, electromagnetic, or similar capabilities.*

*(2)   "Digital product" includes:*

*(i)   a work that results from the fixation of a series of sounds that are transferred electronically, including:*

*1.   prerecorded or live music or performances, readings of books or other written materials, and speeches; and*

*2.   audio greeting cards sent by e–mail;*

*(ii)   a digitized sound file, such as a ring tone, that is downloaded onto a device and may be used to alert the user of the device with respect to a communication;*

*(iii)   a series of related images that, when shown in succession, impart an impression of motion, together with any accompanying sounds that are transferred electronically, including motion pictures, musical videos, news and entertainment programs, live events, video greeting cards sent by e–mail, and video or electronic games;*

*(iv)   a book, generally known as an "e–book", that is transferred electronically; and*

*(v)   a newspaper, magazine, periodical, chat room discussion, weblog, or any other similar product that is transferred electronically.*

***(3)   "DIGITAL PRODUCT" DOES NOT INCLUDE:***

***(I)   PRERECORDED OR LIVE INSTRUCTION BY A PUBLIC, PRIVATE, OR PAROCHIAL ELEMENTARY OR SECONDARY SCHOOL OR A PUBLIC OR PRIVATE INSTITUTION OF HIGHER EDUCATION;***

***(II)   INSTRUCTION IN A SKILL OR PROFESSION IN A BUYER'S CURRENT OR PROSPECTIVE BUSINESS, OCCUPATION, OR TRADE IF THE INSTRUCTION:***

***1.   IS NOT PRERECORDED; AND***

***2.   FEATURES AN INTERACTIVE ELEMENT BETWEEN THE BUYER AND THE INSTRUCTOR OR OTHER BUYERS CONTEMPORANEOUS WITH THE INSTRUCTION;***

***(III)   A SEMINAR, DISCUSSION, OR SIMILAR EVENT HOSTED BY A NONPROFIT ORGANIZATION OR BUSINESS ASSOCIATION, IF THE SEMINAR, DISCUSSION, OR EVENT:***

***1.   IS NOT PRERECORDED; AND***

**_2._      _FEATURES AN INTERACTIVE ELEMENT BETWEEN THE BUYER AND HOST OR OTHER BUYERS CONTEMPORANEOUS WITH THE SEMINAR, DISCUSSION, OR EVENT; OR_**

**_(IV)     A PROFESSIONAL SERVICE OBTAINED ELECTRONICALLY OR DELIVERED THROUGH THE USE OF TECHNOLOGY HAVING ELECTRICAL, DIGITAL, MAGNETIC, WIRELESS, OPTICAL, ELECTROMAGNETIC, OR SIMILAR CAPABILITIES._**

_(c–5)_  **_(1)_**  _"End user" means any person [other than a]_ **WHO RECEIVES OR ACCESSES A DIGITAL CODE OR DIGITAL PRODUCT CODE FOR USE.**

**_(2)_**  **"END USER" DOES NOT INCLUDE ANY** _person who receives [by contract] a_ **DIGITAL CODE OR** _digital product [transferred electronically] for further commercial broadcast, rebroadcast, transmission, retransmission, licensing, relicensing, distribution, redistribution, or exhibition of the_ **DIGITAL** _product[, in whole or in part, to another person]._

_(c–6)_  _(1)_  _"Marketplace facilitator" means a person that:_

_(i)_     _facilitates a retail sale by a marketplace seller by listing or advertising for sale in a marketplace tangible personal property_**, DIGITAL CODE, OR A DIGITAL PRODUCT**; _and_

_(ii)_    _regardless of whether the person receives compensation or other consideration in exchange for the person's services, directly or indirectly through agreements with third parties, collects payment from a buyer and transmits the payment to the marketplace seller._

_(e–1)_  _(1)_  _"Primary use location" means the street address representative of where the buyer's use of a_ **DIGITAL CODE OR** _digital product will primarily occur, as determined by:_

_(i)_     _the residential street address or a business street address of the actual end user of the_ **DIGITAL CODE OR** _digital product, including, if applicable, the address of a donee of the buyer that is designated by the buyer; or_

_(ii)_    _if the buyer is not an individual, the location of the buyer's employees or equipment that makes use of the_ **DIGITAL CODE OR** _digital product._

_(2)_  _"Primary use location" does not include the location of a person who uses a_ **DIGITAL CODE OR** _digital product as the purchaser of a separate good or service from the buyer._

_(h)_  _(1)_  _"Retail sale" means the sale of:_

        *(i)*      *tangible personal property;*

        *(ii)*      *a taxable service;* **[*or*]**

        ***(III)***   ***A DIGITAL CODE; OR***

        **[*(iii)*]** ***(IV)***     *a digital product.*

    *(2)*     *"Retail sale" includes:*

        *(i)*      *a sale of tangible personal property for use or resale in the form of real estate by a builder, contractor, or landowner;*

        *(ii)*      *except as provided in paragraph (3)(i) of this subsection, use of tangible personal property as facilities, tools, tooling, machinery, or equipment, including dies, molds, and patterns, even if the buyer intends to transfer title to the property before or after that use;*

        *(iii)*     *a sale of a digital product that is sold with rights of permanent use or sold with rights of less than permanent use to an end user;*

        *(iv)*     *a sale of a digital product that is sold with rights of use conditioned on continued payment by the subscriber or buyer to an end user; and*

        *(v)*     *a sale* ***TO AN END USER*** *of* ***A DIGITAL CODE OR A*** *subscription to, access to,* ***RECEIPT OF, OR*** *streaming of* ***A DIGITAL PRODUCT[****, or the purchase of a digital code for receiving or accessing digital products to an end user****]****.*

    *(3)*     *"Retail sale" does not include:*

        *(i)*      *a transfer of title to tangible personal property after its use as facilities, tools, tooling, machinery, or equipment, including dies, molds, and patterns, if:*

        *1.*      *at the time of purchase, the buyer is obligated, under the terms of a written contract, to make the transfer; and*

        *2.*      *the transfer is made for the same or greater consideration to the person for whom the buyer manufactures goods or performs work;*

        *(ii)*      *a sale of tangible personal property,* ***A DIGITAL CODE,*** *or a digital product if the buyer intends to:*

        *1.*      *resell the tangible personal property,* ***DIGITAL CODE,*** *or digital product in the form that the buyer receives or is to receive the property,* ***DIGITAL CODE,*** *or* ***DIGITAL*** *product;*

> 2. *use or incorporate the tangible personal property,* **DIGITAL CODE,** *or digital product in a production activity as a material or part of other tangible personal property or another digital product to be produced for sale; or*
>
> 3. *transfer the tangible personal property,* **DIGITAL CODE,** *or digital product as a part of a taxable service transaction; or*
>
> (iii) *a sale of a taxable service if the buyer intends to resell the taxable service in the form that the buyer receives or is to receive the service.*

(i) (1) *"Sale" means a transaction for a consideration whereby:*

> (i) *title* **TO** *or possession of property,* **A DIGITAL CODE, OR A DIGITAL PRODUCT** *is transferred or is to be transferred absolutely or conditionally by any means, including by lease, rental, royalty agreement, or grant of a license for use; or*
>
> (ii) *a person performs a service for another person.*
>
> (2) *"Sale" does not include a transaction whereby an employee performs a service for the employee's employer.*

(j) *"Sale for use" means a sale in which tangible personal property,* **A DIGITAL CODE,** *a digital product, or a taxable service that is consumed, possessed, stored, or used in the State is acquired.*

(l) (1) *"Taxable price" means the value, in money, of the consideration of any kind that is paid, delivered, payable, or deliverable by a buyer to a vendor in the consummation and complete performance of a sale without deduction for any expense or cost, including the cost of:*

> (i) *any labor or service rendered;*
>
> (ii) *any material used; or*
>
> (iii) *any property,* **DIGITAL CODE, OR DIGITAL PRODUCT** *sold.*
>
> (2) *"Taxable price" includes, for tangible personal property,* **A DIGITAL CODE,** *or a digital product acquired by a sale for use in the State by the person who assembles, fabricates, or manufactures the property or digital product, only the price of the raw materials and component parts contained in the property or digital product.*

(n) (1) *"Use" means an exercise of a right or power to use, consume, possess, or store that is acquired by a sale for use of:*

> (i) *tangible personal property;*

*(ii)      a taxable service; [or]*

***(III)     A DIGITAL CODE; OR***

*[(iii)] **(IV)***      *a digital product.*

*(2)      "Use" includes an exercise of a right or power to use, consume, possess, or store that is acquired by a sale for use of tangible personal property, **A DIGITAL CODE,** or a digital product:*

*(i)      for use or resale in the form of real estate by a builder, contractor, or landowner; or*

*(ii)      except as provided in paragraph (3)(i) of this subsection, as facilities, tools, tooling, machinery, or equipment, including dies, molds, and patterns, even if the buyer intends to transfer title to the property, **DIGITAL CODE,** or digital product before or after that use.*

*(3)      "Use" does not include:*

*(i)      a transfer of title to tangible personal property after its use as facilities, tools, tooling, machinery, or equipment, including dies, molds, and patterns, if:*

*1.      at the time of purchase, the buyer is obligated, under the terms of a written contract, to make the transfer; and*

*2.      the transfer is made for the same or greater consideration to the person for whom the buyer manufactures goods or performs work;*

*(ii)      an exercise of a right or power over tangible personal property, **A DIGITAL CODE,** or a digital product acquired by a sale for use if the buyer intends to:*

*1.      resell the tangible personal property, **DIGITAL CODE,** or digital product in the form that the buyer receives or is to receive the property, **DIGITAL CODE,** or digital product;*

*2.      use or incorporate the tangible personal property or digital product in a production activity as a material or part of other tangible personal property or another digital product to be produced for sale; or*

*3.      transfer the tangible personal property, **DIGITAL CODE,** or digital product as part of a taxable service transaction;*

App. 45

*(iii)     an exercise of a right or power over a taxable service acquired by a sale for use if the buyer intends to resell the taxable service in the form that the buyer receives or is to receive the service;*

*(iv)     an exercise of a right or power over a digital code to receive or access a digital product;*

*(v)     an exercise of a right or power over a digital product acquired by a sale for use if the buyer is not an end user; or*

*(vi)     the use or transfer of a digital product or digital code by the transferor and obtained by the end user free of charge.*

*(o)     (1)     "Vendor" means a person who:*

*(i)     engages in the business of an out–of–state vendor, as defined in § 11–701 of this title;*

*(ii)     engages in the business of a retail vendor, as defined in § 11–701 of this title;*

*(iii)     holds a special license issued under § 11–707 of this title;*

*(iv)     is an accommodations intermediary;*

*(v)     is a short–term rental platform;*

*(vi)     engages in the business of a marketplace facilitator; or*

*(vii)     engages in the business of a marketplace seller.*

*(2)     "Vendor" includes, for an out–of–state vendor, a salesman, representative, peddler, or canvasser whom the Comptroller, for the efficient administration of this title, elects to treat as an agent jointly responsible with the dealer, distributor, employer, or supervisor:*

*(i)     under whom the agent operates; or*

*(ii)     from whom the agent obtains the tangible personal property, **A DIGITAL CODE,** a digital product, or taxable service for sale.*

*11–102.*

*(a)     Except as otherwise provided in this title, a tax is imposed on:*

*(1)     a retail sale in the State; and*

(2)      *a use, in the State, of tangible personal property,* **A DIGITAL CODE,** *a digital product, or a taxable service.*

*11–204.*

(a)      *The sales and use tax does not apply to:*

(6)      *a sale of tangible personal property,* **A DIGITAL CODE, OR A DIGITAL PRODUCT** *to a nonprofit parent–teacher association located in the State if the association makes the purchase to contribute the property to a school to which a sale is exempt under item (3) of this subsection or § 11–220 of this subtitle;*

*11–208.*

(b)      *The sales and use tax does not apply to a sale of film,* **[***or***]** *video tape,* **OR A DIGITAL PRODUCT** *for use only in television broadcasting by a television station that the Federal Communications Commission licenses specifically to broadcast to a city or town outside the State.*

(c)      *The sales and use tax does not apply:*

(1)      *to a sale of an aircraft, motor vehicle, railroad rolling stock, or vessel that is used principally to cross State lines in interstate or foreign commerce;*

(2)      *to a sale of a replacement part,* **[***or***]** *other tangible personal property,* **OR A DIGITAL PRODUCT** *to be used physically in, on, or by a conveyance described in item (1) of this subsection; or*

(3)      *except for a rental, to a sale of a motor vehicle, other than a house or office trailer, that will be titled or registered in another state.*

*11–209.*

(a)      *The sales and use tax does not apply to a casual and isolated sale by a person who regularly does not sell tangible personal property,* **A DIGITAL CODE, A DIGITAL PRODUCT,** *or a taxable service if:*

(1)      *the sale price is less than $1,000; and*

(2)      *the sale is not made through an auctioneer or a dealer.*

(b)      *The sales and use tax does not apply to a distribution of tangible personal property,* **A DIGITAL CODE, OR A DIGITAL PRODUCT** *by:*

> (1)     *a corporation or joint–stock company to its stockholders as a liquidating distribution;*
>
> (2)     *a partnership to a partner; or*
>
> (3)     *a limited liability company to a member.*

(c)     (1)     *The sales and use tax does not apply to a transfer of tangible personal property,* **A DIGITAL CODE, OR A DIGITAL PRODUCT**:

> (i)     *under a reorganization within the meaning of § 368(a) of the Internal Revenue Code;*
>
> (ii)     *on organization of a corporation or joint–stock company, to the corporation or company principally in consideration for the issuance of its stock;*
>
> (iii)     *to a partnership only as a contribution to its capital or in consideration for a partnership interest in the partnership; or*
>
> (iv)     *to a limited liability company only as a capital contribution or in consideration for an interest in the limited liability company.*

> (2)     *For a transfer that would qualify as a casual and isolated sale under subsection (a) of this section if the sale price limitation were disregarded, the amount of liability transferred to or assumed by a corporation, joint–stock company, partnership, or limited liability company shall be excluded from the consideration transferred by the corporation, joint–stock company, partnership, or limited liability company in exchange for the tangible personal property,* **DIGITAL CODE, OR DIGITAL PRODUCT** *to determine whether the transfer is made:*

> (i)     *principally in consideration for the issuance of stock of a corporation or joint–stock company;*
>
> (ii)     *only as a contribution to the capital of a partnership or in consideration for a partnership interest; or*
>
> (iii)     *only as a capital contribution to a limited liability company or in consideration for an interest in a limited liability company.*

*11–210.*

(b)     *The sales and use tax does not apply to a sale of:*

> (1)     *tangible personal property,* **A DIGITAL CODE, OR A DIGITAL PRODUCT** *used directly and predominantly in a production activity at any stage of operation on the production activity site from the handling of raw material or components to the movement*

App. 48

*of the finished product, if the tangible personal property, **DIGITAL CODE, OR DIGITAL PRODUCT** is not installed so that it becomes real property;*

*11–214.*

 *The sales and use tax does not apply to use of tangible personal property, **A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service that:*

  *(1) a nonresident:*

   *(i) acquires before the property, **DIGITAL CODE, DIGITAL PRODUCT,** or service enters the State; and*

   *(ii) uses:*

    *1. for personal enjoyment or use or for a use that the Comptroller specifies by regulation, other than for a business purpose; or*

    *2. in a presentation or in conjunction with a presentation of an exhibit, show, sporting event, or other public performance or display; and*

  *(2) does not remain in the State for more than 30 days.*

*11–216.*

 *(a) The sales and use tax does not apply to:*

  *(1) a sale for use of tangible personal property, **A DIGITAL CODE, OR A DIGITAL PRODUCT** that:*

   *(i) is bought outside this State;*

   *(ii) is intended solely for use in another state; and*

   *(iii) is stored in this State pending shipment to another state;*

  *(2) a sale of tangible personal property to a person obligated under a contract to incorporate that property into real property located in another state where the purchase or use of that property would not be subject to a sales tax, use tax, or similar tax; or*

  *(3) except for that portion of the purchase price allocable to intended viewing in this State, a sale of a series of images stored on video tape or in other optical or digital forms or electronic signals generated from these images to a cable or other nonbroadcast television network, if the images are intended for viewing by television viewers located outside the State.*

App. 49

*11–217.*

*(b)     The sales and use tax does not apply to a sale of tangible personal property,* **A DIGITAL CODE,** *or a digital product for use or consumption in research and development.*

*11–219.*

*(b)     The sales and use tax does not apply to a sale of custom computer software,* **REGARDLESS OF THE METHOD TRANSFERRED OR ACCESSED, OR [**services**] A SERVICE** *relating to [procedures and programs]* **CUSTOM COMPUTER SOFTWARE** *that:*

*(1)     **WOULD** otherwise [are]* **BE** *taxable under this title;*

*(2)     [are]* **IS** *to be used by a specific person;*

*(3)     (i)     [are]* **IS** *created for that person; or*

*(ii)     [contain]* **CONTAINS** *standard or proprietary routines [that incorporate]* **REQUIRING** *significant creative input to customize,* **CONFIGURE, OR MODIFY** *the procedures and programs [for that person]* **THAT ARE NECESSARY TO PERFORM THE FUNCTIONS REQUIRED FOR THE SOFTWARE TO OPERATE AS INTENDED**; and*

*(4)     do not constitute a program, procedure, or documentation that is mass produced and sold to:*

*(i)     the general public; or*

*(ii)     persons [associated]* **ENGAGED** *in a trade, profession, or industry,* **EXCEPT AS PROVIDED IN ITEM (3) OF THIS SUBSECTION**.*

*11–220.*

*(a)     The sales and use tax does not apply to a sale to the State or a political subdivision of the State.*

*(b)     The exemption under subsection (a) of this section may not be construed to exempt any sale of tangible personal property,* **A DIGITAL CODE, OR A DIGITAL PRODUCT,** *otherwise taxable under this title, to a contractor to be used under a contract with the State or a political subdivision of the State for construction, repair, or alteration of real property.*

*11–221.*

*(b)     If a person who buys tangible personal property,* **A DIGITAL CODE, A DIGITAL PRODUCT,** *or a taxable service in a retail sale pays the sales and use tax when the retail*

App. 50

*sale is made, the person is not required to pay the tax again when the person uses that tangible personal property, **DIGITAL CODE, DIGITAL PRODUCT,** or taxable service in the State.*

    *(c)    (1)    To the extent that a buyer pays another state a tax on a sale or gross receipts from a sale of tangible personal property, **A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service that the buyer acquires before the property, **DIGITAL CODE, DIGITAL PRODUCT,** or service enters this State, the sales and use tax does not apply to use of the property or service in this State.*

    *(2)    If the tax paid to another state is less than the sales and use tax, the buyer shall pay the difference between the sales and use tax and the amount paid to the other state in accordance with the formula under § 11–303(b) of this title.*

*11–227.*

    *(a)    (1)    In this section the following words have the meanings indicated.*

    *(2)    (i)    "Film production activity" means the production or postproduction of film or video projects including feature films, television projects, commercials, corporate films, infomercials, music videos, or other projects for which the producer or production company will be compensated, and which are intended for nationwide commercial distribution.*

    *(ii)    "Film production activity" includes the production or postproduction of digital, animation, and multimedia projects.*

    *(iii)    "Film production activity" does not include:*

    *1.    production or postproduction of student films or noncommercial personal videos; or*

    *2.    any activity not necessary to and undertaken directly and exclusively for the making of a master film, tape, or image.*

    *(3)    "Tangible personal property, **A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service used directly in connection with a film production activity" includes:*

    *(i)    camera equipment and supplies;*

    *(ii)    film and tape;*

    *(iii)    lighting and stage equipment and supplies;*

    *(iv)    sound equipment and supplies;*

      *(v)*     *recording equipment and supplies;*

      *(vi)*    *costumes, wardrobes, and materials to construct them;*

      *(vii)*   *props, scenery, and materials to construct them;*

      *(viii)*  *design supplies and equipment;*

      *(ix)*    *drafting supplies and equipment;*

      *(x)*     *special effects supplies and equipment;*

      *(xi)*    *short–term vehicle rentals; and*

      *(xii)*   *fabrication, printing, or production of scripts, storyboards, costumes, wardrobes, props, scenery, or special effects.*

    *(b)*   *The sales and use tax does not apply to a sale of tangible personal property**, A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service used directly in connection with a film production activity by a film producer or production company certified by the Department of Commerce under Title 6, Subtitle 2 of the Economic Development Article.*

*11–303.*

    *(a)*   *A buyer is allowed a depreciation allowance as an adjustment to taxable price if:*

      *(1)*   *tangible personal property**, A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service is acquired before the tangible personal property**, DIGITAL CODE, OR DIGITAL PRODUCT** is brought into the State for use in the State or before the taxable service is used in the State; and*

      *(2)*   *the use first occurs in another state or federal jurisdiction.*

    *(b)*   *The allowance under subsection (a) of this section for each full year that follows the date of purchase is 10% of the taxable price paid to acquire the tangible personal property**, DIGITAL CODE, DIGITAL PRODUCT,** or taxable service.*

*11–401.*

    *(a)*   *A vendor is a trustee for the State and is liable for the collection of the sales and use tax for and on account of the State.*

    *(b)*   *A vendor has the same rights to collect the sales and use tax from a buyer and the same rights regarding the nonpayment of the sales and use tax by a buyer that the vendor*

*would have if the sales and use tax were a part of the purchase price of the tangible personal property, **DIGITAL CODE, DIGITAL PRODUCT,** or taxable service at the time of the sale.*

*11–405.*

*A vendor who sells tangible personal property, **A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service through a vending or other self–service machine:*

> *(1)     shall pay the sales and use tax to the Comptroller; and*

> *(2)     may not collect the sales and use tax from the buyer as a separately stated item.*

*11–408.*

*(a)     If a buyer is required under Subtitle 2 of this title or by regulation to provide a vendor with evidence of an exemption, the vendor may not recognize the exemption unless the buyer, before the sale is consummated, provides the vendor with:*

> *(1)     evidence that the buyer has an exemption certificate; or*

> *(2)     the evidence that the Comptroller requires by regulation.*

*(b)     (1)     Except as provided in paragraph (3) of this subsection, the duty of a vendor to collect the sales and use tax from a buyer is waived if the buyer provides the vendor with a signed resale certificate that:*

> *(i)     is in the form that the Comptroller requires by regulation;*

> *(ii)     states the name and address of the buyer;*

> *(iii)     1.     provides the Maryland sales and use tax registration number of the buyer; or*

> *2.     for the sale of an antique or used collectible, provides a sales and use tax registration number of another state and states that the buyer is an out–of–state vendor who does not engage in the business of an out–of–state vendor, as defined in § 11–701 of this title; and*

> *(iv)     contains a statement to the effect that the tangible personal property, **DIGITAL CODE, DIGITAL PRODUCT,** or taxable service is bought for the purpose of resale.*

> *(2)     (i)     If a buyer provides a resale certificate with a sales and use tax registration number of another state as provided under paragraph (1)(iii)2 of this subsection,*

*the buyer shall also provide a copy of a sales and use tax registration license issued to the buyer from that state.*

*(ii)        If a buyer is from a state without a sales and use tax, that buyer shall provide a copy of a trader's license from that state or a comparable type of identification.*

*(3)        (i)        A vendor may not accept a resale certificate if the vendor knows or should know that the sale is not for the purpose of resale.*

*(ii)        A vendor may not accept a resale certificate for a cash, check, or credit card sale if:*

*1.        the taxable price is less than $200; and*

*2.        the tangible personal property,* ***DIGITAL CODE, DIGITAL PRODUCT,*** *or taxable service is not delivered by the vendor directly to the buyer's retail place of business.*

*(4)        A vendor shall obtain a resale certificate from a buyer:*

*(i)        before the sale is consummated; or*

*(ii)        if the vendor receives a notice of the Comptroller's intent to assess sales and use tax for failure to obtain a proper resale certificate, within 60 days after the date on which the notice is mailed.*

*(5)        If the vendor fails to obtain the resale certificate as required, the Comptroller's assessment under paragraph (4)(ii) of this subsection is final.*

*(c)        If the taxable price is less than $200 for a cash, check, or credit card sale or sale for use that is not a retail sale and the tangible personal property,* ***DIGITAL CODE, DIGITAL PRODUCT,*** *or taxable service is not delivered by the vendor directly to the buyer's retail place of business:*

*(1)        the sales and use tax shall be paid when the sale is made or when the use becomes taxable; and*

*(2)        the buyer who pays the sales and use tax may file a claim for a refund with the Comptroller.*

*11–501.*

*(a)        A buyer who fails to pay the sales and use tax on a purchase or use subject to the tax to the vendor as required in § 11–403 of this title or to a marketplace facilitator as required in § 11–403.1 of this title or who is required by regulation to file a return for a*

App. 54

*purchase or use subject to the tax shall complete, under oath, and file with the Comptroller a sales and use tax return:*

> *(1)   on or before the 20th day of the month that follows the month in which the buyer makes that purchase or use; and*

> *(2)   for other periods and on other dates that the Comptroller specifies, by regulation, including periods in which the buyer does not make any purchase or use subject to the sales and use tax.*

*(b)   The return shall state for the period that the return covers:*

> *(1)   the total value of the tangible personal property, **DIGITAL CODE, DIGITAL PRODUCT,** or taxable service that is subject to the sales and use tax; and*

> *(2)   the sales and use tax due.*

*11–502.1.*

*(a)   Each marketplace facilitator shall complete, under oath, and file with the Comptroller a sales and use tax return:*

> *(1)   on or before the 20th day of the month that follows the month in which a marketplace seller makes any retail sale or sale for use through the marketplace facilitator; and*

> *(2)   for other periods and on other dates that the Comptroller specifies by regulation, including periods in which a marketplace seller does not make any retail sale or sale for use through the marketplace facilitator.*

*(b)   A return shall state, for the period that the return covers:*

> *(1)   for a marketplace facilitator facilitating a retail sale or a sale for use:*

>> *(i)   the marketplace facilitator's gross revenues from the sales of marketplace sellers that the marketplace facilitator has facilitated and delivered in the State;*

>> *(ii)   the taxable price of sales of those marketplace sellers on which the sales and use tax is computed; and*

>> *(iii)   the sales and use tax due; and*

> *(2)   for a marketplace facilitator facilitating a sale for use:*

   *(i)* *the total value of the tangible personal property,* **DIGITAL CODE,** **DIGITAL PRODUCT,** *or taxable service sold by marketplace sellers the use of which became subject to the sales and use tax; and*

   *(ii)* *the sales and use tax due.*

 *(c)* *If the Comptroller approves, a marketplace facilitator engaging in more than one business in which the marketplace facilitator facilitates retail sales or sales for use may file a consolidated return covering the activities of the businesses.*

*11–701.*

 *(a)* *In this subtitle the following words have the meanings indicated.*

 *(b)* *(1)* *"Engage in the business of an out–of–state vendor" means to sell or deliver tangible personal property or a taxable service for use in the State* **OR A DIGITAL PRODUCT OR DIGITAL CODE TO A CUSTOMER TAX ADDRESS IN THE STATE***.*

  *(2)* *"Engage in the business of an out–of–state vendor" includes:*

   *(i)* *permanently or temporarily maintaining, occupying, or using any office, sales or sample room, or distribution, storage, warehouse, or other place for the sale of tangible personal property,* **A DIGITAL CODE, A DIGITAL PRODUCT,** *or a taxable service directly or indirectly through an agent or subsidiary;*

   *(ii)* *having an agent, canvasser, representative, salesman, or solicitor operating in the State for the purpose of delivering, selling, or taking orders for tangible personal property,* **A DIGITAL CODE, A DIGITAL PRODUCT,** *or a taxable service; or*

   *(iii)* *entering the State on a regular basis to provide service or repair for tangible personal property* **OR A DIGITAL PRODUCT***.*

 *(c)* *(1)* *"Engage in the business of a retail vendor" means to sell or deliver tangible personal property,* **A DIGITAL CODE, A DIGITAL PRODUCT,** *or a taxable service in the State.*

  *(2)* *"Engage in the business of a retail vendor" includes liquidating a business that sells tangible personal property,* **A DIGITAL CODE, A DIGITAL PRODUCT,** *or a taxable service, when the liquidator holds out to the public that the business is conducted by the liquidator.*

 *(d)* *(1)* *"License" means a license issued by the Comptroller:*

  *(i)* *to engage in the business of an out–of–state vendor;*

        *(ii)*     *to engage in the business of a retail vendor; or*

        *(iii)*     *to engage in the business of a marketplace facilitator.*

    *(2)*     *"License" includes a special license issued under § 11–707 of this subtitle.*

*11–703.*

    *An applicant for a license to engage in the business of an out–of–state vendor, to engage in the business of a retail vendor, or to engage in the business of a marketplace facilitator shall submit an application to the Comptroller:*

    *(1)*     *for each place of business in the State where the applicant sells tangible personal property, **A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service;*

    *(2)*     *if the applicant has no fixed place of business and sells from 1 or more vehicles, for each vehicle; or*

    *(3)*     *if the applicant has no fixed place of business and does not sell from a vehicle, for the place designated as the address to which notices are to be mailed.*

*11–707.*

    *(a)*     *The Comptroller may issue a special license to an applicant who:*

    *(1)*     *is not required to be licensed as an out–of–state vendor or a retail vendor;*

    *(2)*     *operates out of the State and sells tangible personal property, **A DIGITAL CODE, A DIGITAL PRODUCT,** or a taxable service for use in the State; and*

    *(3)*     *submits to the Comptroller an application on the form that the Comptroller requires.*

    *(b)*     *While it is effective, a special license authorizes the licensee to collect the sales and use tax.*

### Chapter 37 of the Acts of 2021

SECTION 3. AND BE IT FURTHER ENACTED, That:

    (1)     as provided in § 12–105 of the Tax – General Article, as enacted by Section 1 of this Act, all cigarettes and other tobacco products used, possessed, or held in the State on or after **[**July 1, 2020**] MARCH 14, 2021**, by any person for sale or use in the State shall be subject to the tax on cigarettes and other tobacco products as enacted under Section 1 of this Act;

(2)    the Comptroller may provide an alternative method of assessing and collecting the additional tax; and

(3)    the revenue attributable to this requirement shall be remitted to the Comptroller no later than [September 30, 2020] **JUNE 13, 2021**.

SECTION 4. AND BE IT FURTHER ENACTED, That on or before December 31, [2020] **2021**, the Comptroller's Office shall report to the Senate Budget and Taxation Committee and the House Committee on Ways and Means, in accordance with § 2–1257 of the State Government Article, on the change in consumption of cigarettes, other tobacco products, and electronic smoking devices in the State over the immediately preceding 12 months.

[SECTION 5. AND BE IT FURTHER ENACTED, That it is the intent of the General Assembly that the Comptroller distribute, as necessary, the sales and use tax and tobacco tax collected in fiscal year 2021 under Section 1 of this Act to:

(1)    the expenditure accounts of the appropriate units of State government to fund costs associated with the Coronavirus Disease 2019 (COVID–19); and

(2)    the Revenue Stabilization Account established under § 7–311 of the State Finance and Procurement Article.]

SECTION 6. AND BE IT FURTHER ENACTED, That Section 2 of this Act shall be applicable to all taxable years beginning after December 31, [2020] **2021**.

~~SECTION 2. AND BE IT FURTHER ENACTED, That this Act shall be applicable to all taxable years beginning after December 31, 2020.~~

~~SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 2021, contingent on the taking effect of Chapter _____ (H.B. 732 of 2020 Regular Session) of the Acts of the General Assembly of 2021, and if Chapter _____ (H.B. 732 of the 2020 Regular Session) does not become effective, this Act, with no further action required by the General Assembly, shall be null and void.~~

*SECTION 2. AND BE IT FURTHER ENACTED, That the Laws of Maryland read as follows:*

### *Article – Tax – General*

*10–102.1.*

(a)    (1)    *In this section the following words have the meanings indicated.*

      (8)    *"Pass–through entity's taxable income" means the portion of a pass–through entity's income under the federal Internal Revenue Code,* **CALCULATED WITHOUT REGARD TO ANY DEDUCTION FOR TAXES BASED ON NET INCOME THAT ARE IMPOSED BY ANY STATE OR POLITICAL SUBDIVISION OF A STATE,** *that is derived from or reasonably attributable to the trade or business of the pass–through entity in this State.*

      *SECTION 3. AND BE IT FURTHER ENACTED, That the General Assembly declares that this Act conforms the provisions of the Tax – General Article, as enacted by Section 1 of this Act, to reflect the intent of the General Assembly at the time of the enactment of Chapters 37 and 38 of the Acts of the General Assembly of 2021.*

      *SECTION 4. AND BE IT FURTHER ENACTED, That Section 2 of this Act shall be applicable to all taxable years beginning after December 31, 2019.*

      SECTION ~~2.~~ *5.* AND BE IT FURTHER ENACTED, That this Act is an emergency measure, is necessary for the immediate preservation of the public health or safety, has been passed by a yea and nay vote supported by three–fifths of all the members elected to each of the two Houses of the General Assembly, and shall take effect from the date it is enacted.

**Enacted under Article II, § 17(c) of the Maryland Constitution, May 30, 2021.**

**47 USC 151: Purposes of chapter; Federal Communications Commission created**
Text contains those laws in effect on March 11, 2021

**From Title 47-TELECOMMUNICATIONS**CHAPTER 5-WIRE OR RADIO
COMMUNICATIONSUBCHAPTER I-GENERAL PROVISIONS

### §151. Purposes of chapter; Federal Communications Commission created

For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

(June 19, 1934, ch. 652, title I, §1, 48 Stat. 1064 ; May 20, 1937, ch. 229, §1, 50 Stat. 189 ; Pub. L. 104–104, title I, §104, Feb. 8, 1996, 110 Stat. 86 .)

## EDITORIAL NOTES

### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning act June 19, 1934, ch. 652, 48 Stat. 1064 , known as the Communications Act of 1934, which is classified principally to this chapter. For complete classification of this Act to the Code, see section 609 of this title and Tables.

### AMENDMENTS

**1996**-Pub. L. 104–104 inserted ", without discrimination on the basis of race, color, religion, national origin, or sex," after "to all the people of the United States".

**1937**-Act May 20, 1937, inserted "for the purpose of promoting safety of life and property through the use of wire and radio communication".

## STATUTORY NOTES AND RELATED SUBSIDIARIES

### EXTENSION OF INTERNET TAX FREEDOM ACT

Pub. L. 114–113, div. E, title VI, §633, Dec. 18, 2015, 129 Stat. 2471 , provided that: "Sections 1101(a) and 1104(a)(2)(A) of the Internet Tax Freedom Act (title XI of division C of Public Law 105–277; 47 U.S.C. 151 note) shall be applied by substituting 'October 1, 2016' for 'October 1, 2015'."

**MORATORIUM ON INTERNET TAXES**

Pub. L. 105–277, div. C, title XI, Oct. 21, 1998, 112 Stat. 2681–719 , as amended by Pub. L. 107–75, §2, Nov. 28, 2001, 115 Stat. 703 ; Pub. L. 108–435, §§2–6A, Dec. 3, 2004, 118 Stat. 2615–2618 ; Pub. L. 110–108, §§2–6, Oct. 31, 2007, 121 Stat. 1024–1026 ; Pub. L. 113–235, div. E, title VI, §624, Dec. 16, 2014, 128 Stat. 2377 ; Pub. L. 114– 125, title IX, §922, Feb. 24, 2016, 130 Stat. 281 , provided that:

"SEC. 1100. SHORT TITLE.

"This title may be cited as the 'Internet Tax Freedom Act'.

"SEC. 1101. MORATORIUM.

"(a) Moratorium.-No State or political subdivision thereof may impose any of the following taxes:

"(1) Taxes on Internet access.

"(2) Multiple or discriminatory taxes on electronic commerce.

"(b) Preservation of State and Local Taxing Authority.-Except as provided in this section, nothing in this title shall be construed to modify, impair, or supersede, or authorize the modification, impairment, or superseding of, any State or local law pertaining to taxation that is otherwise permissible by or under the Constitution of the United States or other Federal law and in effect on the date of enactment of this Act [Oct. 21, 1998].

"(c) Liabilities and Pending Cases.-Nothing in this title affects liability for taxes accrued and enforced before the date of enactment of this Act, nor does this title affect ongoing litigation relating to such taxes.

"(d) Exception to Moratorium.-

"(1) In general.-Subsection (a) shall also not apply in the case of any person or entity who knowingly and with knowledge of the character of the material, in interstate or foreign commerce by means of the World Wide Web, makes any communication for commercial purposes that is available to any minor and that includes any material that is harmful to minors unless such person or entity has restricted access by minors to material that is harmful to minors-

"(A) by requiring use of a credit card, debit account, adult access code, or adult personal identification number;
"(B) by accepting a digital certificate that verifies age; or
"(C) by any other reasonable measures that are feasible under available technology.

"(2) Scope of exception.-For purposes of paragraph (1), a person shall not be considered to [be] making a communication for commercial purposes of material to the extent that the person is-

"(A) a telecommunications carrier engaged in the provision of a telecommunications service;

"(B) a person engaged in the business of providing an Internet access service;

"(C) a person engaged in the business of providing an Internet information location tool; or

"(D) similarly engaged in the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication made by another person, without selection or alteration of the communication.

"(3) Definitions.-In this subsection:

"(A) By means of the world wide web.-The term 'by means of the World Wide Web' means by placement of material in a computer server-based file archive so that it is publicly accessible, over the Internet, using hypertext transfer protocol, file transfer protocol, or other similar protocols.

"(B) Commercial purposes; engaged in the business.-

"(i) Commercial purposes.-A person shall be considered to make a communication for commercial purposes only if such person is engaged in the business of making such communications.

"(ii) Engaged in the business.-The term 'engaged in the business' means that the person who makes a communication, or offers to make a communication, by means of the World Wide Web, that includes any material that is harmful to minors, devotes time, attention, or labor to such activities, as a regular course of such person's trade or business, with the objective of earning a profit as a result of such activities (although it is not necessary that the person make a profit or that the making or offering to make such communications be the person's sole or principal business or source of income). A person may be considered to be engaged in the business of making, by means of the World Wide Web, communications for commercial purposes that include material that is harmful to minors, only if the person knowingly causes the material that is harmful to minors to be posted on the World Wide Web or knowingly solicits such material to be posted on the World Wide Web.

"(C) Internet.-The term 'Internet' means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

"(D) Internet access service.-The term 'Internet access service' means a service that enables users to access content, information, electronic mail, or other services offered over the Internet and may also include access to proprietary content, information, and other services as part of a package of services offered to consumers. The term 'Internet access service' does not include telecommunications services, except to the extent such services are purchased, used, or sold by a provider of Internet access to provide Internet access.

"(E) Internet information location tool.-The term 'Internet information location tool' means a service that refers or links users to an online location on the World Wide Web. Such term includes directories, indices, references, pointers, and hypertext links.

"(F) Material that is harmful to minors.-The term 'material that is harmful to minors' means any communication, picture, image, graphic image file, article, recording, writing, or other matter of any kind that is obscene or that-

"(i) the average person, applying contemporary community standards, would find, taking the material as a whole and with respect to minors, is designed to appeal to, or is designed to pander to, the prurient interest;

"(ii) depicts, describes, or represents, in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act, or a lewd exhibition of the genitals or post-pubescent female breast; and

"(iii) taken as a whole, lacks serious literary, artistic, political, or scientific value for minors.

"(G) Minor.-The term 'minor' means any person under 17 years of age.

"(H) Telecommunications carrier; telecommunications service.-The terms 'telecommunications carrier' and 'telecommunications service' have the meanings given such terms in section 3 of the Communications Act of 1934 (47 U.S.C. 153).

"(e) Additional Exception to Moratorium.-

"(1) In general.-Subsection (a) shall also not apply with respect to an Internet access provider, unless, at the time of entering into an agreement with a customer for the provision of Internet access services, such provider offers such customer (either for a fee or at no charge) screening software that is designed to permit the customer to limit access to material on the Internet that is harmful to minors.

"(2) Definitions.-In this subsection:

"(A) Internet access provider.-The term 'Internet access provider' means a person engaged in the business of providing a computer and communications facility through which a customer may obtain access to the Internet, but does

not include a common carrier to the extent that it provides only telecommunications services.

"(B) Internet access services.-The term 'Internet access services' means the provision of computer and communications services through which a customer using a computer and a modem or other communications device may obtain access to the Internet, but does not include telecommunications services provided by a common carrier.

"(C) Screening software.-The term 'screening software' means software that is designed to permit a person to limit access to material on the Internet that is harmful to minors.

"(3) Applicability.-Paragraph (1) shall apply to agreements for the provision of Internet access services entered into on or after the date that is 6 months after the date of enactment of this Act [Oct. 21, 1998].

"SEC. 1102. ADVISORY COMMISSION ON ELECTRONIC COMMERCE.

"(a) Establishment of Commission.-There is established a commission to be known as the Advisory Commission on Electronic Commerce (in this title referred to as the 'Commission'). The Commission shall-

"(1) be composed of 19 members appointed in accordance with subsection (b), including the chairperson who shall be selected by the members of the Commission from among themselves; and

"(2) conduct its business in accordance with the provisions of this title.

"(b) Membership.-

"(1) In general.-The Commissioners shall serve for the life of the Commission. The membership of the Commission shall be as follows:

"(A) 3 representatives from the Federal Government, comprised of the Secretary of Commerce, the Secretary of the Treasury, and the United States Trade Representative (or their respective delegates).

"(B) 8 representatives from State and local governments (one such representative shall be from a State or local government that does not impose a sales tax and one representative shall be from a State that does not impose an income tax).

"(C) 8 representatives of the electronic commerce industry (including small business), telecommunications carriers, local retail businesses, and consumer groups, comprised of-

"(i) 5 individuals appointed by the Majority Leader of the Senate;

"(ii) 3 individuals appointed by the Minority Leader of the Senate;

"(iii) 5 individuals appointed by the Speaker of the House of Representatives; and

"(iv) 3 individuals appointed by the Minority Leader of the House of Representatives.

"(2) Appointments.-Appointments to the Commission shall be made not later than 45 days after the date of the enactment of this Act [Oct. 21, 1998]. The chairperson shall be selected not later than 60 days after the date of the enactment of this Act.

"(3) Vacancies.-Any vacancy in the Commission shall not affect its powers, but shall be filled in the same manner as the original appointment.

"(c) Acceptance of Gifts and Grants.-The Commission may accept, use, and dispose of gifts or grants of services or property, both real and personal, for purposes of aiding or facilitating the work of the Commission. Gifts or grants not used at the expiration of the Commission shall be returned to the donor or grantor.

"(d) Other Resources.-The Commission shall have reasonable access to materials, resources, data, and other information from the Department of Justice, the Department of Commerce, the Department of State, the Department of the Treasury, and the Office of the United States Trade Representative. The Commission shall also have reasonable access to use the facilities of any such Department or Office for purposes of conducting meetings.

"(e) Sunset.-The Commission shall terminate 18 months after the date of the enactment of this Act [Oct. 21, 1998].

"(f) Rules of the Commission.-

"(1) Quorum.-Nine members of the Commission shall constitute a quorum for conducting the business of the Commission.

"(2) Meetings.-Any meetings held by the Commission shall be duly noticed at least 14 days in advance and shall be open to the public.

"(3) Opportunities to testify.-The Commission shall provide opportunities for representatives of the general public, taxpayer groups, consumer groups, and State and local government officials to testify.

"(4) Additional rules.-The Commission may adopt other rules as needed.

"(g) Duties of the Commission.-

"(1) In general.-The Commission shall conduct a thorough study of Federal, State and local, and international taxation and tariff treatment of transactions using the Internet and Internet access and other comparable intrastate, interstate or international sales activities.

"(2) Issues to be studied.-The Commission may include in the study under subsection (a)-

"(A) an examination of-

"(i) barriers imposed in foreign markets on United States providers of property, goods, services, or information engaged in electronic commerce and on United States providers of telecommunications services; and

"(ii) how the imposition of such barriers will affect United States consumers, the competitiveness of United States citizens providing property, goods, services, or information in foreign markets, and the growth and maturing of the Internet;

"(B) an examination of the collection and administration of consumption taxes on electronic commerce in other countries and the United States, and the impact of such collection on the global economy, including an examination of the relationship between the collection and administration of such taxes when the transaction uses the Internet and when it does not;

"(C) an examination of the impact of the Internet and Internet access (particularly voice transmission) on the revenue base for taxes imposed under section 4251 of the Internal Revenue Code of 1986 [26 U.S.C. 4251];

"(D) an examination of model State legislation that-

"(i) would provide uniform definitions of categories of property, goods, service, or information subject to or exempt from sales and use taxes; and

"(ii) would ensure that Internet access services, online services, and communications and transactions using the Internet, Internet access service, or online services would be treated in a tax and technologically neutral manner relative to other forms of remote sales;

"(E) an examination of the effects of taxation, including the absence of taxation, on all interstate sales transactions, including transactions using the Internet, on retail businesses and on State and local governments, which examination may include a review of the efforts of State and local governments to collect sales and use taxes owed on in-State purchases from out-of-State sellers; and

"(F) the examination of ways to simplify Federal and State and local taxes imposed on the provision of telecommunications services.

"(3) Effect on the communications act of 1934.-Nothing in this section shall include an examination of any fees or charges imposed by the Federal Communications Commission or States related to-

"(A) obligations under the Communications Act of 1934 (47 U.S.C. 151 et seq.); or

"(B) the implementation of the Telecommunications Act of 1996 [Pub. L. 104–104, see Short Title of 1996 Amendment note set out under section 609 of this title] (or of amendments made by that Act).

"(h) National Tax Association Communications and Electronic Commerce Tax Project.- The Commission shall, to the extent possible, ensure that its work does not undermine the

efforts of the National Tax Association Communications and Electronic Commerce Tax Project.

"SEC. 1103. REPORT.

"Not later than 18 months after the date of the enactment of this Act [Oct. 21, 1998], the Commission shall transmit to Congress for its consideration a report reflecting the results, including such legislative recommendations as required to address the findings of the Commission's study under this title. Any recommendation agreed to by the Commission shall be tax and technologically neutral and apply to all forms of remote commerce. No finding or recommendation shall be included in the report unless agreed to by at least two-thirds of the members of the Commission serving at the time the finding or recommendation is made.

"SEC. 1104. GRANDFATHERING OF STATES THAT TAX INTERNET ACCESS.

"(a) Pre-October 1998 Taxes.-

"(1) In general.-Section 1101(a) does not apply to a tax on Internet access that was generally imposed and actually enforced prior to October 1, 1998, if, before that date-

"(A) the tax was authorized by statute; and
"(B) either-

"(i) a provider of Internet access services had a reasonable opportunity to know, by virtue of a rule or other public proclamation made by the appropriate administrative agency of the State or political subdivision thereof, that such agency has interpreted and applied such tax to Internet access services; or

"(ii) a State or political subdivision thereof generally collected such tax on charges for Internet access.

"(2) Termination.-

"(A) In general.-Except as provided in subparagraph (B), this subsection shall not apply after June 30, 2020.

"(B) State telecommunications service tax.-

"(i) Date for termination.-This subsection shall not apply after November 1, 2006, with respect to a State telecommunications service tax described in clause (ii).

"(ii) Description of tax.-A State telecommunications service tax referred to in subclause (i) is a State tax-

"(I) enacted by State law on or after October 1, 1991, and imposing a tax on telecommunications service; and

"(II) applied to Internet access through administrative code or regulation issued on or after December 1, 2002.

"(3) Exception.-Paragraphs (1) and (2) shall not apply to any State that has, more than 24 months prior to the date of enactment of this paragraph [Oct. 31,

2007], enacted legislation to repeal the State's taxes on Internet access or issued a rule or other proclamation made by the appropriate agency of the State that such State agency has decided to no longer apply such tax to Internet access.

"(b) Pre-November 2003 Taxes.-

"(1) In general.-Section 1101(a) does not apply to a tax on Internet access that was generally imposed and actually enforced as of November 1, 2003, if, as of that date, the tax was authorized by statute and-

"(A) a provider of Internet access services had a reasonable opportunity to know by virtue of a public rule or other public proclamation made by the appropriate administrative agency of the State or political subdivision thereof, that such agency has interpreted and applied such tax to Internet access services; and

"(B) a State or political subdivision thereof generally collected such tax on charges for Internet access.

"(2) Termination.-This subsection shall not apply after November 1, 2005.

"(c) Application of Definition.-

"(1) In general.-Effective as of November 1, 2003-

"(A) for purposes of subsection (a), the term 'Internet access' shall have the meaning given such term by section 1104(5) of this Act, as enacted on October 21, 1998; and

"(B) for purposes of subsection (b), the term 'Internet access' shall have the meaning given such term by section 1104(5) of this Act as enacted on October 21, 1998, and amended by section 2(c) of the Internet Tax Nondiscrimination Act (Public Law 108–435).

"(2) Exceptions.-Paragraph (1) shall not apply until June 30, 2008, to a tax on Internet access that is-

"(A) generally imposed and actually enforced on telecommunications service purchased, used, or sold by a provider of Internet access, but only if the appropriate administrative agency of a State or political subdivision thereof issued a public ruling prior to July 1, 2007, that applied such tax to such service in a manner that is inconsistent with paragraph (1); or

"(B) the subject of litigation instituted in a judicial court of competent jurisdiction prior to July 1, 2007, in which a State or political subdivision is seeking to enforce, in a manner that is inconsistent with paragraph (1), such tax on telecommunications service purchased, used, or sold by a provider of Internet access.

"(3) No inference.-No inference of legislative construction shall be drawn from this subsection or the amendments to section 1105(5) made by the Internet Tax Freedom Act Amendments Act of 2007 [Pub. L. 110–108] for any period

prior to June 30, 2008, with respect to any tax subject to the exceptions described in subparagraphs (A) and (B) of paragraph (2).

"SEC. 1105. DEFINITIONS.

"For the purposes of this title:

"(1) Bit tax.-The term 'bit tax' means any tax on electronic commerce expressly imposed on or measured by the volume of digital information transmitted electronically, or the volume of digital information per unit of time transmitted electronically, but does not include taxes imposed on the provision of telecommunications.

"(2) Discriminatory tax.-The term 'discriminatory tax' means-

"(A) any tax imposed by a State or political subdivision thereof on electronic commerce that-

"(i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;

"(ii) is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as part of a phase-out of the tax over not more than a 5-year period;

"(iii) imposes an obligation to collect or pay the tax on a different person or entity than in the case of transactions involving similar property, goods, services, or information accomplished through other means;

"(iv) establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means; or

"(B) any tax imposed by a State or political subdivision thereof, if-

"(i) the sole ability to access a site on a remote seller's out-of-State computer server is considered a factor in determining a remote seller's tax collection obligation; or

"(ii) a provider of Internet access service or online services is deemed to be the agent of a remote seller for determining tax collection obligations solely as a result of-

"(I) the display of a remote seller's information or content on the out-of-State computer server of a provider of Internet access service or online services; or

"(II) the processing of orders through the out-of-State computer server of a provider of Internet access service or online services.

"(3) Electronic commerce.-The term 'electronic commerce' means any transaction conducted over the Internet or through Internet access, comprising the

sale, lease, license, offer, or delivery of property, goods, services, or information, whether or not for consideration, and includes the provision of Internet access.

"(4) Internet.-The term 'Internet' means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

"(5) Internet access.-The term 'Internet access'-

"(A) means a service that enables users to connect to the Internet to access content, information, or other services offered over the Internet;

"(B) includes the purchase, use or sale of telecommunications by a provider of a service described in subparagraph (A) to the extent such telecommunications are purchased, used or sold-

"(i) to provide such service; or

"(ii) to otherwise enable users to access content, information or other services offered over the Internet;

"(C) includes services that are incidental to the provision of the service described in subparagraph (A) when furnished to users as part of such service, such as a home page, electronic mail and instant messaging (including voice- and video-capable electronic mail and instant messaging), video clips, and personal electronic storage capacity;

"(D) does not include voice, audio or video programming, or other products and services (except services described in subparagraph (A), (B), (C), or (E)) that utilize Internet protocol or any successor protocol and for which there is a charge, regardless of whether such charge is separately stated or aggregated with the charge for services described in subparagraph (A), (B), (C), or (E); and

"(E) includes a homepage, electronic mail and instant messaging (including voice- and video-capable electronic mail and instant messaging), video clips, and personal electronic storage capacity, that are provided independently or not packaged with Internet access.

"(6) Multiple tax.-

"(A) In general.-The term 'multiple tax' means any tax that is imposed by one State or political subdivision thereof on the same or essentially the same electronic commerce that is also subject to another tax imposed by another State or political subdivision thereof (whether or not at the same rate or on the same basis), without a credit (for example, a resale exemption certificate) for taxes paid in other jurisdictions.

"(B) Exception.-Such term shall not include a sales or use tax imposed by a State and 1 or more political subdivisions thereof on the same electronic

commerce or a tax on persons engaged in electronic commerce which also may have been subject to a sales or use tax thereon.

"(C) Sales or use tax.-For purposes of subparagraph (B), the term 'sales or use tax' means a tax that is imposed on or incident to the sale, purchase, storage, consumption, distribution, or other use of tangible personal property or services as may be defined by laws imposing such tax and which is measured by the amount of the sales price or other charge for such property or service.

"(7) State.-The term 'State' means any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States.

"(8) Tax.-

"(A) In general.-The term 'tax' means-

"(i) any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes, and is not a fee imposed for a specific privilege, service, or benefit conferred; or

"(ii) the imposition on a seller of an obligation to collect and to remit to a governmental entity any sales or use tax imposed on a buyer by a governmental entity.

"(B) Exception.-Such term does not include any franchise fee or similar fee imposed by a State or local franchising authority, pursuant to section 622 or 653 of the Communications Act of 1934 (47 U.S.C. 542, 573), or any other fee related to obligations or telecommunications carriers under the Communications Act of 1934 (47 U.S.C. 151 et seq.).

"(9) Telecommunications.-The term 'telecommunications' means 'telecommunications' as such term is defined in section 3(43) of the Communications Act of 1934 (47 U.S.C. 153(43) [now 153(50)]) and 'telecommunications service' as such term is defined in section 3(46) of such Act (47 U.S.C. 153(46) [now 153(53)]), and includes communications services (as defined in section 4251 of the Internal Revenue Code of 1986 (26 U.S.C. 4251)).

"(10) Tax on internet access.-

"(A) In general.-The term 'tax on Internet access' means a tax on Internet access, regardless of whether such tax is imposed on a provider of Internet access or a buyer of Internet access and regardless of the terminology used to describe the tax.

"(B) General exception.-The term 'tax on Internet access' does not include a tax levied upon or measured by net income, capital stock, net worth, or property value.

"(C) Specific exception.-

"(i) Specified taxes.-Effective November 1, 2007, the term 'tax on Internet access' also does not include a State tax expressly levied on commercial activity, modified gross receipts, taxable margin, or gross

income of the business, by a State law specifically using one of the foregoing terms, that-

"(I) was enacted after June 20, 2005, and before November 1, 2007 (or, in the case of a State business and occupation tax, was enacted after January 1, 1932, and before January 1, 1936);

"(II) replaced, in whole or in part, a modified value-added tax or a tax levied upon or measured by net income, capital stock, or net worth (or, is a State business and occupation tax that was enacted after January 1, 1932 and before January 1, 1936);

"(III) is imposed on a broad range of business activity; and

"(IV) is not discriminatory in its application to providers of communication services, Internet access, or telecommunications.

"(ii) Modifications.-Nothing in this subparagraph shall be construed as a limitation on a State's ability to make modifications to a tax covered by clause (i) of this subparagraph after November 1, 2007, as long as the modifications do not substantially narrow the range of business activities on which the tax is imposed or otherwise disqualify the tax under clause (i).

"(iii) No inference.-No inference of legislative construction shall be drawn from this subparagraph regarding the application of subparagraph (A) or (B) to any tax described in clause (i) for periods prior to November 1, 2007.

"SEC. 1106. ACCOUNTING RULE.

"(a) In General.-If charges for Internet access are aggregated with and not separately stated from charges for telecommunications or other charges that are subject to taxation, then the charges for Internet access may be subject to taxation unless the Internet access provider can reasonably identify the charges for Internet access from its books and records kept in the regular course of business.

"(b) Definitions.-In this section:

"(1) Charges for internet access.-The term 'charges for Internet access' means all charges for Internet access as defined in section 1105(5).

"(2) Charges for telecommunications.-The term 'charges for telecommunications' means all charges for telecommunications, except to the extent such telecommunications are purchased, used, or sold by a provider of Internet access to provide Internet access or to otherwise enable users to access content, information or other services offered over the Internet.

"SEC. 1107. EFFECT ON OTHER LAWS.

"(a) Universal Service.-Nothing in this Act [probably means "this title"] shall prevent the imposition or collection of any fees or charges used to preserve and advance Federal universal service or similar State programs-

"(1) authorized by section 254 of the Communications Act of 1934 (47 U.S.C. 254); or

"(2) in effect on February 8, 1996.

"(b) 911 and E–911 Services.-Nothing in this Act [probably means "this title"] shall prevent the imposition or collection, on a service used for access to 911 or E–911 services, of any fee or charge specifically designated or presented as dedicated by a State or political subdivision thereof for the support of 911 or E–911 services if no portion of the revenue derived from such fee or charge is obligated or expended for any purpose other than support of 911 or E–911 services.

"(c) Non-Tax Regulatory Proceedings.-Nothing in this Act [probably means "this title"] shall be construed to affect any Federal or State regulatory proceeding that is not related to taxation.

"[SEC. 1108. REPEALED. PUB. L. 110–108, §5(B), OCT. 31, 2007, 121 STAT. 1026 ]

"SEC. 1109. EXCEPTION FOR TEXAS MUNICIPAL ACCESS LINE FEE.

"Nothing in this Act [probably means "this title"] shall prohibit Texas or a political subdivision thereof from imposing or collecting the Texas municipal access line fee pursuant to Texas Local Govt. Code Ann. ch. 283 (Vernon 2005) and the definition of access line as determined by the Public Utility Commission of Texas in its 'Order Adopting Amendments to Section 26.465 As Approved At The February 13, 2003 Public Hearing', issued March 5, 2003, in Project No. 26412."

[ Pub. L. 110–108, §7, Oct. 31, 2007, 121 Stat. 1027 , provided that: "This Act [enacting provisions set out as a note under section 609 of this title and amending title XI of div. C of Pub. L. 105–277, set out above], and the amendments made by this Act, shall take effect on November 1, 2007, and shall apply with respect to taxes in effect as of such date or thereafter enacted, except as provided in section 1104 of the Internet Tax Freedom Act [title XI of div. C of Pub. L. 105–277] (47 U.S.C. 151 note)."]

[ Pub. L. 108–435, §8, Dec. 3, 2004, 118 Stat. 2619 , provided that: "The amendments made by this Act [amending title XI of div. C of Pub. L. 105–277, set out above] take effect on November 1, 2003."]

## STYLISTIC CONSISTENCY

Pub. L. 104–104, title I, §101(c), Feb. 8, 1996, 110 Stat. 79 , provided that: "The Act [Communications Act of 1934 (47 U.S.C. 151 et seq.)] is amended so that-

"(1) the designation and heading of each title of the Act shall be in the form and typeface of the designation and heading of this title of this Act [110 Stat. 61]; and

"(2) the designation and heading of each part of each title of the Act shall be in the form and typeface of the designation and heading of part I of title II of the Act [110 Stat. 61], as amended by subsection (a)."

STUDY OF TELECOMMUNICATIONS AND INFORMATION GOALS

Pub. L. 97–259, title II, §202, Sept. 13, 1982, 96 Stat. 1099 , required the National Telecommunications and Information Administration to conduct a comprehensive study of the long-range international telecommunications and information goals of the United States and the policies and the strategies needed to achieve these goals, with a review of these policies, and provided the Administration would not make public information regarding usage or traffic patterns which would damage United States commercial interests.

COMMISSION ON GOVERNMENTAL USE OF INTERNATIONAL TELECOMMUNICATIONS

Act July 29, 1954, ch. 647, 68 Stat. 587 , established the Commission on Governmental Use of International Telecommunications to examine, study and report on the objectives, operations, and effectiveness of information programs with respect to the prompt development of techniques, methods, and programs for greatly expanded and far more effective operations in this vital area of foreign policy through the use of foreign telecommunications. The Commission was required to make a report of its findings and recommendations on or before Dec. 31, 1954, and the Commission ceased to exist 90 days after submission of its report to the Congress.

COMMUNICATION PRIVILEGES TO PARTICIPANTS IN WORLD TELECOMMUNICATION CONFERENCES

Act May 13, 1947, ch. 51, 61 Stat. 83 , provided that nothing in this chapter, or in any other provision of law should be construed to prohibit United States communication common carriers from rendering free communication services to official participants in the world telecommunications conferences which were held in the United States in 1947.

EXECUTIVE DOCUMENTS

EXECUTIVE ORDER NO. 10460

Ex. Ord. No. 10460, eff. June 18, 1953, 18 F.R. 3513, as amended by Ex. Ord. No. 10773, eff. July 1, 1958, 23 F.R. 5061; Ex. Ord. No. 10782, eff. Sept. 8, 1958, 23 F.R. 6971, which related to the performance of telecommunication functions by Director of the Office of Civil and Defense Mobilization, was revoked by section 4 of Ex. Ord. No. 10995, eff. Feb. 16, 1962, 27 F.R. 1519.