**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

                 *Plaintiffs*,

v.

PETER FRANCHOT,

                 *Defendant*.

No. 1:21-cv-410-DKC

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO MOTION TO DISMISS
AND MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

Michael B. Kimberly (No. 19086)
Paul W. Hughes (No. 28967)
Stephen P. Kranz*
Sarah P. Hogarth*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *mkimberly@mwe.com*
   *(202) 756-8000*

*Attorneys for All Plaintiffs*

Tara S. Morrissey*
Jennifer B. Dickey*
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *tmorrissey@uschamber.com*
   *(202) 463-5337*

*Attorneys for the Chamber of Commerce
of the United States of America*

July 29, 2021               *\* admitted pro hac vice*

# TABLE OF CONTENTS

Introduction ........................................................................................................ 1

Statement ........................................................................................................... 3

    A.   The Maryland Digital Ad Tax Act ......................................................... 3

    B.   Remedies available in state court........................................................ 9

Argument ......................................................................................................... 10

I.   The case is ripe........................................................................................... 11

II.  The case is not barred by the TIA or tax comity ....................................... 14

    A.   The Act does not assess a "tax" within the meaning of the TIA ....... 15

        1.   According to more than a century of Supreme Court precedent, the TIA does not bar pre-enforcement challenges to punitive fees ................... 15

        2.   Contemporary cases have carried forward the tax/fee distinction ............. 18

        3.   In both purpose and operation, the assessment here is a punitive fee.......... 21

    B.   *CIC Services* did not abrogate this century-old framework ................. 29

    C.   Scores of long-delayed, company-by-company refund actions would be a manifestly inefficient remedy ........................................................ 33

    D.   For the same reason, tax comity does not bar this suit ...................... 36

    E.   At a minimum, the TIA does not bar plaintiffs' challenge to the Act's pass-through prohibition. ................................................................. 37

III.  Plaintiffs are entitled to summary judgment on their preemption claim ................... 38

    A.   There is no presumption against preemption...................................... 39

    B.   The Act assesses a discriminatory tax within the meaning of ITFA.................. 40

    C.   The State's defenses are meritless ..................................................... 45

        1.   ITFA does not violate the anti-commandeering principle ............................ 45

        2.   Plaintiffs have a private cause of action to enforce ITFA............................. 47

IV.  Plaintiffs are entitled to summary judgment on their constitutional claims ............. 50

    A.   The Act facially discriminates against out-of-state commerce ......................... 50

    B.   The Act's assessment applies to extraterritorial conduct, in violation of both the Commerce Clause and Due Process Clause ......................... 53

V.  Plaintiffs are entitled to summary judgment on their challenge to the pass-through prohibition ................................................................................. 56

    A.   If the pass-through prohibition regulates what payers may say on bills and invoices, it violates the First Amendment ................................... 56

    B.   If the pass-through prohibition regulates conduct rather than speech, it violates the Commerce Clause ......................................................... 58

Conclusion........................................................................................................ 61

## TABLE OF AUTHORITIES

**Cases**

*Air Evac EMS, Inc. v. Cheatham,*
910 F.3d 751 (2018) ............................................................... 39, 40

*Alcan Aluminum Ltd. v. Department of Revenue of Oregon,*
724 F.2d 1294 (7th Cir. 1984) ............................................... 12

*Aloha Airlines v. Director of Taxation of Hawaii,*
464 U.S. 7 (1983) ................................................................. 39, 47

*American Trucking Associations, Inc. v. Alviti,*
944 F.3d 45 (1st Cir. 2019) ................................................. *passim*

*Appalachian Power Co. v. Train,*
566 F.2d 451 (4th Cir. 1977) ............................................... 12

*Arizona Public Service Co. v. Snead,*
441 U.S. 141 (1979) ............................................................. 47

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) ............................................................ *passim*

*Association for Accessible Medicines v. Frosh,*
887 F.3d 664 (4th Cir. 2018) (*AAM*) ..................... 53, 54, 58, 59

*Babbitt v. United States Workers National Union,*
442 U.S. 289 (1979) ............................................................. 14

*Bailey v. Drexel Furniture Co.,*
259 U.S. 20 (1922) ............................................................. *passim*

*Bailey v. George,*
259 U.S. 16 (1922) ............................................................... 30, 31

*Baldwin v. G.A.F. Seelig, Inc.,*
294 U.S. 511 (1935) ............................................................. 54

*BellSouth Telecommunications, Inc. v. Farris,*
542 F.3d 499 (6th Cir. 2008) ......................... 38, 56, 57, 58

*Bidart Bros. v. California Apple Commission,*
73 F.3d 925 (9th Cir. 1996) ............................................... *passim*

*Birdman v. Office of the Governor,*
677 F.3d 167 (3d Cir. 2012) ............................................... 12

*Blessing v. Freestone,*
520 U.S. 329 (1997) ............................................................. 48

*BMW of North America v. Gore,*
517 U.S. 559 (1996) ............................................................. 54, 55

Cases—continued

*Boston Stock Exchange v. State Tax Commission*,
429 U.S. 318 (1977) ............................................................... 51

*Cabral v. Caesars Entertainment Corp.*,
467 P.3d 638, 2020 WL 4353616 (Nev. July 29, 2020) ............................................. 49

*Capitol Indus.-EMI, Inc. v. Bennett*,
681 F.2d 1107 (9th Cir. 1982) ................................................... 35

*Central of Georgia Railway v. Wright*,
207 U.S. 127 (1907) .......................................................... 17, 29

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011) .............................................................. 39

*Charter Federal Savings Bank v. Office of Thrift Supervision*,
976 F.2d 203 (4th Cir. 1992) .................................................. 13

*Chemical Waste Management, Inc. v. Hunt*,
504 U.S. 334 (1992) .......................................................... 50, 53

*CIC Services v. IRS*,
141 S. Ct. 1582 (2021) ...................................................... *passim*

*Clear Channel Outdoor, Inc. v. Baltimore*,
153 F. Supp. 3d 865 (D. Md. 2015) ............................................. 27

*Collins Holding Corp. v. Jasper County, South Carolina*,
123 F.3d 797 (4th Cir. 1997) ................................................ 20, 29

*Commonwealth Edison Company v. Montana*,
453 U.S. 609 (1981) .............................................................. 53

*Complete Auto Transit v. Brady*,
430 U.S. 274 (1977) .............................................................. 52

*Comptroller v. Wynne*,
64 A.3d 453 (Md. 2013) ............................................. 10, 34, 52, 55

*Consol. Edison Co. of N.Y. v. Pataki*,
292 F.3d 338 (2d Cir. 2002) ........................................... 8, 20, 25

*Container Corp. of America v. Franchise Tax Board*,
463 U.S. 159 (1983) .......................................................... 54, 55

*Denton v. City of Carrollton, Georgia*,
235 F.2d 481 (5th Cir. 1956) ................................... 19, 20, 21, 35

*Department of Revenue of Montana v. Kurth Ranch*,
511 U.S. 767 (1994) ...................................................... 19, 20, 21

*Direct Marketing Association v. Brohl*,
575 U.S. 1 (2015) ............................................................ 15, 17

Cases—continued

*DIRECTV, Inc. v. Tolson*,
  513 F.3d 119 (4th Cir. 2008) ................................................................ 36, 37

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*,
  651 F.3d 722 (7th Cir. 2011) (en banc) ....................................... 19, 31

*Environmental Defense v. Duke Energy Corp.*,
  549 U.S. 561 (2007) ............................................................................ 41

*Ex Parte Young*,
  209 U.S. 123 (1908) ............................................................. 39, 47, 48

*Exxon Corp. v. Eagerton*,
  462 U.S. 176 (1983) ............................................................... 60, 61

*Folio v. City of Clarksburg, West Virginia*,
  134 F.3d 1211 (4th Cir. 1998) .................................................. 31

*Frey v. Comptroller*,
  29 A.3d 475 (Md. 2011) .............................................................. 34

*Fulton Corp. v. Faulkner*,
  516 U.S. 325 (1996) ........................................................... 50, 51

*Garrett v. Bamford*,
  538 F.2d 63 (3d Cir. 1976) ........................................................ 34, 35

*Gary D. Peake Excavating Inc. v. Town Board of Town of Hancock*,
  93 F.3d 68 (2d Cir. 1996) ................................................................. 14

*GenOn Mid-Atlantic, LLC v. Montgomery County, Maryland*,
  650 F.3d 1021 (4th Cir. 2011) ............................................. *passim*

*Georgia Railroad & Banking Co. v. Redwine*,
  342 U.S. 299 (1952) ........................................................ 33, 34, 35

*Golden State Transit Corp. v. City of Los Angeles*,
  493 U.S. 103 (1989) .......................................................... 49

*Gonzaga University v. Doe*,
  536 U.S. 273 (2002) ........................................................ 48

*Graham v. Dupont*,
  262 U.S. 234 (1923) ....................................................... 16, 31, 35

*Gwozdz v. HealthPort Technologies, LLC*,
  846 F.3d 738 (4th Cir. 2017) ......................................... 36

*Harris v. Mexican Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009) ................................... 12

*Head Money Cases*
  112 U.S. 580 (1884) ....................................................... 17, 21, 26

**Cases—continued**

*Healy v. Beer Inst.*,
    491 U.S. 324 (1989) ............................................................. 54, 59

*Helvering v. National Grocery Co.*,
    304 U.S. 282 (1938) ....................................................................... 60

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ......................................................................... 18

*Holland v. Florida*,
    560 U.S. 631 (2010) ................................................................. 15, 43

*Holzheid v. Comptroller of Treasury of Maryland*,
    205 A.3d 43 (Md. Ct. Sp. App. 2019) ..................................... 10, 34

*Just Puppies, Inc. v. Frosh*,
    438 F. Supp. 3d 448 (D. Md. 2020) ............................................. 48

*Kathrein v. City of Evanston, Illinois*,
    636 F.3d 906 (7th Cir. 2011) ................................................. 21, 29

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ................................................. 21, 22

*Levin v. Commerce Energy*,
    560 U.S. 413 (2010) ....................................................................... 37

*Lewis v. BT Investment Managers, Inc.*,
    447 U.S. 27 (1980) ......................................................................... 60

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ....................................................................... 13

*Lipke v. Lederer*,
    259 U.S. 557 (1922) ................................................. 16, 17, 19, 20

*Maryland v. Louisiana*,
    451 U.S. 725 (1981) ....................................................................... 59

*Matthews v. Rodgers*,
    284 U.S. 521 (1932) ....................................................................... 37

*McBurney v. Young*,
    667 F.3d 454 (4th Cir. 2012) ....................................................... 50

*McGoldrick v. Berwind-White Coal Mining Co.*,
    309 U.S. 33 (1940) ......................................................................... 55

*Miller v. Brown*,
    462 F.3d 312 (4th Cir. 2006) ....................................................... 13

*Miller v. French*,
    530 U.S. 327 (2000) ....................................................................... 15

**Cases—continued**

*Mobil Oil Corp. v. Dubno,*
   639 F.2d 919 (2d Cir. 1981) ........................................ 38

*Mobil Oil Corp. v. Tully,*
   639 F.2d 912 (2d Cir. 1981) ........................................ 38

*Murphy v. National Collegiate Athletic Association,*
   138 S. Ct. 1461 (2018) ........................................ *passim*

*National Private Truck Council v. Oklahoma Tax Commission,*
   515 U.S. 582 (1995) ........................................ 17, 37

*National Treasury Employees Union v. Chertoff,*
   452 F.3d 839 (D.C. Cir. 2006) ........................................ 12

*New York v. United States,*
   505 U.S. 144 (1992) ........................................ 45, 46

*NFIB v. Sebelius,*
   567 U.S. 519 (2012) ........................................ 31, 32

*North Dakota v. Heydinger,*
   825 F.3d 912 (8th Cir. 2016) ........................................ 14

*Oklahoma Tax Commission v. Jefferson Lines, Inc.,*
   514 U.S. 175 (1995) ........................................ 55

*OverDrive Inc. v. Open E-Book Forum,*
   986 F.3d 954 (6th Cir. 2021) ........................................ 13

*Pacific Gas & Electric Co. v. State Energy Resource Conserv. & Dev. Comm'n,*
   461 U.S. 190 (1983) ........................................ 12, 14

*Performance Marketing Association v. Hamer,*
   998 N.E.2d 54 (Ill. 2013) ........................................ 44

*Peterson v. State,*
   226 A.3d 246 (2020) ........................................ 58

*Planned Parenthood South Atlantic v. Baker,*
   941 F.3d 687 (4th Cir. 2019) ........................................ 48

*Pleasures of San Patricio, Inc. v. Mendez-Torres,*
   596 F.3d 1 (1st Cir. 2010) ........................................ 35, 36

*Printz v. United States,*
   521 U.S. 898 (1997) ........................................ 46

*Puerto Rico v. Franklin California Tax-Free Trust,*
   136 S. Ct. 1938 (2016) ........................................ 39

*Regal Drug Corporation v. Wardell,*
   260 U.S. 386 (1922) ........................................ 16, 17

**Cases—continued**

*Retail Industry Leaders Association v. Fielder*,
   475 F.3d 180 (4th Cir. 2007)..................................................................*passim*

*Rosewell v. LaSalle National Bank*,
   450 U.S. 503 (1981) ............................................................ 33, 34, 35, 36

*San Juan Cellular Telephone Co.* v. *Public Services Commission of Puerto Rico*,
   967 F.2d 683 (1st Cir. 1992) ...............................................................*passim*

*Shalala v. Illinois Council on Long Term Care, Inc.*,
   529 U.S. 1 (2000) .......................................................................... 30, 33

*Shell Oil Co. v. New York State Tax Commission*,
   91 A.D.2d 81 (N.Y. App. 1983)..............................................................59, 60

*Shell Petroleum v. Graves*,
   709 F.2d 593 (9th Cir. 1983) ..................................................................... 12

*Smith v. Robinson*,
   568 U.S. 992 (1984) ..................................................................................... 48

*South Dakota, Inc. v. Wayfair*,
   138 S. Ct. 2080 (2018) ................................................................................ 47

*Southland Royalty Co. v. Navajo Tribe of Indians*,
   715 F.2d 486 (10th Cir. 1983) .................................................................. 12

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
   252 F. Supp. 3d 537 (E.D. Va. 2017) ...................................................... 33

*Trailer Marine Transportation Corp. v. Rivera Vazquez*,
   977 F.2d 1 (1st Cir. 1992)...................................................................*passim*

*Travelers Insurance v. Cuomo*,
   14 F.3d 708 (2d Cir. 1993) ........................................................................ 20

*United Haulers Assn., v. Oneida-Herkimer Solid Waste*,
   550 U.S. at 338, aff'd 569 U.S. 221 (2013) ............................................ 50

*United States v. La Franca*,
   282 U.S. 568 (1931) ..................................................................................... 32

*United States v. Reorganized CF & I Fabricators of Utah, Inc.*,
   518 U.S. 213, 224 (1996) ........................................................................... 32

*Valero Terrestrial Corp. v. Caffrey*,
   205 F.3d 130 (4th Cir. 2000) ............................................................*passim*

*W. Lynn Creamery, Inc. v. Healy*,
   512 U.S. 186 (1994) ..............................................................................50, 54

*Wal-Mart v. Zaragoza-Gomez*,
   834 F.3d 110 (1st Cir. 2016)..................................................................... 12

**Cases—continued**

*Westinghouse Electric Corp. v. Tully*,
  466 U.S. 388 (1984) ................................................................ 51, 52

*White v. Massachusetts Council of Const. Emps., Inc.*,
  460 U.S. 204 (1983) ............................................................................ 60

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) ............................................................................ 54

*Wright v. Riveland*,
  219 F.3d 905 (9th Cir. 2000) ............................................................. 21

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ............................................................................ 39

*Yates v. United States*,
  574 U.S. 528 (2015) ............................................................................ 42

**Statutes**

Anti-Injunction Act, 26 U.S.C. § 421 ............................... 15, 29, 30, 31

Internet Tax Freedom Act, 47 U.S.C. § 151 note ..................... *passim*
  § 1101(2)(A) ........................................................................................ 38
  § 1105(2)(A)(i) ...................................................................... 40, 43, 44
  § 1105(2)(A)(iv) ................................................................................. 45
  § 1105(3) ................................................................................... 40, 43
  § 1105(8)(A) ...................................................................................... 42
  § 1105(8)(A)(k) ................................................................................. 40

Ky. Rev. Stat. Ann. § 136.616(3) ............................................................ 58

Md. Code Ann., Educ.
  § 5-219 ................................................................................................. 8
  § 1-302(a) ..................................................................................... 9, 27

Md. Code Ann., Tax-Gen
  §2-4A-01 ............................................................................................... 8
  § 2-4A-02 ............................................................................................. 8
  § 10-105(b) .................................................................................. 7, 22
  § 13-505 ............................................................................................. 10
  § 13-523 ............................................................................................... 9
  § 13-508(a) ................................................................................... 9, 36
  § 13-805 ............................................................................................... 6
  § 13-809 ............................................................................................... 6
  § 13-812 ............................................................................................. 14
  § 13-901(a)(2) .............................................................................. 9, 34

**Statutes—continued**

Md. Code Ann., Tax-Gen (continued)
 § 13-904 ....................................................................................................... 9
 § 13-1001(f) ............................................................................................... 14
 § 13-1002(b) .............................................................................................. 14
 § 701(a) ...................................................................................................... 14

Md. Code Ann., Local Gov't § 20-202 ..................................................... 43

Pub. L. No. 105-277, 112 Stat. 2681-719 (1998) ................................... 40

Tax Injunction Act, 28 U.S.C. § 1341 .......................... 1, 2, 15, 19, 33

Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125,
 130 Stat. 122 ........................................................................................ 40, 41

**Other Authorities**

Garrett Watson, *Resisting the Allure of Gross Receipts Taxes:*
 *An Assessment of Their Costs and Consequences*,
 29 J. Multistate Tax'n 8 (May 2019) ............................................... 22

H.R. Rep. No. 105-570 (1998)....................................................... 40, 41

H.R. Rep. No. 113-510 (2014) ............................................................ 41

H.R. Rep. No. 75-1503 (1937) ............................................................ 18

Md. H.B. 732 (2020)........................................................................... 4, 5

Md. S.B. 787 (2021) .................................................................. 5, 24, 25

H.R. 3086, 113th Cong. (2013) .......................................................... 41

Letter from Attorney General Brian E. Frosh to Governor Lawrence J. Hogan, Jr.
 (April 22, 2020), perma.cc/Y8RD-KVDJ ...................................... 4

Letter from Sandra Benson Brantley to Delegate Alonzo T. Washington
 (Feb. 25, 2020), perma.cc/9SNH-S3F.............................................. 4

Paul Romer, *A Tax That Could Fix Big Tech*, N.Y. Times (May 6, 2019) ............................ 4, 8

S. Rep. No. 75-1035 (1937) ................................................................. 18

*Similar*, Merriam Webster's Third New International Dictionary 2120 (2002).................... 44

Tax Foundation, *State Corporate Income Tax Rates for 2021*................................. 22

U.S. Trade Rep., Report on France's Digital Services Tax
 (Dec. 2, 2019), perma.cc/E7BG-6KJF .............................. 7, 22, 35

**INTRODUCTION**

This case involves one of the clearest-cut examples of an unconstitutional state statute that the Court is likely to see. The Maryland Digital Advertising Gross Revenues Tax Act imposes a first-of-its-kind surcharge on digital advertising. It is designed to tightly target a small number of large, multinational technology companies, which it punishes for their out-of-State conduct using an incredibly burdensome assessment against gross revenue. The larger a company is—that is, the more revenue it generates outside of Maryland—the greater the rate of assessment on all in-State revenue the company must pay.[1]

The Act is a manifest violation of the Internet Tax Freedom Act (ITFA), which expressly preempts state charges that discriminate against internet-based commerce. It also violates both the Commerce Clause and Due Process Clause, which forbid States from burdening or punishing out-of-State conduct, as the Act does on its face. What is more, the Act includes an express pass-through prohibition, which violates the First Amendment (if it regulates what companies are permitted to say about the Act on invoices) or the Commerce Clause (if it forbids passing on of the Act's charge in extraterritorial transactions).

So apparent are these constitutional transgressions that the Maryland Attorney General barely attempts to defend them, shunting an abbreviated response to the complaint's four causes of action to the final third of its brief. Rather than focusing on the merits, it instead attempts to evade judicial review, invoking both the ripeness doctrine and the Tax Injunction Act. Neither of those jurisdictional arguments applies here.

---

[1] We describe the Act as imposing a charge, surcharge, assessment, levy, or exaction rather than a tax. The Act uses the word "tax," and so does the State throughout its motion. It bears emphasis, however, that the outcome here turns on substance, not labels. *See infra* at 31.

As for ripeness, there are no relevant contingencies in play here. The statute has been duly enacted. There is no question that it will apply to transactions beginning at the end of this year or that plaintiffs' members will be liable for its charge. No more is needed.

As for the TIA, that law specifies that federal courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. But the assessment here is not a "tax" within the meaning of the TIA. Nor is Maryland's state-court remedy an "efficient" alternative in any event.

As demonstrated more fully below, the word "tax" has a unique meaning under the TIA, one that is based on more than 130 years of judicial precedent. In this special context, the word "tax" excludes state exactions imposed for principally punitive purposes—so-called punitive fees or penalties. And numerous features of the Act's surcharge here indicate that it falls within that excluded category:

- it is remarkably onerous, so much so that it could more than wipe out a payer's profits on its in-State commercial activity;

- it is extremely narrowly targeted, especially at its highest rates of assessment, which apply to just a handful of companies;

- it includes a pass-through prohibition, which ensures that the payers of the charge, and they alone, bear its brunt—a limitation that courts repeatedly have found inherently punitive;

- its proceeds are placed in a segregated fund earmarked to offset the perceived negative "externalities" of the payers' conduct, akin to a restitution payment; and

- the legislative history shows that the Act's architects intended the Act to function as a penalty against large multinational companies, punishing them for growing too big and allegedly harming the free and reliable flow of information over the internet.

Courts across the country have held that features like this put an exaction outside the TIA's

reach, permitting a pre-enforcement constitutional challenge in federal court. The Fourth Circuit, in particular—in *GenOn Mid-Atlantic, LLC v. Montgomery County, Maryland*, 650 F.3d 1021, 1023 (4th Cir. 2011), and *Retail Industry Leaders Association v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (*RILA*)—has permitted pre-enforcement challenges to punitive fees bearing strong resemblance to the one at issue here. The State claims in response that a recent Supreme Court case—*CIC Services v. IRS*, 141 S. Ct. 1582 (2021), which had nothing to do with the tax/fee distinction—abrogated the century-plus of case law underlying *GenOn* and *RILA*. It did nothing of the sort. Instead, *CIC* reaffirmed the continued vitality of these precedents, clarifying only that a reporting requirement backed by a penalty for non-compliance also is not a "tax."

Beyond that, the TIA does not apply here because state-court remedies would not be "efficient." The Supreme Court and other courts of appeals have held that when the state-court alternative entails a multiplicity of lawsuits spread over many years, a single pre-enforcement challenge in federal court is appropriate. That is the case here. The Court accordingly should hold that the TIA does not bar this suit and deny the motion to dismiss. It should, in turn, grant summary judgment to plaintiffs and declare the Act illegal and unenforceable.

STATEMENT

### A.   The Maryland Digital Ad Tax Act

This case involves a challenge to the Maryland Digital Advertising Gross Revenues Tax Act, which was first enacted by the General Assembly in March 2020.

**1.**   In the months leading up to introduction of the Act, Professor Paul Romer published an op-ed in the *New York Times*. The op-ed accused Google, Facebook, and other

"dominant social media platforms" of "mak[ing] their profits using business models that erode" the "shared values and norms on which democracy depends." Compl. ¶ 43 (quoting Paul Romer, *A Tax That Could Fix Big Tech*, N.Y. Times (May 6, 2019), perma.cc/MZ83-NF5Y (*Romer Op-Ed*)). The op-ed described large digital advertising companies as "too big to trust" and blamed them for creating "a haven for dangerous misinformation and hate speech." *Id.* (quoting same). It called on States like Maryland to impose a "surcharge" or "penalty" on digital advertisers' business models. *Id.* (quoting same).

Maryland lawmakers answered the call, introducing the Act in January 2020 as House Bill 732. *See* perma.cc/49CZ-NGZW. From the beginning, the Act was modeled on Professor Romer's op-ed. Senate President Bill Ferguson—a sponsor of the Senate companion bill, S.B. 2—made this clear, testifying that the law "is based off a model originally built by Paul Romer." Compl. ¶ 45. Senator Ferguson also presented Professor Romer as a witness in support of the Act and lodged his op-ed in the legislative history. Compl. ¶ 43.

Lawmakers expressed concern early on that the Act may be unlawful. In a February 25, 2020 response to an inquiry by Democratic Delegate Alonzo Washington, the Office of the Attorney General of Maryland—the same office representing the defendant here—concluded that an earlier-introduced (but substantively identical) version of the Act "would likely be preempted by the ITFA," insofar as the Act is interpreted to tax "the transmission of digital advertising to a user." *See* Compl. ¶ 8; Letter from Sandra Benson Brantley to Delegate Alonzo T. Washington (Feb. 25, 2020), perma.cc/9SNH-S3FU; *accord* Letter from Attorney General Brian E. Frosh to Governor Lawrence J. Hogan, Jr. (April 22, 2020), perma.cc/Y8RD-KVDJ). The letter also advised that the Act may require revisions to avoid potential invalidation under the Commerce Clause. *Id.* Such revisions were never made. *Id.*

**2.**    Notwithstanding these concerns, the General Assembly passed H.B. 732 on March 18, 2020. Governor Hogan vetoed the bill on May 7, 2020, but the Assembly overrode the veto in the next legislative session, on February 12, 2021. The Assembly then amended the Act with S.B. 787 on February 18, 2021. *See* Compl. ¶¶ 1, 4, 5, 26.

As amended, the Act imposes a graduated charge on "digital advertising services," but not on advertising services through other means. *See* Md. Code Ann., Tax-Gen. § 7.5-101. "Digital advertising services" are defined as "advertisement services on a digital interface, including advertisements in the form of banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services." *Id.* § 7.5-101(e)(1). A "digital interface" is "any type of software, including a website, part of a website, or application, that a user is able to access." *Id.* § 7.5-101(f).

Following passage of S.B. 787, the Act exempts from this exaction "advertisement services on digital interfaces owned or operated by or on behalf of a broadcast entity or news media entity." *Id.* § 7.5-101(e)(2). A broadcast entity is one "primarily engaged in the business of operating a broadcast television or radio station" (*id.* § 7.5-101(d)), and a news media entity is one "engaged primarily in the business of newsgathering, reporting, or publishing articles or commentary," other than news aggregators (*id.* § 7.5-101(g)).

The Act's charge is assessed against "annual gross revenues derived from digital advertising services in the State." Tax-Gen. § 7.5-102(b)(1). But the rate at which the assessment is imposed is tiered, depending on a payer's "*global* annual gross revenues" (*id.* § 7.5-103 (emphasis added))—which is to say, on its extraterritorial economic activity:

- For firms with global annual gross revenues of $100 million or more, the Act imposes a 2.5% assessment rate on all assessable revenue.

- For firms with global annual gross revenues of $1 billion or more, the Act imposes a 5.0% assessment rate on all assessable revenue.

- For firms with global annual gross revenues of $5 billion or more, the Act imposes a 7.5% assessment rate on all assessable revenue.

- For firms with global annual gross revenues of $15 billion or more, the Act imposes a 10% assessment rate on all assessable revenue.

*Id.* According to this scheme, a company's overall liability is a function of its out-of-State conduct. *See* Compl. ¶¶ 36-37, 85. For example, if two firms both had $5 million of *in*-State revenue, but the first firm had $100 million in *out*-of-State revenue and the second had $1 billion in *out*-of-State revenue, the second firm would pay double the assessment of the first firm. Starker still, a third firm with $15 billion in out-of-State revenue would pay *four times* as much as the first firm on the same taxable base.

**3.** Each company that "reasonably expects . . . annual gross revenues derived from digital advertising services in the state to exceed $1,000,000" in a given year must file "a declaration of estimated tax, on or before April 15 of that year." Tax-Gen § 7.5-201(b)(1). Such companies must also submit quarterly estimated payments on or before June 15, September 15, and December 15 of that year. *Id.* § 7.5-201(b)(2). A willful failure to file accurate paperwork and pay the charge is a criminal offense. *Id.* §§ 13-1001(g), 13-1002(b). Unpaid assessed taxes are subject to penalties (Tax-Gen. § 701(a)) and may be collected via judgment liens (*id.* §§ 13-805–809) or asset attachments (*id.* § 13-812).

By setting such high thresholds for liability, and by excluding broadcast entities and news media firms, the Act's architects precisely targeted "massive technology companies" (Compl. ¶ 39) and "the largest tech companies" (Compl. ¶ 51)—those with global footprints and predominantly internet-based business models—to pay the assessment. According to the

2021 Fortune 500, just 521 companies anywhere in the world have annual gross revenue exceeding $5 billion, and just 203 companies have gross revenues exceeding $15 billion. *See Fortune 500*, bit.ly/3wiBi18. Among those, exceedingly few (and none based in-state) derive more than $1 million annually in Maryland-based revenue from digital advertising, subjecting them to the Act's penalty. *See* Tax-Gen. § 7.5-201(b)(1); Compl. ¶¶ 39, 85.

An assessment against gross receipts as opposed to net receipts is highly unusual. Corporate income taxes are traditionally assessed against net income on a flat-rate basis. Compl. ¶ 57. Maryland's corporate income tax rate, for example, is a flat 8.25% assessed against net income. *Id.*; Tax.-Gen. § 10-105(b). Because it applies to gross revenue, by contrast, the Act's surcharge for digital advertising companies is many multiples greater. For example, a company with $15 billion in global gross revenue and $1 billion in profits, with 2% of its revenues and profits apportioned to Maryland, would pay a corporate income tax of $1.65 million on $20 million of Maryland-based pre-tax profit. Under the Act, however, that same company would be liable for an *additional* $30 million—that is, 10% of 2% of $15 billion. That is nearly 20 times the rate of the corporate income tax and would more than wipe out the $20 million in profits attributable to the company's economic activity in Maryland. And assessments on gross receipts apply even to *un*profitable firms. Compl. ¶ 58. Precisely because gross-revenue assessments are so harsh, it is widely recognized that "gross revenue" is not "a usual [or] appropriate basis for taxation." Compl. ¶ 60 (quoting U.S. Trade Rep., Report on France's Digital Services Tax 55 (Dec. 2, 2019), perma.cc/E7BG-6KJF (*USTR Report*)).

**4.** The amendment to the Act—in addition to narrowing the universe of putatively blameworthy companies subject to the surcharge—added a so-called pass-through pro-

hibition. Accordingly, "[a] person who derives gross revenues from digital advertising services in the State may not directly pass on the cost of the tax imposed under this section to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c). The provision is intended to ensure the payers of the exaction, and they alone, bear its burden. Courts have observed that provisions of this sort are "unavoidably punitive in operation." *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 355 (2d Cir. 2002).

It is unclear whether the pass-through prohibition forbids companies only from speaking about the Act's assessment on bills or invoices, or instead forbids payers from actually passing on the charge to downstream market participants. In its briefing before this Court (MTD 49), the Attorney General says that the prohibition "regulates the taxpayer's ability to engage in *conduct* that directly imposes on a customer the cost of the digital ad tax paid by the taxpayer." If that is the correct interpretation, then the pass-through prohibition purports to regulate transactions taking place outside Maryland's borders.

**5.** The proceeds from the Act are not placed in the general treasury. Instead, they are used to pay for administration of the Act, and the remainder is deposited in the "Blueprint for Maryland's Future Fund." Tax-Gen. §§ 2-4A-01, 2-4A-02. The Blueprint Fund is strictly segregated from the State's general fund, and it is earmarked for specific educational purposes. Md. Code Ann., Educ. § 5-219; Compl. ¶ 46.

The point of devoting the proceeds to the Blueprint Fund is remediation. In Romer's view—and those of the lawmakers that heeded his call—a technology-company "surcharge" is necessary because technology companies had "created a haven for dangerous misinformation and hate speech that has undermined trust in democratic institutions." *Romer Op-Ed*,

at 1. From that perspective, the growth of "[m]assive technology corporations . . . has resulted in negative externalities socialized and borne by the public." Compl. ¶ 45 (quoting testimony of Sen. Ferguson). By placing the proceeds of the Act in the Blueprint Fund, lawmakers effectively were setting them aside to remediate, through education, the perceived "externalities" created by the companies targeted by the Act. Compl. ¶ 46; *accord* Educ. § 1-302(a)(1) (the Blueprint Fund is intended to provide "students with instruction and skills" to be "productive citizens of the State").

### B. Remedies available in state court

To challenge an assessment under the Act in state court, a company must first pay the charge. Tax-Gen. § 13-901(a)(2). The Act's assessment will not take effect until January 1, 2022, and first tax returns—a procedural prerequisite to seeking a refund—will not be due until April 15, 2023. Tax-Gen. §§ 7.5-201(a), 7.5-201(b)(1). An administrative challenge therefore will not be available any earlier than April 15, 2023.[2]

Once having paid the charge, the company may appeal to the Comptroller for a refund. Tax-Gen. § 13-901(a)(2). The Comptroller subsequently holds a hearing, makes a determination, and issues a "notice" of "the determination of the claim." *Id.* § 13-904.

Pursuant to Section 13-510(a)(6), the claimant may next appeal "a disallowance of a claim for refund under § 13-904" to the Tax Court. A matter before the Tax Court arising under Section 13-904 "shall be heard de novo and conducted in a manner similar to a proceeding in a court of general jurisdiction sitting without a jury." Tax-Gen. § 13-523.

---

[2]    The State asserts in its motion to dismiss (at 4) that a firm liable for the surcharge could "decline to pay the tax and be assessed," in turn appealing from a notice of assessment. That is incorrect. An appeal from an assessment without payment is available only in cases proceeding under Section 13-508(a), not Section 13-904. And Section 13-508(a) relief is available only for a narrow range of tax liabilities, which do not include the surcharge here.

Following these steps, a claimant still aggrieved may seek judicial review in Circuit Court. *See* Tax-Gen. § 13-505. But "because the Tax Court has exclusive jurisdiction over issues involving refunds," claimants must "exhaust their administrative remedies with the Tax Court before seeking judicial review in the circuit court." *Holzheid v. Comptroller of Treasury of Maryland*, 205 A.3d 43, 58 (Md. Ct. Sp. App. 2019).

Administrative exhaustion and litigation through an initial Circuit Court judgment would take approximately five years, meaning that an initial court judgement would not issue any earlier than 2028. In *Comptroller v. Wynne*, 64 A.3d 453 (Md. 2013), aff'd, 575 U.S. 542 (2015), for example, the taxpayer first challenged his 2006 tax liability in 2007, obtained a Tax Court decision in late 2008, and an initial Circuit Court decision in mid-2011—five years after the taxpayer's initial administrative challenge.

## ARGUMENT

The State's motion to dismiss devotes limited attention to the merits of plaintiffs' claims. That is unsurprising, given that the Act cannot be reconciled with either ITFA or multiple well-settled constitutional limits on state lawmaking authority. Rather than grappling with the merits, the State contends, in the main, that the Court has no power to resolve this case. That is wrong. The complaint challenges the Act on its face, alleging that it is unlawful as written, in all its applications. Claims of that sort are purely legal and presumptively ripe, and hardship considerations favor immediate review. Nor is the TIA a bar to review: The Act assesses a punitive fee, not a "tax," within the meaning of the TIA. In addition, Maryland's administrative and judicial refund system is not an efficient alternative to a prospective federal-court judgment here. The Court accordingly should proceed to the merits and enter summary judgment for plaintiffs.

## I.    THE CASE IS RIPE

**A.**  The State leads with ripeness, asserting (MTD 6) that the case is unripe because it is presently "unanswerable" whether any of the plaintiffs' members will actually be liable to pay the Act's assessment. As the State sees it (MTD 9), the case will not ripen until the Comptroller "promulgate[s] regulations to determine the source of taxable revenues" under the Act, before which "the amount of tax, if any, that plaintiffs' members will have to pay is unknowable." That is mistaken.

The Act has been duly enacted by the General Assembly over the governor's veto, and the State does not deny that it *will* be enforced. Nor does it dispute that some of plaintiffs' members *will* be liable for the assessment. *See* Compl. ¶¶ 15, 17, 19, 21. There is therefore nothing "conjectural or hypothetical" (*Retail Industry Leaders Association v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (*RILA*)) about the injury that the Act will inflict on plaintiffs' members absent an injunction from this Court.

The Comptroller's forthcoming regulations change nothing. The regulations will announce a methodology for attributing digital advertising services to Maryland. Tax. Gen. § 7.5-102(b)(2). While sourcing rules may impact amounts owed at the margins, they will not affect the fact of liability or the rate of assessment, which turn on a company's global revenues. It is inescapable that some of plaintiffs' members will be liable for the charge, which is all that is needed for ripeness. Indeed, the State made a similar argument in *RILA*, and the Fourth Circuit roundly rejected it. *See* 475 F.3d at 188. There, a trade association challenged a state law requiring employers with 10,000 or more Maryland employees (targeting Wal-Mart) to spend 8% of their payrolls on employees' health insurance costs or turn the difference over to Maryland (*id.* at 183), similar to the Act's targeting here. The

Court found the case ripe because the trade association plaintiff had shown that at least one of its members "will very likely incur liability to the State under the Act[]" and intervening "[r]egulations could not alter the Act's provisions." *Id.* at 188. Just so here. Thus, "resolution of the preemption issue need not await [the] development" of intervening interpretive regulations. *Pacific Gas & Electric Co. v. State Energy Resource Conservation & Development Commission*, 461 U.S. 190, 201 (1983).

Where, as here, a state statute is "alleged to be invalid as written," it is fit for immediate judicial review. *Appalachian Power Co. v. Train*, 566 F.2d 451, 458 (4th Cir. 1977); *accord Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009) (describing facial constitutional challenges to state statutes as "presumptively ripe for judicial review"); *National Treasury Employees Union v. Chertoff*, 452 F.3d 839, 854-855 (D.C. Cir. 2006) (similar).

The State implies (MTD 8) that tax cases have received special treatment in other circuits, which have required state taxing authorities "to first assess or collect the disputed tax" before allowing a suit to proceed. But three of the cases that the State cites involved fact-intensive, as-applied challenges (*Southland Royalty Co. v. Navajo Tribe of Indians*, 715 F.2d 486, 491 (10th Cir. 1983)) or a significant possibility that no enforcement action would be taken (*Birdman v. Office of the Governor*, 677 F.3d 167, 173 (3d Cir. 2012); *Alcan Aluminum Ltd. v. Department of Revenue of Oregon*, 724 F.2d 1294, 1299 (7th Cir. 1984)). That does not describe this case. Two other cases are likewise inapposite: *Shell Petroleum v. Graves*, 709 F.2d 593 (9th Cir. 1983), rested on the TIA, which we address in Section II. And *Wal-Mart v. Zaragoza-Gomez*, 834 F.3d 110 (1st Cir. 2016), held only that payment of estimated taxes is sufficient to ripen a claim, not that it is necessary.

Plaintiffs seek relief based on a purely legal, facial challenge to a duly enacted state statute that will burden their businesses without regard for intervening uncertainties. There is no doubt that, without this Court's intervention, plaintiffs' members will be subject to the Act's assessment. The case is thus fit for review.

**B.** The State asserts (MTD 9-10) further that the Court should hold the case is prudentially unripe because "[p]laintiffs have failed to show that immediate, direct, and significant hardship will result if the Court declines to hear this suit" pre-enforcement.

As a starting point, it is "doubtful" that the Court could "refuse to resolve a claim . . . on the ground that the parties would not be hurt by a delayed resolution of their claim." *OverDrive Inc. v. Open E-Book Forum*, 986 F.3d 954, 958 (6th Cir. 2021). Article III's case and controversy requirement calls only for "a concrete and particularized 'injury in fact'" that is redressable "by a favorable judicial decision." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). The notion that the Court could decline jurisdiction on a discretionary, equitable ground like absence of hardship "is in some tension with [the Supreme Court's] recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id*. at 125-126 (quotation marks omitted).

In any event, "[t]he hardship prong is measured by the immediacy of the threat and the burden imposed on the plaintiffs who would be compelled to act under threat of enforcement of the challenged law." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting *Charter Federal Savings Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208-209 (4th Cir. 1992))). Those considerations weigh strongly in favor of immediate review.

The Act's surcharge will be incredibly burdensome—and deliberately so. It is meant to punish larger digital advertising companies, potentially forcing them to "break[ themselves] into several smaller companies" or to "switch[] [their] business model[s]" altogether. *Romer Op-Ed*. The threat of imminent enforcement of the Act is presently "interfering with the ability of plaintiffs . . . to plan, invest in, and conduct their business operations." *North Dakota v. Heydinger*, 825 F.3d 912, 918 (8th Cir. 2016).

More generally, courts have recognized that parties need not "expend substantial sums of money before challenging the constitutionality" of a law. *Gary D. Peake Excavating Inc. v. Town Board of Town of Hancock*, 93 F.3d 68, 72 (2d Cir. 1996). As the Supreme Court has said, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief," and "[i]f the injury is certainly impending, that is enough." *Pacific Gas & Electric*, 461 U.S. at 201.

It is no answer to say that the targets of the charge could decline to pay it. Doing so may open them to criminal liability (Tax-Gen. §§ 13-1001(f), 13-1002(b)) and would permit the State to levy penalties (*id.* § 701(a)) and attach in-State assets (*id.* § 13-812). "[I]t is well settled that a litigant need not expose himself to criminal prosecution to challenge the constitutionality of a statute providing criminal penalties." *Gary D. Peake*, 93 F.3d at 72 (citing *Babbitt v. United States Workers National Union*, 442 U.S. 289, 302 (1979)).

## II.   THE CASE IS NOT BARRED BY THE TIA OR TAX COMITY

The State turns next (MTD 10-25) to the TIA. For two reasons, the TIA does not bar this action: *First*, the digital advertising charge is not a "tax" within the meaning of that statute; it is instead a punitive fee. *Second*, Maryland refund procedures do not constitute an "efficient" remedy within the unique context of this case. "The ability to sue to enjoin un-

constitutional actions by state [officials] . . . reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015). And only the "clearest command" from Congress will "displace courts' traditional equitable authority." *Holland v. Florida*, 560 U.S. 631, 646 (2010) (quoting *Miller v. French*, 530 U.S. 327, 340 (2000). That command is missing here.

### A. The Act does not assess a "tax" within the meaning of the TIA

#### 1. According to more than a century of Supreme Court precedent, the TIA does not bar pre-enforcement challenges to punitive fees

**a.** Enacted in 1937, the TIA provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The TIA's language "was modeled on the Anti-Injunction Act," which is the federal-tax analogue of the TIA. *Direct Marketing Association v. Brohl*, 575 U.S. 1, 8 (2015). Enacted in 1867, the AIA provides that "no suit for the purpose of restraining the assessment or collection of any [federal] tax shall be maintained in any court." 26 U.S.C. § 421.

Because the TIA and AIA are so closely related, the Supreme Court has long "assume[d] that words used in both Acts are generally used in the same way." *Direct Marketing*, 575 U.S. at 8. When the 75th Congress used the word "tax" in the TIA, in other words, it intended to invest it with the same meaning that courts had given the word "tax" in years prior, under the AIA. This Court's interpretation of the word "tax" under the TIA must therefore begin with cases construing the AIA in the years before 1937. *See American Trucking Associations, Inc. v. Alviti*, 944 F.3d 45, 50 (1st Cir. 2019) (recognizing the relevance to the meaning of the word "tax" in the TIA of "pre-1937 authority interpreting 'tax' under the AIA").

**b.** At the time of the TIA's enactment in 1937, the Supreme Court had drawn a clear distinction between "taxes" on the one hand (to which the AIA applied) and "penalties" and "fees" on the other hand (to which the AIA did *not* apply). *See, e.g.*, *Graham v. Dupont*, 262 U.S. 234, 258 (1923) (assessments that are "penalt[ies] in the form of a tax" do not constitute "taxes at all" for purposes of the AIA).

As early as 1922, the Court had recognized, in a case concerning the Tax Clause, that taxes may be enacted for the purpose not only "of obtaining revenue" but also "discouraging" and punishing conduct. *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922). The Court explained that, in typical circumstances, such assessments "do not lose their character as taxes because of the incidental motive" to regulate. *Id.* "But," the Court cautioned, "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty, with the characteristics of regulation and punishment" rather than taxation. *Id.* Although "[t]he difference between a tax and a penalty is sometimes difficult to define," the "consequences" of the exaction and "the required method of their collection often are important" to the distinction. *Id.* And, importantly, an exaction may be a "penalty" even when lawmakers do not "expressly declare" that the conduct being assessed "is illegal." *Id.*

Applying this tax/fee distinction in *Lipke v. Lederer*, 259 U.S. 557 (1922), the Court held that an assessment denominated a "tax" by Congress fell outside the reach of the AIA because it "lack[ed] all the ordinary characteristics of a tax" and instead had the "function of a penalty." *Id.* at 562. The Court held similarly in *Regal Drug Corporation v. Wardell*, 260 U.S. 386 (1922), where it recognized "[t]he distinction between a tax and a penalty" for AIA purposes, holding that "even if [an] imposition may be considered a tax, if it [has a] punitive

purpose, it must be preceded by opportunity to contest its validity." *Id.* at 391-392 (citing *Central of Georgia Railway v. Wright*, 207 U.S. 127 (1907)).

These cases all accorded with the Court's earlier and seminal decision in *The Head Money Cases*, 112 U.S. 580 (1884), which, like *Drexel Furniture*, concerned the meaning of "tax" under the Constitution's Tax Clause. *The Head Money Cases* involved a challenge to a $0.50-per-person fee assessed against shipping companies for each non-citizen passenger they brought to the United States. *Id.* at 586. In holding that the fee was not an exercise of the government's taxing power, the Court explained that "the real purpose and effect of the statute" was "to mitigate the evils inherent in the business of bringing foreigners to this country." *Id.* at 595. The Court found it especially relevant that the funds raised were "appropriated in advance to the uses of the statute, and [did] not go to the general support of the government." *Id.* at 596. The proceeds thus "constitute[d] a fund raised from those who are engaged in the transportation of these passengers, and who make profit out of it, for the temporary care of the passengers whom they bring among us, and for the protection of the citizens among whom they are landed." *Id.* It therefore did not qualify as an "ordinary tax," even if "called a tax," because its proceeds were strictly earmarked to offset the costs of externalities of the businesses upon which the exaction was assessed. *Id.*

**c.** Thus, by the time the 75th Congress enacted the TIA in 1937—using the word *tax* "in the same way" as the Supreme Court had by then construed it under the AIA (*Direct Marketing*, 575 U.S. at 8)—there was no question that an assessment with a principally punitive purpose and earmarked for restitutionary programs and not commingled with general government funds was not a "tax" within the meaning of the law.

That conclusion was consistent, too, with the settled purposes of the TIA. A principal aim of the statute was "to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances." *Hibbs v. Winn*, 542 U.S. 88, 104 (2004) (citing S. Rep. No. 75-1035, at 1–2 (1937)). Congress was concerned principally with "the damaging effect of state tax suits in federal court on state budgets." *Bidart Bros. v. California Apple Commission*, 73 F.3d 925, 929 (9th Cir. 1996). In particular,

> The existing practice of the Federal courts in entertaining tax-injunction suits against State officers ma[de] it possible for foreign corporations doing business in such States to withhold from them and their governmental subdivisions, taxes in such vast amounts and for such long periods of time as to seriously disrupt State and county finances. The pressing needs of these States for this tax money is so great that in many instances they have been compelled to compromise these suits, as a result of which substantial portions of the tax have been lost to the States without a judicial examination into the real merits of the controversy.

*Id.* (quoting S. Rep. No. 75-1035 (1937); H.R. Rep. No. 75-1503 (1937)). Interpreting the TIA to bar prospective federal-court relief against classic state taxes, as to which injunctions would "threaten the flow of general revenue" and risk significant "damage to the State's budget" (*id.*), serves that purpose. Interpreting the TIA to bar prospective federal-court relief against levies imposed on narrow populations for predominantly punitive reasons, where revenues are segregated from the general treasury and earmarked for narrow purposes, does not. *See, e.g.*, *American Trucking*, 944 F.3d at 50.

### 2. *Contemporary cases have carried forward the tax/fee distinction*

The analytical framework established in the Supreme Court's early Tax Clause and AIA cases has been carried forward by the courts of appeals in more recent decisions interpreting the TIA.

Courts today recognize that the TIA applies to so-called "classic" taxes, or assessments "imposed by a legislature upon many, or all, citizens" to "raise[] money, contribute[] to a general fund, and spen[d] for the benefit of the entire community." *San Juan Cellular Telephone Co.* v. *Public Services Commission of Puerto Rico*, 967 F.2d 683, 685 (1st Cir. 1992); *accord Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000) (citing *San Juan Cellular*). But the TIA does *not* bar pre-enforcement challenges to government assessments with "punitive qualities." *Denton v. City of Carrollton, Georgia*, 235 F.2d 481, 485 (5th Cir. 1956). Exactions that reflect "punitive purposes" are properly classified as fees or penalties, which are "distinguished from a mere 'tax.'" *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767, 779-780 (1994) (Tax Clause case). In other words, "a tax might be so totally punitive in purpose and effect that, since nomenclature is unimportant, it should be classified as a fine rather than a tax," even when nominally enacted as a tax. *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 729 (7th Cir. 2011) (en banc) (citing *Lipke*, *RILA*, *Denton*, and *Kurth Ranch*, among others).

In the Fourth Circuit, when determining whether a particular charge is a punitive fee or a tax "for purposes of the Tax Injunction Act," courts should "not focus on the superficial nomenclature provided to the charge at issue." *GenOn Mid-Atlantic, LLC v. Montgomery County, Maryland*, 650 F.3d 1021, 1023 (4th Cir. 2011) (quotation marks omitted) (quoting *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000)). "Instead, [courts] must examine the explicit factual circumstances that transcend the literal meaning of the terminology and ask whether the charge is levied primarily for revenue raising purposes, making it a 'tax,' or whether it is assessed primarily for regulatory or punitive purposes, making it a 'fee.'" *Id.* (some quotation marks omitted) (quoting same).

"Various circuit court decisions provide guidance for considering the . . . question[] whether the law is a 'tax' or a 'fee'" under the TIA. *Collins Holding Corp. v. Jasper County, South Carolina*, 123 F.3d 797, 800 (4th Cir. 1997). Courts ask, among other things:

*a.* whether the assessment is unusually harsh or otherwise has functional characteristics that break from traditional taxes (suggesting a fee)—*see, e.g., Kurth Ranch*, 511 U.S. at 783; *Denton*, 235 F.2d at 485; *see also Lipke*, 259 U.S. at 562 (assessments "lack[ing] all the ordinary characteristics of a tax" are not taxes);

*b.* whether the assessment is paid by a broad population (suggesting a tax), or a narrowly-defined group of carefully-targeted payers (suggesting a fee)—*see, e.g., GenOn*, 650 F.3d at 1024-1025; *Valero*, 205 F.3d at 134; *Bidart Brothers*, 73 F.3d at 931; *San Juan Cellular*, 967 F.2d at 685;

*c.* whether the charge is subject to a pass-through prohibition (suggesting a fee)—*see, e.g., GenOn*, 650 F.3d at 1024-1025; *Consolidated Edison Co. of New York v. Pataki*, 292 F.3d 338, 355 (2d Cir. 2002) (*ConEd*) (holding that an express "cost-pass-through prohibition is plainly punitive");

*d.* whether the proceeds are deposited in the general treasury for open-ended use (suggesting a tax), or instead set aside in a separate fund and earmarked to fund programs related to the purposes of the assessment (suggesting a fee)—*see, e.g., GenOn*, 650 F.3d at 1023; *RILA*, 475 F.3d at 189; *Collins Holding Corp.*, 123 F.3d at 800; *American Trucking*, 944 F.3d at 52-53; *Travelers Insurance v. Cuomo*, 14 F.3d 708, 713 (2d Cir. 1993); *Trailer Marine Transportation Corp. v. Rivera Vazquez*, 977 F.2d 1, 6 (1st Cir. 1992); *San Juan Cellular*, 967 F.2d at 685;

*e.* whether the law's legislative history and the circumstances surrounding its enactment demonstrate a punitive purpose (suggesting a fee)—*see, e.g., GenOn*, 650 F.3d at 1025; *RILA*, 475 F.3d at 189.

These factors and the cases supporting them all paint a consistent picture that the assessment here is a fee. More generally, they make clear that the word "tax" under the TIA has a specific and special meaning, and it does not include levies with a principal purpose to punish or to extract restitutionary support for programs designed to remediate purported harms caused by the payers' activities.

### 3. In both purpose and operation, the assessment here is a punitive fee for purposes of the TIA

Evaluated within this framework, the Act's levy demonstrably is a punitive fee and not a "tax" within the narrow meaning of the TIA. The Fourth Circuit has frequently held exactions like this are not taxes under the TIA. *See GenOn*, 650 F.3d at 1022-1026 (holding that an "exaction on carbon dioxide emissions" was "in substance a punitive and regulatory" charge, not a "tax," within the meaning of the TIA); *RILA*, 475 F.3d at 182, 189 (holding that "payments" for a statewide employee healthcare program, "collected by the Secretary [and] directed to the Fair Share Health Care Fund," were "a quintessential fee or penalty, not a tax" for purposes of the TIA). Other circuits have as well, including the First Circuit in *American Trucking*, *San Juan Cellular*, and *Trailer Marine*, and the Ninth Circuit in *Bidart Brothers*. *See also, e.g.*, *Kathrein v. City of Evanston, Illinois*, 636 F.3d 906, 912 (7th Cir. 2011) (citing *RILA*); *Wright v. Riveland*, 219 F.3d 905, 911-12 (9th Cir. 2000) (citing *San Juan Cellular*, *Trailer Marine*, *Bidart Brothers*, and *The Head Money Cases*).

Because the relevant factors weigh overwhelmingly in this case against application of the TIA, the same result is warranted here.

*a. The unusual magnitude of the levy and its extraterritorial focus.* An unusually "high rate of taxation" is "consistent with a punitive character." *Kurth Ranch*, 511 U.S. at 780; *accord Korte v. Sebelius*, 735 F.3d 654, 670 (7th Cir. 2013) ("The sheer size of the required payment fairly screams 'penalty.'"); *Denton*, 235 F.2d at 485 (finding a "so-called tax" to be "punitive" and not subject to the TIA where the amount imposed was "exorbitant").

That is what the facts show here. The assessment is enormous, easily enough to make digital advertising services unprofitable in Maryland. As the complaint demonstrates (at

¶¶ 57-58), a digital advertising company earning $1 billion in pre-tax net income on $15 billion in U.S.-based gross revenue—with 2% of that income apportioned to Maryland, commensurate with Maryland's population as a share of the nation—would have $20 million in pre-tax net income from $300 million in gross revenues earned in Maryland. That would result, under the State's standard 8.25% corporate income tax rate (Tax.-Gen. § 10-105(b)), in a $1.65 million income tax. *See* Tax Foundation, *State Corporate Income Tax Rates for 2021*, perma.cc/M4XT-UZEV. But the Act's 10% gross revenue surcharge would impose liability for an *additional $30 million*—10% of the entire $300 million in gross revenues earned in Maryland. That's nearly 20 times the amount of the corporate income tax and 50% more than the $20 million in net income attributable to the company's economic activity in Maryland.

In condemning a similar charge imposed by the French Government, the Office of the U.S. Trade Representative noted for just this reason that "gross revenue" is not "a usual [or] appropriate basis for taxation." *USTR Report*, at 55. Among other problems, assessments against gross revenue apply to *all* of a company's income, even if the company is unprofitable or has a low net income, potentially "entirely eliminat[ing] their profit margin." *Id.* at 4; *accord id.* at 55-60; Garrett Watson, *Resisting the Allure of Gross Receipts Taxes: An Assessment of Their Costs and Consequences*, 29 J. Multistate Tax'n 8, 12 (May 2019).

When a State imposes such "severe and disproportionate monetary consequences" on an entire business model, "the primary purpose of the scheme must be understood as regulatory and punitive rather than revenue raising." *Kortes*, 735 F.3d at 670 (holding that a "$100 per day per employee" assessment was "such a high price" as to suggest "the congressional objective is punitive").

**b.   *Narrow targeting.*** The Act's punitive purpose and effect is confirmed further by the extraordinarily tight targeting of the exaction.

"[T]he whole idea of a tax" is not only that it helps to fund the general treasury, but also that it is "a burden generally borne." *GenOn*, 650 F.3d at 1024; *accord Valero*, 205 F.3d at 134 (a tax is assessed "upon a large segment of society") (citing *San Juan Cellular*, 967 F.2d at 685). Thus, "[a]n assessment imposed upon a broad class of parties is more likely to be a tax than an assessment imposed upon a narrow class." *Bidart Brothers*, 73 F.3d at 931. "The fact that [a] charge affects the narrowest possible class is compelling evidence that it is a punitive fee rather than a tax." *GenOn*, 650 F.3d at 1024.

That is the case here. The Act's tiered structure ensures that only a small handful of very large firms pay the highest, most burdensome levels of the exaction. Just 203 companies across the globe have gross revenues exceeding $15 billion (*see Fortune 500*, bit.ly/3wiBi18), and just 521 have annual gross revenue exceeding $5 billion—including banks, pharmaceutical companies, car manufacturers, oil companies, and defense contractors. It stands to reason that among those 521 companies, a very small number derive more than $1 million annually in Maryland from digital advertising, subjecting them to the Act's penalties. *See* Compl. ¶¶ 39, 85. Lawmakers sold the Act on just this basis. *See* Compl. ¶¶ 39, 48 (Act "targets" "massive, multinational companies").

Further, the Act does not impose its assessment against in-state revenues evenhandedly. Rather, the tiering of rates based on global revenue means that Company A will pay more than Company B—double, triple, even quadruple—for precisely the same in-state conduct, solely because Company A has greater out-of-state sales. There is no rational explanation for that additional burden—a progressively more crushing exaction against in-

state revenues—except an intent to punish large technology companies for their size.

With S.B. 787, moreover, the legislature amended the Act so that it now exempts from liability all "broadcast" and "news media" entities. Tax-Gen. § 7.5101(d), (g). Such companies are among the largest sellers of digital advertising services and would have borne much of the Act's brunt. But in lawmakers' eyes, they are not among the "[m]assive technology companies" whose perceived bad behavior has "resulted in negative externalities socialized and borne by the public." Compl. ¶ 45 (quoting testimony of Sen. Ferguson). The 2021 amendment's exclusion of "broadcast" and "news media" entities thus underscores that the Act is not predominantly about raising revenue (else, why reduce the population of payers?), but instead about targeting "the narrowest possible class" (*GenOn*, 650 F.3d at 1024) of disfavored companies.

For its part, the State does not deny that the Act deliberately and precisely singles out a narrow range of disfavored firms (unlike a classic sales tax or even a broadly-applicable "sin" tax, like a tax on cigarettes or alcohol). It instead attempts to minimize this factor (MTD 20), dismissing it as "relatively minor" and not "decisive." But our position is not that the Act's extraordinarily narrow targeting of large technology companies is alone "decisive" of the tax/fee distinction. Rather, our position is that the law's narrow targeting is "compelling evidence" (650 F.3d at 1024) that the exaction is a punitive fee, just as the Fourth Circuit held in *GenOn*. When considered alongside other relevant factors to the tax/fee distinction, the punitive nature of the fee is manifest.

The State rejoins (MTD 20-21) that so long as "more than one entity" is subject to an assessment, that "easily" indicates a tax rather than a fee. Neither the Fourth Circuit nor any court has so held. The question is whether the charge is assessed "upon a large segment of

24

society" (*Valero*, 205 F.3d at 134), so that it constitutes "a burden generally borne" (*GenOn*, 650 F.3d at 1024). "[A]n assessment imposed upon a narrow class is less likely to be a tax than an assessment imposed upon a broad class of parties." *GenOn*, 650 F.3d at 1024. It should go without saying that an exaction paid by *two or three* companies, or even 20 or 30, is narrow and not generally borne. *Cf. RILA*, 475 F.3d at 185 (four companies were eligible for the assessment, which was expressly aimed at Wal-Mart).

*c. The pass-through prohibition.* S.B. 787's addition of a pass-through prohibition lends powerful support to the Act's punitive purpose. If the point of the Act were merely to raise revenue, the legislature would have been indifferent to whether the initial payers pass the charge on to downstream market participants through ordinary economic forces. But it was not. The pass-through prohibition is express evidence that the legislature wanted to ensure that the initial targets of the surcharge, *and they alone*, bear its burden. The Second Circuit has held that provisions of this sort are "unavoidably punitive in operation" because nothing "other than punishment can justify . . . preventing [payers] from passing" an exaction along to downstream market participants. *ConEd*, 292 F.3d at 353-355.

That was a principal basis for the Fourth Circuit's decision in *GenOn*. There, the court held that when a company subject to a charge is unable "to pass the cost of the charge on to its customers" because of market regulations, and when the legislature is "well aware" of that limitation and "hail[s] [it] as a selling point," courts should have "no difficulty conclud-ing that such an exaction is a fee that targets [the payer] in punitive fashion." 650 F.3d at 1024-1025. Here, of course, the punitive implications of the pass-through prohibition are even clearer: The prohibition in this case was not merely a consequence of pre-existing regulation; rather, it was enacted as an express element of the Act itself.

***d. Segregation of the funds and use for remediation.*** Another critical question under the TIA is "whether an injunction would pose a 'threat to the central stream of tax revenue relied on by' the state," which is, after all, the possibility the TIA was intended to prevent. *American Trucking*, 944 F.3d at 53 (quoting *Trailer Marine*, 977 F.2d at 6).

An injunction here would not pose such a threat. When the proceeds of a levy are "placed in a segregated account and expended by a single entity for a single purpose," they "stand quite apart from the [S]tate's central stream of government funding provided by traditional types of taxes, enough so as to" demonstrate that it is not a "'tax' as used in the TIA." *American Trucking*, 944 F.3d at 53. Thus, in *Trailer Marine*, the First Circuit held that a prospective federal-court injunction "poses no threat to the central stream of tax revenue" where "the fees paid are held separately from general state funds" and "dedicated exclusively to" paying for the fee's administration and otherwise remediating "the specific damages resulting from [the assessed] activity." 977 F.2d at 6. *Accord Bidart Brothers*, 73 F.3d at 932 (citing *The Head Money Cases*). The Fourth Circuit reached a similar conclusion in *GenOn*, where lawmakers had determined that "the largest emitters of carbon dioxide in the County [should] contribute to paying for [certain] greenhouse gas reduction programs" and therefore had expressly earmarked 50% of the assessment's proceeds "to funding for County [those] programs." 650 F.3d at 1025. The court held the assessment not a tax in part because it was strictly earmarked for that specific purpose.

This element of the analysis factors in precisely the same way here: The proceeds of the Act's levy are "placed in a segregated account and expended by a single entity for a single purpose," thus "stand[ing] quite apart from the [S]tate's central stream of government funding provided by traditional types of taxes." *American Trucking*, 944 F.3d at 53.

The anodyne observation that the Blueprint Fund "benefit[s] the general public" by helping fund public education (MTD 22 (quoting *Clear Channel Outdoor, Inc. v. Baltimore*, 153 F. Supp. 3d 865, 874 (D. Md. 2015))) is no answer. Here, unlike in *Clear Channel*, sponsoring lawmakers stated plainly that the proceeds from the Act were being set aside to remediate, through education, the perceived "externalities" created by the targeted firms. Compl. ¶ 46; *see also* Educ. § 1-302(a)(1). Under the reasoning in both *GenOn* and *Trailer Marine*, that sets this case apart.

Just like the surcharge here, the purpose of the charge in *GenOn* was to ensure that large greenhouse gas emitters "contribute[d] to paying for the programs" deemed necessary to offset the external social costs of burning coal. 650 F.3d at 1025. Although reducing greenhouse gas emissions assuredly "benefit[s] the general public" (*Clear Channel*, 153 F. Supp. 3d at 874), the Fourth Circuit held that the charge was a "punitive and regulatory" fee in light of its restitutionary function. *GenOn*, 650 F.3d at 1024.

The result was similar in *Trailer Marine*. There, Puerto Rico assessed a fee against motor vehicle owners to fund a "compensation plan . . . [f]or anyone injured in a motor vehicle accident." 977 F.2d at 2. The exaction's proceeds were placed in a segregated fund set aside to pay for "damage resulting from [the] activity" in which the payers were engaged (977 F.2d at 6), just as here. Like the State in this case, the Commonwealth in *Trailer Marine* argued that the charge was a tax because it was used to fund a general "social welfare program" that served a general public purpose, and not to offset the "agency's costs of regulation." *Id*. at 5. The First Circuit rejected that argument. Accepting such a broad interpretation of the word "tax" would mean that virtually any levy that serves some public need would be a "tax" under the TIA. *Id*.

Nor is it relevant that dollars are fungible, and "more revenue from the general fund would have to be spent" on education if the Act's surcharge were not collected and deposited in the Blueprint Fund. *American Trucking*, 944 F.3d at 52. That "can be said of virtually all activity by a [S]tate and all sources of state revenue: the activity serves the public benefit, and that benefit would need to be paid for (or lost) with general tax revenues but for the alternative revenue source." *Id.* at 53. By those lights, all assessments would be taxes, which "proves too much." *Id.*

*e.* ***The legislative history and circumstances.*** The Fourth Circuit also has emphasized the importance to the TIA inquiry of "[t]he circumstances surrounding the Act's enactment" and its legislative history. *RILA*, 475 F.3d at 189; *accord GenOn*, 650 F.3d at 1025. These considerations, too, point toward a punitive fee not covered by the TIA.

Maryland legislators wore their punitive intent on their sleeves. Senate President Ferguson heralded the Romer op-ed as a model for the Act. Compl. ¶¶ 43-45. The op-ed described large digital advertising companies as "too big to trust" and blamed them for creating "a haven for dangerous misinformation and hate speech," expressly inviting States to impose a "surcharge" or "penalty" on digital advertising. Compl. ¶ 43; *see also* Compl. ¶ 48. In written testimony before the Senate, Romer continued to rail against these companies as guilty of "pervasive dishonesty," decrying "that something is terribly wrong with the market for digital services." Compl. ¶ 44. The Act was openly and expressly intended as a "solution" to this perceived misconduct, and was "based off a model originally" proposed by Romer. Compl. ¶ 45. Together with the other facts indicating clear legislative disapproval and a punitive purpose, "[t]he circumstances surrounding the Act's enactment" (*RILA*, 475 F.3d at

189) strongly suggest that the TIA is not a bar to this lawsuit.[3]

### B.    *CIC Services* did not abrogate this century-old framework

The State's principal response to all of this (MTD 12-19) is a puzzling one. It does not directly dispute that the factors discussed above all indicate that the Act is a punitive fee. The State does not deny, for instance (1) that the exaction is exorbitantly, unconventionally large; or (2) that its extremely narrow targeting and pass-through prohibition are entirely unexplainable absent a punitive purpose; or (3) that the segregation of the Act's proceeds from the State's general fund places the surcharge outside the central stream of tax revenue relied on by the State to fund its operations. Instead, the State's primary rejoinder is to say that the Supreme Court's recent decision in *CIC Services v. IRS*, 141 S. Ct. 1582 (2021), discarded *sub silentio* the entire, century-old framework we've just discussed. *See* MTD 18 (asserting that *RILA* and *Valero* "are now superseded" by *CIC Services*). With due respect to the State, that is not an argument the Court should take seriously.

**1.**    For starters, *CIC Services* did not implicate the distinction between a punitive fee and a classic tax within the meaning of the AIA or TIA. The issue in *CIC Services* was only "whether the Anti-Injunction Act bars CIC's suit complaining that [certain IRS] reporting requirements violate the [Administrative Procedure Act]." 141 S. Ct. at 1588. Answering that question in the negative, the Court reasoned straightforwardly that "[a] reporting requirement is not a tax[,] and a suit brought to set aside such a rule is not one to enjoin a tax's

---

[3]    We acknowledge that the Act was adopted by a legislative body and not imposed unilaterally by an executive agency. *See* MTD 20 (citing *Collins Holding*, 123 F.3d at 800). But the same was true in *GenOn* and *RILA*, to say nothing of *American Trucking*, *Bidart Brothers*, *Kathrein*, and *Wright*. In any event, that singular factor cannot "disguise what is in substance a punitive and regulatory matter" according to every other relevant consideration. *GenOn*, 650 F.3d at 1024.

assessment or collection." *Id.* at 1588-1589. It is implausible to say that, in answering that narrow question, the Supreme Court intended to jettison a century of precedent concerning a distinction that was not even implicated in the case. The Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio.*" *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000). It did not do so here.

To be sure, after laying out its holding, the Court addressed the government's concern for "the possible consequences of [its] ruling." *CIC Services*, 141 S. Ct. at 1593. And in doing so, the Court reiterated that "regulatory tax cases" do not "have a special pass from the Anti-Injunction Act," which "draws no distinction between regulatory and revenue-raising tax laws." *Id.* at 1593-1594. But that statement—which, we hasten to add, is dictum—is both inapposite and entirely consistent with the reams of precedent we have just discussed.

To begin with, this case is about a punitive fee, not a regulatory one. A regulatory fee is one that is "designed mainly to influence private conduct, rather than to raise revenue." *CIC Services*, 141 S. Ct. at 1593. But as we have shown, the surcharge here singles out massive technology companies to punish them for using a particular business model (and growing large doing so), not to influence or incentivize aspects of their business conduct. That does not describe the surcharge here.

In any event, *CIC Services* is consistent with the cases we have discussed. The Supreme Court there cited its century-old decision in *Bailey v. George*, 259 U.S. 16 (1922), a companion case to *Drexel Furniture*, for its statement about regulatory taxes. And it was in *Drexel Furniture* that the Court first held that although assessments generally "do not lose their character as taxes because of [an] incidental motive" to regulate, there does "come[] a time in the extension of the penalizing features of the so-called tax when it loses its character

as such and becomes a mere penalty" rather than a tax. 259 U.S. at 38; *accord Graham*, 262 U.S. at 258 (assessments that are "penalt[ies] in the form of a tax" do not constitute "taxes at all" for purposes of the AIA). That is what this case is about, and nothing in *CIC Services* is inconsistent with that line of precedent.

The State is correct (MTD 16 & n.5) that *Drexel Furniture* was a Tax Clause case and *George* was an AIA case, but that is an irrelevant distinction for TIA purposes. In an AIA case, "the best evidence of Congress's intent" to bar a pre-enforcement challenge to a *federal* exaction under the AIA is Congress's use of the "tax" label—a clear indication that it wants the AIA to apply. *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012). The Supreme Court has "thus applied the Anti-Injunction Act to statutorily described 'taxes' *even where that label was inaccurate.*" *Id.* (emphasis added) (citing *George*).

That reasoning is out of place in TIA cases, where the analysis is "guided by federal law rather than state tax labels." *Folio v. City of Clarksburg, West Virginia*, 134 F.3d 1211, 1217 (4th Cir. 1998); *accord Empress Casino*, 651 F.3d at 728 (and collecting cases). Because, in TIA cases, courts should not "focus on the superficial 'nomenclature provided to the charge'" by the state legislature (*GenOn*, 650 F.3d at 1023 (quoting *Valero*, 205 F.3d at 134)), the label used cannot override the punitive nature of the charge. And the implication of *NFIB*'s reasoning is that *Drexel Furniture*'s explication of the tax/fee distinction remains relevant to determining whether a state legislature's use of the tax "label" is "inaccurate." 567 U.S. at 544 (citing *George* as an example where the "tax" label was inaccurate, as held in *Drexel Furniture*). We have shown that the label is inaccurate here.

**2.** The State seems to acknowledge (MTD 16) that this case is not about a regulatory fee (a "conduct-influencing imposition"), but instead a punitive one. Pointing to *NFIB* and

*CIC Services*, however, it takes the position that a punitive fee within the meaning of the TIA can only ever encompass exactions levied as "punishment for an unlawful act or omission." *Id.* (quoting *NFIB*, 567 U.S. at 567). Not so.

In assessing the scope of Congress's constitutional taxing power, the Court recognized that if an exaction is imposed for a violation of the law, it *necessarily* is a penalty. *See* 567 U.S. at 567 (citing *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996); *United States v. La Franca*, 282 U.S. 568, 572 (1931)). But no member of the Court suggested the inverse, that exactions imposed for disapproved by lawful conduct can*not* be penalties—and *Drexel Furniture* and *GenOn* both show that they can be.

As for *CIC Services*, the State grossly misrepresents (MTD 13) the Court's analysis by taking snippets of language out of context and rearranging them misleadingly. The Court did not hold that any assessment that "imposes a cost on perfectly legal behavior" is "always" a tax covered by the AIA or TIA. *Id.* Rather, the Court, in discussing exactions that "impos[e] a cost on perfectly legal behavior," was merely distinguishing between the government's hypotheticals and the facts of the case, explaining why its actual holding was limited. 141 S. Ct. at 1593. The Court was not answering the question whether a particular government-imposed "cost" is or is not a tax; the Court's point was that, *when* the obligation to be enjoined is a tax rather than a separate non-tax mandate (like the reporting requirement), the AIA applies. That is not a grand new principle of law, nor is it a silent overruling of more than a century of AIA and TIA precedent on the tax/fee distinction.

**3.** We have shown that the Act's exaction is a punitive fee outside the TIA's reach based on a century-old body of Supreme Court and Fourth Circuit law. There is zero merit to the State's contention (MTD 18) that cases like *RILA* and *GenOn* were "superseded" *sub*

*silentio* by *CIC Services. See Shalala*, 529 U.S. at 18. Nor, in any event, would that be an

argument that this Court could entertain: "[A] clear holding from the Court of Appeals is

binding [on district courts], and if dicta from the Supreme Court is to change that precedent,

it is the Supreme Court or the Fourth Circuit that must make that change." *Steves & Sons,*

*Inc. v. JELD-WEN, Inc.*, 252 F. Supp. 3d 537, 545 n. 6 (E.D. Va. 2017).

### C.    Scores of long-delayed, company-by-company refund actions would be a manifestly inefficient remedy

All that we have said so far is more than sufficient to hold that the TIA is not a bar to

this suit. But there is more. Even if the Act's exaction were a tax rather than a punitive fee,

the TIA deprives the Court of jurisdiction only if the state-court alternative is a "plain,

speedy and efficient remedy." 28 U.S.C. § 1341. Here, however, the state-court remedy

would not suffice because it is not "efficient." That is so for two reasons.

*First,* the alternative to this single, pre-enforcement federal lawsuit by plaintiff

associations is a multiplicity of potentially hundreds of refund actions in state court over

what is likely to be the course of many years.

The Supreme Court has held that, when the state-court alternative involves "an un-

necessary expenditure of time or energy," such as when the "state-court remedy would

require a multiplicity of suits," the TIA "permit[s] federal-court jurisdiction." *Rosewell v.*

*LaSalle National Bank*, 450 U.S. 503, 517-518 (1981) (citing *Georgia Railroad & Banking Co.*

*v. Redwine*, 342 U.S. 299, 303 (1952)). In *Georgia Railroad*, for example, the Court observed

that pursuing relief in state court "would require the filing of over three hundred separate

claims in fourteen different counties to protect the single federal claim asserted" in the

prospective federal-court suit. 342 U.S. at 303. For that reason among others, the Court held

that "[w]e cannot say that the [state court] remedies . . . afford appellant the 'plain, speedy and efficient remedy' necessary to deprive the District Court of jurisdiction." *Id*. In *Rosewell* itself, the Court recognized that "[a] remedy to contest a tax that requires repetitive suits on the same issue in succeeding years may not be 'efficient.'" 450 U.S. at 518 n.22; *accord Garrett v. Bamford*, 538 F.2d 63, 71 (3d Cir. 1976) ("Where legal remedies require multiple suits involving identical issues against the same defendant, federal equity practice has recognized the inadequacy of the legal remedy and has provided a forum.").

That is the case here. Plaintiffs are four trade associations that represent the interests of hundreds of thousands of businesses, including nearly every company that might be subject to the levy under the Act. *See* Compl. ¶¶ 14-21. They bring four, overlapping, purely legal claims in this single federal action to stave off what is otherwise certain to be a large multiplicity of refund actions—one for each *payer*, for each *year* in which the levy is collected, likely hundreds in total.

On this score, the lengthy period of time that will elapse before even an initial state-court injunction can be entered works powerfully against the State. As a starting point, Maryland law does not permit prospective tax challenges under any circumstance, even with respect to facial constitutional challenges. *See Holzheid v. Comptroller*, 205 A.3d 43, 58 (Md. Ct. Sp. App. 2019) (claimants must "exhaust their administrative remedies with the Tax Court before seeking judicial review in the circuit court" in all cases). And as the State acknowledges (MTD 10), payers of the exaction cannot begin the administrative exhaustion process until mid-2023. *See* Tax-Gen. § 13-901(a)(2). In recent cases like *Comptroller v. Wynne*, 64 A.3d 453 (Md. 2013), and *Frey v. Comptroller*, 29 A.3d 475 (Md. 2011), the administrative review process took nearly two years to complete, meaning the first lawsuits

here could not even be initiated in Circuit Court until 2025. By then, there will be a three-year backlog of refund suits in the pipeline for each of the payers. And by the time the Circuit Court issues an initial decision enjoining the Act, there will be another two years' worth of claims to adjudicate. If there were only 20 payers of the exaction, it would mean 80-120 different refund suits; if there were 50 payers, it would be 200-300 refund suits. That is precisely the kind of "multiplicity" of suits that disqualifies a state-court remedy under the TIA's efficiency requirement. *Rosewell*, 450 U.S. at 517-518 & n.22; *Georgia Railroad*, 342 U.S. at 303; *Garrett*, 538 F.2d at 71.

**Second,** the extreme nature of the exaction here makes a years-long wait for a state-court remedy "utterly impracticable" and therefore inefficient. *Graham*, 262 U.S. at 257; *cf. Rosewell*, 450 U.S. at 525 & n.33 (because the TIA "has its roots in equity practice," general equity principles are "instructive on whether a state remedy is 'plain, speedy and efficient'"). The whole point of a gross-receipts tax is to burden heavily, and to apply to unprofitable and low-net-income companies (like startups), eliminating their profits altogether. *USTR Report* at 4, 55-60; *see also* Compl. ¶¶ 42, 86. It is no answer to companies driven entirely out of the State or into bankruptcy to tell them they may receive refunds five or more years from now. As the First Circuit has put it, "requiring a taxpayer to pay an exorbitant or effectively punitive tax in order to challenge it may present 'such a heavy burden that to decline federal equitable relief would be to deny judicial review altogether.'" *Pleasures of San Patricio, Inc. v. Mendez-Torres*, 596 F.3d 1, 9 (1st Cir. 2010) (quoting *Denton v. City of Carrollton, Ga.*, 235 F.2d 481, 485 (5th Cir. 1956); *see also Capitol Indus.-EMI, Inc. v. Bennett*, 681 F.2d 1107, 1114 n.20 (9th Cir. 1982) (recognizing that inability of a taxpayer to pay proposed assessment may render a state refund action an inadequate remedy). Just so here.

In saying this, we appreciate that—as the State notes (MTD 23)—the Fourth Circuit held in *Gwozdz v. HealthPort Technologies, LLC*, 846 F.3d 738 (4th Cir. 2017), that Maryland's administrative tax-challenge scheme passes TIA muster as a general matter. But that case involved an as-applied challenge by a single taxpayer that (unlike this case) could be litigated through Tax General § 13-508(a). Section 13-508(a) permits challenges based on assessments *without* payment, but only for a very narrow range of assessments (*id.*), which do not include the Act's levy here. *See supra* at 9 n.1. Thus the pre-payment remedies that were available in *Gwozdz* are not in fact available here. And it is hardly an "efficient" remedy that requires companies to completely abandon their business models, exit the Maryland market, or declare bankruptcy (*Pleasures of San Patricio*, 596 F.3d at 9) before obtaining relief in a multiplicity of refund actions (*Rosewell*, 450 U.S. at 525 & n.33).

### D. For the same reason, tax comity does not bar this suit

For the same reasons that the TIA does not bar this action, neither does the tax comity doctrine. As a starting point, the State acknowledges (MTD 28 n.10) that, in the Fourth Circuit, if an exaction is not a "tax" for TIA purposes, it is not a "tax" for comity purposes, either. *See DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 125 (4th Cir. 2008) (applying the TIA's tax/fee distinction "for purposes of [the] comity analysis" as well). Crucially, the court of appeals held the franchise fee in *DIRECTV* to be a "tax" covered by the comity doctrine only "because cable providers [were] authorized by statute to pass along the costs of franchise charges to their customers," in effect "spread[ing]" the exaction "among a wide proportion of the population"; and because "the proceeds of franchise charges go into the general operating funds of the localities that levy them, rather than into discrete funds established" to pay for specific programs related to the payers. *Id.* at 125-126. Here, the precise opposite is

true, strongly indicating that tax comity cannot apply in this case.

Additionally, the tax comity doctrine does not apply when state-court remedies are inadequate (*Levin v. Commerce Energy*, 560 U.S. 413, 422 (2010) (citing *Matthews v. Rodgers*, 284 U.S. 521, 525-526 (1932)), which is the case here. Neither *Levin* nor *National Private Truck Council v. Oklahoma Tax Commission*, 515 U.S. 582 (1995)—discussed at pages 26-28 of the motion to dismiss—support application of tax comity here. The *Truck Council* case is not really a comity case at all; it instead concerned the meaning of Section 1983. And the Court held simply that damages actions in federal court under Section 1983 are foreclosed in tax cases, so long as the plaintiff may seek and obtain that legal relief in state court instead. 515 U.S. at 589-592. Because plaintiffs do not seek damages, that holding has no relevance here. And although *Levin* confirmed that tax comity applies in some scenarios where the TIA does not, it did so by narrowly holding that comity will sometimes prevent federal courts from granting an injunction that would *create* state tax liabilities rather than *eliminate* them. 560 U.S. at 424-426. That is not this case.

As *DIRECTV* explains, the tax comity doctrine reflects a concern to avoid "inappropriate intrusion by the federal courts into [state] tax laws." 513 F.3d at 127. But it does not apply when the state law at issue is not really a "tax" law within the meaning of AIA and TIA precedents, or when state-court remedies are inadequate.

E. **At a minimum, the TIA does not bar plaintiffs' challenge to the Act's pass-through prohibition.**

In no event can the Court dismiss Count IV on TIA or comity grounds. The Act's pass-through prohibition is not a tax in any conceivable respect—rather, it is a direct regulation of what plaintiffs' members may say on their bills and invoice or what amounts they are

permitted to charge in certain transactions. Courts have uniformly held that challenges to pass-through prohibitions like the one in the Act do not implicate the TIA.

For example, in *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499 (6th Cir. 2008), the Sixth Circuit considered a similar pass-through prohibition enacted as part of a gross revenues tax on telecommunications providers. *Id.* at 501. The court explained that the TIA did not bar plaintiffs' bid to invalidate the pass-through prohibition, which was "not a request for a tax injunction," but "a request to end a ban on what the provider may say about the tax and on what the provider may do to collect the tax from someone else." *Id.* (cleaned up). The relief sought—invalidation of the pass-through prohibition—would not "halt the collection or assessment of taxes," but would "merely allow the providers to identify the tax on the bill and allow them in the process to explain to their customers why they have raised prices." *Id.* "The mere fact that the anti-pass-through section is contained in a tax law of the State" does not change the analysis. *Id.* at 503 (internal quotation marks omitted).

The Second Circuit has held the same. *See, e.g.*, *Mobil Oil Corp. v. Tully*, 639 F.2d 912, 918 (2d Cir. 1981) (pass-through prohibition enacted as part of a gross-receipts tax assessed against oil companies "is not insulated from federal scrutiny by [the TIA]"); *Mobil Oil Corp. v. Dubno*, 639 F.2d 919, 922 (2d Cir. 1981) (similar). So too should this Court.

III. **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR PREEMPTION CLAIM**

The federal Internet Tax Freedom Act (ITFA) preempts any charge imposed in a discriminatory manner on electronic commerce. 47 U.S.C. § 151 note (ITFA) § 1101(2)(A). Maryland has, without a doubt, imposed a discriminatory charge within the meaning of ITFA, subjecting advertising services delivered over the internet to an onerous charge not imposed

on "similar" advertising services published through newspapers, mailings, billboards, or radio and television programming. ITFA's plain text thus invalidates the Act.

The State's objections are not persuasive. ITFA is a constitutional express-preemption provision, and plaintiffs have a cause of action under Section 1983 and *Ex Parte Young* to enforce their federal preemption rights against Maryland's discriminatory surcharge.

## A.     There is no presumption against preemption

To begin, the State invokes the presumption against preemption. *See* MTD 36 (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). But there is no presumption against preemption in the context of an express-preemption clause like ITFA's. As the Supreme Court held in *Puerto Rico v. Franklin California Tax-Free Trust*, 136 S. Ct. 1938 (2016), when a statute "'contains an express pre-emption clause,' [courts] do not invoke any presumption against pre-emption but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Id.* at 1946 (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)). And the Fourth Circuit reiterated that "the best course is simply to follow as faithfully as we can the wording of the express preemption provision, without applying a presumption one way or the other." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (2018).

Contrary to the State's assertion (MTD 36), it makes no difference that ITFA pre-empts state tax laws. The Supreme Court has applied an express-preemption provision's plain language even when it applies to state tax systems. In *Aloha Airlines v. Director of Taxation of Hawaii*, 464 U.S. 7 (1983), the Court "acknowledge[d] that" although a tax-preemption statute "may result in the disruption of state systems of taxation," courts nevertheless are "bound by the plain language of the statute." *Id.* at 12. Accordingly, this Court's task "is

simply to interpret the words [of ITFA's express preemption clause] as they are written," with no presumption against preemption. *Air Evac*, 910 F.3d at 762.

## B.  The Act assesses a discriminatory tax within the meaning of ITFA

As enacted in 1998, the Internet Tax Freedom Act imposed an initially temporary moratorium on "discriminatory taxes on electronic commerce." Pub. L. No. 105-277, 112 Stat. 2681-719 (1998). Congress extended ITFA's moratorium three times, making it permanent in 2015. *See* Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125 § 922, 130 Stat. 122, 281 (2015).

ITFA defines "electronic commerce" as "any transaction conducted over the internet or through internet access, comprising the sale, lease, license, offer, or delivery of property, goods, services, or information, whether or not for consideration." ITFA § 1105(3). It defines "tax," in turn, to mean "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes," carving out only simple use-fees, or fees "for a specific privilege, service, or benefit conferred." ITFA § 1105(8)(A)(k).

A "discriminatory tax" is defined as a tax on electronic commerce that "is not generally imposed . . . on transactions involving similar property, goods, services, or information accomplished through other means." ITFA § 1105(2)(A)(i). ITFA's definition of "discriminatory tax" is meant to "capture instances where State or local tax policies seek to place electronic commerce at a disadvantage compared to similar commerce conducted through more traditional means." H.R. Rep. No. 105-570, at 33 (1998).

In making ITFA permanent, Congress recognized that the internet, nascent in 1998, had become "the primary driver of U.S. economic growth, innovation and productivity," bringing enormous benefits to individuals and businesses alike. H.R. Rep. No. 113-510, at 5

(2014).[4] Because internet commerce is "inherently susceptible to multiple and discriminatory taxation in a way that commerce conducted in more traditional ways is not" (H.R. Rep. No. 105-570, pt.1, at 29), Congress determined that making ITFA permanent was necessary to foster economic growth (H.R. Rep. No. 113-510, at 5). Making ITFA permanent also addressed Congress's concern that discriminatory or multiple internet taxes would have a disproportionate impact on low-income and minority households. H.R. Rep. No. 113-510, at 6-7.

Neither the Supreme Court nor the Fourth Circuit has had occasion to articulate a test for ITFA discrimination. But the statutory text readily supplies one. There must be:

(1) a State "tax";

(2) imposed on "electronic commerce";

(3) that is not imposed, or is imposed at a different rate, on "similar" services "accomplished" or "delivered" "through other means."

As we describe below, each prong of this test is satisfied as a matter of law. Plaintiffs are therefore entitled to summary judgment on their ITFA claim.

**1.** Although the charge imposed by the Act is not a "tax" for purposes of the TIA, it does constitute a "tax" for purposes of ITFA preemption. In the context of two "different statutes" serving different purposes like these, singular words appearing in both statutes may be given "different shades of meaning and consequently may be variously construed." *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). The meanings of

---

[4]    ITFA was officially made permanent in 2015 through a large consolidated bill, the Trade Facilitation and Trade Enforcement Act of 2015, Pub. L. No. 114-125, 130 Stat. 122. The House Report was issued on July 3, 2014, in conjunction with House Bill 3086, a standalone bill proposing to make ITFA permanent that did not itself pass.

words must "vary to meet the purposes of the law, to be arrived at by a consideration of the language in which those purposes are expressed, and of the circumstances under which the language was employed." *Yates v. United States*, 574 U.S. 528, 538 (2015); *accord id.* at 537 ("We have several times affirmed that identical language may convey varying content when used in different statutes."). Given the unique meaning of the word "tax" under the TIA, these principles have special force here. As the Ninth Circuit explained in *Bidart Brothers*, distinguishing the meaning of the word "tax" for the TIA from the meaning of the word in bankruptcy doctrine, there is no "universal definition of 'tax' applicable in every legal context." 73 F.3d at 929.

Here, ITFA was enacted by the 105th Congress in 1999—several generations after the TIA and twice as many after the AIA. While the TIA was enacted for *federalism* purposes, ITFA was enacted for *federal* purposes—to prevent discriminatory charges that would harm the development of electronic commerce. Thus, what the 39th and 75th Congresses meant by the word "tax" in the AIA and TIA differs from the meaning ascribed by the 105th Congress in ITFA.

This is undeniably clear because, unlike the TIA, ITFA supplies an express definition of a covered "tax." It specifies, in particular that ITFA applies to "any charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes," with the sole exception that it does not apply to "a fee imposed for a specific privilege, service, or benefit conferred." 47 U.S.C. § 151 note § 1105(8)(A). That broader meaning of "tax" encompasses punitive assessments that are not use fees. And that broader meaning of "tax" makes sense in view of the purpose and context of ITFA. In contrast with the TIA—which operates against a long history of federal judicial review of unconstitutional state action

(*Armstrong*, 575 U.S. at 327 (2015); *Holland*, 560 U.S. at 646)—ITFA's purpose is to prevent discriminatory and, where applicable, punitive charges in internet commerce. The assessment here plainly constitutes "any charge" that is not a fee imposed for a specific privilege, service, or benefit—and it is therefore a "tax" for ITFA purposes.

**2.** The charge is imposed on "electronic commerce." ITFA defines "electronic commerce" expansively as including "any transaction conducted over the Internet," including "the sale . . . or delivery of . . . services, or information." ITFA § 1105(3). The Act's charge here is assessed against digital advertising services, including "banner advertising, search engine advertising, interstitial advertising, and other comparable advertising services." Tax. Gen. § 7-5.101(D). Such services are both sold and delivered over the internet.

**3.** The Act does not assess the same charge against advertising services "accomplished through other means." ITFA § 1105(2)(A)(i). Traditional offline advertising services include advertising in newspapers, magazines, periodicals, and other printed publications; on billboards, structures, or vehicles; or on radio or television broadcasts. *See* Md. Code Ann., Local Gov't § 20-202. These many categories of advertising, however, are not subject to the digital advertising services charge, even though they are "similar" services.

The State asserts (MTD 37-39) that the features and efficiencies of digital advertising make it not "similar" to offline advertising for ITFA purposes. But that line of reasoning— that digital advertising is dissimilar from print advertising *because it is digital*—would reduce ITFA to a nullity. By the State's lights, the fact that services are sold and delivered over the internet by itself renders them not "similar" to services sold and delivered by "other means" (ITFA § 1105(2)(A)(i)), permitting discrimination.

The statute's text does not permit such a purpose-destroying interpretation. The word "similar" means "having characteristics in common" or being "alike in substance." *Similar*, Merriam Webster's Third New International Dictionary 2120 (2002). A banner ad on a website plainly has characteristics in common with a print ad in a newspaper; an online video commercial plainly has characteristics in common with a TV commercial; and a product plug over a digital music streaming service plainly has characteristics in common with one over broadcast radio. Discrimination across these types of media is precisely what Congress had in mind when it enacted ITFA. *See Performance Marketing Association v. Hamer*, 998 N.E.2d 54, 59 (Ill. 2013) (holding, in an ITFA case, that online advertising "is not different in kind from advertising . . . in Illinois newspapers or Illinois radio broadcasts").

For its part, the State identifies nothing meaningfully different between traditional and digital advertising services. It points (MTD 39) only to the ability of digital advertising to "target a particular audience efficiently, based on factors like location and user interests, as expressed in their search terms." That does not make internet advertising dissimilar within the meaning of ITFA. Indeed, the point of electronic commerce is to make more efficient the old ways of doing business. If superior "efficiency" were enough to make ITFA inapplicable, the statute would be meaningless. That is not the law.

**4.**   For these reasons, the Act undeniably discriminates between digital advertising services and "similar" services accomplished or delivered through "other means." ITFA § 1105(2)(A)(i). Still, the State responds (MTD 38) in cursory fashion that the surcharge is not discriminatory because it is not imposed on a "per-transaction basis."

This is wrong for two reasons. First, the notion that ITFA only reaches state charges imposed on a per-transaction basis finds no support in the statute's text. The relevant

question under ITFA is whether the charge applies to the sale or delivery of services over the internet. The Act's charge here does exactly that: It applies to "annual gross revenues *derived from digital advertising services*" (Tax-Gen. § 7.5-102(b)(1)) sold and delivered over the internet; but not to annual gross revenues derived from alternative advertising services sold and delivered using traditional media. ITFA requires nothing further.

Second, ITFA invalidates any state charge that "establishes a classification of . . . online service providers" for discriminatory tax treatment. ITFA § 1105(2)(A)(iv). The Act does that, too: It classifies online service providers—*i.e.*, those who offer advertising services over a digital interface, other than news and broadcast companies—and establishes a special assessment against their gross revenues. Again, ITFA requires nothing further.[5]

### C. The State's defenses are meritless

#### 1. *ITFA does not violate the anti-commandeering principle*

The State contends (MTD 36-37) that ITFA violates the anti-commandeering doctrine, as articulated in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018). That is wrong. The anti-commandeering doctrine reflects the commonsense notion that "the Constitution simply does not give Congress the authority to require the States to regulate." *New York v. United States*, 505 U.S. 144, 178 (1992). "The Constitution instead gives Congress the authority to regulate matters directly and to pre-empt contrary state legislation." *Id.* ITFA is constitutional under that rule: It does not require the State to regulate and instead simply preempts state and local laws inconsistent with federal policy.

---

[5] The Act also assesses a "multiple tax" within the meaning of IFTA. *See* Compl. ¶¶ 80-81. The State does not meaningfully address this element of the ITFA claim, which turns on the Act's extraterritoriality. Because the contours of the "multiple tax" claim require the development of a factual record, we reserve it for later proceedings following discovery, in the event the Court does not dispose of the case on the basis of the parties' threshold briefing.

The Supreme Court has only three times invalidated federal statutes on anti-commandeering grounds. The first, in 1992 in *New York*, the Supreme Court invalidated a federal statute that required States to either "take title" to radioactive waste or to implement legislation designed by Congress. 505 U.S. at 176-177. Either choice was "unconstitutionally coercive" of state authorities, commandeering state regulators and legislatures to carry out a federal regulatory program. *Id.*

Second, in *Printz v. United States*, 521 U.S. 898 (1997), the Supreme Court invalidated a federal statute that required state and local law enforcement officers to conduct background checks on prospective handgun purchasers. *Id.* at 902. The Court there reaffirmed its rule that "[t]he Federal Government may not compel the State to enact or administer a federal regulatory program," including by directly ordering state law enforcement officials to carry out a federal program's background check. *Id.* at 933 (quoting *New York*, 506 U.S. at 187).

Finally, in *Murphy*, the Supreme Court invalidated a federal statute that made it "unlawful for a State" to "authorize" sports-gambling. 138 S. Ct. at 1470. The statute did not make sports-gambling a *federal* crime, but instead "require[d] States to maintain their laws against sports gambling without alteration." *Id.* The Supreme Court held that the law violated the anti-commandeering doctrine because it "command[ed] states legislatures to enact or refrain from enacting state law." 138 S. Ct. at 1478.

The common thread among all three of these cases is that Congress cannot command States to adopt or enforce federal policies. But that is not what ITFA does; it instead announces a federal policy and—like any other express preemption provision—protects private parties from state laws inconsistent with that policy. To be sure, express preemption

provisions like ITFA's sometimes use a formulation like "no State . . . shall enact or enforce any law . . . relating to" a subject of federal regulation. *Murphy*, 138 S. Ct. at 1480. While "[t]his language might appear to operate directly on the States," the Supreme Court has held that such provisions in fact "operate[] just like any other federal law with preemptive effect" by "confer[ring] on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints," free from contrary state constraints. *Id*.

That is what ITFA does. It is well-established that Congress has the power to protect interstate commerce from discrimination by the States, even beyond the negative implications of the Commerce Clause. *See Aloha Airlines*, 464 U.S. at 14 n.10 ("Congress clearly has the authority to regulate state taxation of [transactions] in interstate commerce.") (citing *Arizona Public Service Co. v. Snead*, 441 U.S. 141, 150 (1979)); *see also South Dakota, Inc. v. Wayfair*, 138 S. Ct. 2080, 2098 (2018) (confirming same authority). And in doing so here, ITFA merely gives private parties the right to be free from discriminatory state taxation. That is entirely consistent with *Murphy*.

### 2.  *Plaintiffs have a private cause of action to enforce ITFA*

The State argues (MTD 28-34) next that plaintiffs lack a "private right of action" to enforce ITFA. That, too, is wrong. Plaintiffs have a private right of action pursuant to *Ex Parte Young* and Section 1983 to enjoin the State's infringement of their members' rights under federal law.

**1.** *Ex Parte Young* and its progeny conclusively establish plaintiffs' right to seek an injunction against state action that is preempted by federal law. The Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Armstrong v. Exceptional*

*Child Care Center*, 575 U.S. 320, 326-327 (2015). This includes when "an individual claims federal law immunizes him from state regulation." *Id.* at 326. In that case, "the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* (citing *Ex Parte Young*, 209 U.S. 123, 155-156 (1908)); *accord Just Puppies, Inc. v. Frosh*, 438 F. Supp. 3d 448, 498 (D. Md. 2020) ("[A] preemption claim asserted in a pre-enforcement challenge is merely a claim in equity for injunctive relief, precisely the cause of action that the Supreme Court recognized in *Ex parte Young*."). That is this lawsuit exactly.

The only limit on the equitable cause of action under *Ex Parte Young* is if Congress affirmatively "displace[s] the equitable relief that is traditionally available to enforce federal law." *Armstrong*, 575 U.S. at 329. The State does not argue anything to that effect.

**2.** The Court need go no further than *Ex Parte Young* to reject the State's argument that ITFA is not privately enforceable. But as *Murphy* demonstrates beyond reasonable dispute, ITFA confers a private right also enforceable under Section 1983.

Section 1983 "imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Blessing v. Freestone*, 520 U.S. 329, 340 (1997). For a plaintiff to enforce a federal statute through a Section 1983 action, the Court "must first determine whether Congress *intended to create a federal right*." *Gonzaga University v. Doe*, 536 U.S. 273, 283-284 (2002). "Once a plaintiff demonstrates that the statute confers an individual right, the right is presumptively enforceable by § 1983," unless the State rebuts the presumption "by showing that Congress 'specifically foreclosed a remedy under § 1983.'" *Id.* at 284 & n.4 (quoting *Smith v. Robinson*, 568 U.S. 992, 1004-1005 n.9 (1984)); *accord Planned Parenthood South Atlantic v. Baker*, 941 F.3d 687, 695 (4th Cir. 2019).

Again, the State does not assert that Congress has explicitly foreclosed relief under ITFA—because it has not. Thus, the only question is whether ITFA creates an enforceable federal right. Our response to the State's anti-commandeering argument had already shown that it does: *Murphy* holds that express-preemption provisions "confer on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints." *Murphy*, 138 S. Ct. at 1480. Thus, under *Murphy*, express-preemption clauses must be understood to create an enforceable federal right under Section 1983. That was the Supreme Court's holding in *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103 (1989), as well, where it explained that federal preemption provisions generally will "create a federal right for which § 1983 provides a remedy," namely "a guarantee of freedom for private conduct that the State may not abridge." *Id.* at 108, 112.

The State suggests (at 35) that the Nevada Supreme Court in *Cabral v. Caesars Entertainment Corp.*, 467 P.3d 638 (Table), 2020 WL 4353616 (Nev. July 29, 2020), held that ITFA does not create a private right of action. But the plaintiffs there sued hotel operators who merely collected county-imposed taxes. Naturally, the Court held there is no right of action against a *private party* for violation of ITFA because "[a]s private entities, respondents do not impose taxes and are not regulated by the ITFA." *Id.* at *1-2. Instead, it explained, "[i]f appellants are unsatisfied with Clark County's enforcement of the [tax] or allege that the [tax] is being collected in violation of the ITFA, they must direct their complaint to, or against, Clark County." *Id.* That is this case.

The State's efforts to dodge ITFA thus fail. If the State had its way, ITFA would mean nothing, and courts would never have authority to enforce it. Those are not propositions the Court can or should countenance.

IV.    **PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CONSTITUTIONAL CLAIMS**

The Act is unlawful even apart from ITFA because it violates the Commerce Clause and Due Process Clause. The pass-through prohibition also violates the First Amendment. On those independent grounds, the Court should declare the Act invalid and unenforceable.

A.    **The Act facially discriminates against out-of-state commerce**

**1.**    "State laws discriminating against interstate commerce on their face are 'virtually *per se* invalid.'" *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 575 (1997) (quoting *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331 (1996)). Because "[t]he commerce clause forbids discrimination, whether forthright or ingenious," the question on this score is simply whether the law "will in its practical operation work discrimination against interstate commerce." *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994); *see also Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334, 342 (1992) (where a "fee discriminates both on its face and in practical effect," it discriminates against interstate commerce). "Once a state tax is found to discriminate against out-of-state commerce, it is typically struck down without further inquiry." *Chemical Waste*, 504 U.S. at 342.

**2.**    The Act discriminates against interstate commerce both facially and in practical effect. "'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *McBurney v. Young*, 667 F.3d 454, 468 (4th Cir. 2012) (quoting *United Haulers*, 550 U.S. at 338), *aff'd*, 569 U.S. 221 (2013). That describes the surcharge precisely.

The Act sets tiered rates of assessment on annual gross revenue derived from digital advertising services in the State based solely on a firm's *global* annual gross revenues—which

is to say, revenues earned outside of the State of Maryland. Once a firm's global annual revenues reach $100 million, the Act imposes an assessment at a rate of 2.5%, with the rate progressively increasing to 10% as global annual gross revenue increases. According to this scheme, a company's liability under the Act is a function of its out-of-State conduct. As we noted earlier (*supra* at 6; Compl. ¶¶ 36-37, 85), if two firms both had $5 million of *in*-State revenue, but the first firm had $100 million in *out*-of-State revenue and the second had $1 billion in *out*-of-State revenue, the second firm would pay double the assessment of the first firm. The only difference between the two companies is the extent of their extraterritorial economic conduct. That is a straightforward example of *per se* illegal "discriminat[ion] between transactions on the basis of some interstate element." *Boston Stock Exchange v. State Tax Commission*, 429 U.S. 318, 332 n.12 (1977).

Two cases demonstrate the point beyond doubt. First, in *Fulton*, the Supreme Court considered a North Carolina tax assessed against the value of corporate stock in proportion to the company's in-state income. 516 U.S. at 327-328. In short, the more activity a company engaged in *outside* of the State, the greater the tax assessed. *Id*. The Court held that "[t]here is no doubt that the [North Carolina] tax facially discriminates against interstate commerce." *Id*. at 333. A tax that grows with the increasing "degree that [a company] participate[s] in interstate commerce" is one that necessarily "favors domestic corporations over their foreign competitors" and "discourage[s] . . . interstate commerce." *Id*. The Court had no hesitation striking the law under the Commerce Clause.

The circumstances and outcome were the same in *Westinghouse Electric Corp. v. Tully*, 466 U.S. 388 (1984). That case involved a New York tax coupled with a credit granted in proportion to a company's "gross receipts" from business conducted in-state compared with

business conducted out-of-state. *Id*. at 392-395. Simply put, the greater a company's in-state revenues relative to its out-of-state revenues, the greater the credit. The Court explained that, in practical effect, two companies that "maintain the same amount of business in New York" would bear starkly different tax burdens depending on "the amount of [economic] activity each conducts outside New York." *Id*. at 400 n.9. This, the Court reasoned, was not only to "provide a positive incentive for increased business activity in New York State, . . . but also [to] penalize[] increases in [economic] activities in other States." *Id*. at 400-401. The Court had no trouble holding that such a scheme is a "violation of the Commerce Clause." *Id*. at 407. The surcharge here suffers the precise same defects.

The Act is also discriminatory in practical effect because its "scheme falls in a predictably disproportionate way on out-of-staters." *Camps Newfound*, 520 U.S. at 579-580. By setting global revenue thresholds for the charge and each escalating rate so high, the Act favors smaller in-state companies, exceedingly few of which will be subject to the charge imposed by the Act at all, and none of which will be subject to the Act's higher revenue thresholds. Compl. ¶ 85.

**3.** The State relies principally on the dormant Commerce Clause analysis that applies to "taxes" announced in *Complete Auto Transit v. Brady*, 430 U.S. 274 (1977). Because the surcharge here is not a tax in the relevant sense, the *Complete Auto* test is inapplicable. But even if it were otherwise, *Complete Auto* straightforwardly invalidates taxes that "discriminate against interstate commerce." *Wynne*, 575 U.S. at 548. The outcome is thus the same either way.

The State disagrees that the charge is discriminatory, asserting (MTD 45) that because "the Act applies equally to Maryland-based and out-of-state businesses" it is "nondis-

criminatory on its face." That ignores how the Act actually functions. By imposing progressively greater liability for in-state economic activity based on the company's *out-of-state* activity, and by "fall[ing] in a predictably disproportionate way on out-of-staters" (*Camps Newfound*, 520 U.S. at 579-580), the Act discriminates both facially and in effect.

*Commonwealth Edison Company v. Montana*, 453 U.S. 609 (1981), on which the State relies (MTD 45), is not to the contrary. There, Montana imposed a severance tax on coal mined in Montana regardless of the ultimate destination of the coal. *Id.* at 617-618. Although 90% of the coal was delivered out-of-state, the tax applied even-handedly to all coal produced from in-state mines. It thus lacked "the type of differential tax treatment of interstate and intrastate commerce that the Court has found in other 'discrimination' cases." *Id.* at 618-619. The Act here is manifestly different. The same volume of intrastate activity is subjected to dramatically different assessment rates depending entirely on the volume of interstate activity in which the seller engages. That is differential treatment, plain and simple.

Because the charge "discriminate[s] against out-of-state commerce, it [should be] struck down without further inquiry." *Chemical Waste*, 504 U.S. at 342.

### B. The Act's assessment applies to extraterritorial conduct, in violation of both the Commerce Clause and Due Process Clause

The Act is unconstitutional for the closely-related reason that it punishes extraterritorial conduct. "The principle against extraterritoriality as it relates to the dormant commerce clause is derived from the notion that 'a State may not regulate commerce occurring wholly outside of its borders.'" *Association for Accessible Medicines v. Frosh*, 887 F.3d 664, 667 (4th Cir. 2018) (*AAM*). This principle "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations

on interstate commerce and with the autonomy of the individual States within their respective spheres." *Id.* at 667-668 (quoting *Healy v. Beer Inst.*, 491 U.S. 324, 335-336 (1989)). "A state law violates the extraterritoriality principle if it either expressly applies to out-of-state commerce or has that 'practical effect,' regardless of the legislature's intent." *Id.* at 668 (citations omitted).

Similar principles are reflected in the Fourteenth Amendment's Due Process Clause. Under that constitutional provision, "one State's power to impose burdens on the interstate market[s]" is "not only subordinate to the federal power over interstate commerce, but is also constrained by the need to respect the interests of other States." *BMW of North America v. Gore*, 517 U.S. 559, 571 (1996). That is to say, "[t]he sovereignty of each State" implies "a limitation on the sovereignty of all of its sister States." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

"[I]t follows from these principles of state sovereignty and comity" derived from the Commerce and Due Process Clauses "that a State may not impose economic sanctions" on the basis of "conduct in other States." *BMW*, 517 U.S. at 572. Thus, "[u]nder both the Due Process and the Commerce Clauses of the Constitution, a State may not," for example, burden income "earned outside its borders." *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 164 (1983). That is true regardless whether the burden is an exercise of "the power to tax [or] the police power." *W. Lynn Creamery*, 512 U.S. at 194 (quoting *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527 (1935)).

The Act's tiered rates violate these principles. In practical operation, the tiering of rates means that Company A will pay more than Company B for precisely the same in-state conduct if Company A has a higher volume of out-of-state sales. It thus straightforwardly

"impose[s] economic sanctions" on the basis of "conduct in other States." *BMW*, 517 U.S. at 572. That is, the Act punishes companies solely for having greater out-of-state economic activity, not on the basis of any difference in in-state transactions or conduct.

An assessment upon "the operations of interstate commerce measured either by its volume or the gross receipts derived from it has been held to infringe the commerce clause, because the tax if sustained would exact tribute for the commerce carried on beyond the boundaries of the taxing state." *McGoldrick v. Berwind-White Coal Mining Co.*, 309 U.S. 33, 57 (1940). To be sure, the Act here purports to assesses only revenue "derived" from services in the State. *See* MTD 43-44. But that is mere word play. By ratcheting up the rate of the surcharge on in-state activity based on the payer's extraterritorial activity, it plainly "exact[s] tribute" (*id.*) for that extraterritorial activity. It is no answer to say, as the State does (MTD 44-45), that we have not "alleged facts" to show how the Act captures extraterritorial value. The Act's structure and operation speak for themselves.

For the same reasons, the Act fails *Complete Auto*'s external consistency test, which asks "whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995). Additionally, the Act's surcharge is not "fairly related to the services provided by the State" (*Wynne*, 575 U.S. at 547) for the same reasons it captures extraterritorial value in violation of *Container Corp.*

These constitutional violations are as clear as they come, and they are grounds for declaring the Act unlawful and unenforceable.[6]

## V.     PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT ON THEIR CHALLENGE TO THE PASS-THROUGH PROHIBITION

Apart from the Act's assessment itself, the attendant pass-through prohibition is independently unconstitutional. By barring a payer from "directly pass[ing] on the cost of the tax" to a downstream market participant "by means of a separate fee, surcharge, or line item" on an invoice or bill (Tax-Gen. § 7.5-102(c)), it either prohibits speech based upon its content or otherwise it regulates extraterritorial conduct and discriminates against out-of-state purchasers. In all events, it is invalid on its face.

### A.     If the pass-through prohibition regulates what payers may say on bills and invoices, it violates the First Amendment

The pass-through prohibition is most naturally read as a speech regulation. It forbids payers from "directly pass[ing] on the cost of the tax" to downstream market participants only "by means of a separate fee, surcharge, or line item" on invoices or bills. Tax-Gen. § 7.5-102(c). In other words, it prohibits the payers of the Act's assessment only from passing on the cost in the form of an expressly stated line-item; it does not expressly prevent them from recouping the cost by silently rolling the assessment into their overall charges.

Understood in this way, the pass-through prohibition is "a ban on core political speech." *BellSouth*, 542 F.3d at 504. It prohibits payers of the Act's assessment from

---

[6]    The Act violates the Commerce Clause yet further insofar as it (1) burdens interstate commerce more greatly than it advances any supposed local benefits and (2) interferes with U.S. foreign policy. *See* Compl. ¶¶ 85-88. The motion to dismiss does not expressly address these versions of the Commerce Clause claim. Because these elements of the claim require a factual record, however, we reserve them for later proceedings following discovery, in the event the Court does not dispose of the case on the basis of the parties' threshold briefing.

"announcing who bears political responsibility" for the additional charge, and it does so "in the forum most likely to capture voters' attention: an invoice that displays a predictable consequence" of the Act. *Id*. at 505. And at the same time that the law prohibits payers of the charge from attempting "to duck *economic* responsibility for a price increase," it simultaneously "permits legislators to duck *political* responsibility" for the charge by barring companies from identifying the price increase as attributable to the Act. *Id*. (emphasis added). This is a clear gag order on political speech. It does not survive any level of scrutiny, let alone strict scrutiny. *Id*. at 505-509.

The State appears to concede (MTD 50) that, construed as a "no-stating-the-tax" rule, the pass-through prohibition is a facial violation of the First Amendment. It thus characterizes (MTD 49-50) the statutory provision at issue here as a regulation of *both* speech *and* conduct—as both a "no-stating-the-tax" rule and an independent ban on increasing prices to recoup the Act's assessment. It then attempts to save the latter while abandoning the former. We explain in the next section why, even construed as a regulation of conduct (effectively, as a price control), the prohibition is facially unconstitutional under the Commerce Clause. But it bears emphasis here that the State is plainly misreading the statute to characterize it in that way.

That Act specifies that a payer of the charge "may not directly pass on the cost of the tax imposed under this section . . . *by means of* a separate fee, surcharge, or line-item." Tax-Gen. § 7.5-102(c) (emphasis added). That states a single, integrated requirement: payers may not pass-on the charge "by means of" the speech. The State's effort to separate the ban on speech from the regulation of conduct might make sense if the General Assembly had used different language in Section 7.5-102(c)—if it had drafted the statute to say, for example,

that the passing-on of the charge is barred "*including* by means of" an expressly-stated line item. But that is not what the statute says—and in Maryland as anywhere else, courts must "give effect to the statute as it is written." *Peterson v. State*, 226 A.3d 246, 254 (2020).

As support for its contrary view, the State points (MTD 49-50) to the Sixth Circuit's exposition of the Kentucky statute at issue in *BellSouth*. But the distinction between the Maryland and Kentucky statutes proves our point, not the State's. The Kentucky statute specified that the payer "shall not collect the tax directly from [a downstream] purchaser *or* separately state the tax on the bill to the purchaser." Ky. Rev. Stat. Ann. § 136.616(3) (emphasis added). It thus stated dual and standalone prohibitions against passing-through the charge and stating it on an invoice, using a disjunction to separate the two. Here, by contrast, the speech prohibition *is* the pass-through prohibition: one may not be done "by means of" the other. Unlike in the Kentucky statute, these are not analytically distinct prohibitions that can be struck separately of one another. In all events, insofar as it regulates speech, the State effectively concedes that the ban must be struck down as a violation of the First Amendment.

## B.  If the pass-through prohibition regulates conduct rather than speech, it violates the Commerce Clause

The Act's pass-through prohibition also violates the Commerce Clause, even if construed as a regulation of conduct. That is because it regulates extraterritorially; and if it is read more narrowly to apply only to in-state conduct, it facially discriminates against out-of-state consumers of digital advertising services.

**1.**  Construed as a regulation of conduct, the pass-through prohibition is "invalid because it . . . controls the price of transactions that occur wholly outside the state." *AAM*, 887 F.3d at 671. Again, where the "practical effect" of a state law is "to control conduct

beyond the boundaries of the State," the law "exceeds the inherent limits of the enacting State's authority." *Healy*, 491 U.S. at 336. And it is irrelevant that the transaction may have "effects within the State." *Id.*

That describes the pass-through prohibition. Maryland is purporting to limit the fees that digital advertisers may charge to their customers, even in sales of digital advertising services taking place "wholly outside of the State's borders." *Healy*, 491 U.S. at 336. That is a *per se* violation of the Commerce Clause. *AAM*, 887 F.3d at 671 (invalidating Maryland drug-price-gouging law as regulating extraterritorially because it was not limited only to sales that occurred in Maryland or to transactions with Maryland consumers).

**2.** The pass-through prohibition, construed as a regulation of conduct, cannot be saved by reading it narrowly as a regulation of in-State sales only. *Cf. AAM*, 887 F.3d at 670-671 n.3 (considering whether a limiting construction was plausible). For starters, there is no textual basis for such a narrowing construction. But even if there were, it would mean only that in-State purchasers of digital advertising services would be insulated from the economic effects of the Act's charge, and that the incidence of the charge would therefore fall entirely on out-of-State purchasers. Such straightforward discrimination between in-State and out-of-State purchasers would "provid[e] a direct commercial advantage to local business" in violation of the Commerce Clause. *Maryland v. Louisiana*, 451 U.S. 725, 753 (1981).

Multiple cases confirm this point. In *Maryland v. Louisiana* itself, Louisiana's tax regime used a scheme of tax credits to "protect" local consumers from the incidence of a gas tax, ensuring that the tax was "passed on to consumers out of the State." *Id.* at 758–59 (citation omitted). The Supreme Court struck the scheme down for that reason. *Id.* A New York appellate court struck down a statutory pass-through prohibition in *Shell Oil Co. v. New*

*York State Tax Commission*, 91 A.D.2d 81 (N.Y. App. 1983), on the same reasoning. It explained that the "practical effect of the [local-only pass-through] prohibition [was] to shift the direct burden of the tax from the companies' New York customers to their out-of-State customers," resulting in a *per se* violation of the Commerce Clause. *Id.* at 93.

Any limiting construction here would meet the same fate: The practical effect would be to shift the burden of the tax from in-State customers to out-of-State customers, resulting in facially impermissible discrimination against interstate commerce.

**3.** The State's defense (MTD 47-48) of the pass-through prohibition falls far short. Curiously, the State begins with an articulation of *Congress's* power to control where the incidence of *federal* taxes falls. *See id.* (quoting *Helvering v. National Grocery Co.*, 304 U.S. 282 (1938)). But neither the negative Commerce Clause nor the Due Process Clause's extra-territoriality constraints apply to Congress. *Helvering*, which is self-consciously a decision about Congress's powers, has zero relevance to the question whether a state statute exceeds a State's authority under those principles.

That State also cites (MTD 48) to *Exxon Corp. v. Eagerton*, 462 U.S. 176 (1983), for the proposition that "a State may lawfully impose a pass-through prohibition to prevent a taxpayer from passing on the cost of the tax to customers, except to the extent the prohibition would interfere with a comprehensive [federal] regulatory scheme." But in *Exxon*, Congress had specifically authorized Alabama to enact the type of pass-through prohibition that it did. *Id.* at 186-187. Congress had thus expressly "conferred upon [Alabama] an ability to restrict the flow of interstate commerce that they would not otherwise enjoy" (*Lewis v. BT Invest-ment Managers, Inc.*, 447 U.S. 27, 44 (1980)), which is a recognized exception to the Commerce Clause's default ban on interstate commercial discrimination. *See White v. Massa-*

*chusetts Council of Const. Emps., Inc.*, 460 U.S. 204, 213 (1983) ("Where state or local government action is specifically authorized by Congress, it is not subject to the Commerce Clause even if it interferes with interstate commerce.")). There is nothing like that here, and *Exxon* is therefore inapposite.

In sum, the State does not defend the pass-through prohibition under the First Amendment. And its defense of the prohibition under the Commerce Clause misses the mark. Construed either way, the ban violates the Constitution.

## CONCLUSION

The Court should deny the State's motion to dismiss and enter summary judgment for plaintiffs. If it does not, it should at minimum deny the motion to dismiss and permit the parties to engage in discovery, including on the claims not fully addressed by the State in its motion and expressly reserved by plaintiffs in this brief. *See supra* at 45 n.5, 56 n.6.

Dated: July 29, 2021

Respectfully submitted,

*/s/ Michael B. Kimberly*

Michael B. Kimberly (No. 19086)
Paul W. Hughes (No. 28967)
Stephen P. Kranz*
Sarah P. Hogarth*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *mkimberly@mwe.com*
   *(202) 756-8000*

*Attorneys for All Plaintiffs*

Tara S. Morrissey*
Jennifer B. Dickey*
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *tmorrissey@uschamber.com*
   *(202) 463-5337*

*Attorneys for the Chamber of Commerce
of the United States of America*

 *\* admitted pro hac vice*