**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, | * | |
| | * | |
| *Plaintiffs*, | * | |
| v. | * | No. 1:21-cv-00410-DKC |
| | * | |
| PETER FRANCHOT, | * | |
| *Defendant*. | * | |
| | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
AND RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

BRIAN E. FROSH
Attorney General of Maryland

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

BRIAN L. OLINER
Federal Bar No. 05780
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404
(410) 260-7808

September 13, 2021                    Attorneys for Defendant

# TABLE OF CONTENTS

Page

REPLY ARGUMENT ....................................................................................................1

I.    THE PLAINTIFFS' CLAIMS ARE NOT RIPE............................................................1

      A.    The Comptroller Has Delegated Authority to Adopt Legislative Regulations
            with the Force of Law, Not Interpretive Regulations as Plaintiffs Mistakenly
            Claim...................................................................................................................1

      B.    Because the Comptroller Has Not Yet Adopted Legislative Regulations
            Required to Enforce the Act, the Case Is Not Ripe. ................................................2

II.   THE TAX INJUNCTION ACT PRECLUDES JURISDICTION AND PLAINTIFFS HAVE A
      PLAIN, SPEEDY, AND EFFICIENT REMEDY AVAILABLE UNDER MARYLAND LAW.................4

      A.    The Digital Advertising Tax Is a "Tax" and Not a "Penalty" Within the
            Meaning of the Tax Injunction Act Because the Activity Subject to the Tax
            Is Not Unlawful.....................................................................................................5

      B.    Supreme Court Precedent Requiring That the Digital Advertising Tax Be
            Treated as a Tax Under the Tax Injunction Act Cannot Be Overcome by
            Plaintiffs' Various Arguments. ...............................................................................9

      C.    This Case Cannot Satisfy the Tax Injunction Acts's Narrow Exception for
            Instances Where State Law Fails to Offer a "Plain, Speedy and Efficient"
            Remedy. ...............................................................................................................15

      D.    The Tax Injunction Act Bars This Entire Action....................................................23

III.  COMITY REQUIRES DISMISSAL OF THIS ACTION...............................................25

IV.   PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE THE INTERNET TAX
      FREEDOM ACT. ...............................................................................................26

V.    IF THERE IS A PRIVATE RIGHT OF ACTION TO ENFORCE THE INTERNET TAX FREEDOM
      ACT, THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE STATUTE. ...........30

VI.   THE DIGITAL ADVERTISING TAX ACT DOES NOT VIOLATE THE COMMERCE CLAUSE
      OR THE DUE PROCESS CLAUSE..........................................................................33

VII.  THE PASS-THROUGH PROVISION OF THE ACT DOES NOT VIOLATE THE DUE PROCESS
      CLAUSE, COMMERCE CLAUSE, OR FIRST AMENDMENT. .....................................37

OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT...........................39

    SUMMARY JUDGMENT IS INAPPROPRIATE PRIOR TO DISCOVERY, ESPECIALLY IN THE CONTEXT OF THIS CASE. ..............................................................................................39

CONCLUSION...........................................................................................................40

EXHIBITS:

    Exhibit 1—Affidavit of Andrew Maschas

    Exhibit 2—Affidavit of John T. Hearn

    Exhibit 3—Affidavit of Brian L. Oliner

    Exhibit 4—Dep't of Legis. Servs., *Fiscal & Policy Note Enrolled—Revised*, 2021 Md. Laws ch. 669 (S.B. 787), 2021 Regular Legis. Sess. (May 18, 2021)

## REPLY ARGUMENT

**I.    THE PLAINTIFFS' CLAIMS ARE NOT RIPE.**

**A.    The Comptroller Has Delegated Authority to Adopt Legislative Regulations with the Force of Law, Not Interpretive Regulations as Plaintiffs Mistakenly Claim.**

In arguing that their claims are ripe, plaintiffs mistake both the nature of the Comptroller's power to promulgate regulations under the Digital Advertising Tax Act ("Act") and the effect of those regulations once they become law.  ECF 31-1, at 21-22.  The Act defines the "assessable base" as the business's "annual gross revenues derived from digital advertising services in the State" of Maryland.  Md. Code Ann. Tax-Gen. § 7.5-101(c).  The assessable base will be determined using an apportionment fraction based on the annual gross revenues of the business derived from digital advertising services in the State (the numerator) and in the United States (the denominator).  *Id.* § 7.5-102(b)(1).  "The Comptroller shall adopt regulations that determine the state from which revenues from digital advertising services are derived."  *Id.* Thus, the Act delegates to the Comptroller the power to determine the source of taxable revenues—that is, to adopt a regulation that will determine how to calculate the assessable base: "annual gross revenues derived from digital advertising services in the State."  Tax-Gen. § 7.5-101(c).

"Regulations based on statutory authority—sometimes referred to as 'legislative rules'— have the force and effect of law."  *State v. Roshchin*, 446 Md. 128, 148 n.20 (2016) (citing *Maryland Port Admin. v. Brawner Contracting Co.*, 303 Md. 44, 60 (1985)).  "In contrast to an interpretive regulation, which does not result from a specific statutory grant, and which merely expresses an agency's interpretation of what a statute means, 'a substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.'"  *State v. Merritt Pavilion, LLC*, 230 Md. App. 597, 618 (2016) (quoting *Building Materials Corp. v. Board of Educ.*, 428 Md. 572, 591 n.25 (2012)).  *See Comptroller v. Miller*,

169 Md. App. 321, 346 (2006), *aff'd*, 398 Md. 272 (2007) ("The regulatory provisions [adopted by the Comptroller] are legislative in nature.  Accordingly, they have the force of law."); *Maryland Restorative Justice Initiative v. Hogan*, No, 1:16-cv-01021-ELH, 2017 WL 467731, at *5 (D. Md. Feb. 3, 2017) (stating that because the state agency "has been delegated legislative authority to 'adopt regulations governing its policies and activities' . . . its regulations have the force of law") (citing *Roshchin*, 446 Md. at 148 n.20; *Building Materials*, 428 Md. at 591 n.25).

### B. Because the Comptroller Has Not Yet Adopted Legislative Regulations Required to Enforce the Act, the Case Is Not Ripe.

Plaintiffs' ripeness argument is based on their mistaken claim that the Comptroller's regulations will be "interpretative," and, therefore, according to plaintiffs, there is no reason to await regulations that "could not alter the Act's provisions."  ECF 31-1, at 22 (quoting *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)).  Plaintiffs are wrong, because the Act grants legislative authority to the Comptroller to adopt regulations regarding the calculation of a fair apportionment formula based on a taxpayer's source of income; thus, there is a gap in the legislation, which the Comptroller has been granted legislative authority to fill.  *See Yashenko v. Harrah's N.C. Casino Co.*, LLC, 446 F.3d 541, 549 n.1 (4th Cir. 2006) (describing legislative regulations as "those filling explicit gaps in the statute" and interpretative regulations as "those clarifying terms and provisions of the statute").

Plaintiffs attempt to distinguish cases requiring taxpayers to await the tax assessment before challenging a new tax law by arguing that the cases were either fact-intensive or presented a significant possibility that no enforcement action would be taken.  ECF 31-1, at 22-23.  But plaintiffs' attempt sidesteps the salient point, which is that because the Act lacks a critical piece necessary for enforcement—how to determine the State from which the digital advertising services are derived—even a facial challenge is premature.  *See Comptroller of Md. v. Wynne*, 575 U.S.

542, 547 (2015) (stating that a component of the analysis is whether the state tax is "fairly apportioned" (quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S 274, 279 (1977)).

A tax's apportionment formula is a critical part of determining whether the tax is discriminatory or impermissibly reaches out-of-state values. *Wynne*, 575 U.S. at 547. Because the General Assembly delegated to the Comptroller the authority to adopt by regulation an essential determinative element of the apportionment formula, Maryland law currently lacks that critical piece. Plaintiffs' claims cannot be adjudicated without evaluating the fairness of the State's apportionment formula.

Under similar circumstances, the Supreme Court found a commerce clause challenge premature. *Great Atl. & Pac. Tea Co. v. Grosjean*, 301 U.S. 412, 429-30 (1937). In that case, Montgomery, Ward & Company challenged a Louisiana law adopting a progressive rate scheme based on the number of chain stores operated by the taxpayer, "whether operated in this State or not." *Id.* at 418. The company claimed that the state tax discriminated "in favor of local as against national chains, in the attempt to tax property and activities which are beyond the state's jurisdiction," and burdened interstate commerce. *Id.* at 419. The Supreme Court rejected the company's Commerce and Due Process Clause challenges as premature because the record disclosed "no rules or regulations promulgated by the appellee Supervisor of Public Accounts and no ruling by any responsible state official as to which of [the] Company's establishments are to be included in reckoning the total of its retail stores." *Id.* at 429. "It is manifest that Montgomery, Ward & Company cannot upon mere supposition that the act will be unconstitutionally construed and applied in respect of its five stores in Louisiana obtain an advisory decree that the act must not be so administered as to burden or regulate interstate commerce." *Id.* at 429-30.

Because, under current circumstances, there is no way to predict that any of plaintiffs' member firms will be subject to unconstitutional taxation, their facial challenge is not ripe for judicial decision.[1]

## II. THE TAX INJUNCTION ACT PRECLUDES JURISDICTION AND PLAINTIFFS HAVE A PLAIN, SPEEDY, AND EFFICIENT REMEDY AVAILABLE UNDER MARYLAND LAW.

Plaintiffs argue that this Court should disregard the Supreme Court's recent explanation of its precedent regarding the Anti-Injunction Act ("AIA") and Tax Injunction Act ("TIA"); instead, plaintiffs urge the Court to accept plaintiffs' alternative take on that precedent, based on their own preferred reading of case law.  But this Court is not at liberty to ignore the Supreme Court's instructions, especially when that guidance pertains to the meaning and consequences of the Supreme Court's own precedent.  In any case, when read correctly, even the Supreme Court decisions emphasized by plaintiffs support the conclusion that Maryland's digital ad tax is a tax within the meaning of the TIA.  There is also no merit whatsoever to plaintiffs' new argument attempting to bring this case within the TIA's narrow exception that applies where the taxing State fails to offer a "plain, speedy and efficient" remedy.  The Fourth Circuit and this Court have repeatedly found Maryland's available remedies to be "plain, speedy and efficient," and nothing about this case justifies contradicting that uniformly recognized truth.  The TIA bars this entire action, including its challenge to both the tax and the pass-through prohibition, because the amended complaint makes clear that "the target of [its] requested injunction is a tax obligation,"

---

[1] Under the Maryland Administrative Procedure Act, an agency may not adopt a proposed regulation until after submitting the proposed regulation to the Maryland General Assembly Joint Committee on Administrative, Executive, and Legislative Review, Md. Code Ann., State Gov't §§ 10-110(d), 10-111(a)(1), and at least 45 days after its first publication in the Maryland Register, *id.* § 10-111(a)(2).  On August 30, 2021, the Comptroller undertook step one of that process by submitting draft regulations for preliminary review to the Committee.  Affidavit of Brian Oliner, attached to this Reply as Exhibit 3.

*CIC Servs.*, 141 S. Ct. at 1590, and federal courts have permitted a suit challenging a tax pass-through prohibition only where plaintiffs did not challenge the tax itself.  Therefore, the Tax Injunction Act deprives this Court of jurisdiction.

### A.    The Digital Advertising Tax Is a "Tax" and Not a "Penalty" Within the Meaning of the Tax Injunction Act Because the Activity Subject to the Tax Is Not Unlawful.

Plaintiffs contend that the digital ad tax is a "penalty" and, therefore, not a "tax" under the TIA, but their challenge cannot satisfy the clear test the Supreme Court has established for identifying a "penalty."  For purposes of both the AIA and the TIA,[2] the Supreme Court has drawn the following bright line separating a "tax" covered by the statute from a "penalty" that lies beyond it, and the Supreme Court has emphasized this distinction, not just in its most recent decisions, but also in older opinions cited by plaintiffs.  A government charge may be treated as a "penalty" that is exempt from the jurisdictional bar of the AIA and the TIA only if the charge meets one of the following two conditions:  (1) Congress has described the imposition as a "penalty" and not a "tax," *see, e.g.*, *National Fed'n of Indep. Bus.* ("*NFIB*") *v. Sebelius*, 567 U.S. 519, 564 (2012) (That a federal statute "describes the payment as a 'penalty,' not a 'tax'. . . . is fatal to the application of the [AIA.]"), *or* (2) the challenged charge is imposed as a sanction for "the violation of another law that independently prohibits or commands an action," and thereby renders unlawful the activity that is subject to the charge, *CIC Servs., LLC v. Internal Revenue Serv.*, 141 S. Ct. 1582, 1593 (2021).

The first alternative is not at issue here, because there is no contention that Congress has provided that the digital ad tax, or taxes like it, should be treated as "penalties."  Quite the contrary:

---

[2] Plaintiffs have indicated they agree with defendant that courts may look to AIA case law when interpreting and applying the TIA.  ECF 31-1, at 25.

the amended complaint, ECF 25 ¶¶ 55, 77, alleges that the digital ad tax is a "tax" as defined by Congress in the Internet Tax Freedom Act ("ITFA"), 47 U.S.C. § 151 note), to include "*any* charge imposed by any governmental entity for the purpose of generating revenues for governmental purposes" that "is not a fee imposed for a specific privilege, service, or benefit conferred," ITFA § 1105(8)(A)(i) (emphasis added).  Plaintiffs concede that the digital ad tax "is a governmental charge with revenue-generating purposes and is not a fee assessed for a specific privilege, service, or benefit conferred."  ECF 25 ¶ 77.  Therefore, because both the TIA and the ITFA "are creatures of Congress's own creation" and the "best evidence of Congress's intent is the statutory text," Supreme Court precedent requires application of the TIA's jurisdictional bar to this suit challenging what are "statutorily described" by the ITFA as "'taxes.'"  *NFIB*, 567 U.S. at 544; *see id.* at 564 ("It is up to Congress whether to apply the Anti–Injunction Act [or the Tax Injunction Act] to any particular statute, so it makes sense to be guided by Congress's choice of label on that question.").

As for the second means of establishing that a charge is a "penalty," the Supreme Court has emphasized repeatedly, and in multiple contexts, that "[i]n distinguishing penalties from taxes, . . . 'if the concept of penalty means anything, it means punishment for an unlawful act or omission.'"  *NFIB*, 567 U.S. at 567 (quoting *United States v. Reorganized CF & I Fabricators*, 518 U.S. 213, 224 (1996), and citing *United States v. La Franca*, 282 U.S. 568, 572 (1931)).  Thus, whereas "'[a] *tax* is an enforced contribution to provide for the support of government; a *penalty* . . . is an exaction imposed by statute as *punishment for an unlawful act*.'"  *Reorganized CF & I Fabricators*, 518 U.S. at 224 (quoting *La Franca*, 282 U.S. at 572) (emphasis added).

This same distinction between a tax and a penalty is underscored by the AIA decisions cited by plaintiffs, ECF 31-1, at 26, including *Lipke v. Lederer*, 259 U.S. 557 (1922), *Regal Drug*

*Corp. v. Wardell*, 260 U.S. 386 (1922), and *Graham v. Dupont*, 262 U.S. 234 (1923).  In *Lipke*, the Supreme Court held that the challenged charge was a penalty and not a tax, for purposes of the AIA, because the charge was imposed by a statute "primarily designed to define and suppress crime," "[e]vidence of crime [was] essential to assessment" under the statute, and imposition of the charge "clearly involve[d] the idea of punishment for infraction of the law—the definite function of a penalty."  259 U.S. at 561-62.  Similarly, relying on *Lipke*, the Court in *Regal Drug* "emphasized" the "distinction between a tax and a penalty":  "The function of a tax, . . . 'is to provide for the support of the government'; the function of a penalty clearly involves the 'idea of punishment for infringement of the law[.]'"  260 U.S. at 391-92 (quoting *Lipke*, 259 U.S. at 562).  The reason these decisions treated a penalty for unlawful activity as different from a tax for purposes of the AIA was not simply a matter of nomenclature.  As explained in both decisions, the AIA did not prevent a pre-enforcement court challenge to a penalty because, "in the absence of [statutory] language" to the contrary, the Court could not conclude that "Congress intended that *penalties for crime* should be enforced through the secret findings and summary action of executive officers," lest "[t]he guaranties of due process of law and trial by jury . . . be forgotten or disregarded."  *Lipke*, 259 U.S. at 562 (emphasis added); *Regal Drug*, 260 U.S. at 392 (same).  That is, unlike taxes, "penalties for criminal violations of the law" cannot be lawfully assessed in the first instance "without notice or hearing."  *Regal Drug*, 260 U.S. at 392.

Plaintiffs argue that the Supreme Court has merely recognized that punishment for violation of law is *sufficient* to establish that a charge is a penalty but, they insist, the Court has not yet held "that exactions imposed for disapproved b[ut] lawful conduct cannot be penalties."  ECF 31-1, at 42.  Their argument is refuted by the very Supreme Court precedent they cite.  In *Graham v. Dupont*, 262 U.S. 234 (1923), cited at ECF 31-1, at 26, the Supreme Court dissolved a

temporary injunction against a 1915 federal tax assessment of $1,576,015.06—more than $41 million in today's dollars[3]—and ordered the district court to dismiss the case on AIA grounds.  In doing so, the Court distinguished both *Lipke* and *Regal Drug*.  The AIA did not apply in *Lipke* and *Regal*, the Court explained, because they "were not cases of enjoining taxes at all," but were challenges to "illegal penalties in the nature of punishment for a criminal offense."  *Dupont*, 262 U.S. at 257.  The AIA *did* apply in *Dupont*, however, because it presented "no such case" of charges imposed for unlawful conduct, *id.* at 258; instead, like plaintiffs here, Dupont was challenging taxes imposed on *lawful* activity.  Thus, the Supreme Court held in *Dupont* that punishment for unlawfulness is a necessary condition for a government charge to be considered a "penalty" under the AIA—and, consequently, under the TIA.

Recent Supreme Court decisions reaffirm this principle.  When, as here, the challenged "tax imposes a cost on perfectly legal behavior," *CIC Servs.*, 141 S. Ct. at 1593, and Congress has not designated the challenged tax as a "penalty," *NFIB*, 567 U.S. at 564, the tax will be treated as a "tax" and cannot be deemed a "penalty" for AIA or TIA purposes, under controlling Supreme Court precedent.  Therefore, in this case the TIA "bars pre-enforcement review, prohibiting a taxpayer from bringing . . . a 'preemptive[ ]' suit to foreclose tax liability."  *CIC Servs.*, 141 S. Ct. at 1593.

---

[3] The inflation-adjusted value (in July 2021 dollars) of the 1915 tax assessment equals $41,772,508.68, as generated by the Bureau of Labor Statistics' online Consumer Price Index inflation calculator app, available at https://www.bls.gov/data/inflation_calculator.htm (last visited Sept. 7, 2021).

**B.      Supreme Court Precedent Requiring That the Digital Advertising Tax Be Treated as a Tax Under the Tax Injunction Act Cannot Be Overcome by Plaintiffs' Various Arguments.**

Plaintiffs acknowledge the Supreme Court's insistence that the AIA, like the TIA, "'draws no distinction between regulatory and revenue-raising tax laws,'" and that challenges to the former enjoy no "'special pass'" from the statutory bar to federal court jurisdiction.  ECF 31-1, at 40 (quoting *CIC Servs.*, 141 S. Ct. at 1593-94).  Still, plaintiffs contend that the Supreme Court's guidance is of no consequence to their challenge for five reasons, none of them valid.

First, plaintiffs suggest that *CIC Services*' pertinent instructions can be disregarded as mere "dictum."  ECF 31-1, at 40.  They are mistaken, on multiple levels.  In the portions of *CIC Services* cited by defendant, the Supreme Court explains the meaning and import of its precedent governing what is, and what is not, a "tax" under the AIA and TIA, a question essential to its ultimate determination that the suit was not barred by the AIA because the challenged "reporting requirement is not a tax."  141 S. Ct. at 1588.  "[T]he Supreme Court's analysis" supporting and justifying that conclusion "is not dicta, but is the rationale supporting the Court's application of" pertinent principles.  *United States v. Davis*, 690 F.3d 226, 256 n.34 (4th Cir. 2012); *see County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring and dissenting) ("[S]tare decisis directs us to adhere not only to the holdings of [the Supreme Court's] prior cases, but also to their explications of the governing rules of law."); *Virginia Uranium, Inc. v. Warren*, 848 F.3d 590, 609 n.14 (4th Cir. 2017) ("Dictum is statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it." (citation omitted)), *aff'd*, 139 S. Ct. 1894 (2019).

Even if the part of *CIC Services* plaintiffs seek to downplay "were dicta, which it is not," this Court "would still be bound to follow it considering the obvious importance of the analysis to

the opinion." *Virginia Uranium*, 848 F.3d at 609 n.14.  Lower federal courts are "'bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *United States v. Fareed*, 296 F.3d 243, 247 (4th Cir. 2002) (following "dictum endorsed by six justices" of the Supreme Court) (citations omitted).  When faced with what is arguably "mere dictum," a lower court "cannot simply override a legal pronouncement endorsed just last year by a majority of the Supreme Court." *McCravy v. Metropolitan Life Ins. Co*., 690 F.3d 176, 182 n.2 (4th Cir. 2012).  The need for adherence is all the stronger when, only a few months ago, all nine justices joined an opinion explaining applicable law, as they did in *CIC Services*.

Plaintiffs seek to cast doubt on whether *CIC Services* can be deemed to contradict or "jettison," as they put it, the lower court decisions on which they rely.  ECF 31-1, at 40.  They note that the Supreme Court "'does not normally overturn, or so dramatically limit, earlier authority sub silentio,'" *id.* (quoting *Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000)), but the "earlier authority" referenced in *Illinois Council* meant "the [Supreme] Court's earlier holdings," *id.* at 15, specifically those in *Weinberger v. Salfi*, 422 U.S. 749 (1975), and *Heckler v. Ringer*, 466 U.S. 602 (1984), which *Illinois Council* discussed at length.  The Court in *CIC Services* did not, either expressly or implicitly, "overturn" or "dramatically limit" its "earlier holdings," *Illinois Council*, 529 U.S. at 17; instead, *CIC Services* explains and clarifies principles established by Supreme Court precedent, including the correct test for distinguishing between a "tax" and a "penalty" for purposes of the AIA and TIA, as explained in Argument II.A above.  On the other hand, when issuing a decision, the Supreme Court is under no obligation to identify and expressly overrule whichever lower court decisions might be contradicted, in whole or in part, by

the Supreme Court's analysis. Instead, the expectation is that each lower court will conform its future rulings to the Supreme Court's instructions.

Next, plaintiffs argue that the guidance in *CIC Services* is "inapposite" because, in their view, "this case is about a punitive fee, not a regulatory one," ECF 31-1, at 40, but that distinction is both inaccurate and not one the Supreme Court considers meaningful. As pointed out in *CIC Services*, "'Every tax is in some measure regulatory,'" a truism that necessarily includes the digital ad tax.[4] 141 S. Ct. at 1593 (quoting *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937)). The only pertinent distinction the Supreme Court recognizes for AIA and TIA purposes differentiates between a "tax" and a "penalty clearly involv[ing] the 'idea of punishment for infringement of the law[.]'" *Regal Drug*, 260 U.S. at 391-92 (quoting *Lipke*, 259 U.S. at 562). As explained above, applying this distinction here compels the conclusion that the digital ad tax is a "tax" under the TIA, because the activity it taxes is "legal," even if "disfavored for tax purposes." *CIC Servs.*, 141 S. Ct. at 1593.

Finally, plaintiffs argue that "*CIC Services* is consistent with the cases" on which plaintiffs rely, ECF 31-1, at 41, and to some extent they are partially correct, but not in any way that supports their argument. As shown above in Argument II.A, *CIC Services* is consistent with the correct reading of *Lipke*, *Regal Drug*, and *Dupont*—all AIA cases cited by plaintiffs—because all three of those decisions agree with *CIC Services*' analysis that, for AIA purposes, a government charge is

---

[4] Plaintiffs nonetheless insist that the tax is not regulatory because it lacks a purpose "to influence or incentivize aspects of [taxpayers'] business conduct." ECF 31-1, at 40. Even if that proposition were relevant to the question whether the TIA bars this action, which it is not, plaintiffs' assertion must be discounted because it contradicts the amended complaint's allegations. *See* ECF 25 ¶ 44 (quoting Paul Romer's testimony that "a tax on digital advertising can help restore the conditions needed for the market to work"); *id.* at 10 n.1 (criticizing Romer's view that the tax would, among other things, "improve the quality of content online" and incentivize sites to opt for "subscription-only paywalls").

a "tax" unless it is a penalty imposed on *unlawful* activity.  On the other hand, as explained in defendant's opening memorandum, ECF 29-1, at 22-23, the Fourth Circuit's decisions that plaintiffs emphasize, *Retail Indus. Leaders Ass'n* ("*RILA*") *v. Fielder* and *GenOn Mid-Atlantic, LLC v. Montgomery County, Md*., ECF 31-1, at 21, 29-31, 33, like other Fourth Circuit decisions applying the *Valero* framework, conflict with *CIC Services* because those decisions expressly proceed from a premise that the Supreme Court has rejected:  the now debunked notion "that the Tax Injunction Act turns on the difference 'between broader-based taxes that sustain the essential flow of revenue to state (or local) government and fees that are connected to some regulatory scheme.'"  *GenOn*, 650 F.3d 1021, 1025 (4th Cir. 2011) (quoting *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir.1997)); *see also GenOn*, 650 F.3d at 1023 (framing the decisive question as "'whether the charge is levied primarily 'for revenue raising purposes, making it a 'tax,'' or whether it is assessed primarily 'for regulatory or punitive purposes, making it a 'fee.''")  (quoting *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130, 134 (4th Cir. 2000)); *RILA*, 475 F.3d 180, 189 (4th Cir. 2007) (stating that the TIA's "applicability depends primarily on whether a given measure serves 'revenue raising purposes' rather than 'regulatory or punitive purposes,'" and "[t]he less a measure serves as a revenue-raising provision, the less likely it is protected by the [TIA]") (quoting *Valero*, 205 F.3d at 134).  The analysis applied in *GenOn*, *RILA*, and *Valero* cannot remain valid in light of the Supreme Court's unanimous instruction that the AIA, and therefore the TIA, "draws no distinction between regulatory and revenue-raising tax rules," and "[i]t applies whenever a suit calls for enjoining the . . . assessment and collection of taxes—of

whatever kind," including taxes imposed on "conduct that [is] legal but disfavored for tax purposes."[5] *CIC Servs.*, 141 S. Ct. at 1594, 1593.

Most mistaken of all is plaintiffs' reliance on *Bailey v. Drexel Furniture Co*., which involved neither the TIA nor the AIA, but instead addressed considerations for determining the limits of Congress's constitutional authority under the Tax Clause vis-à-vis the powers reserved to the States. *Drexel Furniture* cannot have any bearing on a case challenging a state tax, because the constitutional limits applied in *Drexel Furniture* apply only to federal taxes. This conclusion is obvious from the way *Drexel Furniture* framed the dispute it decided: The taxpayer challenged the Child Labor Tax "on the ground that it is a regulation of the employment of child labor in the states—an exclusively state function under the federal Constitution and within the reservations of the Tenth Amendment," whereas the IRS defended "on the ground that it is a mere excise tax levied . . . under [Congress's] broad power of taxation[.]" *Drexel Furniture*, 259 U.S. 20, 36 (1922). Agreeing with the taxpayer, the Supreme Court expressed its concern that, were it to "[g]rant the validity of this law, . . . all that Congress would need to do . . . to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the States have never parted with, and which are reserved to them by the Tenth Amendment, would be to enact a detailed measure of complete regulation of the subject and enforce it by a so-called tax upon departures from it." *Id.* at 38. The Court declined "[t]o give such magic to the word 'tax'" because doing so would "break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the states." *Id.*

---

[5] Plaintiffs mistakenly suggest that defendant "does not directly dispute that the factors" applied in *Valero*, *GenOn*, and *RILA* "all indicate that the Act is a punitive fee." ECF 31-1, at 39. Defendant's opening memorandum explained why the digital ad tax is a "tax" under the TIA even under the *Valero* factors. ECF 29-1, at 23-26.

More recently, in *NFIB* the Supreme Court further explained the principles that were at work in *Drexel Furniture*.  "In our federal system, the National Government possesses only limited powers," and it "must show that a constitutional grant of power authorizes each of its actions," *NFIB*, 567 U.S. at 533, but "[t]he same does not apply to the States, because the Constitution is not the source of their power," *id.* at 535.  Though "[t]he Constitution may restrict state governments," "where such prohibitions do not apply, state governments do not need constitutional authorization to act," *id.*, and "this general power of governing, possessed by the States but not by the Federal Government, [is] the 'police power,'" *id.* at 536.  This police power includes the power to tax.  *New York, Lake Erie & W.R.R. Co. v. Pennsylvania*, 153 U.S. 628, 643 (1894).

The problem with the Child Labor Tax, according to *Drexel Furniture*, was not that it was excessively punitive or regulatory as a matter of abstract principle; rather, the tax was deemed to be excessive only in relation to constitutional limits on Congress's authority to regulate matters within the States' police power.  Indeed, *Drexel Furniture* made clear that "[w]here the sovereign enacting the law has power to impose both tax and penalty," as a State does, "the difference between revenue production and mere regulation may be immaterial, but not so when one sovereign"—meaning the federal government—"can impose a tax only, and the power of regulation rests in another," *i.e.* a State.  259 U.S. at 38.  It would amount to an extreme distortion of *Drexel Furniture*'s holding and rationale if that decision emphasizing the need to respect state sovereignty were used to justify federal court interference in state taxation, against the wishes of Congress as expressed in the Tax Injunction Act.

### C. This Case Cannot Satisfy the Tax Injunction Acts's Narrow Exception for Instances Where State Law Fails to Offer a "Plain, Speedy and Efficient" Remedy.

Though unmentioned in the TIA argument contained in the amended complaint, ECF 25, at 9-12, plaintiffs now assert that Maryland's available remedies are not sufficiently "efficient." ECF 31-1, at 11, 24, 43-45.  In making that assertion, plaintiffs disagree with a host of decisions from this Court and the Fourth Circuit, all uniformly concluding that Maryland's system for redressing grievances pertaining to taxes is "plain, speedy and efficient" within the meaning of the TIA.[6]  Most specifically, plaintiffs' argument is foreclosed by *Grozdz*, which rejected a similar efficiency argument when it held that the TIA barred an attempted class action, though Maryland law would not permit a tax to be challenged via class action.  846 F.3d at 741.

To "be faithful to the congressional intent 'to limit drastically' federal-court interference with state tax systems," courts "must construe *narrowly* the 'plain, speedy and efficient' exception to the Tax Injunction Act*."  California v. Grace Brethren Church*, 457 U.S. 393, 413 (1982) (emphasis added).  This "exception to the Act's prohibition was designed to require only that the state remedy satisfy certain procedural criteria," *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522 (1981), which the Supreme Court has described as "minimal," *id.* at 512, consisting of an opportunity for "'full hearing and judicial determination' at which [the taxpayer] may raise any and all constitutional objections to the tax, *id.* at 514.  "A plaintiff who seeks to surmount the

---

[6] *See*, *e.g.*, *Gwozdz v. HealthPort Tech.*, *LLC*, 846 F.3d 738, 740-42 (4th Cir. 2017); *Strescon Indus., Inc. v. Cohen*, 664 F.2d 929, 931-32 (4th Cir. 1981); *Herron v. Annapolis, Md.*, 388 F. Supp. 2d 565, 572 (D. Md. 2005), *aff'd*, 198 F. App'x 301 (4th Cir. 2006); *Antosh v. College Park*, 341 F. Supp. 2d 565, 569-70 (D. Md. 2004); *Kuypers v. Comptroller of Md.*, 173 F. Supp. 2d 393, 397 (D. Md.), *aff'd*, 21 F. App'x 161 (4th Cir. 2001).

jurisdictional bar of the TIA bears the burden of demonstrating the insufficiency of the remedy available in the state court system." *Scott Air Force Base Props., LLC v. County of St. Clair, Ill.*, 548 F.3d 516, 521 (7th Cir. 2008) (citing cases from other circuits); *accord Groff v. Maryland*, 639 F. Supp. 568, 573 (D. Md. 1986). Plaintiffs here cannot satisfy this burden.

First, plaintiffs effectively concede that Maryland's remedy satisfies the "minimal procedural criteria" the Supreme Court has established for a state remedy to be considered "plain, speedy and efficient" under the TIA, because plaintiffs have "made no argument that the [Maryland] refund procedure is uncertain or otherwise unclear," *Rosewell*, 450 U.S. at 512, and there is "no question that under the [Maryland] procedure, the court will hear and decide any federal claim," *id.* at 517.

Still, plaintiffs assert that Maryland's available remedies are not "efficient" because "the alternative to this single, pre-enforcement federal lawsuit by plaintiff associations is a multiplicity of potentially hundreds of refund actions in state court." ECF 31-1, at 43. Plaintiffs' argument repackages a notion already rejected by the Fourth Circuit in *Gwozdz*, which found Maryland's remedy adequate under the TIA even though state law does not permit a tax challenge to proceed as a class action and requires each taxpayer to exhaust administrative remedies separately. *See id.*, 846 F.3d at 741; *accord Lowe v. Washoe County*, 627 F.3d 1151, 1156 (9th Cir. 2010); *Waldron v. Collins*, 788 F.2d 736, 739 (11th Cir. 1986) (discussing like cases from other circuits). "Although filing a class action in federal court" (or pursuing the functional equivalent in the form of a suit by trade associations on behalf of their members, as here) "may be more efficient than filing individual suits in state court, the state court remedy need not be equal to or better than the remedy available in federal court to qualify as 'efficient' under the Act." *Lowe*, 627 F.3d at 1156. "[P]articularly concerned," as Congress was, about the "practice of out-of-state corporations"

challenging state taxes in federal court, *Rosewell*, 450 U.S. at 522 n.29 (citation omitted), Congress could not have intended that the TIA's jurisdictional bar would be lifted whenever "trade associations that represent the interests of hundreds of thousands of businesses," ECF 31-1, at 44, team up to execute an end run around a state's remedial procedures.

Plaintiffs make an ill-considered attempt to distinguish *Gwozdz*, because, they say, "the pre-payment remedies that were available in *Gwozdz* are not in fact available here," ECF 31-1, at 46, but that point is both immaterial to *Gwozdz*'s analysis and wrong as a matter of Maryland statutory law.   *Gwozdz* reviewed and blessed as "plain, speedy and efficient" Maryland's "'comprehensive remedial scheme for the refund of taxes erroneously paid,'" 846 F.3d at 740 (citation omitted), just as *Rosewell* concluded that the "Illinois state-court refund procedure" was "plain, speedy and efficient," 450 U.S. at 514.   Plaintiffs have not identified any feature of Maryland's scheme that would make it less "plain, speedy and efficient" than the Illinois scheme that *Rosewell* approved.

As a matter of Maryland law, plaintiffs are wrong in suggesting that a company subject to the digital ad tax would lack the option to appeal the assessment before paying the tax.   Although the procedures in Tax-General § 13-508 (providing for application to the Comptroller for revision of tax assessment) would not be available (because the legislature has not amended § 13-508(a) to add the newly adopted digital ad tax to the list of covered taxes), a company that receives a digital ad tax assessment under Tax-General § 13-410 may choose not to pay in the first instance and instead contest the assessment under Tax-General § 13-510(a)(1), which permits an appeal directly to the Tax Court.   Or the company could choose to pay the assessment and file a refund claim under Tax-General § 13-901(a), which the Comptroller would then investigate and, if requested by the taxpayer, conduct a hearing on the refund claim.   Tax-Gen. § 13-904(a).   The Comptroller

would then issue a notice of determination on the refund claim. *Id.* § 13-904(b). If the taxpayer disagrees with the Comptroller's determination, or if the Comptroller does not issue its determination within six months after the filing of the claim, the company can appeal to the Maryland Tax Court. *Id.* §§ 13-510(a)(6), 13-510(b).

Thus, although Supreme Court and Fourth Circuit precedent would consider Maryland's remedy "plain, speedy and efficient" even if it were limited to a refund procedure, *Grace Brethren Church*, 457 U.S. at 416, Maryland law offers, as an alternative, the ability to challenge the digital ad tax without first paying an assessment.

Plaintiffs suggest that a State's remedial scheme might be inadequate if it would involve "'an unnecessary expenditure of time or energy'" by "'requir[ing] a multiplicity of suits,'" ECF 31-1, at 43 (quoting *Rosewell*, 450 U.S. at 517); *see Rosewell*, *id.* (citing the example of *Georgia R.R. & Banking Co. v. Redwine*, 342 U.S. 299, 303 (1952), "where [the State's] remedy 'would require the filing of over three hundred separate claims in fourteen different counties to protect the single federal claim asserted by [the taxpayer]'"). Whether any such argument remains available under Supreme Court precedent "is unclear," according to the Ninth Circuit. *May Trucking Co. v. Oregon Dep't of Transp*., 388 F.3d 1261, 1272-74 (9th Cir. 2004) (questioning whether "the wholesale adoption of principles of equity practice in *Redwine* . . . has withstood the [Supreme] Court's decision in *Rosewell*"); *see Mandel v. Hutchinson*, 494 F.2d 364, 367 (9th Cir. 1974) (finding state court remedy adequate under the TIA though it necessitated litigation involving 58 counties and several thousand potential plaintiffs). Although *Rosewell* acknowledged that federal equity practice had employed such a "multiplicity of suits" rationale, *Rosewell* also cautioned that "[n]othing in our decisions suggests that every wrinkle of federal equity practice was codified,

intact, by Congress." 450 U.S. at 525. On the contrary, Congress "legislated to solve an existing problem by *cutting back* federal equity jurisdiction." *Id.* at 526 (emphasis added).

Even if "multiplicity of suits" arguably remains a potential basis for establishing that a State's remedy is not "efficient," its applicability is, at best, limited and it cannot justify disregarding the TIA's bar in this case. The Supreme Court has "made clear" that "the multiplicity-of-suits rationale . . . extends only to those situations where there is a real risk of 'numerous suits between the *same* parties, involving the same issues of law or fact,'" *National Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 591 n.6 (1995) (quoting *Matthews v. Rodgers*, 284 U.S. 521, 530 (1932)) (emphasis added). That is, the "multiplicity-of-suits" concern is not implicated simply because there might be "numerous parties plaintiff." *Matthews*, 284 U.S. at 530; *see*, *e.g.*, *Antosh*, 341 F. Supp. 2d at 567, 569 (finding Maryland's "remedy meets the procedural criteria required by the 'plain, speedy, and efficient' provision in the TIA" where "fifty-four Petitions for Appeal in the Maryland Tax Court" raised the same constitutional issue). The pertinent form of "multiplicity" might arise, the Supreme Court has suggested, "if a state court awards a refund to a taxpayer on the ground that the tax violates the Federal Constitution, but state tax authorities continue to impose the unconstitutional tax," thereby necessitating additional challenges; "[i]n such circumstances, the remedy might be thought to be 'inadequate.'" *National Private Truck Council*, 515 U.S. at 591 n.6.

Plaintiffs do not claim that Maryland's remedy demands "a multiplicity of suits" within the meaning of that term as used by the Supreme Court. That is, they do not suggest that a single taxpayer will face the need to do anything so onerous as filing multiple "separate claims in fourteen different counties" of Maryland to challenge the digital ad tax. *Redwine*, 342 U.S. at 303. Nor do plaintiffs claim that Maryland law poses the threat of "numerous suits between the same parties."

19

*National Private Truck Council*, 515 U.S. at 591 n.6.  Rather, plaintiffs object to the need for each of their multiple members, when assessed with the tax, to do what every other Maryland taxpayer must do to challenge an assessment:  pursue available administrative remedies.  Finally, plaintiffs do not suggest any reason to believe that "state tax authorities [would] continue to impose" the digital ad tax if a state court were to strike it down.  *Id.*  In fact, "the long-standing practice of the Comptroller of Maryland" is "to apply the holdings in the final appellate decision" rendered in an appeal and to apply the ruling, not just to the specific taxpayer who brought that appeal, but also to other pending and future refund claims involving the same issues.  Affidavit of Andrew Maschas, attached hereto as Exhibit 1, at 2 ¶ 6; *see id.* at 3-6 (citing specific examples of cases in which this practice has been or will be applied).

Plaintiffs also argue that Maryland's remedy is not efficient because—they speculate— their members may find it necessary to appeal assessments for successive years before obtaining a definitive ruling on their challenge, resulting in "'repetitive suits on the same issue in succeeding years.'"  ECF 31-1, at 44 (quoting *Rosewell*, 450 U.S. at 518 n.22).  But in *Rosewell*, the Supreme Court declined to find the state remedy was "not 'efficient,'" even though the taxpayer "appealed unsuccessfully to the Board of Appeals for four straight years, 1974, 1975, 1976, and 1977, . . . but it was not until after her 1977 appeal that the Circuit Court of Cook County rendered its judgment," which meant that in the interim neither the tax assessing agency nor the administrative appeals board "had the benefit of a judicial determination to weigh in their considerations."  450 U.S. at 518 n.22.  The future appeal proceedings that plaintiffs envision for their members are no less "efficient" than those the Supreme Court deemed satisfactory in *Rosewell*.

The Supreme Court concluded that, notwithstanding the taxpayer's experience of having to litigate the same issue in multiple successive appeals, Illinois' remedy was sufficiently

20

"efficient" and "impose[d] no unusual hardship . . . requiring ineffectual activity or an unnecessary expenditure of time or energy[.]" 450 U.S. at 518.  Maryland's scheme is, if anything, less likely than Illinois' to cause taxpayers "unusual hardship," because of the steps the Comptroller takes to minimize "ineffectual activity or an unnecessary expenditure of time or energy." *Id.*  As a matter of long-standing practice, when an appeal is pending before the Maryland Tax Court or on judicial review, the Comptroller will hold at the administrative level claims by other taxpayers raising the same issues, if there is a significant possibility that the pending appeal in the lead case will resolve those matters.  Exhibit 1, Maschas Aff. ¶ 4; *see id.* ¶¶ 9, 12, 19, 21, 22 (citing specific examples). Where that significant possibility of resolution exists, the Comptroller will also stipulate to stays of appeals pending in the Tax Court if those appeals raise the same issue that is already being litigated in a case that has progressed further in the appeal process before the Tax Court or on judicial review. *Id.* ¶ 5; *see id.* ¶¶ 12, 15 (citing specific examples).  The purpose of these practices is to reduce, to the extent possible, the cost and inconvenience to taxpayers and the State when multiple taxpayers raise an issue that is already being litigated by another taxpayer. *Id.* ¶ 7.

Plaintiffs further complain of "the lengthy period of time that will elapse before even an initial state-court injunction can be entered," ECF 31-1, at 44, but "[n]owhere in the Tax Injunction Act did Congress suggest that the remedy must be the speediest." *Rosewell*, 450 U.S. at 520. "'Speedy' is perforce a relative concept," and a court must assess a claim of delay "against the usual time for similar litigation." *Id.* at 518.  "The fact of the matter is that legal conflicts are not resolved as quickly as we would like," *id.* at 519, and "delay inheres in the very nature of state tax administration," *id.* at 520 n.26.  As the Supreme Court has recognized and accepted as part of inevitable reality, "[t]here has yet to be devised a taxing system universally viewed as speedy enough to resolve complaints, . . . largely because '[t]he procedures for mass assessment and

collection of state taxes and for administration and adjudication of taxpayers' disputes with tax officials are generally complex and necessarily designed to operate according to established rules.'" *Id.*; *see, e.g.*, *Long Island Lighting Co. v. Brookhaven*, 889 F.2d 428, 433 (2d Cir. 1989) (TIA applied despite more than twelve-year delay due to difficulties in state court administration and the taxpayer's "considerable tactical maneuverings").  Even so, the Comptroller and the Maryland Tax Court strive to minimize delay as much as possible.  For example, for calendar year 2019, the Maryland Tax Court closed a total of 1,248 appeals.  Affidavit of John T. Hearn, attached hereto as Exhibit 2, ¶ 6.  The average duration per appeal, from commencement to closing, was 189.54 days.  *Id.*  Of the 1,248 appeals closed, 1,107 had a duration of less than 365 days.  *Id.*

Finally, plaintiffs assert that the allegedly "extreme nature of the exaction" imposed by the digital ad tax renders Maryland's remedy '"utterly impracticable."'  ECF 31-1, at 45 (quoting *Dupont*, 262 U.S. at 257).  First, the principle that plaintiffs invoke is another vestige of pre-TIA equity practice, which might not retain its vitality under the TIA.  *Rosewell*, 450 U.S. at 525.  Even if it is still available, when the Supreme Court used the term "utterly impracticable" in *Dupont*, it was referring to a scenario far more extreme and devastating than anything plaintiffs have alleged here.  The term "utterly impracticable" was used there to describe the situation in a prior case, *Hill v. Wallace*, 259 U.S. 44 (1922), where, if the plaintiff Chicago Board of Trade had to pay the tax and sue for refunds with respect to "each of the many thousands of transactions on the board," it "would have blocked the entire future grain business of the country"—a disastrous consequence "so clear that the government in effect consented to the temporary injunction."  *Dupont*, 262 U.S. at 257.

The circumstances alleged by plaintiffs here are not nearly so dire nor far-reaching.  Plaintiffs do make conclusory assertions that the digital Advertising Tax is unduly burdensome

and that some unnamed, unknown member corporations might be "driven entirely out of the state or into bankruptcy" if forced to submit to Maryland's remedial procedures, ECF 31-1, at 45, but "the conclusory nature" of those allegations "disentitles them to the presumption of truth," *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).  Neither the amended complaint nor plaintiffs' opposition offers "factual content" sufficient to render those allegations "plausible," *id*. at 678, especially given that the digital ad tax has been designed to affect only successful businesses, which the amended complaint describes as "massive technology companies," ECF 25 ¶ 39.  The Act provides for progressively graduated rates to ensure that any companies less able to afford the tax will be assessed at a lower tax rate or pay no tax at all, if their global annual gross revenues fall below the $100 million threshold.  Tax-Gen. §§ 7.5-102, 7.5-103.  At any rate, "Congress, and later the Supreme Court when asked to review state refund procedures, surely understood a taxpayer might have to bear the economic burden of a tax in order to contest it in state courts." *Pleasures of San Patricio, Inc. v. Mendez-Torres*, 596 F.3d 1, 8-9 (1st Cir. 2010); *see id.* at 10 (finding "meritless" plaintiff's contention that Puerto Rico failed to provide a plain, speedy and efficient remedy).

The circumstances plaintiffs lament are merely the fulfillment of what Congress intended when it enacted the TIA, which codifies the law's general expectation that *everyone* aggrieved by state taxes will pursue available state remedies and *not* bring pre-enforcement challenges in federal court**.**

### D. The Tax Injunction Act Bars This Entire Action.

Plaintiffs incorrectly assert that they could continue to litigate their challenge to the digital ad tax law's pass-through prohibition in this Court even if the TIA bars jurisdiction over the rest of the amended complaint.  As the Supreme Court has demonstrated, the pertinent unit of analysis that determines whether the TIA applies is the "suit"—that is, the "action" as a whole.  *See CIC*

*Servs.*, 141 S. Ct. at 1588, 1589-90; *see* Fed. R. Civ. P. 2 advisory committee's note (1937) (statutory references to "actions" or "suits" to be "treated as referring to the civil action prescribed in these rules"). Thus, "[i]f the *suit* is for [the] purpose" of "restraining the assessment or collection of any tax,'" then "it must be dismissed." *CIC Servs.*, 141 S. Ct. at 1588 (quoting 26 U.S.C. § 7421(a)) (emphasis added). In this case, the "face of the [amended] complaint" leaves no doubt about "the action's objective aim," *id.* at 1589: "This *lawsuit* seeks a declaration and injunction against enforcement of Maryland House Bill 732, as amended by Senate Bill 787, . . . insofar as it imposes a 'Digital Advertising Gross Revenues Tax' on sellers of digital advertising services." ECF 25 ¶ 1 (emphasis added). Therefore, this lawsuit "must be dismissed" in its entirety. *CIC Servs.*, 141 S. Ct. at 1588.

In contrast, the suit in *CIC Services* can proceed because the complaint there challenges a reporting requirement that "is not a tax," the suit "brings no legal claim against the separate statutory tax," and the "compliance costs" associated with the reporting requirement are "not tied to . . . any tax." 141 S. Ct. at 1590-91. The suit here is far different because its main objective is to prevent "enforcement of" the digital ad tax, ECF 31-1, at 11, and the suit's claim regarding the pass-through prohibition is subsidiary to, intertwined with, and entirely contingent upon plaintiffs' challenge to the tax itself. For example, the "compliance costs" associated with the pass-through prohibition are not only "tied to" the amount of the digital ad tax, *CIC Servs.*, 141 S. Ct. at 1591— those compliance costs and the amount of tax are one and the same. The challenge to the pass-through prohibition is contingent upon the fate of plaintiffs' tax challenge, because if they prevail on the latter, plaintiffs and their members "will never have to worry about" the pass-through prohibition. *Id.* Therefore, the analysis in *CIS Services* calls for dismissal of this suit in its entirety.

The three decisions cited by plaintiffs, ECF 31-1, at 48, do not contradict this conclusion. In all three cases, a challenge to a pass-through prohibition was permitted to proceed, notwithstanding the TIA, because there was "nothing about [the] lawsuit that seeks to avoid paying taxes or to limit the amount of taxes due." *BellSouth Telecomm., Inc. v. Farris*, 542 F.3d 499, 501 (6th Cir. 2008); *see Mobil Oil Corp. v. Tully*, 639 F.2d 912, 918 (2d Cir. 1981) ("[T]he plaintiffs 'do not challenge the imposition of the tax, or the rate of the tax, or the allocation formula on the collection of the tax.'"); *Mobil Oil Corp. v. Dubno*, 639 F.2d 919, 922 (2d Cir. 1981) ("[T]he district court was not barred . . . because these actions did not seek to restrain the assessment, levy or collection of a tax."). The same cannot be said of the suit here. It must be dismissed.

## III.   COMITY REQUIRES DISMISSAL OF THIS ACTION.

Plaintiffs' argument against the application of comity is little more than a condensed version of their erroneous TIA arguments, plus some incorrect characterizations of Supreme Court precedent. ECF 31-1, at 46-47. They offer little response to the Supreme Court's instruction that the comity doctrine's reach is "more embracive" than the TIA. *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 417, 424 (2010). Plaintiffs' reliance on their TIA analysis does not suffice, because "the law in this area does not end there," and because "*Levin*—and the history of comity abstention more broadly—delivered a clear message that federal courts should think twice before taking too couched a view of the comity abstention doctrine." *City of Fishers, Ind. v. DIRECTV*, 5 F.4th 750, 753, 754 (7th Cir. 2021) (holding TIA did not apply to franchise fee collection suit against video service providers, but comity prevented the case from proceeding in federal court).

What plaintiffs do say about the Supreme Court's guidance regarding 42 U.S.C. § 1983 in the state tax context is wrong or, at best, misleading. Most significantly, there is no validity to their suggestion, ECF 31-1, at 47, that Supreme Court precedent renders a § 1983 claim unavailable for challenges to state taxes only if the plaintiff attempts to bring a damages claim.

The Supreme Court disagrees, and instead has made clear that, if state law provides an adequate remedy at law, § 1983 does not authorize relief of any kind against state tax schemes. *See National Private Truck Council*, 515 U.S. at 588 ("Congress did not authorize injunctive or declaratory relief under § 1983 in state tax cases when there is an adequate remedy at law" provided by the State."); *id.* (Under § 1983 federal courts "may not award damages or declaratory or injunctive relief in state tax cases when an adequate state remedy exists."); *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 116 (1981) (holding that "taxpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts"); *DIRECTV, Inc. v. Tolson*, 513 F.3d 119, 124 (4th Cir. 2008) ("It is clear that this holding [in *McNary*] applies to claims for both legal and equitable relief under § 1983.").

## IV.  PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE THE INTERNET TAX FREEDOM ACT.

Plaintiffs have offered nothing to contradict defendant's showing that Congress did not authorize a private right of action when it enacted the ITFA.  Evidently, plaintiffs concede that nothing in the text of the ITFA "'unambiguously' express[es] the intent 'to create not just a private *right* but also a private *remedy*,'" as a "statute must" if it is to be privately enforced.  *Clear Sky Car Wash LLC v. Chesapeake*, 743 F.3d 438, 444 (4th Cir. 2014) (citations omitted) (emphasis in original).  Instead, plaintiffs contend that, despite the lack of Congressional authorization, they have a right of action to enforce the ITFA under the *Ex parte Young* doctrine and § 1983.  They are wrong.  Their argument conflicts with the comity doctrine, the TIA, and the Supreme Court's long-standing interpretation of § 1983, and nothing in the ITFA suggests that Congress intended the legislation to create an exemption from those constraints that prevent a private federal suit challenging a state tax.  These well-established constraints on federal court intervention in state

tax disputes render it unimaginable that Congress, without saying so, would authorize or condone a private suit to enforce the ITFA against a state.

First, the Supreme Court's precedent does not support plaintiffs' assertion that "[t]he only limit on the equitable cause of action under *Ex parte Young* is if Congress affirmatively 'displace[s] the equitable relief that is traditionally available to enforce federal law.'"  ECF 31-1, at 58 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015)).  That characterization of applicable law conflicts with the Supreme Court's view in at least three respects.  For one, the Supreme Court has not identified that proposition as the "only limit" on *Ex parte Young*.  Instead, the Court has instructed that "in a proper case," "in some circumstances," a federal court may "grant injunctive relief against state officers," *Armstrong*, 575 U.S. at 326, 327, thus indicating that it is a circumscribed doctrine, subject to constraints.  Second, the majority opinion in *Armstrong* expressly dismissed the dissent's suggestion that a statute should "be presumed to contemplate such enforcement unless it affirmatively manifests a contrary intent." *Armstrong*, 575 U.S. at 329.  Instead, the majority emphasized that "[t]he power of courts of equity to enjoin executive action is subject to [both] express and implied statutory limitations," *id.* at 327, and the Court refused to conclude that an *Ex parte Young* suit to enforce a statute was available "simply because [the statute] did not 'affirmatively' preclude the availability of a judge-made action at equity," *Armstrong*, 575 U.S. at 328, 329.  Third, *Armstrong* observed that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers" is "a judge-made remedy" reflecting a "long history," *id.* at 327, which presupposes that it must accommodate and coexist harmoniously with the Supreme Court's other "judge-made" doctrines.

In this case, the unavailability of an *Ex Parte Young* action to enforce the ITFA stems from "limitations" that are both "implied" (the comity doctrine) and "express" (the TIA).  *Armstrong*,

27

575 U.S. at 328.  As for the former, during the long history that preceded the 1908 *Ex parte Young* decision, federal courts also created another doctrine:  "the fundamental principle of comity between federal courts and state governments that is essential to 'Our Federalism,' particularly in the area of state taxation."  *McNary*, 454 U.S. at 103.  Thus, in 1870, the Supreme Court could state its already established guiding principle that, due to the need to avoid interference with states' tax collection, "No court of equity will, therefore, allow its injunction to issue to restrain their action, except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law."  *Dows v. City of Chicago*, 78 U.S. 108, 110 (1870).  The year after *Ex parte Young* issued, the Supreme Court emphasized that "a proper reluctance to interfere by prevention with the fiscal operations of the state governments has caused it to refrain from so doing in all cases where the Federal rights of the persons could otherwise be preserved unimpaired."  *Boise Artesian Water Co. v. Boise City*, 213 U.S. 276, 282 (1909).  The Supreme Court obviously did not consider *Ex parte Young* to pose any limitation on, or exception to, the comity doctrine as it applied in state tax cases then and continues to apply today.  *See Levin*, 560 U.S. at 421, 423-24.

The role of comity necessarily bears upon the question whether the ITFA can be privately enforced, because, as the Supreme Court instructed three years before the ITFA's original enactment, courts "must interpret" a federal statute "in light of the strong background principle against federal interference with state taxation."  *National Private Truck Council*, 515 U.S. at 589 (construing § 1983).  Because comity is a "fundamental principle" of "Our Federalism," *McNary*, 454 U.S. at 103, any claim that a federal statute contradicts or modifies the comity principle implicates the "clear statement" rule:  "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably

clear in the language of the statute.'" *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation

omitted). Such "a clear statement is required not simply in determining whether a statute applies

to the States, but also in determining whether the statute applies in the particular manner claimed."

*Virginia, Dep't of Educ. v. Riley*, 106 F.3d 559, 568 (4th Cir. 1997) (en banc) (citing *Gregory*, 501

U.S. at 460-70). No clear statement supporting private enforcement appears anywhere in the

language of the ITFA. Therefore, the comity principle and controlling Supreme Court and Fourth

Circuit precedent do not permit the statute to be privately enforced.

The same conclusion is also compelled by the "'express . . . statutory limitation[],"

*Armstrong*, 575 U.S. at 327, that Congress imposed when it enacted the TIA, which is "first and

foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so

important a local concern as the collection of taxes.'" *McNary*, 454 U.S. at 110 (quoting *Rosewell*,

450 U.S. at 503). "The Tax Injunction Act was only one of several statutes reflecting congressional

hostility to federal injunctions issued against state officials in the aftermath of . . . *Ex parte Young*."

*Rosewell*, 450 U.S. at 522 n.28; *see Arkansas v. Farm Credit Servs.*, 520 U.S. 821, 826-27 (1997)

("Enactment of the [TIA] reflects a congressional concern to confine federal court intervention in

state government, a concern prominent after the Court's ruling in *Ex parte Young*."). Thus, "after

[the Supreme] Court conclusively decided that federal courts may enjoin state officers from

enforcing an unconstitutional state law, . . . Congress also recognized that the autonomy and fiscal

stability of the States survive best when state tax systems are not subject to scrutiny in federal

courts" and, accordingly, enacted the TIA to codify the principle. *McNary*, 454 U.S. at 102-03

(citing *Ex parte Young*).

Since then, the Supreme Court has recognized the "the systemic importance of the federal

balance" that Congress sought to maintain through courts' faithful adherence to the TIA. *Farm*

*Credit Servs.*, 520 U.S. at 827.  As is true of the comity principle, if Congress wanted to "alter th[is] 'usual constitutional balance between the States and the Federal Government,'" *Gregory*, 501 U.S. at 460 (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 (1989)), by authorizing private enforcement of the ITFA against states, the statute would need to contain a "clear statement" to that effect, *Riley*, 106 F.3d at 568.  The ITFA contains no such statement, clear or otherwise.

Finally, plaintiffs insist that they can bring a § 1983 action to enforce the ITFA, but that notion is foreclosed by Supreme Court and Fourth Circuit precedent.  Their resort to § 1983 cannot alter the analysis of whether the law permits private enforcement of the ITFA, because the necessary inquiry "is no different" when § 1983 is invoked.  *Clear Sky Car Wash*, 743 F.3d at 444. In any case, the Supreme Court has held that "Congress did not authorize injunctive or declaratory relief under § 1983 in state tax cases when," as here, "there is an adequate remedy at law" provided by the State.  *National Private Truck Council*, 515 U.S. at 588; *see McNary*, 454 U.S. at 116 ("[T]axpayers are barred by the principle of comity from asserting § 1983 actions against the validity of state tax systems in federal courts.").

## V.    IF THERE IS A PRIVATE RIGHT OF ACTION TO ENFORCE THE INTERNET TAX FREEDOM ACT, THE AMENDED COMPLAINT FAILS TO STATE A CLAIM UNDER THE STATUTE.

Plaintiffs' merits argument regarding their ITFA claim persists with their theme of wanting to have it both ways:  the digital ad tax "is not a tax for purposes of the TIA," they say, but quickly add that "it does constitute a 'tax' for purposes of ITFA preemption."  ECF 31-1, at 51. They say in the amended complaint that the techniques used by digital advertising service providers, including "search engine marketing," differ from other forms of advertising because digital advertising services can "target a particular audience" by literally and continuously reading computer users' minds, via the thoughts, "location," and "interests" "expressed in their search

terms." ECF 25 ¶ 72.  But according to plaintiffs' ITFA argument, digital advertising services are not so special, and are merely "similar" to traditional, non-internet forms of advertising and marketing.  ECF 31-1, at 53-54.  As explained in defendant's opening memorandum, ECF 29-1, at 19 n.3, plaintiffs' wish to ascribe to the term "tax" in the ITFA a meaning beyond the TIA's reach contradicts the Supreme Court's analysis in *NFIB*, which calls for applying the TIA to a charge that another federal statute describes as a "tax." 567 U.S. at 544.  Their attempt to boast of digital advertising services' distinctiveness while denying dissimilarity also strains credulity, and nothing in the ITFA compels the Maryland General Assembly to conform its tax laws to plaintiffs' self-contradictory reading of the word "similar."

Plaintiffs' opposition admits that "[n]either the Supreme Court nor the Fourth Circuit has had occasion to articulate a test for ITFA discrimination."  ECF 31-1, at 51.  They might well have added that no other federal court has had an opportunity to venture an interpretation of the statute, which itself should give this Court pause.  When a federal statute addressing taxation has been on the books for nearly 23 years, during an era of maximum litigiousness, but no federal court has addressed the substance of the statute in all that time, there must be a reason.  There is, as explained in our arguments above.  Since, as plaintiffs acknowledge, there is no pertinent case law, the Court may look to what the Supreme Court has instructed in analogous situations where the similarity of businesses taxed has been at issue.

Precedent establishes that, "'in taxation, even more than in other fields, legislatures possess the greatest freedom in classification,'" and "state tax classifications require only a rational basis to satisfy the Equal Protection Clause." *General Motors Corp. v. Tracy*, 519 U.S. 278, 311 (1997) (rejecting dormant Commerce Clause and equal protection challenges to state tax scheme that treated independent marketers of natural gas differently from local distribution companies because

they were deemed not similarly situated).  Thus, absent any language in the ITFA requiring a level of scrutiny more demanding than the Constitution requires, the legislature's determination should be upheld if there is a rational basis for the distinction drawn by the digital ad tax.  As was true in *Tracy*, "there is unquestionably a rational basis for [Maryland's] distinction" between those companies that provide digital advertising services and those that do not.  *Id.* at 312.

Plaintiffs suggest that the Act distinguishes digital advertising services from "print advertising because it is digital," or because the "services are sold and delivered over the internet," ECF 31-1, at 53, but that characterization is woefully inaccurate and does not do justice to the law's intent and purpose.  The legislature adopted the Act to tax entities that make certain choices in their business practices and use technology and software that are not, by any means, inherent in internet usage or electronic commerce.  None of the businesses and individuals involved in traditional, non-internet forms of advertising have the capability to engage in the kind of round-the-clock and instantaneous data mining and exploitation of user personal information that are the digital advertising services providers' stock-in-trade.  The legislature was prompted to adopt the tax because the methods used by those offering digital advertising services have been associated with social ills that have surfaced only relatively recently.  ECF 25, at 1-2, 10-11.  Therefore, the tax is not discriminatory within the meaning of the ITFA because it taxes companies engaged in similar practices but does not apply to those whose practices are dissimilar.

Plaintiffs' have offered no substantive response to defendant's showing, ECF 29-1, at 44, that the digital ad tax, which the amended complaint labels "one-of-a kind," ECF No. 25 ¶ 25, is not a "multiple tax" under the ITFA because it is not duplicative of taxes imposed by other States.  *See* ECF 31-1, at 55 n.5.  As for plaintiffs' remaining arguments on the law of preemption, they acknowledge that the Supreme Court's doctrine is "violated" if a federal statute "command[s]

state[] legislatures to . . . refrain from enacting state law," ECF 31-1, at 56 (quoting *Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018)), which is precisely what the ITFA does.

If the Court reaches the issue, it should dismiss the ITFA challenge for failure to state a claim.

## VI.   THE DIGITAL ADVERTISING TAX ACT DOES NOT VIOLATE THE COMMERCE CLAUSE OR THE DUE PROCESS CLAUSE.

Plaintiffs' arguments under the Commerce and Due Process Clauses contradict Supreme Court precedent.  Contrary to plaintiffs' claims, a state tax need only be "'applied to an activity with a substantial nexus with the taxing State," be fairly apportioned," "not discriminate against interstate commerce," and be "fairly related to the services provided by the State.'" *Wynne*, 575 U.S. at 547 (2015) (quoting *Complete Auto*, 430 U.S at 279).  Under the Court's precedents, the *Complete Auto* analysis is as applicable to taxes on gross revenues as it is to taxes on net income. *Complete Auto*, 430 U.S. at 275, 289.  And, as *Wynne* noted, the Court has "squarely rejected" the idea that "the Commerce Clause distinguishes between taxes on net and gross income." 575 U.S. at 552.

Here, it is undisputed that the plaintiffs' member firms do some business in Maryland, ECF 25 ¶¶ 15, 14-21, 57, "the taxing State," *MeadWestvaco Corp. ex rel. Mead Corp. v. Illinois Dep't of Revenue*, 553 U.S. 16, 24 (2008).  Thus, "the inquiry shifts from whether the State may tax to what it may tax." *Id.* at 25 (citation omitted).  "Under [the unitary business] principle, a State 'may tax an apportioned sum of the corporation's multistate business.'"  *Id.* (citation omitted).  The plaintiffs' attack on the progressive rate structure "as both facially [discriminatory] and [discriminatory] in practical effect," ECF 31-1, at 60, ignores the focus of the inquiry under both the Commerce and Due Process Clauses, which is "what [the State] may tax."  *MeadWestvaco*, 553 U.S. at 24.  Plaintiffs' argument, which sidesteps that part of the analysis, is based on the

notion that it is impermissible to include in a taxpayer's assessable base any tax-exempt property, *id.*, at 60-61.  Plaintiffs are wrong.

The Supreme Court has long held that a State may set a tax rate by including tax-exempt income in the total amount of the taxpayer's income.  That is, for purposes of the Commerce and Due Process Clauses, in evaluating a franchise or gross receipts tax, the Court distinguishes between "the subject and the measure of the tax."  *Kansas City, Fort Scott, & Memphis Ry. Co. v. Botkin*, 240 U.S. 227, 232 (1916) (rejecting challenge to tax rate in part "measured by capital stock . . . not subject to state's taxing power").  Thus, as the Court has explained, "When the state levies taxes within its authority, property not in itself taxable by the state may be used as a measure of the tax imposed.  This principle has been frequently declared by decisions of this court."  *Maxwell v. Bugbee*, 250 U.S. 525, 539 (1919) (rejecting argument that "the effect of including the property beyond the jurisdiction of the state in measuring the tax amounts to a deprivation of property without due process of law because it in effect taxes property beyond the jurisdiction of the state"); *see Ford Motor Co. v. Beauchamp*, 308 U.S. 331, 332-33, 336-37 (1939) (rejecting commerce clause and due process challenges to state tax franchise tax formula that measured tax by a "graduated charge upon such proportion of the outstanding capital stock, surplus and undivided profits of the corporation, plus its long term obligations, as the gross receipts of its [in-state] business bear to the total gross receipts from its entire business"); *Great Atl. & Pac. Tea Co.*, 301 U.S. at 419, 424 (rejecting due process challenge to State's method of calculating tax rate, which adopted a progressive rate scheme based on the number of chain stores operated by the taxpayer, "whether operated in this State or not," based on national chain's claim that the state tax discriminated "in favor of local as against national chains, in the attempt to tax property and activities which are beyond the state's jurisdiction"; "The measure of the exaction is the number

of units of the chain within the state—a measure sanctioned by our decisions.  The rate of tax for each such unit is fixed by reference to the size of the entire chain."); *Educational Films Corp. of Am. v. Ward*, 282 U.S. 379, 392 (1931) (stating then-70-year-old rule that "a nondiscriminatory tax upon corporate franchises is valid, notwithstanding the inclusion of tax exempt property or income in the measure of it").  More recently, the Court observed that it "has consistently upheld franchise taxes measured by a yardstick which includes tax-exempt income or property, even though a part of the economic impact of the tax may be said to bear indirectly upon such income or property." *Werner Machine Co. v. Director of Div. of Taxation*, 350 U.S. 492, 494 (1956) (per curiam) (citing cases).

Both of plaintiffs' cases cited in support of their argument on this point, ECF 31-1, at 51-52, dealt with the *subject* matter of the tax, not the *measure* of it, and therefore do not support a finding of discrimination, either "facially" or "in practical effect." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 (1996) (taxing stock only to the degree that its issuing corporation participated in interstate commerce); *Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388 (1984) (taxing in-state shipping activity at a lower rate than out-of-state shipping activity.

Plaintiffs' hypothetical featuring a comparison of imaginary firms, one with $5 million of in-state revenues and $100 million of out-of-state revenues and the other with $5 million of in-state revenues and $100 billion of out-of-state revenues, does nothing to establish that the Act discriminates against out-of-state firms.  To the contrary, if one changes the hypothetical scenario so that one firm has $1,005,000,000 in sales all within Maryland and the other has $1,005,000 in global sales both in and outside the State, the first firm (with the billion in sales in Maryland) will be taxed at the higher rate and the firm with sales both in and out of Maryland will be taxed at the lower rate.

The final step of the constitutional analysis focuses on whether the tax is fairly apportioned, that is, whether it is both internally and externally consistent. *Wynne*, 575 U.S. at 562 (quoting *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185 (1995)); *Trinova Corp. v. Michigan Dep't of Treasury*, 498 U.S. 358, 380 (1991). On its face, Maryland's digital ad tax passes both prongs of the test because it mandates that the Comptroller assess only revenue earned from digital advertising in Maryland, Tax-Gen. § 7.5-102(a), and do so in fair proportion to a taxpayer's economic activity in the State, *id.* § 7.5-102(b)(1) (providing for "an apportionment fraction" with a "numerator" of in-State revenue and a "denominator" including revenue earned "in the United States"), and it requires the Comptroller to adopt legislative regulations that "determine the state from which revenues from digital advertising services are derived," Tax-Gen. § 7.5-102(b)(2). Thus, the Act's plain language shows the General Assembly's intent to implement a taxing scheme with attributes of both fair attribution and fair apportionment. If an individual taxpayer believes that the Act, as applied to that taxpayer's assessment, violates either the Commerce or Due Process Clauses, the taxpayer may challenge the assessment using the State's "'plain, speedy and efficient'" administrative remedy. *Gwozdz*, 846 F.3d at 742 (quoting 28 U.S.C. § 1341).

Finally, there is no substance to plaintiffs' claims that a progressive rate structure is so unfair as to discriminate against commerce or deny due process. "Graduated income taxes, involving as they do the concept of ability to pay, are based upon 'intelligible grounds of policy.'" *Alaska S.S. Co. v. Mullaney*, *Comm'r of Taxation*, 180 F.2d 805, 818 (9th Cir. 1950) (quoting *Pacific Am. Fisheries v. Alaska*, 269 U.S. 269, 278 (1925) ("The inequalities of the tax are based upon intelligible grounds of policy and cannot be said to deny the petitioner its constitutional rights."); *State v. Brady*, 576 N.Y.S.2d 896, 899 (N.Y. App. Div. 1991) (collecting cases upholding

application of progressive tax rate to taxpayer's income from all sources and then apportioning based on in-state income to calculate amount due).

## VII.   THE PASS-THROUGH PROVISION OF THE ACT DOES NOT VIOLATE THE DUE PROCESS CLAUSE, COMMERCE CLAUSE, OR FIRST AMENDMENT.

Plaintiffs' arguments under the Commerce and Due Process Clauses focus on the pass-through provision's alleged extraterritoriality and discriminatory effect, but as explained previously in Argument VI, in making those arguments plaintiffs ignore Supreme Court precedent explaining why the scheme's fair attribution and fair apportionment conclusively resolve those claims in favor of the State.   *MeadWestvaco*, 553 U.S. at 24.   Because the digital ad tax itself applies only to digital advertising in the State, there is no extraterritorial or discriminatory impact in the Act's prohibition against passing on the cost of the tax to purchasers of in-state digital advertising services.

As for plaintiffs' arguments under the First Amendment, first, plaintiffs do not even mention the most recent pronouncement from the Supreme Court on this issue, *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150 (2017).   In that case, the Court explained the applicable standard of review, where, as here, the law prohibits a merchant from passing on a charge to a consumer: "[T]he law's effect on speech would be only incidental to its primary effect on conduct, and 'it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Id.*, 137 S. Ct. at 1151 (quoting *Rumsfeld v. Forum for Academic and Inst. Rights, Inc.*, 547 U.S. 47, 62 (2006) (other citations omitted)).   Because the pass-through prohibition in the Maryland statute regulates only what a digital advertising firm "could collect," from a purchaser of digital advertising services, i.e. the digital ad tax paid, it "regulate[s] the [firm's] conduct," *Expressions Hair Design*, 137 S. Ct. at

1150, not speech.  To be able to collect any fee for the purchase of digital advertising services, the firm already must invoice to the purchaser an amount to be paid for services.  The First Amendment is not offended because the pass-through prohibition "would indirectly dictate the content of that speech" by "determining the amount [of the digital ad tax] charged" to the customer (and limiting that amount to zero).  *Id.*

Plaintiffs also fail to take into account that the standard for a facial attack on legislation requires them to establish that the Act "is unconstitutional in *all* of its applications."  *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added). Under a plausible interpretation of the statute, which they concede, ECF 25 ¶ 95; ECF 31-1, at 66, the direct pass-through prohibition regulates conduct, not speech.  Not only is that a plausible interpretation, but the legislative history confirms that the General Assembly intended to prohibit digital advertising taxpayers from passing the tax through to purchasers of digital advertising services.  Dep't of Legis. Servs., *Fiscal & Policy Note Enrolled—Revised* 2, 2021 Md. Laws ch. 669 (S.B. 787), 2021 Regular Legis. Sess. (May 18, 2021), attached hereto as Exhibit 4 ("The bill also prohibits a person who derives gross revenues from digital advertising services in the State from directly passing on the cost of the tax imposed to a customer who purchases the digital advertising services by means of a separate fee, surcharge, or line-item.").  Like the legislation itself, the fiscal and policy note contains not a word about what language a company may use, be it in an invoice, a digital advertisement, or any other communication.

———————————————

**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### SUMMARY JUDGMENT IS INAPPROPRIATE PRIOR TO DISCOVERY, ESPECIALLY IN THE CONTEXT OF THIS CASE.

On motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986)). At this early stage of the proceedings, before the defendant has even answered, plaintiffs are not entitled to the various negative factual inferences that they attempt to draw based on the taxing scheme and from the defendant's motion to dismiss arguments. Such negative inference drawing is not permissible, because of the presumption that, on motion for summary judgment, the facts must be construed in the light most favorable to the nonmovant. *Id.*

Moreover, as the Fourth Circuit has repeatedly instructed, "summary judgment should only be granted 'after adequate time for discovery.'" *Goodman v. Diggs*, 986 F.3d 493, 500 (4th Cir. 2021) (quoting *McCray v. Maryland Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014)). "Discovery is usually essential . . . prior to summary judgment because" the party opposing summary judgment must support the assertion of disputed material facts "by, inter alia, citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials.'" *Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Baltimore*, 721 F.3d 264, 280 (4th Cir. 2013) (citing Fed. R. Civ. P. 56(c)(1)(A) (internal quotation marks omitted; ellipsis in original). Because the summary judgment process "presupposes the existence of an adequate record, a district court "must refuse summary judgment 'where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.'" *Greater Baltimore Ctr.*, 721 F.3d at 280 (quoting *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008) (alteration in

*Nader*)).  Accordingly, the Fourth Circuit has "not hesitated to vacate a grant of summary judgment issued before adequate discovery has occurred."  *Goodman*, 986 F.3d at 500 (citing *Ingle v. Yelton*, 439 F.3d 191, 193, 196-97 (4th Cir. 2006)).

A party opposing summary judgment may file an affidavit explaining that without discovery the party "cannot present facts essential to justify its opposition" to summary judgment. Fed. R. Civ. P. 56(d).  As explained in the Affidavit of Brian L. Oliner, attached hereto as Exhibit 3, among the matters as to which discovery is necessary, should the Court deny defendant's motion to dismiss, are plaintiffs' conclusory assertions of the tax's burdensomeness, which feature in their arguments raised on summary judgment (e.g., burdensome nature of the tax compared to other taxes and as compared to the taxed entities' ability to pay, an issue on which discovery into the entities' financial information is critical).  Discovery would also be necessary to determine the accuracy of the plaintiffs' conclusory allegations that nearly all digital advertising services conduct takes place outside Maryland, ECF 25, at 16, and plaintiffs' allegations describing the distinctive nature of digital advertising services as compared to all other types of advertising, ECF 25, at 16-17.  Oliner Aff. ¶ 5.  This is especially necessary given that the latter allegations directly contradict the plaintiffs' allegation that the Digital Tax Act is discriminatory under the ITFA.  ECF 25, at 18.

These and other facts essential to oppose the motion for summary judgment cannot be set forth without discovery nor without the regulations to be promulgated by the Comptroller under the delegated legislative authority to "determine the state from which revenues from digital advertising services are derived."  Tax-Gen. § 7.5-102(b)(2).  Oliner Aff. ¶¶ 4, 5.

## CONCLUSION

The motion to dismiss should be granted and the plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt
_____

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us

/s/ Steven M. Sullivan
_____

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

/s/ Brian L. Oliner
_____

BRIAN L. OLINER
Federal Bar No. 05780
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404
(410) 260-7808

Attorneys for Defendant