IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, et al., *Plaintiffs*, v. PETER FRANCHOT, *Defendant*. | Case No. 1:21-cv-410-DKC |

**BRIEF OF *AMICI CURIAE* TAX LAW PROFESSORS[1] IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

---

[1] This brief is submitted by Professors Darien Shanske and Young Ran (Christine) Kim, who collectively have significant experience in state and local taxation, business taxation, digital taxation, and cross-border taxation. Their interest and expertise are set forth more fully in their motion for leave to file as *amici*. Professors Shanske and Kim thank Aaron Rieke, Managing Director of Upturn, for his technical assistance and thoughtful guidance in the drafting of this brief.

**INTRODUCTION**

Digital advertising is a more than $191 billion market that touches the lives of almost every American in significant and often nearly invisible ways.[2] Enabled by complex modern technologies, digital advertising platforms have no parallel in the non-digital world.

These platforms sell advertisers precisely targeted, individualized, and verifiable access to Maryland residents. Their business practice relies on two-sided, mutually re-enforcing transactions. On one side, advertisers pay digital advertising platforms to display their ads to users and provide information on the number and kinds of users that respond to those ads. On the other, the platforms engage in a barter with users: exchanging services (e.g., social networking or search) for the right to place targeted advertising in front of them and to collect expansive user data (e.g., where those users browse the web, how they use the platforms' services, or whether they click on an ad), including by installing small bits of tracking code on users' web browsers and mobile devices. The success of the first side of the transaction depends on, and is deeply integrated with, the barter exchange (e.g., platforms simultaneously show a user a targeted ad, collect data about that users' activities, adapt ads in real-time to increase the chance of affecting user behavior, and get paid by the advertiser based on the user's activities).

Maryland's new law imposes a tax on a percentage of revenues derived from digital advertising in Maryland by certain digital advertising platforms with over $100 million in global revenues. Md. Code Ann., Tax-Gen. §§ 7.5-102, 7.5-103. Plaintiffs allege that this scheme punishes out-of-state conduct. *E.g.*, Pl. Mot. at 1. It does not. It is essentially a consumption tax on the delivery of ads to Maryland users. These ads represent a constant, real-time exchange

---

[2] Nicole Perrin, *US Digital Ad Spending in 2021,* eMarketer (Apr. 14, 2021), https://www.emarketer.com/content/us-digital-ad-spending-2021.

1

with Maryland residents that allows platforms to collect both the raw material for, and the basis for payment by, advertisers to the platform.[3] The provision of data from Marylanders generates substantial revenues at high profit margins for digital advertising platforms, typically without being recognized or taxed in the location where valuable user data is collected.[4] Maryland's law merely taxes revenues uniquely generated by digital advertising platforms that were previously untaxed and that result from exchanges with Maryland users.[5] Likewise, examining a taxpayer's revenues outside a jurisdiction to apportion taxable revenues generated in-state and to set the proper tax rate is a common and reasonable practice.[6]

---

[3] For further discussion of the relationship between digital services, value creation, and traditional consumption tax structures, *see* Young Ran (Christine) Kim, *Digital Services Tax: A Cross-Border Variation of the Consumption Tax Debate*, 72 Ala. L. Rev. 131, 131-145, 179-184 (2020).

[4] *See* Laura Power & Austin Frerick, *Have Excess Returns to Corporations Been Increasing Over Time?*, 69 Nat'l Tax J. 831, 837 (2016) ("The calculations therefore suggest that industries that hold intangible assets seem to earn higher than average excess returns."); Darien Shanske, *How the States Can Tax Shifted Corporate Profits: An Application of Strategic Conformity,* 94 S. Calif. L. Rev. 251, 262 (2021) ("The state-level corporate tax has been in decline even more than the federal corporate tax. In particular, the productivity of the tax has declined relative to the increased profitability of corporations."); Wei Cui, *The Digital Services Tax: A Conceptual Defense*, 73 Tax L. Rev. 69, 70 (2019).

[5] Indeed, it is precisely because the Maryland tax simply seeks to fulfill purposes well within the bailiwick of its traditional taxing authority that, as Maryland explains, the Tax Injunction Act (TIA) bars this lawsuit. *See* MD Br. at 4–25. While Maryland's tax may be in part motivated by policy concerns over the digital advertising industry, "even a tax with 'regulatory character and prohibitive burden . . . does not cease to be valid merely because it regulates, discourages, or even definitely deters the activities taxed.'" *Seven-Sky v. Holder*, 661 F.3d 1, 50 (D.C. Cir. 2011), *abrogated by Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (Kavanaugh J., dissenting) (citing *United States v. Sanchez*, 340 U.S. 42, 44 (1950)). Note that *amici* do not believe that the Maryland tax imposes anything near a prohibitive burden.

[6] Jerome R. Hellerstein & Walter Hellerstein, State Taxation, Secs. 8.05 (apportionment generally), 8.17 (apportionment of worldwide income) and 20.05[1][b] (3d. Ed. 2012) ("[W]e cannot fairly and rationally implement the concept that those who earn more should pay taxes at an increasingly higher rate unless we determine how much the individual earns without regard to the particular political entities in which the earnings were accumulated.").

*Amici* write here to respond to Plaintiffs' attempt to permanently shield the digital advertising industry from the reach of state tax law by seeking a declaration that such taxes are categorically preempted by the nondiscrimination provisions of the federal Internet Tax Freedom Act (ITFA). The ITFA prohibits only state taxation that discriminates between products in e-commerce and "similar" non-digital products or services. Digital advertising is not similar to any non-digital service for purposes of the ITFA, including non-digital advertising, and there is no evidence that Congress intended to shelter digital advertising platforms from targeted taxes in the states where the platforms deliver ads and extract significant value for themselves.

Maryland is the first state to enact a digital advertising tax, but it is far from unique. Many taxing authorities are actively grappling with the proper allocation and taxation of the digital economy.[7] Indeed, as of this writing, at least seven other states are considering following in Maryland's stead and enacting similar taxes on digital services.[8] If the Court reaches the ITFA claim at all, the Court should decline to create the tax shield that Plaintiffs seek.

## ARGUMENT

**I.   The Internet Tax Freedom Act prohibits only state taxation of e-commerce products where "similar" non-digital products exist that are taxed more favorably.**

The ITFA includes two restrictions on the abilities of states to pass certain taxes related to the internet: first, it prohibits imposition of taxes on internet access itself, 47 U.S.C. § 151 Note, § 1101(a)(1) ("IFTA"), and second, it prohibits imposition of "multiple or discriminatory

---

[7] *See, e.g.*, *Tax Challenges Arising from Digitalisation – Interim Report 2018: Inclusive Framework on BEPS*, OECD (Mar. 16, 2018), https://read.oecd.org/10.1787/9789264293083-en?format=pdf.

[8] Jessi Vice, et al., *State proposals to tax digital ads are popping up everywhere*, The Tax Adviser (Sept. 1, 2021), https://www.thetaxadviser.com/issues/2021/jun/state-proposals-tax-digital-ads.html (proposals in Connecticut, Indiana, New York, Massachusetts, Montana, Oregon, and Washington).

3

taxes on electronic commerce." *Id.* § 1101(a)(2).  The ITFA defines a discriminatory tax, in relevant part, as "any tax imposed . . . on electronic commerce that is not generally imposed . . . on transactions involving similar property, goods, services, or information accomplished through other means."  *Id.* § 1105(2)(A)(i).

While the Supreme Court has not yet interpreted the nondiscrimination provisions of the ITFA, the Court has explained in related contexts that "discrimination . . . assumes a comparison of substantially similar entities," so that "when the allegedly competing entities provide different products . . . there is a threshold question whether the companies are indeed similarly situated for constitutional purposes."  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 279, 299 (1997).  The Court accordingly does not treat superficially comparable products as similar for purposes of discrimination under the dormant Commerce Clause.  *See id.* (holding that Ohio tax law treating state-regulated natural gas utilities as "natural gas companies" receiving favorable tax treatment while excluding natural gas producers and independent marketers did not violate the dormant Commerce Clause because the different entities were not "similar").  Thus, the mere fact that some "advertising" is taxed and some is not is hardly sufficient to establish discrimination.

Accordingly, in interpreting "discrimination" under the ITFA, courts have gone beyond mere labels to analyze the substance of what is taxed and what is not to determine if they are actually similar.  For example, in *Labell v. City of Chicago*, an Illinois Appellate Court declined to find that the ITFA's nondiscrimination provision preempted a city "amusement" tax that applied to "television shows, movies, or videos," as well as music and games, that are "electronically delivered" to customers.  147 N.E.3d 732, 736 (App. Ct. Ill. 1st Dist. 2019).  The court compared streaming entertainment services (such as Netflix or Spotify) subject to the tax with other products and services not subject to the tax (such as physical entertainment devices

4

like video machines, jukeboxes, or pinball machines), and with live cultural performances. *Id.* at 743. The court found substantive differences between streaming services and physical entertainment devices: "[s]treaming services are primarily used privately in the home or on devices owned and maintained by the patron. In contrast, automatic amusement devices are used publicly, outside the home and are owned and maintained by businesses." *Id.* at 746. The court concluded that the tax on streaming services was not preempted because streaming entertainment services are not "similar" to the most analogous non-internet-based products. *Id.* at 747–48.

Other courts have likewise rejected a finding of similarity under the ITFA when there were substantive differences between allegedly analogous products and services. *See, e.g., Village of Rosemont, Ill. v. Priceline.com, Inc.*, No. 09 C 4438, 2011 WL 4913262 at *9 (N.D. Ill. Oct. 14, 2011) (tax resulting in higher fees for online travel companies than their brick-and-mortar counterparts did not violate the ITFA because the disparate tax rates were the result of differences in business models and fee structures rather than the mere fact that online travel companies conducted their business via the internet); *Mayor & City Council of Baltimore v. Priceline.com, Inc.*, Civil Action No. MJG-08-3319, 2012 WL 3043062 at *7–8 (D. Md. July 24, 2012) (similar to *Rosemont*); *Gartner, Inc. v. Dep't of Revenue*, 455 P. 3d 1179, 1192–93 (Wash. Ct. App. 2020) (taxing internet research database sales at a different rate than the physical transmittal of research was not discriminatory within the meaning of the ITFA because the research database was an automated digital service using software applications that would not be used in an analogous physical setting).

Consistent with prior cases under the ITFA and the Supreme Court's established understanding of the requirements for discrimination more generally, evaluation of Maryland's tax under the ITFA's nondiscrimination provision must be more nuanced. If the digital product

5

or service being taxed—here the delivery of digital advertising—relies on a different business model and fee structure, is used differently, or has a different impact than the most analogous non-digital product or service, it is not "similar" for the purposes of the ITFA to non-digital products subject to a different tax scheme.

II.     **The delivery of digital advertising, which relies on a constant stream of two-way communication between an ad platform and its users, is not "similar" to non-digital advertising for purposes of the ITFA.**

Maryland's law taxes revenues that digital advertising platforms derive from the delivery of digital ads to Maryland users. Md. Code Ann., Tax-Gen. §§ 7.5-101(d), 7.5-102, 7.5-103. Contrary to Plaintiff's argument, digital advertising is not truly "similar" under the ITFA to non-digital "advertising services published through newspapers, mailings, billboards, or radio and television programming." *See* ITFA § 1105(2)(A)(i); Pl. Mot. at 38-39. Rather, Maryland's law taxes a service that does not exist in the non-digital world. Moreover, the unique features of the delivery of digital ads highlight the appropriateness of Maryland's scheme.[9]

*Unique business model.* Traditional, non-digital advertising is delivered through a simple market exchange. Non-digital advertisers pay a newspaper, billboard owner, or radio station to place an ad in their media.

Digital advertising platforms rely on a business model that is fundamentally different. Most digital ads in the United States are distributed by a small number of gargantuan advertising platforms: Google, Facebook, and Amazon, which control over 64% of the U.S. digital advertising market.[10] These platforms conduct two-sided, mutually reinforcing transactions with

---

[9] These same differences also provide the basis for concluding that Maryland's law does not discriminate in violation of the Commerce Clause.

[10] Alexandra Bruell, *Amazon Surpasses 10% of U.S. Digital Ad Market Share,* Wall St. J. (Apr. 6, 2021), https://www.wsj.com/articles/amazon-surpasses-10-of-u-s-digital-ad-market-share-11617703200 (reporting that, in 2020, Amazon's digital ad revenues accounted for 10.3% of the

two sets of participants.[11]  The first is a cash exchange between the platform and advertisers.  An advertiser (e.g., a shoe store) pays the platform (e.g., Google or Facebook) to display an ad to targeted users, either directly to the platform's own users (e.g., inserting ads into a user's Facebook feed) or in digital space on third-party websites or mobile apps (like the *Baltimore Sun* website), and provide information about how many and what kinds of users respond, for a cut of the platform's fee.  The second related transaction involves a barter exchange between the platform and a user (e.g., a Google user).  The user allows the platform to collect personal data in exchange for services (like web browsing, videos, or a constant stream of kitten photographs).[12]

These two sides of the transaction are deeply intertwined in both a business and technical sense.  The collection of data allows the platform to target users, which is the very service being sold: targeted and individualized access to users.[13]  And the *very act of displaying an ad* is often both (1) an ad impression for which the advertiser pays and (2) a data collection tool for the advertising platforms, allowing them to verify the basis for payment and further refine future ad

---

market, Google's accounted for 28.9%, and Facebook's accounted for 25.2%).  Notably, at least three of the named plaintiffs in this case boast two or more of these behemoth companies in their limited membership rosters.  *See* Computer & Communications Industry Association, *Members List* , https://www.ccianet.org/about/members/ (last visited Sept. 18, 2021) (Amazon, Google, Facebook); NetChoice, *About Us*, https://netchoice.org/about/ (last visited Sept. 18, 2021)(Amazon, Google); Internet Association, *Members*, https://internetassociation.org/our-members/ (last visited Sept. 18, 2021)(Amazon, Google, Facebook).

[11] Kim, *supra* n. 1, at 141–45.

[12] Data collection techniques fall into four general categories: web tracking, location tracking, cross-device tracking, and browser fingerprinting.  Spandana Singh, Open Technology Institute, *Special Delivery: How Internet Platforms Use Artificial Intelligence to Target and Deliver Ads,* Part 3: The Role of Data in the Targeted Advertising Industry, New America (Feb. 18, 2020), https://www.newamerica.org/oti/reports/special-delivery/.

[13] *See* Singh, *supra* n. 12, Part 4: The Role of Automated Tools in Digital Advertising.

placement.[14] In other words, the behavior of users, even while viewing an ad, allows the platform to more precisely target them and to verify impressions, click-throughs, and completed transactions with the advertiser, for which the platforms get paid. Maryland's law imposes a consumption tax on the portion of the transaction that was previously untaxed: the side of the transaction that occurs between the platform and Maryland users.[15]

*User targeting with sophistication and specificity.* A traditional non-digital advertiser can know some high-level things about the target audience. For example, buyers of radio station ads can research the demographics of a station's listeners as a whole. Or an advertiser may learn through a focus group that readers of the print edition of the *Baltimore Sun* are interested in a certain local service. But a non-digital advertiser cannot precisely target *individuals*.

Digital advertising platforms, on the other hand, collect an enormous amount of data about their users—everything from a user's demographics and her friend network to her web history and geolocation relative to another user.[16] The platforms feed all this into sophisticated algorithms that allow them to precisely target users and command higher bids from advertisers.[17]

---

[14] *See, e.g.,* Google Privacy & Terms, How Google Uses Cookies, https://policies.google.com/technologies/cookies?hl=en-US#types-of-cookies (noting that "Google uses cookies for advertising, including serving and rendering ads, personalizing ads . . . and measuring the effectiveness of ads.")

[15] *See* Kim, *supra* n. 1 at 131–145, 179–184.

[16] Facebook, for example, collects users' location, demographics, interests and hobbies, behavior such as purchases and device usage, and "connections." Facebook For Business, *Ad Targeting*, https://www.facebook.com/business/ads/ad-targeting (last visited Sept. 15, 2021). Google has information on, at least, its users' age, gender, parental status, search history, interests, and affinities. Google Ads, *Reach a larger or new audience with Google Display Network targeting*, https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/ (last visited Sept. 15, 2021).

[17] For an in-depth analysis of how this works, see Singh, *supra* n. 12. *See also, e.g.,* Google Ads Help, *Setup and basics - How to be successful with Google Ads*, https://support.google.com/google-ads/answer/6080949?hl=en&ref_topic=6146239 (last visited

The techniques range from fairly obvious (a user searches for a grill one day, and ads for grills show up on every website visited for months)[18] to rather opaque (after visiting family, a user suddenly receives ads for a relative's toothpaste).[19] Platforms make sophisticated inferences from a user's personal data. A user who buys unscented soap, for example, may suddenly start receiving pregnancy-related ads because platforms infer that "when someone suddenly starts buying lots of scent-free soap and extra-big cotton balls," they may be "getting close to their delivery date."[20] Ad targeting can be helpful (e.g., after moving, user receives ads for needed housewares) or problematic (e.g., ads for programmer jobs are selectively delivered to young, white males).[21] But in all cases in which digital ads are delivered to Marylanders, the techniques rely on valuable data extracted from Marylanders and assumptions made about Marylanders by advertising platforms' algorithms and the data they have collected—something that is unique to digital advertising and that was previously untaxed.[22]

***Individually verifiable advertising.*** A traditional non-digital advertiser cannot truly know whether an individual in its target market saw the ad. People flip past the ads in

---

Sept. 18, 2021) ("Through Google Ads, you can create online ads to reach people *exactly when they're interested in the products and services that you offer*." (emphasis added)).

[18] Platforms can push ads in response to a user search. Google Ads, *Resources - How Google Ads works*, https://ads.google.com/intl/en_id/home/resources/reach-larger-new-audiences/ (last visited Sept. 18, 2021).

[19] Robert G. Reeve (@RobertGReeve), Twitter (May 24, 2021, 11:32pm), https://twitter.com/RobertGReeve/status/1397032784703655938.

[20] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. Times (Feb. 16, 2012), https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html.

[21] *See* Tolga Bolukbasi et al., *Man Is To Computer Programmer As Woman Is To Homemaker? Debiasing Word Embeddings*, Neural and Information Processing Systems (30th Conf., Barcelona, Spain, Dec. 2016), https://proceedings.neurips.cc/paper/2016/file/a486cd07e4ac3d270571622f4f316ec5-Paper.pdf.

[22] *See* Power, *supra* n. 4, 837; Cui, *supra* n. 4.

9

magazines, enter the subway without looking up, get a snack during television commercials. A person inspired to take action by a traditional ad generally leaves no proof that she walked into the store because of the ad on the radio. Traditional non-digital advertisers pay for the mere privilege of ad placement and use proxies to make assumptions about whether ads worked.[23]

But digital advertising platforms are able to both ensure that an ad is seen and verify whether it worked. Digital advertising platforms place ads where users are unable to *avoid* seeing them, like at the top of a webpage the user is loading or in line with a user's Facebook feed.[24] And they do not simply show an image or video, like in a print newspaper or on broadcast television. They collect detailed information about users—in real time, as the ad is shown—simultaneously helping themselves with more detailed user profiles and providing advertisers with verifiable reports about their ad's performance.[25] Platforms take note of which user the ad is shown to and how that user interacts with the ad.[26] Platforms can record the fact that a user paused for a fraction of a second at the ad for a summer dress while scrolling through their social media feed. They know that a user took a break from reading that news article on a

---

[23] Traditional, non-digital advertising presents consumers as "passive recipients" of advertising messages, where consumers are expected to make a purchase at a later time and a later place. Anna-Greta Nystrom & Jacob Mickelsson, *Digital Advertising as Service: Introducing Contextually Embedded Selling*, J. Servs. Marketing 3 (June 2019), https://www.researchgate.net/publication/333738138_Digital_advertising_as_service_introducing_contextually_embedded_selling.

[24] Upturn, *Leveling the Platform: Real Transparency for Paid Messages on Facebook*, 8 (May 2018), https://www.upturn.org/reports/2018/facebook-ads/ ("[T]he boundary between ads and other types of posts can be porous. Ads are designed to exist seamlessly among other kinds of posts that users see in their news feeds. . . . And in many cases, it can be infeasible for users to determine when a post was initially propelled by money before going viral.")

[25] *See, e.g.*, Google Ads Help, *Measure Results - About return on investment (ROI)*, https://support.google.com/google-ads/answer/1722066?hl=en&ref_topic=3121936 (last visited Sept. 18, 2021) (in Google Ads, an advertiser can track "how many clicks lead to conversion" and "how your customers interact with your website").

[26] *Id*.

laptop to respond to an invitation for a barbeque on a smartphone.[27] All the while, digital advertising platforms update their algorithms in real time, pushing more and more personalized ads to users.

Platforms can also know when a user clicks on an ad—indeed, the ads are gateways directly to the product or service being advertised—and whether the user purchases a product or applies for a loan after doing so.[28] This allows advertisers to choose to pay only for (or to pay more for) an ad placement that leads directly to a sales event, something that is entirely infeasible for non-digital ads.[29] These capabilities rely on the unique ability of digital advertising platforms to track users' activities and collect reams of data, including about Maryland users, and, again, generate currently untaxed profits. Non-digital "advertising services published through newspapers, mailings, billboards, or radio and television programming,"[30] are simply incomparable.

***Advertising platform can control ad placement.*** In traditional, non-digital advertising, the advertiser has control over where its ad is placed and the entity displaying or playing the ad typically selects, approves, or places the ads in front of its audience. The print edition of the *New York Times*, for example, can choose to show readers an ad for a local business or can decline to show its readers a misleading or offensive ad.

---

[27] *See* Singh, *supra* n. 12, Part 3: The Role of Data in the Targeted Advertising Industry, (advertising platforms track users across multiple devices and track users' movements across third-party websites).

[28] *See, e.g.*, Google Ads Help, *Measure Results, About return on investment (ROI)*, *supra* n. 25.

[29] *See* Singh, *supra* n. 12, Part 4: The Role of Automated Tools in Digital Advertising, (advertisers bid on ad placement and can choose to pay on a per-impression or per-click basis).

[30] *See* Pl. Mot. at 29.

In the delivery of digital ads, on the other hand, the advertising platform can, and often does, have complete control of which ads to display in front of whom on third-party websites. The *New York Time's* website, unlike the print edition, can simply choose to "lease" web space to a digital advertising platform, allowing the platform to place any ad in the designated location without review by the *New York Times*, and advertisers may be unaware of where their ads are placed.[31] For example, a typical third-party website that signs up to allow Google to place ads on their site often hands control over *which* ads to place to Google.[32] The platforms typically choose whether to place an ad based on a function of which advertiser is willing to pay the most for access to a particular user and the likelihood that a user will click on the ad, allowing the platform to get paid a higher rate.[33] The platforms make the choice that is most profitable to themselves. And an assessment that it is profitable to place an ad in front of a particular Maryland user is made possible by data extracted from users in Maryland.

### III. The ITFA's legislative history and principles of preemption counsel against finding the Maryland tax preempted by the ITFA.

The plain text of the ITFA, along with the particular features of digital advertising described in the previous section, counsels against a finding that the Maryland tax discriminates against "similar" products for the purposes of the ITFA. This conclusion is further buttressed by

---

[31] Indeed, this has led to embarrassment when advertisers discovered that their ads were being displayed alongside offensive content. *See* Financial Post, *Major brands aren't happy they're still appearing next to online hate videos as Google's crisis spreads* (Mar. 24, 2017), https://financialpost.com/technology/major-brands-arent-happy-theyre-still-appearing-next-to-online-hate-videos-as-googles-crisis-spreads.

[32] Google AdSense, *Solutions, Auto Ads*, https://www.google.com/adsense/start/solutions/auto-ads/ (last visited Sept. 18, 2021) ("Auto ads helps you make money with an easy-to-use, automated platform that makes smart decisions on your behalf.").

[33] *See* Singh, *supra* n. 12, Part 4: The Role of Automated Tools in Digital Advertising, (advertisers bid on ad placement and can choose to pay on a per-impression or per-click basis).

a closer examination of the ITFA's history, as well as general principles of preemption in the state tax context.

> A.  The legislative history of the ITFA reveals a focus on protecting a developing industry from measures designed to advantage physical retail competitors.

During the passage and subsequent extensions of the ITFA, Congress's animating challenge was ensuring that internet retailers could compete on equal footing with brick-and-mortar retailers selling similar products, an issue not implicated by Maryland's tax.

In 1998, the House Committee on the Judiciary suggested that states feared losing tax revenues "on the sale of goods and services over the Internet to local customers . . . as the situs of sales drifts inexorably into cyberspace." HR Rep. No. 105-808, 1998 WL 710063, at *9 (1998). When passing the 2001 extension of the ITFA, the same Committee described "The Scope of Internet Commerce" by noting that "e-commerce retail sales reached $7.5 billion," but that "during the first quarter of 2000, online retail sales represented less than 1 percent of overall retail sales." H.R. Rep. No. 107–240, at 2 (2001). In 2003, the Committee noted that retail sales still dwarfed e-commerce, touting findings that "despite early warnings that online businesses would drive their 'bricks and mortar' counterparts to extinction, 'nothing approaching these degrees of transformation has yet occurred.'" H.R. Rep. No. 108–234, at 3 (2003).

During the 2007 extension of the ITFA, legislators advocating for a permanent extension of the ITFA explained that it would never "be a good idea to allow states to tax a purchase of a book on Amazon.com at a higher rate than they tax the purchase of the same book on Main Street." H.R. Rep. 110-372, 2007 WL 979639, at *303 (2007) (Supplemental Views). In 2016, Senator Mike Enzi critiqued the permanent extension of the ITFA in similar terms, lamenting the challenge to states of "offset[ting] the growing loss of sales tax revenue. In December, in-store

sales were about the same as the year before, but Internet sales grew by about 40 percent." 162 Cong. Rec. S836-02, 2016 WL 544351, at *S842, (Feb. 11, 2016).

The core concern of the ITFA's nondiscrimination provisions (as well as the dormant Commerce Clause)—that states would seek to advantage in-state businesses threatened by out-of-state internet competitors—is not implicated here, where Maryland simply seeks to extend its tax regime to cover certain in-state economic activity that is currently untaxed. Unlike the concerns expressed by the ITFA's champions (and critics), Maryland does not seek to discriminatorily tax a product by online retailers that is sold in a substantively similar form by Maryland businesses operating offline. Maryland's tax of a purely digital product that is fundamentally different in myriad ways from any non-digital counterpart does not threaten the ITFA's goals of preventing favoritism and protectionism from threatening the internet's growth.

    B.    <u>Principles of preemption, particularly in the state taxation context, counsel against Plaintiffs' broad construction of the ITFA.</u>

Finally, in analyzing this issue, the Court should bear in mind that the established principles that existed when Congress drafted the ITFA require that state tax authority not be superseded unless that is the statute's clear intent. *See*, *e.g.*, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("We start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *see also Heublein, Inc. v. S.C. Tax Comm'n*, 409 U.S. 275, 281–82 (1972) (Upholding state regulations that had the effect of subjecting businesses to state taxation, noting, "[s]uch regulation is an important function of local governments in our federal scheme . . . unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the Federal-State balance." (internal citation and quotation marks omitted)); *Disney Enterprises, Inc. v. Tax Appeals Tribunal of State*, 888 N.E.2d 1029, 1036 (2008) ("[W]e will

not, 'absent unambiguous evidence, infer a scope of pre-emption beyond that which clearly is mandated by Congress' language.'" (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 533 (1992)); *Gartner, Inc. v. Dep't of Revenue*, 455 P.3d 1179, 1192 (Wash. Ct. App.) (applying presumption against preemption in ITFA case).[34]

Plaintiffs incorrectly imply that a statute that partially preempts state law should be read to impose the broadest possible preemption. *See* Pl. Mot. at 39–40. That approach would be inconsistent with courts' interpretation of the scope of express preemption statutes. As the Court explained in the ERISA context, treating ambiguity as an invitation to expand preemption "would be to read Congress's words of limitation as mere sham, and to read the presumption against pre-emption out of the law whenever Congress speaks to the matter with generality." *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (internal citation omitted).

## CONCLUSION

The text of the ITFA, nationwide precedent, and strong principles requiring clear evidence of an intent to preempt a state tax law counsel courts to carefully consider claims of "similarity" between digital and non-digital products before finding a state tax preempted. Here, digital advertising is unlike any non-digital service. This Court should reject Plaintiffs' attempt to construct an extraordinarily broad shelter from state tax law.

---

[34] Note that this principle is also relevant to resolution of the TIA issue. See *Nat'l Priv. Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 590 (1995) ("Given the strong background presumption against interference with state taxation, the Tax Injunction Act may be best understood as but a partial codification of the federal reluctance to interfere with state taxation.").

Dated: September 20, 2021            Respectfully submitted,

/s/ *Patrick A. Thronson*
Patrick A. Thronson, MD Bar No. 18906
Janet, Janet & Sugg, LLC
4 Reservoir Circle, Ste 200
Baltimore, MD 21208
(410) 653-3200
(410) 653-9093 (fax)
pthronson@jjsjustice.com

Samara M. Spence, DC Bar No. 1031191*
Aman George, DC Bar No. 1028446*
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
sspence@democracyforward.org
ageorge@democracyforward.org

Counsel for *Amici* Tax Professors

* *Pro hac vice* motions pending

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2021, the above brief was served electronically on all parties via the Court's CM/ECF system.

Dated: September 20, 2021            /s/ *Patrick A. Thronson*
                                     Attorney for *Amici* Tax Professors