## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

*Plaintiffs*,

v.

PETER FRANCHOT,

*Defendant.*

No. 1:21-cv-410-DKC

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR
## CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael B. Kimberly (No. 19086)
Paul W. Hughes (No. 28967)
Stephen P. Kranz*
Sarah P. Hogarth*
  *McDermott Will & Emery LLP*
  *500 North Capitol Street NW*
  *Washington, DC 20001*
  *mkimberly@mwe.com*
  *(202) 756-8000*

*Attorneys for All Plaintiffs*

Tara S. Morrissey*
Jennifer B. Dickey*
  *U.S. Chamber Litigation Center*
  *1615 H Street NW*
  *Washington, DC 20062*
  *tmorrissey@uschamber.com*
  *(202) 463-5337*

*Attorneys for the Chamber of Commerce*
*of the United States of America*

October 13, 2021

*\* admitted pro hac vice*

**TABLE OF CONTENTS**

Introduction ................................................................................................ 1

Argument ..................................................................................................... 1

I.   The Court has authority to hear this case ............................................. 1

    A.   The controversy is ripe ................................................................... 1

    B.   The TIA does not bar plaintiffs' challenge to the Act's assessment .................... 2

        1.   *CIC Services* did not silently abrogate a century of settled precedent ........... 2

        2.   An exaction that punishes legislatively disapproved conduct is not a tax under the TIA, even if the disapproved conduct is lawful ...................... 5

        3.   A multiplicity of state refund actions spanning many years would not be an "efficient" alternative to this single pre-enforcement challenge ........ 8

    C.   The TIA does not bar plaintiffs' challenge to the pass-through provision .......... 12

    D.   ITFA is privately enforceable under *Ex Parte Young* and Section 1983 ............. 13

II.   Plaintiffs are entitled to judgment on the merits ..................................... 15

    A.   The Act is preempted by ITFA ....................................................... 15

    B.   The Act violates the dormant Commerce Clause and Due Process Clause ......... 17

    C.   The pass-through prohibition is unconstitutional .............................. 19

    D.   The Court can and should enter judgment now .................................. 20

## TABLE OF AUTHORITIES

**Cases**

*Aloha Airlines v. Director of Taxation of Hawaii,*
    464 U.S. 7 (1983) ............................................................................................... 17

*Ankenbrandt v. Richards,*
    504 U.S. 689 (1992) ............................................................................................ 6

*Armstrong v. Exceptional Child Center, Inc.,*
    575 U.S. 320 (2015) .......................................................................................... 13

*Bailey v. Drexel Furniture Co.,*
    259 U.S. 20 (1922) ................................................................................... *passim*

*Bailey v. George,*
    259 U.S. 16 (1922) .............................................................................................. 6

*Baltimore v. Priceline.com,*
    2012 WL 3043062 (D. Md. July 24, 2012) ...................................................... 16

*BellSouth Telecommunications, Inc. v. Farris,*
    542 F.3d 499 (6th Cir. 2008) ..................................................................... 13, 20

*CareFirst, Inc. v. Taylor,*
    235 F. Supp. 3d 724 (D. Md. 2017) ................................................................. 14

*Central Green Co. v. United States,*
    531 U.S. 425 (2001) ............................................................................................ 4

*CIC Services v. IRS,*
    141 S. Ct. 1582 (2021) ............................................................................. *passim*

*Complete Auto Transit v. Brady,*
    430 U.S. 274 (1977) .......................................................................................... 17

*Container Corp. v. Franchise Tax Board,*
    463 U.S. 159 (1983) .......................................................................................... 17

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) .......................................................................................... 14

*Educational Films Corp. of America v. Ward,*
    282 U.S. 379 (1931) .......................................................................................... 18

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.,*
    651 F.3d 722 (7th Cir. 2011) (en banc) ............................................................. 7

*Expressions Hair Design v. Schneiderman,*
    137 S. Ct. 1144 (2017) ...................................................................................... 20

*Ford Motor Co. v. Beauchamp,*
    308 U.S. 331 (1939) .......................................................................................... 18

*Foster v. Love,*
    522 U.S. 67 (1997) ............................................................................................ 14

*Fuller v. Bartlett,*
    894 F. Supp. 874 (D. Md. 1995) ...................................................................... 14

Case 1:21-cv-00410-DKC   Document 47   Filed 10/13/21   Page 4 of 26


**Cases—continued**

*Fulton Corp. v. Faulkner*,
516 U.S. 325 (1996) .................................................................. 18

*GenOn Mid-Atlantic v. Montgomery County*,
650 F.3d 1021 (4th Cir. 2011) .......................................*passim*

*Georgia Railroad & Banking Co. v. Redwine*,
342 U.S. 299 (1952) ..................................................................... 9

*Graham v. Dupont*,
262 U.S. 234 (1923) ................................................................. 7, 8

*Gray v. Owens*,
413 F. Supp. 2d 573 (D. Md. 2006) ......................................... 12

*Great Atlantic and Pacific Tea Co. v. Grosjean*,
301 U.S. 412 (1937) ............................................................. 2, 18

*Gwozdz v. HealthPort Technologies*,
846 F.3d 738 (4th Cir. 2017) ................................................. 8, 9

*Hill v. Wallace*,
259 U.S. 44 (1922) ....................................................................... 7

*Holland v. Florida*,
560 U.S. 631 (2010) ..................................................................... 8

*Judicial Watch v. Rossotti*,
317 F.3d 401 (4th Cir. 2003) ................................................... 12

*Just Puppies, Inc. v. Frosh*,
2021 WL 3233760 (D. Md. Sept. 17, 2021) ............................ 13

*Labell v. City of Chicago*,
147 N.E.3d 732 (App. Ct. Ill. 2019) ....................................... 16

*Lawrence County v Lead-Deadwood School Dist. No. 40-1*,
469 US 256 (1985) ..................................................................... 14

*Levin v. Commerce Energy, Inc.*,
560 U.S. 413 (2010) .............................................................. 8, 14

*Matthews v. Rodgers*,
284 U.S. 521 (1932) ................................................................... 10

*Maxwell v. Bugbee*,
250 U.S. 525 (1919) ................................................................... 18

*NFIB v. Sebelius*,
567 U.S. 519 (2012) ..................................................................... 6

*Nw. States Portland Cement Co. v. Minnesota*,
358 U.S. 450 (1959) ............................................................. 17, 18

*Philip Morris Inc. v. Harshbarger*,
957 F. Supp. 327 (D. Mass. 1997) ........................................... 20

*Ray v. Atlantic Richfield Co.*,
435 U.S. 151 (1978) ................................................................... 14

iii

**Cases—continued**

*ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*,
    754 F.3d 754 (9th Cir. 2014) .................................................................. 20

*Retail Industry Leaders Association v. Fielder*,
    475 F.3d 180 (4th Cir. 2007) .............................................................*passim*

*Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989) ...................................................................... 4, 9

*Rosewell v. LaSalle National Bank*,
    450 U.S. 503 (1981) ................................................................ 8, 9, 10

*Shaw v. Delta Air Lines, Inc.*,
    463 U.S. 85 (1983) ........................................................................ 14

*Sprint Communications, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ........................................................................ 14

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    252 F. Supp. 3d 537 (E.D. Va. 2017) ...................................................... 5

*Texas Entertainment Association v. Hegar*,
    10 F.4th 495 (5th Cir. 2021) ................................................................ 4

*United States v. L.A. Tucker Truck Lines*,
    344 U.S. 33 (1952) ........................................................................ 9

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) .............................................................. 13

*Verizon Maryland, Inc. v. Public Service Comm'n of Maryland*,
    535 U.S. 635 (2002) ...................................................................... 14

*Verizon Maryland v. Global NAPS*,
    377 F.3d 355 (4th Cir. 2004) .............................................................. 14

*Village of Rosemont v. Priceline.com*,
    2011 WL 4913262 (N.D. Ill. Oct. 14, 2011) ............................................. 16

*Ex parte Young*,
    209 U.S. 123 (1908) .................................................................. 13, 14

**Statutes and regulations**

28 U.S.C. § 1331 ............................................................................... 14

Md. Code Ann., Tax-Gen.

    § 7.5-101(b) ........................................................................... 2

    § 7.5-101(e)(1) ...................................................................... 15

    § 7.5-201 ............................................................................. 10

    § 13-602(g) .......................................................................... 11

    § 13-701(a) .......................................................................... 11

    § 13-812 ............................................................................. 11

49 Md. Reg. 896 ................................................................................. 2

**Other Authorities**

Webster's Third New International Dictionary 2120 (2002) ............................... 16

## INTRODUCTION

The State's reply-response brief does not deny that the purpose, form, and function of the Maryland Digital Advertising Tax Act is to punish its targets for purportedly causing "social ills" (Reply-Response 32), or that the Act's monetary exaction therefore qualifies as a penalty for TIA purposes under the framework approved and applied by the Fourth Circuit in *GenOn Mid-Atlantic v. Montgomery County*, 650 F.3d 1021 (4th Cir. 2011), and *Retail Industry Leaders Association v. Fielder*, 475 F.3d 180 (4th Cir. 2007) (*RILA*). The State instead doubles down on its contention that *CIC Services v. IRS*, 141 S. Ct. 1582 (2021)—a case having nothing to do with the tax/fee distinction—wiped away a century's worth of case law and established a new rule that all state levies other than fines punishing illegal conduct are "taxes" within the meaning of the TIA. That is not plausible. None of the State's other efforts to avoid pre-enforcement judicial review is persuasive either: The case is ripe, tax comity does not apply, and plaintiffs have a cause of action to enforce ITFA.

On the merits, the State's arguments fall equally flat. Internet-based advertising services are undeniably "similar" to advertising services furnished "through other means" under ITFA § 1105(2)(A)(i). The Act also plainly burdens out-of-State economic activity, and the pass-through prohibition (if construed as the State insists) regulates companies extra-territorially. The Court accordingly should enter judgment for plaintiffs.

## ARGUMENT

## I.   THE COURT HAS AUTHORITY TO HEAR THIS CASE

### A.   The controversy is ripe

The State no longer argues that the case is prudentially unripe. It asserts only that the case is unripe in the Article III sense because the Comptroller has yet to finalize his implementing regulations. *See* Reply-Response 2-4.

In taking that position, the State ignores the governing standards. To be sure, the Comptroller must set rules for determining when revenue is earned within Maryland. Md. Code Ann., Tax-Gen. § 7.5-101(b). But as we noted in the opening-response (at 11), those rules will affect that Act's implementation only at the margins and will not alter the unavoidable fact that *some* of the plaintiffs' members will have to pay the exaction in *some* amount. *See* Compl. ¶¶ 17, 19, 21 (providing links to member lists, which include companies expressly targeted by lawmakers, as alleged at ¶¶ 2, 39). Nor will they alter the Act's tiered structure, which punishes extraterritorial conduct on its face.

The Court need not take our word for it. The Comptroller's proposed rule implementing the Act was published on October 8, 2021 and will become effective before the end of the year. *See* 49 Md. Reg. 896. As the legislature directed, the rule specifies a method for determining "[t]he amount of digital advertising gross revenue attributable to the State" and sets paperwork requirements. *Id*. Nothing in the proposed rule renders plaintiffs' facial challenge speculative or hypothetical. That is in contrast with the as-applied challenge in *Great Atlantic and Pacific Tea Co. v. Grosjean*, 301 U.S. 412, 429 (1937), which turned on "mere supposition" as to application of the challenged law. And it is irrelevant that the Comptroller's regulations will have the force and effect of law, which we have never denied.

### B.     The TIA does not bar plaintiffs' challenge to the Act's assessment

#### *1.     CIC Services did not silently abrogate a century of settled precedent*

We showed in detail (Opening-Response 21-29) that the Act assesses not a tax, but a punitive fee within the meaning of the TIA and the cases construing it. *First*, the assessment's focus on gross revenues is extraordinarily burdensome and sets it far apart from traditional taxes, which apply to net income. *Second*, the exaction is paid by a very narrow and

intentionally targeted population—especially at the highest rate of assessment, which applies to only a small handful of singled-out companies. *Third*, the charge is subject to an express pass-through prohibition designed to ensure that the targeted companies alone shoulder the Act's burden and are unable to spread it among downstream consumers in the market. *Fourth*, the proceeds are not deposited in the general treasury but instead in a strictly segregated fund earmarked to offset the asserted externalities of the targets' conduct, akin to a restitution arrangement. *Finally*, the law's legislative history refers to the exaction as a "penalty" and evinces a clear intent to punish. Under contemporary precedents like *GenOn* and *RILA* and their early Supreme Court forebears like *Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922), these factors lead inexorably to the conclusion that the Act's surcharge is a penalty, and not a "tax" within the meaning of the TIA.

The State's reply-response does not dispute this conclusion as such. Its sole rejoinder is, instead, to insist that *CIC Services* abrogated the countless TIA precedents that have filled the Federal Reports since *Drexel Furniture*. Although neither the holding nor the outcome in *CIC Services* turned on the tax/penalty distinction, the State reads the case nonetheless as authoritatively "clarif[ying] . . . the correct test for distinguishing between a 'tax' and a 'penalty' for purposes of the AIA and TIA." Reply-Response 10. According to this supposed clarification, there is no longer any such thing as a regulatory fee (not even simple use fees), and *every* "government charge is a 'tax' [under the TIA] unless it is a penalty imposed on *unlawful* activity." *Id.* at 11-12. The State acknowledges that this reading of *CIC Services* would be a fundamental paradigm shift in TIA law, silently abrogating a century's worth of uniform court-of-appeals decisions, including *GenOn* and *RILA*. *Id.* at 12. It shrugs off that observation as inconsequential: "[T]he Supreme Court is under no obligation," it says, "to

3

identify and expressly overrule [the] lower court decisions [that] might be contradicted, in whole or in part, by [its] analysis." *Id.* at 10-11.

That is too large a pill to swallow. To begin with, whatever the Court said in *CIC Services* about the tax/fee distinction "was unquestionably dictum because it was not essential to [its] disposition of any of the issues" presented for decision. *Central Green Co. v. United States*, 531 U.S. 425, 431 (2001). The question in *CIC Services* was whether an injunction against a reporting rule was the practical equivalent of an injunction against collection of tax penalties admittedly covered by the AIA, which the IRS imposed for violations of the rule. *CIC Services*, 141 S. Ct. at 1586. The Court held not. Because an injunction would run against taxpayers' "affirmative reporting obligations," and any taxes imposed for violations were "several steps removed," the suit was not one "to restrain the assessment or collection of a tax." *Id.* at 1591-1592. That was the extent of the Court's holding.

Although the Court went on to address peripheral concerns raised by the government, that portion of the Court's opinion was not essential to its resolution of the case. And in the five months since *CIC Services* was decided, no court has concluded that the Supreme Court announced the watershed revision to TIA law that the State says it has. Courts instead have carried on utilizing the same framework applied in *GenOn* and *RILA*, just as they did before. *See, e.g.*, *Texas Entertainment Association v. Hegar*, 10 F.4th 495, 506-507 (5th Cir. 2021) (applying the multi-factor TIA framework to conclude that the charge at issue "is a fee, not a tax, and the TIA does not bar federal court jurisdiction"); *cf. Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989) (admonishing lower courts not to take it upon themselves to determine when the Supreme Court has overruled its own precedents).

The State insists (at 10) that even if its isolated snippets from *CIC Services* are dictum, Supreme Court dictum can bind lower courts. Regardless, this Court is not at liberty to disregard the clearly controlling Fourth Circuit decisions in *GenOn* and *RILA* on the basis of dictum alone. "[I]f dicta from the Supreme Court is to change [Fourth Circuit] precedent[s], it is the Supreme Court or the Fourth Circuit that must" say so. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 252 F. Supp. 3d 537, 545 n.6 (E.D. Va. 2017). We made this point in our opening-response brief (at 33), but the State does not address it.

### 2. An exaction that punishes legislatively disapproved conduct is not a tax under the TIA, even if the disapproved conduct is lawful

The State asserts that an assessment "cannot be deemed a 'penalty' for AIA or TIA purposes" if it "imposes a cost on perfectly legal behavior." Reply-Response 8. In its view, only assessments imposed for the commission of unlawful conduct qualify as punitive fees under the TIA. But as we explained in our opening-response brief (at 31-32), that proposition was long ago rejected in *Drexel Furniture*.

In *Drexel Furniture*, the Supreme Court held that "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty." 259 U.S. at 38. On that basis, the Court concluded that a child labor tax—a charge assessed against the net income of only those companies employing boys under the age of 14—was in fact a penalty for asserted "wrongdoing," rather than a tax. *Id.* That was so, the Court said, despite that Congress had not "expressly declare[d] that the employment within the mentioned ages is illegal." *Id.* That forecloses the State's contrary argument.

The State notes that *Drexel Furniture* is a Tax Clause case, not an AIA case (Reply-Response 13), but that is irrelevant. There is no historical evidence that Congress intended to

5

reject judicial constructions of the word "tax" in the Tax-Clause context when enacting the TIA. This Court must "presume" that when the 75th Congress enacted the TIA in 1937, it "did so with full cognizance of the [Supreme Court's] interpretation" of the word "tax" in *Drexel Furniture* and, absent contrary indications, intended to incorporate that interpretation undisturbed. *Ankenbrandt v. Richards*, 504 U.S. 689, 700 (1992).

Nor is there a substantive distinction between a "tax" under the AIA and a "tax" under the Tax Clause in any event. As the Supreme Court explained in *NFIB v. Sebelius*, 567 U.S. 519 (2012), the only reason a court might reach a different result under the two provisions is that Congress's invocation of the word "tax" generally controls the AIA question. *Id.* at 544. In other words, Congress's use of the "tax" label is an express direction to federal courts to dismiss pre-enforcement challenges under the AIA, regardless of the true nature of the underlying assessment. *Id.* Thus, the Supreme Court has "applied the [AIA] to statutorily described 'taxes' even where that label was *inaccurate*." *Id.* (emphasis added). That was the basis for the dismissal in *Bailey v. George*, 259 U.S. 16 (1922), which concerned the same assessment as *Drexel Furniture*. As *NFIB* recognized, the exaction in *George* was substantively a punitive fee regardless of whether it was viewed through the Tax Clause lens or the AIA lens. 567 U.S. at 544. The pre-enforcement challenge in *George* had to be dismissed under the AIA only because Congress had affixed an "inaccurate" label to the exaction, calling it a "tax," and indicating that the AIA should apply. *Id.*

In this respect, Tax Clause cases are even more relevant to the TIA analysis than AIA cases. Under the Tax Clause (unlike the AIA), legislative labels do not control the outcome, which turns on constitutional law. Likewise under the TIA: The nomenclature adopted by the state legislature (a matter of state law) does not control the TIA analysis (a matter of federal

law). *GenOn*, 650 F.3d at 1023; *see also Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 729 (7th Cir. 2011) (en banc) (explaining that "a tax might be so totally punitive in purpose and effect that" it "should be classified as a fine rather than a tax" under the TIA, despite "nomenclature" suggesting a tax). We made these points in our opening-response brief (at 31), but the State simply talks past them.[1]

The State is also wrong that *Graham v. Dupont*, 262 U.S. 234 (1923), "refute[s]" our position. Reply-Response Br. 7. To be sure, the Court confirmed in *Graham* that *Lipke* and *Regal Drug* involved "penalties" outside the AIA's scope because the assessments in those cases were "in the nature of punishment for a criminal offense." 262 U.S. at 257. It also concluded that the assessment in *Graham*, in particular, could not be analogized to such a penalty. But it reached that conclusion only after observing that a different case, *Hill v. Wallace*, 259 U.S. 44 (1922), *should* "be classed with *Lipke*, as [involving] a penalty in the form of a tax." *Id.* at 258 (full case citation omitted). That is crucial because *Hill* concerned an assessment levied on lawful conduct—namely, the sale of grain. *Id.* at 257. By confirming that *Hill*, like *Lipke*, involved "a penalty in the form of a tax," *Graham* strongly supports our position rather than the State's.

If that were not enough, the Fourth Circuit's decision in *GenOn* dictates the same conclusion. There, the court held that an exaction on lawful greenhouse gas emissions fell outside the TIA's scope because, in substance, it was a "punitive fee." *GenOn*, 650 F.3d at 1024-1025. Despite the State's request, the Court may not disregard *Drexel Furniture*,

---

[1]   The State contends (Reply-Response 6) that because ITFA describes an exaction within its scope as a "tax," this indicates Congress meant for the TIA to apply. We explained in our opening-response brief (at 41-42) why that is not so, including that ITFA expressly defines "tax" to mean something different from the meaning the word has been given under the TIA.

*Graham*, or *GenOn*—all of which straightforwardly hold that a punitive exaction need not punish unlawful conduct to fall outside the definition of a "tax."[2]

### 3. A multiplicity of state refund actions spanning many years would not be an "efficient" alternative to this single pre-enforcement challenge

We explained in our opening-response brief (at 33-36) that hundreds of individual refund suits spanning many years, all pending while the Act's burdensome fee is being exacted, would not be an "efficient" state-court alternative to this single, pre-enforcement, federal-court challenge. This is an inherently case-specific contention that turns on the nature of the parties and claims here; a remedy that is efficient in one case under one set of circumstances may be inefficient in another case, under different circumstances. That follows because the TIA "has its roots in equity practice," meaning that general equity principles, although not firmly binding, are at least "instructive on whether a state remedy is 'plain, speedy and efficient.'" *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 525 & n.33 (1981). Equity practice has always resisted "absolute" rules, working "on a case-by-case basis" instead. *Holland v. Florida*, 560 U.S. 631, 649-650 (2010).

In response, the State points to *Gwozdz v. HealthPort Technologies*, 846 F.3d 738 (4th Cir. 2017), but it badly over-reads that case. *Gwozdz* did not address, and thus does not control, the question of whether hundreds of individual refund suits spanning many years would be an "efficient" remedy under the TIA. It involved a single person's claim for a refund of $23, and the alternative to the plaintiff's federal suit was a single, personal refund

---

[2]   The State urges (at 25-26) that the tax comity doctrine bars this action, as well. But it does not disagree that if the Act doesn't assess a "tax" under the TIA, then tax comity does not apply either. It does say that tax comity is "more embracive" than the TIA, but the only context in which the Supreme Court has ever applied that observation is in the context of a request for an injunction to *impose* a tax rather than restrain it. *See Levin v. Commerce Energy, Inc.*, 560 U.S. 413 (2010). That is not this case.

action before the Comptroller. 846 F.3d at 740. The Fourth Circuit's unchallenged and fact-bound assumption that "Maryland has established" a "plain, speedy and efficient remedy" for a single taxpayer with a single claim within the meaning of the TIA (*id.*) cannot be taken to foreclose challenges in all cases to the efficiency of Maryland's procedure.

The State is equally wrong in its more specific assertion (Reply-Response 16) that our multiplicity-of-suits argument has "already [been] rejected by the Fourth Circuit in *Gwozdz*" because that case involved a putative class action. Again, the plaintiff in *Gwozdz* did not raise an efficiency argument, the district court did not certify a class, and the Fourth Circuit did not consider the putative class-based nature of the plaintiff's case in rejecting his TIA arguments. An issue neither "raised in briefs or argument nor discussed in the opinion of the Court" cannot be taken as "a binding precedent on th[e] point." *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38 (1952).

Aside from *Gwozdz*, the State expresses doubt (at 18-19) that *Rosewell* and *Georgia Railroad & Banking Co. v. Redwine*, 342 U.S. 299 (1952), "remain[] a potential basis for establishing that a State's remedy is not 'efficient.'" It is well established, however, that "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower courts] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas*, 490 U.S. at 484. Here, *Redwine* held that a multiplicity of suits is inefficient, and *Rosewell* restated and confirmed that holding. Neither case has been overruled by the Supreme Court, and they accordingly control the outcome here.

The State observes (at 17) that *Rosewell* upheld Illinois's refund procedure and asserts that we "have not identified any feature of Maryland's scheme that would make it less 'plain,

speedy and efficient' than the Illinois scheme." But the only issue in *Rosewell* was the question whether Illinois's scheme was sufficiently "speedy" (450 U.S. at 522-524), which is not an element of Maryland's scheme we have challenged. And unlike this case, *Rosewell* did not involve a state-court remedy that entailed a sprawling multiplicity of suits.[3]

**2.** We explained (Opening-Response 35-36) that it weighs further in favor of immediate federal judicial review that the Act's exaction is tremendously burdensome, and that those targeted by the law will have to pay massive amounts of money up front, perhaps forcing some to withdraw from the Maryland market altogether. The State challenges both the premise of the argument (that companies will have to pay) and the conclusion (that payment will be so burdensome as to make the administrative scheme inefficient).

First, the State takes the startling position that plaintiffs' members do *not* need to pay to bring their challenges in state court. They may avoid paying the levy, the State says (at 17), by awaiting a notice of assessment under Section 13-410, "choos[ing] not to pay," and filing an appeal immediately to the Tax Court under Section 13-510(a)(1). But there are just two scenarios in which a company subject to the Act would receive a Section 13-410 notice without first paying the assessment: It would have to either (1) file a return as required by Section 7.5-201, unlawfully refuse to remit payment with the return, and invite a Section 13-302 audit that culminates in a Section 13-410 notice; or otherwise (2) refuse to file a

---

[3]   *Matthews v. Rodgers*, 284 U.S. 521 (1932), held that the multiplicity-of-suits rationale "does not extend to cases where there are numerous parties plaintiff or defendant, and the issues between them and the adverse party are not necessarily identical." *Id.* at 530. The circumstance envisioned in *Matthews* is one in which multiple suits involving multiple parties and multiple disparate claims are commenced together or consolidated. That does not describe this case, which involves just four plaintiffs suiting "to enforce the [uniform] rights of [their] members." *RILA*, 475 F.3d at 186. And because the challenges here are facial, the claims and issues would be identical in all of the follow-on suits.

10

return at all, flout the Comptroller's subsequent Section 13-303 demand to file a return and payment, and await a Section 13-410 notice reflecting an estimated assessment calculated pursuant to Section 13-402. In either case, a company would have to *violate the law* before being able to bring a pre-payment appeal under Section 13-510(a)(1), exposing itself to criminal sanctions including imprisonment (Tax-Gen. § 13-602(g)), assessments of further fines and interest (*id*. §§ 13-602(a), 13-701(a)), and a risk that its in-State assets would be seized by the government (*id*. § 13-812). That is not "not the kind of thing an ordinary person risks, even to contest the most burdensome" charge (*CIC Services*, 141 S. Ct. at 11592), necessitating payment followed by myriad refund actions.

The State also brushes aside our contentions concerning the burdensome nature of the exaction as mere "conclusory assertions," rendering them implausible and "disentitle[d] . . . to the presumption of truth." *See* Reply-Response 22-23. But in saying that, the State ignores the U.S. Trade Representative's conclusion that a French law just like the Maryland Act here is "highly unusual" in that it is "unusually burdensome," so much so as to reflect a "penalizing" "purpose." Compl. ¶ 64 (quoting *USTR Report* at 1, 10, 31, 49-50, 55, 65-67). It also disregards our demonstration (Opening-Response 21-22) that the exaction's focus on gross revenue means that it would apply to even *unprofitable* companies, driving them deeper into the red. And any companies with gross margins below the rate of assessment will see their profits wiped out entirely. This is neither implausible nor speculative—it is simply how the Act works, on its face. These observations lend powerful additional support to the notion that scores or hundreds of successive, years-long lawsuits in state court would not be an efficient alternative to this single pre-enforcement action. And it makes no difference that the Comptroller promises to exercise his grace to stay cases "by other taxpayers raising the same

issues, if there is a significant possibility that [a] pending appeal . . . will resolve those matters." Reply-Response 21. That would not obviate the need to file a multitude of administrative and judicial actions, and it would not save companies that are subject to the Act's enormous exaction from having to pay profit-erasing sums annually for years on end.

### C.    The TIA does not bar plaintiffs' challenge to the pass-through provision

The State takes the puzzling position (Reply-Response 23-24) that, if the Court were to hold that the Act assesses a tax within the meaning of the TIA, it would have to dismiss the entire suit, including plaintiffs' challenge to the analytically distinct pass-through prohibition. That is not how the TIA works.

For starters, the Fourth Circuit has previously affirmed the dismissal under the AIA of some but not all claims in a suit. In *Judicial Watch v. Rossotti*, 317 F.3d 401 (4th Cir. 2003), for example, the plaintiff sought "an injunction against [the] defendants from proceeding with [a tax] audit" and included "claims for relief in connection with [related] FOIA requests." *Id.* at 403. The district court dismissed the tax-audit claims on AIA grounds but "did not resolve the FOIA claims." *Id.* at 404. On interlocutory appeal, the Fourth Circuit affirmed the AIA dismissal of the tax-related claims and remanded for further proceedings on the plaintiff's separate FOIA claims. *Id.* at 404-413. Similarly, in *Gray v. Owens*, 413 F. Supp. 2d 573 (D. Md. 2006), this Court resolved the plaintiff's Takings Clause claim on its merits and dismissed a separate tax-refund claim on TIA grounds.

No other approach would make sense. If the State were correct that the TIA applies to whole actions, rather than claims, it would mean that state defendants could bootstrap, using the TIA to obtain dismissals of claims having nothing to do with injunctions against the collection of taxes. And procedurally, it would accomplish nothing of substance: The plaintiff

could refile the same suit the day following the dismissal, simply stripped of the claims that the Court concluded were barred by the TIA. That makes little sense.

The State says (at 24) that our challenge to the pass-through provision is "intertwined with" and "entirely contingent upon" the constitutional challenges to the underlying assessment. That is simply wrong. The State itself characterizes the pass-through prohibition as an analytically separate regulation of payer's subsequent conduct. Opening Br. 49. The Court can and should invalidate the provision for the reasons that we have given (Opening-Response 56-58), wholly apart from the legality of the underlying assessment. And if it were to do so, even the State implicitly acknowledges (Opening Br. 49) that it would not be an injunction against the collection of a tax. *See also BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 501 (6th Cir. 2008).

**D.    ITFA is privately enforceable under *Ex parte Young* and Section 1983**

The State is wrong to assert (at 26-30) that there is no federal right of action to seek an injunction against the Act under ITFA's preemption clause. As the Supreme Court held in *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* at 326. That follows from federal courts' longstanding power to enjoin "state officers who are violating, or planning to violate, federal law." *Id.* (twice citing *Ex parte Young*, 209 U.S. 123 (1908)). A preemption claim raised in pre-enforcement review (as here) is "precisely the cause of action that the Supreme Court recognized in *Ex parte Young*." *Just Puppies, Inc. v. Frosh*, 2021 WL 3233760 at *26 (D. Md. Sept. 17, 2021); *see also United States v. South Carolina*, 720 F.3d 518, 525-526 (4th Cir. 2013) (noting extensive precedents "that have allowed private parties to seek injunctive

13

relief from state statutes allegedly preempted by federal law").[4]

The Fourth Circuit has rejected the State's contrary argument. In *Verizon Maryland v. Global NAPS*, 377 F.3d 355 (4th Cir. 2004), the plaintiff sought injunctive relief against a state agency's order, claiming it was preempted by federal law. The defendants (seeking to enforce the order) asserted that they were entitled to dismissal because the statute did not provide a cause of action. *Id.* at 368. The Fourth Circuit rebuffed that argument: So long as a court has jurisdiction under 28 U.S.C. § 1331, "it can reach the merits" of a preemption claim "even though the relevant statute does not explicitly or implicitly provide for a cause of action." *Id.* at 369; *see also Verizon Maryland v. Public Service Comm'n of Md.*, 535 U.S. 635, 642 (2002). This Court, too, has rejected the contention that a plaintiff "can proceed under *Ex parte Young* only if [it] establish[es] a cause of action under the relevant statute." *CareFirst, Inc. v. Taylor*, 235 F. Supp. 3d 724, 740 (D. Md. 2017).

Citing *Levin*, the State rejoins (at 27-28) that *Ex parte Young* does not apply in light of the TIA and federal-state comity. But we already have shown that neither the TIA nor tax comity applies *at all*, let alone with sufficient force to overcome such clearly settled law. *See supra* at 2-8 & n.3. The State's resort to comity and federalism principles is especially out of place here, given that ITFA contains a strongly-worded express preemption clause, which evidences Congress's clear intent to displace contrary state law. What the State really seeks

---

[4]   Federal courts routinely entertain requests for injunctions against preempted state laws on this ground. *See, e.g.*, *Sprint Communications, Inc. v. Jacobs,* 571 U.S. 69 (2013); *Verizon Maryland, Inc. v. Public Service Comm'n of Md.*, 535 U.S. 635, 642 (2002); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 388 (2000); *Foster v. Love*, 522 U.S. 67 (1997); *Lawrence County v Lead-Deadwood School Dist. No. 40-1*, 469 US 256, 259 n.6 (1985); *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978); *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 593 (D. Md. 2007); *Fuller v. Bartlett*, 894 F. Supp. 874, 877 (D. Md. 1995).

on this score is a presumption against preemption—but as we showed (Opening-Response 39-40), there is no such presumption in circumstances like these.

## II.    PLAINTIFFS ARE ENTITLED TO JUDGMENT ON THE MERITS

### A.    The Act is preempted by ITFA

The Act is manifestly preempted by ITFA because it imposes a "tax" within the meaning of that statute, and the tax is assessed against "the sale . . . or delivery of . . . services, or information" over the internet (ITFA § 1105(3)), but not against "similar" services "accomplished through other means" (ITFA § 1105(2)(A)(i)).

The State responds (at 30-32) that internet-based advertising is not, in fact, similar to advertising by other methods within the meaning of ITFA because internet advertising firms are "literally and continuously reading computer users' minds" and engaging in "round-the-clock and instantaneous data mining and exploitation of user personal information."

The State is mistaking the impetus for the Act with how it operates. As we have said, the Act undoubtedly reflects a legislative purpose to penalize large internet advertising companies for perceived "wrongdoing" (*Drexel Furniture*, 259 U.S. at 38), including the supposed wrongdoing identified in the State's latest brief. But the conduct about which the State complains—and which, in its view, sets internet advertisers apart—is not the activity that the Act taxes. It taxes "advertisement services on a digital interface," meaning banner advertisements, interstitial advertisements, and other advertisements viewed over the internet (Tax-Gen. § 7.5-101(e)(1)), regardless of whether they are accompanied by data collection or are a part of a supposedly two-sided barter exchange. The only question for ITFA purposes is whether *that* service—delivery of an ad on a website—is similar to delivery of an ad by other means, such as in newspapers and magazines, or on television shows.

15

It undeniably *is*. The word "similar" means "having characteristics in common" and "alike in substance." *Similar*, Webster's Third New International Dictionary 2120 (2002). From a consumer's perspective, an ad for blue jeans appearing at the top of a website plainly has "characteristics in common" with a substantively identical ad appearing at the top of a printed page in a magazine. That is equally so from the advertiser's perspective—purchasing the right to display an ad on a website is "alike in substance" to, and has "characteristics in common" with, purchasing the right to display the same ad in a magazine.

Even if it were relevant to the ITFA analysis that internet-based advertising services are often accompanied by certain forms of data collection, the same is true of print advertising. Many print advertisements for supermarkets, for example, offer coupons linked with loyalty programs, which are used to track consumers' buying habits in fine detail. Other times, advertisers will convey different contact information (phone numbers or email addresses) in different versions of the same advertisement placed in different geographic areas or publications, to track response rates by location and medium—a strategy called "unique point of contact." In other cases, print advertisements will direct consumers to websites and in that way are no less capable of collecting data than if the advertisement had been served over the internet. Data collection has been ancillary to advertising for decades, long before the internet. Mere improvements in the efficiency of data collection do not make digital advertising unlike in substance from print advertising.[5]

---

[5]   This case is unlike *Labell v. City of Chicago*, 147 N.E.3d 732, 736 (App. Ct. Ill.2019), which involved a tax on "private" internet streaming services but not "public" digital entertainment services, including digital arcade machines. Nor is it like the facially neutral hotel occupancy taxes in a *Village of Rosemont v. Priceline.com*, 2011 WL 4913262 (N.D. Ill. Oct. 14, 2011), or *Baltimore v. Priceline.com*, 2012 WL 3043062 (D. Md. July 24, 2012), neither of which expressly singled out digital services for special assessments.

**B.     The Act violates the dormant Commerce Clause and Due Process Clause**

The Act discriminates against interstate commerce by imposing progressively greater liability for in-state economic activity based on a company's out-of-State activity, and by giving favorable treatment to in-State firms with smaller out-of-state presences.

In response, the State offers up (at 34-35) a distinction between the "subject" and "measure" of a tax. Its position is that a State may lawfully establish rates on taxable transactions by reference to the value of objects that the State may not tax directly. Whatever merit that view may once have had, it is no longer the law. *See Nw. States Portland Cement Co. v. Minnesota*, 358 U.S. 450, 458 (1959) (indicating that the doctrine identified in the State's brief has been "overruled" and "no longer fully represent[s] the present state of the law," and thus rejecting Georgia's authority to tax net income from extraterritorial economic activity of corporations owning property or doing business within the State).

To be sure, "*at one time*, [the Supreme] Court distinguished between the [measure] and the subject matter of [a] tax when assessing the validity of the tax under the Commerce Clause." *Aloha Airlines v. Director of Taxation of Hawaii*, 464 U.S. 7, 14 n.9 (1983) (emphasis added). But as recognized in *Complete Auto Transit v. Brady*, 430 U.S. 274 (1977), today it is no longer "the formal language of the tax statute but rather its practical effect" that guides the dormant Commerce Clause analysis. *Id.* at 279. And under that approach, to survive challenge "under the Commerce Clause," "an apportionment formula . . . [must] not result in discrimination against interstate or foreign commerce," *period*. *Container Corp. v. Franchise Tax Board*, 463 U.S. 159, 170 (1983); *accord Complete Auto*, 430 U.S. at 279 & n.8 (citing, among others, *Nw. States Portland Cement*). The Act does not survive that straightforward inquiry. *See* Opening-Response 50-52.

The stale cases on which the State relies would not support its position even if they were still good law. At most, they recognize that "a *nondiscriminatory* tax upon corporate franchises is valid, notwithstanding the inclusion of tax exempt property or income in the measure of it." *Educational Films Corp. of America v. Ward*, 282 U.S. 379, 392 (1931) (emphasis added).[6] Here, the Act discriminates against out-of-state businesses facially and in practical effect. The Comptroller's bizarre, counter-factual hypothetical concerning a multi-billion dollar company operating solely within Maryland cannot obscure this basic point: A company will be taxed at higher rates for in-state economic activity if it engages in a greater level of out-of-state activity. It is thus "a tax on the 'privilege' of engaging in interstate commerce." *Nw. States Portland Cement*, 358 U.S. at 458. And a tax that grows with the increasing "degree that [a company] participate[s] in interstate commerce" is one that necessarily "favors domestic corporations over their foreign competitors" and "discourage[s] . . . interstate commerce," in violation of the Commerce Clause. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 333 (1996)). The State does not and cannot refute this basic point.

We further explained (Opening-Response 53-55) that the Act violates the Due Process Clause by imposing sanctions on economic activity taking place outside Maryland's borders. The State does not tackle this claim head-on; it says (at 36) only that "the Act's plain language shows the General Assembly's intent to implement a taxing scheme with attributes of both fair attribution and fair apportionment." A conclusory observation concerning the legislature's expressed intent does not show that the legislature succeeded in achieving its

---

6    Two of the State's cases—*Maxwell v. Bugbee*, 250 U.S. 525 (1919) and *Great Atlantic & Pacific Tea Co. v. Grosjean*, 301 U.S. 412 (1937)—did not resolve Commerce Clause challenges. And *Ford Motor Co. v. Beauchamp*, 308 U.S. 331 (1939), did not discuss discrimination in approving a single-factor apportionment formula for a franchise tax.

objective. The Act punishes companies solely for having greater "global" economic activity. It thus punishes extraterritorial activity and fails the external-consistency test.

### C.    The pass-through prohibition is unconstitutional

**1.**   According to the State, the pass-through prohibition "regulates the taxpayer's ability to engage in *conduct* that directly imposes on a customer the cost of the digital ad tax paid by the taxpayer." Opening Br. 49. We explained that, insofar as the prohibition controls prices charged in transactions taking place entirely outside of Maryland, it is unconstitutional on extraterritoriality grounds. Opening-Response 58-59. We explained further that the prohibition cannot be saved from facial invalidation by invalidating it only as applied to out-of-state transactions. To do so would mean that that only in-State purchasers of digital advertising services would be protected by the pass-through prohibition, and that the incidence of the charge would fall entirely on out-of-State purchasers, violating the dormant Commerce Clause's antidiscrimination principle. *Id.* at 59.

The State's response is a head-scratcher—it says (at 37) that, "[b]ecause the digital ad tax itself applies only to digital advertising in the State, there is no extraterritorial or discriminatory impact in the Act's prohibition against passing on the cost of the tax to purchasers of in-state digital advertising services." But the incidence of the tax itself is irrelevant. The bottom line, as to which the State offers no response at all, is that the pass-through provision, construed as a regulation of conduct, is a price-control statute that applies to transactions taking place entirely in other States and other countries.

**2.**   We showed also that, construed as a regulation of speech, the pass-through prohibition violates the First Amendment. Opening-Response 56-58. The State rejoins that "it has never been deemed an abridgment of freedom of speech or press to make a course of

conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." Reply-Response 37 (quoting *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017)). But that assumes away the dispute by once again characterizing the pass-through prohibition as a regulation of conduct.

If construed as a regulation of *speech*, the pass-through prohibition does not in fact forbid the conduct of passing the Act's charge on to purchasers of advertising services; it forbids only the identification of the pass-through on a bill or invoice. Read in this way, the pass-through prohibition is "a ban on core political speech," including statements on invoices "announcing who bears political responsibility" for the additional charge. *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 504-505 (6th Cir. 2008). We cited *BellSouth* for this proposition in the opening-response brief (at 56-57), but the State does not join issue on this point. Either way, the pass-through prohibition must be stricken.

### D. The Court can and should enter judgment now

The State finally argues that the Court should not enter judgment for plaintiffs until after discovery has taken place. But "[p]reemption is almost always a legal question, the resolution of which is rarely aided by development of a more complete factual record." *ReadyLink Healthcare, Inc. v. State Comp Ins. Fund*, 754 F.3d 754, 761-762 (9th Cir. 2014) (quotation marks omitted); *accord Philip Morris Inc. v. Harshbarger*, 957 F. Supp. 327, 329 (D. Mass. 1997) (the preemptive effect of a federal statute upon a state statute is "a legal question able to be answered without discovery"). The same holds true for our facial constitutional challenges, which turn on the Act's plain terms, not on any questions of historical fact. That said, we agree that if the Court does not dismiss (as it should not) and also does not grant an early partial summary judgment (as it should), discovery would be warranted.

Dated: October 13, 2021

Respectfully submitted,

<u>/s/ *Michael B. Kimberly*</u>

Michael B. Kimberly (No. 19086)
Paul W. Hughes (No. 28967)
Stephen P. Kranz*
Sarah P. Hogarth*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *mkimberly@mwe.com*
   *(202) 756-8000*

*Attorneys for All Plaintiffs*

Tara S. Morrissey*
Jennifer B. Dickey*
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *tmorrissey@uschamber.com*
   *(202) 463-5337*

*Attorneys for the Chamber of Commerce*
*of the United States of America*

 *\* admitted pro hac vice*