# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al*.,

             *Plaintiffs*,

      v.

PETER FRANCHOT,

             *Defendant*.

                        No. 1:21-cv-00410-LKG

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## SUPPLEMENTAL BRIEF ON TAX INJUNCTION ACT APPLICABILITY

BRIAN E. FROSH
Attorney General of Maryland

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

BRIAN L. OLINER
Federal Bar No. 05780
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404
(410) 260-7808

November 19, 2021                Attorneys for Defendant

# TABLE OF CONTENTS

Page

SUPPLEMENTAL BRIEF ...................................................................................................1

ARGUMENT ....................................................................................................................1

I.  UNDER FOURTH CIRCUIT PRECEDENT THE DIGITAL AD TAX IS A "TAX" AND NOT A
    "PENALTY." ........................................................................................................2

    A.  Under the Fourth Circuit's Functional Test, a Revenue-Raising Exaction on
    Lawful Activity Is a Tax and Not a Penalty. ...........................................2

    B.  The Fourth Circuit in *Liberty University* Expressly Rejected Plaintiffs'
    Reading of *Drexel Furniture*. .................................................................4

    C.  The Digital Ad Tax Is Neither a Penalty nor Punishment Within the
    Ordinary and Common Meaning of Those Terms as Defined in *Gonzalez v.
    Sessions*, 894 F.3d 131 (4th Cir. 2018)....................................................5

    D.  The Digital Ad Tax Is a Tax Under the Fourth Circuit's Pre-*Liberty
    University* Case Law. ..............................................................................7

II.  MARYLAND LAW ESTABLISHES A "PLAIN, SPEEDY AND EFFICIENT REMEDY" WITHIN
    THE MEANING OF THE TAX INJUNCTION ACT...................................................11

    A.  Maryland Law Permits an Entity Subject to the Digital Ad Tax to Challenge
    an Assessment Before Paying It or to Pay the Tax First and Then Seek a
    Refund.....................................................................................................11

        1.  Post-Deprivation Remedy ...........................................................11

        2.  Pre-Deprivation Remedy .............................................................12

        3.  Administrative Appeal to Tax Court............................................13

        4.  Judicial Review ...........................................................................14

        5.  Cases Demonstrating Corporations' Use of the Pre-Deprivation
    Remedy .......................................................................................14

    B.  Under Applicable Precedent, Maryland's Remedies Are "Plain, Speedy and
    Efficient."................................................................................................16

CONCLUSION.................................................................................................................24

EXHIBITS:

      Exhibit 5—Affidavit of Brian Oliner (Nov. 19, 2021)

## SUPPLEMENTAL BRIEF

## ARGUMENT

The Court's October 28, 2021 Order, ECF 54, directed the filing of this supplemental brief to address two issues: "(1) Whether the assessment in the Digital Advertising Gross Revenues Tax Act constitutes a 'tax' or a 'penalty' under applicable Fourth Circuit precedent, and (2) Whether the State of Maryland has established a 'plain, speedy and efficient remedy' for Tax Injunction Act purposes."

As shown below, Fourth Circuit precedent unquestionably compels the conclusion that the digital ad tax is a "tax" and not a "penalty" for purposes of applying the Tax Injunction Act ("TIA"). The Fourth Circuit, following Supreme Court guidance, has defined "tax" in a way that encompasses the digital ad tax, and the Fourth Circuit has expressly limited the term "penalty" to assessments that, unlike the digital ad tax, are imposed on unlawful conduct. The Court has also rejected contrary arguments on which the plaintiffs rely here.

As the Fourth Circuit has also confirmed, Maryland law provides a "plain, speedy and efficient remedy" within the meaning of the TIA because Maryland's procedures satisfy the procedural requirements of this narrow exception to the TIA's jurisdictional bar. As a matter of statutory law, Maryland provides taxpayers the option of pursuing either (1) a "pre-deprivation" remedy before paying a tax or (2) a "post-deprivation" remedy to seek a refund of a tax paid. Under both options, taxpayers can raise in a single forum constitutional and statutory challenges, including the ones asserted by plaintiffs here and seek judicial review if they remain aggrieved after exhausting the administrative remedy. These available procedures more than satisfy Supreme Court and Fourth Circuit precedent regarding what constitutes a "plain, speedy and efficient

remedy." The Fourth Circuit has never accepted, and other courts have repeatedly rejected, arguments like the plaintiffs' contentions that the state remedy is not efficient.

I.   **UNDER FOURTH CIRCUIT PRECEDENT THE DIGITAL AD TAX IS A "TAX" AND NOT A "PENALTY."**

Plaintiffs' argument that the digital ad tax is a penalty rests primarily on two sources of authority: (1) the Fourth Circuit decisions, *GenOn Mid-Atlantic, LLC v. Montgomery County, Md.*, 650 F.3d 1021 (4th Cir. 2011), and *Retail Indus. Leaders Ass'n* ("*RILA*") *v. Fielder*, 475 F.3d 180 (4th Cir. 2007),[1] each of which expressly refrained from any thorough consideration of the distinction between a tax and a penalty, *see GenOn*, 650 F.3d at 1024 ("While Bill 29-10 does bear some of the indicia of a tax, 'we can readily conclude, without a seriatim analysis, that [it] is not a tax provision.'") (quoting *RILA*, 475 F.3d at 189); *and* (2) the Supreme Court's decision in *Bailey v. Drexel Furniture*, 259 U.S. 20 (1922),[2] a case involving neither the TIA nor its federal counterpart, the Anti-Injunction Act ("AIA"). In the years since *GenOn* and *RILA* were decided, the Fourth Circuit has issued decisions directly addressing the distinction between a tax and a penalty and elaborating on the principle that a penalty is a charge that punishes unlawful conduct. These more recent decisions demonstrate why the digital ad tax constitutes a tax and not a penalty, and also why plaintiffs' reliance on *Drexel Furniture* is entirely mistaken.

   A.   **Under the Fourth Circuit's Functional Test, a Revenue-Raising Exaction on Lawful Activity Is a Tax and Not a Penalty.**

In *Liberty University, Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013), a case involving a challenge to the Affordable Care Act's "employer mandate" exaction, *id.* at 83, the Fourth Circuit explained the Supreme Court's "'functional approach' for determining whether an exaction . . . constitutes a

---

[1] *See* ECF 41 at 6, 8-10, 12-13 (citing *GenOn*), ECF 41 at 6, 8-10 (citing *RILA*).

[2] *See* ECF 41 at 8, 10-12 (citing *Drexel Furniture*).

tax," *id.* at 96 (quoting *National Fed'n of Indep. Bus.* ("*NFIB*") *v. Sebelius*, 567 U.S. 519, 565 (2012)).   Because *Liberty University* was decided after the Supreme Court vacated the Fourth Circuit's prior decision in the case and remanded for further consideration in light of *NFIB*, *see Liberty Univ. v. Geithner*, 568 U.S. 1022 (2012) (vacating and remanding *Liberty Univ., Inc. v. Geithner*, 671 F.3d 391 (4th Cir. 2011)), *Liberty University* represents the Fourth Circuit's definitive statement on the correct reading and application of Supreme Court precedent as articulated in *NFIB*.   The Fourth Circuit identified four criteria of the "functional approach" for distinguishing a tax from a penalty:  (1) "the 'essential feature' of any tax," which "is that 'it produces at least some revenue for the Government,'" (2) "the absence of a scienter requirement," (3) "collection . . . through the normal means of taxation," and (4) "the absence of negative legal consequences beyond requiring payment" to the taxing authority, i.e., the exaction "does not punish unlawful conduct."  *Liberty Univ.*, 733 F.3d at 96, 98 (quoting *NFIB*, 567 U.S. at 564, and citing *id.* at 565-68).   Moreover, this functional approach treats as "largely irrelevant the 'regulatory motive or effect of revenue-raising measures,'" because the Supreme Court has "rejected the revenue-versus-regulatory distinction as defunct."  *Liberty Univ.*, 733 F.3d at 96 (quoting *NFIB*, 567 U.S. at 573).

Applying this functional approach to the digital ad tax confirms that it is a "tax," because it satisfies each of the four criteria.  The parties agree that the digital ad tax satisfies the first and "essential feature," because all parties expect it to "produce[] at least some revenue for the Government," *Liberty Univ.*, 733 F.3d at 96.  *See* ECF 25 ¶ 77 (plaintiffs acknowledging the challenged Act's "revenue-generating purposes").  The digital ad tax satisfies the second criterion because liability for the tax does not depend on any "scienter requirement," *Liberty Univ.*, 733 F.3d at 96; responsibility to pay the tax arises from "annual gross revenues of a person derived

from digital advertising services in the State" of Maryland, Md. Code Ann., Tax-Gen. § 7.5-102(a), irrespective of that person's intent. Just as the exaction in *Liberty University* "'looks like a tax'" because it was codified "'in the Internal Revenue Code[,] and enforced by the IRS,'" 733 F.3d at 97 (quoting *NFIB*, 567 U.S. at 563), the digital ad tax satisfies the third criterion because it is codified in the Tax-General Article and enforced by Maryland's tax collector, the Comptroller, "through the normal means of taxation," *Liberty Univ.*, 733 F.3d at 96. Finally, the digital ad tax satisfies the fourth criterion because it does not involve "negative legal consequences" beyond the obligation to pay the tax, *id.*; that is, it "does not punish unlawful conduct," since the digital advertising services taxed are not prohibited by law, *id.* at 98.

Therefore, the digital ad tax constitutes a tax under applicable Fourth Circuit and Supreme Court precedent.

### B. The Fourth Circuit in *Liberty University* Expressly Rejected Plaintiffs' Reading of *Drexel Furniture.*

Plaintiffs insist that *Drexel Furniture* stands for the proposition that an exaction may be deemed a "penalty" even if it is imposed on lawful conduct, ECF 31-1 at 26; ECF 47 at 10, but the Fourth Circuit disagrees with that interpretation. Drawing upon *NFIB*'s analysis, the Fourth Circuit in *Liberty University* rejected the University's similar attempt to rely on *Drexel Furniture*. Like the plaintiffs here, Liberty University argued, based on *Drexel Furniture*, that the challenged exaction "'cross[ed] the line' from a reasonable payment to a 'potentially destructive' unconstitutional penalty." *Liberty Univ.*, 733 F.3d at 98. The Fourth Circuit responded that "*Drexel* is easily distinguishable," *id.*, for reasons that apply equally here. As the opinion explained, "[i]n stark contrast to the penalty the Court struck down in *Drexel*, the employer mandate exaction is devoid of any scienter requirement and does not punish unlawful behavior," and "the exaction is collected . . . in the same manner as a tax." *Liberty Univ.*, 733 F.3d at 98.

4

Those same features also distinguish the digital ad tax from the exaction deemed a penalty in *Drexel Furniture*. As demonstrated above, the digital ad tax similarly is "devoid of any scienter requirement," "does not punish unlawful behavior," and "is collected . . . in the same manner as a tax." *Liberty Univ.*, 733 F.3d at 98. Therefore, according to Fourth Circuit precedent, *Drexel Furniture* does not support treatment of the digital ad tax as a penalty.

This limitation of "penalty" to exactions based on unlawful acts can also be found in other Fourth Circuit cases decided after *Drexel Furniture*. For example, in *United States v. United States Industrial Alcohol Co.*, 103 F.2d 97 (4th Cir. 1939), involving a challenge to a tax on distilled spirits, the Court held that because at the time the tax legislation "became effective it was not a violation of the law to withdraw spirits for beverage purposes, . . . the tax it levied cannot be classified as a punitive penalty," *id.* at 100. Similarly, in *Lynn v. West*, 134 F.3d 582 (4th Cir. 1998), the Court determined that North Carolina's so-called "Drug Tax" was a penalty because it was "based on a criminal act" and had "no relationship to lawful possession," among other reasons, *id.* at 591.

C.   **The Digital Ad Tax Is Neither a Penalty nor Punishment Within the Ordinary and Common Meaning of Those Terms as Defined in *Gonzalez v. Sessions*, 894 F.3d 131 (4th Cir. 2018).**

In another case decided after *GenOn* and *RILA*, the Fourth Circuit examined the "ordinary, contemporary, common meaning" of the words "penalty" and "punishment" as those words are used in various legal contexts. *Gonzalez v. Sessions*, 894 F.3d 131, 137 (4th Cir. 2018) (citations omitted). The digital ad tax does not fit within the plain meaning of penalty or punishment as determined in *Gonzales*. The specific issue before the Court in *Gonzales* was whether the imposition of court costs under North Carolina law qualified as a "conviction" as defined by a provision of the Immigration and Naturalization Act to include a court order imposing "some form of punishment" or "penalty." 8 U.S.C. § 1101(a)(48)(A). In answering that question in the

5

negative, the Fourth Circuit considered the meaning of "penalty" and "punishment" according to their standard dictionary definitions, their use in various statutes, and their interpretation and application in case law arising from a variety of contexts.  The Court recognized that "a penalty is '[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine,'" or "'the suffering in person, rights, or property which is annexed by law or judicial decision to the commission of a crime or public offense." *Gonzalez*, 894 F.3d at 137 (quoting "Penalty," *Black's Law Dictionary* (10th ed. 2014); *Webster's Third New Internat'l Dictionary* (Philip Babcock Gove, *et al.* eds., 2002) at 1668).  Similarly, "punishment is '[a] sanction—such as a fine, penalty, confinement, or loss of property, right, or privilege—assessed against a person who has violated the law,'" or "'a penalty inflicted by a court of justice on a convicted offender.'"  *Gonzalez*, 894 F.3d at 137 (quoting "Punishment," *Black's Law Dictionary*; *Webster's* at 1843).  Thus, a key prerequisite of "penalty" and "punishment," as those terms are commonly understood, is an underlying "crime or public offense" or some "violated . . . law."  The digital ad tax does not involve this key component of a "penalty" and "punishment," because the activity it taxes is not unlawful.

*Gonzalez* also identified other attributes of a "penalty" that are not found in the digital ad tax.  For one, "a particular punishment or penalty must account for the culpability flowing from the actor's underlying conduct," such as when an "assessment 'varies in severity with the nature of the crime committed.'"  894 F.3d at 138 (citation omitted).  No such gauging of culpability for wrongdoing figures into assessment of the digital ad tax.  Second, a penalty or punishment is an exaction imposed in an amount or severity that exceeds "the costs of compensating a private party or the government for losses resulting from the wrongdoing" and "'goes beyond remedying the damage caused to the harmed parties by the defendant's action.'"  *Id.* (citations omitted); *see, e.g.,*

*Lynn*, 134 F.3d at 590 ("Drug Tax" held to be a criminal penalty where the tax rate resulted in "liability of eight times the market value" of cocaine seized from one of the plaintiffs). Though the plaintiffs here object to what they deem the excessiveness of the digital ad tax rates, ranging from 2.5% to 10% of annual gross revenues from digital advertising services in Maryland, Md. Code Ann., Tax-Gen. § 7.5-103, not even plaintiffs suggest that the exaction will come anywhere close to *exceeding* the amount that would be needed to compensate all those Marylanders whose personal information has been collected by digital advertising service providers and parlayed into multiple hundreds of millions of dollars in gross revenues. Third, "courts are more likely to treat a monetary assessment as a penalty or punishment if the adjudicator is endowed with discretion to determine both whether to impose the assessment and the amount of any assessment imposed." *Id.* at 139. Under the challenged Act, the persons subject to the digital ad tax and the applicable rate of taxation are established by statutes (Tax-Gen. §§ 7.5-101, 7.5-102, 7.5-103) which do not grant the Comptroller discretion to depart from their provisions on a case-by-case basis.

Thus, the digital ad tax is neither a penalty nor a punishment according "to these long-standing and well-established understandings of the terms," as identified and explained by the Fourth Circuit. *Gonzalez*, 894 F.3d at 139.

**D.   The Digital Ad Tax Is a Tax Under the Fourth Circuit's Pre-*Liberty University* Case Law.**

The Fourth Circuit's recognition that the "revenue-versus-regulatory distinction" is "defunct" per Supreme Court guidance, *Liberty Univ.*, 733 F.3d at 96, draws into question whether the earlier Fourth Circuit case law cited by plaintiffs retains its vitality and to what extent, since those earlier cases expressly relied on the now "defunct" distinction. *See Valero*, 205 F.3d at 134 ("[T]he general inquiry is to assess whether the charge is for revenue raising purposes, making it a 'tax,' or for regulatory or punitive purposes, making it a 'fee.'"); *RILA*, 475 F.3d at 189 ("[T]he

[TIA's] . . . applicability depends primarily on whether a given measure serves 'revenue raising purposes' rather than 'regulatory or punitive purposes.'") (quoting *Valero*, 205 F.3d at 134); *GenOn*, 650 F.3d at 1023 (stating that the TIA inquiry involves "whether the charge is levied primarily 'for revenue raising purposes, making it a 'tax,'' or whether it is assessed primarily 'for regulatory or punitive purposes, making it a 'fee.'") (quoting *Valero*, 205 F.3d at 134).  Even if plaintiffs' earlier Fourth Circuit cases were deemed to remain good law, however, it would not affect the correct result here, and the digital ad tax would still be a tax and not a penalty.

As for the two Fourth Circuit cases most emphasized by plaintiffs, *GenOn* reached its conclusion that the county charge at issue was not a tax because the exaction applied "only to a single entity" and the Court distinguished its holding from all other cases where taxes "apply to at least more than one entity."  650 F.3d at 1024.  *RILA* concluded that the TIA did not apply primarily because the Court was convinced that the charge at issue could not be a tax, "in light of the improbability that the Act will generate any revenue."  475 F.3d at 189.  The circumstances deemed decisive in *RILA* and *GenOn* are not even arguably present here, because it is undisputed that the digital ad tax applies to more than one entity and will generate significant revenue.

As explained in defendant's opening memorandum, ECF 31-1 at 23-26, the digital ad tax qualifies as a tax under the three-part test explained in *Valero*.  The test requires that "tax" be given a "'broader' interpretation" and weighs three factors:  "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge."  *Valero*, 205 F.3d at 134.  The third factor is both "the most important," *id.*, and "the heart of the inquiry."  *Collins Holding Corp. v. Jasper County*, 123 F.3d 797, 800 (4th Cir. 1997)

Here, the first factor indicates "tax" because the digital advertising tax was enacted by the General Assembly, 2021 Md. Laws ch. 37, and will be administered by the State's general assessor and collector of taxes, the Comptroller, *id.* § 2, p. 21 (amending Tax-Gen. § 2-102(a)); *see* Md. Const. art. VI, § 2. *Collins Holding*, 123 F.3d at 800 ("An assessment" is "more likely to be a tax" if "imposed directly by a legislature" and where "responsibility for administering and collecting the assessment lies with the general tax assessor," as opposed to "a regulatory agency.").

The Fourth Circuit has deemed the second factor—what population is subject to the charge—to be a "relatively minor" consideration. *Club Ass'n v. Wise*, 293 F.3d 723, 726 (4th Cir. 2002); *see also Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 737 F.3d 228, 233 (2d Cir. 2013) (The second factor "counts for too little to weigh against the strength of the other factors . . .," since "[m]any revenue measures that are indisputably taxes . . . fall on a limited portion of the population."). *GenOn* is the only Fourth Circuit decision in which the size of the assessed population was deemed decisive, and only because it was a rare case where the exaction applied to only one entity and no one else. 650 F.3d at 1024 ("The chief problem with Montgomery County's carbon charge is that the burden falls on GenOn alone[.]"). Here, it is undisputed that "many" entities will be subject to the tax.[3] Therefore, the number of taxpayers assessed satisfies *GenOn* because the digital ad tax will "apply to at least more than one entity." *Id.*

Even if the second factor were deemed not to indicate "tax," the digital advertising tax is nonetheless a tax under *Valero* because it satisfies "the most important factor," which is "the purpose behind the statute" as determined by "the ultimate use of the revenue" generated. *Valero*,

---

[3] *See* ECF 25 ¶ 15 ("*Many* of the Chamber's members will be liable to pay the charge imposed by the Act." (emphasis added)); *id.* ¶ 17 ("*Many* of IA's members will be liable to pay the charge imposed by the Act." (emphasis added)); *id.* ¶ 19 ("*Many* of NetChoice's members will be liable to pay the charge imposed by the Act.") (emphasis added)); *id.* ¶ 21 ("*Many* of CCIA's members will be liable to pay the charge imposed by the Act." (emphasis added)).

205 F.3d at 134.  That is, "if the ultimate use of the revenue benefits the general public then the charge will qualify as a 'tax.'"  *Id.*  The challenged statute unquestionably benefits the general public, because the digital ad tax aims to generate revenues to fund the educational improvements adopted in the Blueprint for Maryland's Future, 2021 Md. Laws chs. 36, 55, which will benefit every public school district in the State.  Plaintiffs incorrectly see it as somehow significant that digital tax ad "proceeds are not deposited in the general treasury but instead in a strictly segregated fund."  ECF 47 at 8.  As defendant has already explained, ECF 29-1 at 26, under the Fourth Circuit's pre-*Liberty University* case law, where "revenue is placed in a special fund," it has no bearing on whether the exaction is a "tax" if "the revenue of the special fund is used to benefit the population at large," as digital ad tax revenue will be used to improve all of Maryland's public schools via the Blueprint for Maryland's Future Fund.  *Valero*, 205 F.3d at 135.

Unlike charges that in the past have been deemed "fees," no part of digital advertising tax revenue will be used "to benefit regulated entities or defray the cost of regulation" of digital advertising services.  *Collins Holding*, 123 F.3d at 800.  As was true in *Clear Channel Outdoor, Inc. v. Baltimore*, 153 F. Supp. 3d 865 (D. Md. 2015) (TIA barred suit challenging city's billboard ordinance), the digital advertising tax is a tax, because the State is using the "revenue to benefit the general public by funding programming at public schools," *id.* at 874, and not using revenue "to provide narrow benefits to entities owning or operating" digital advertising firms or "to defray the costs of regulating [digital] advertising" services, *id.* at 873..  Therefore, whether viewed according to *Liberty University*'s analysis or under *Valero*, the digital advertising tax is a "tax" within the meaning of the TIA.

## II.   MARYLAND LAW ESTABLISHES A "PLAIN, SPEEDY AND EFFICIENT REMEDY" WITHIN THE MEANING OF THE TAX INJUNCTION ACT.

The procedures available to Maryland taxpayers, including those subject to the digital ad tax, are unquestionably "plain, speedy and efficient."  As the Comptroller has endeavored to explain in the opening memorandum, ECF 29-1 at 7-8, and the reply, ECF 36 at 20-21, Maryland's administrative remedies offer taxpayers the ability to challenge a tax assessment before paying it, or the choice to pay the tax and then challenge the tax through a refund procedure.  Under either alternative, a taxpayer aggrieved by the result of the administrative process may seek judicial review.  Part A below will explain the available remedies more fully, with citation to authorities confirming that these remedies are commonly used by business entities, some of which might be members of one or more of the plaintiff associations.  Part B will then demonstrate why applicable precedent compels the conclusion that Maryland law provides a "plain, speedy and efficient remedy" within the meaning of the TIA.

### A.   Maryland Law Permits an Entity Subject to the Digital Ad Tax to Challenge an Assessment Before Paying It or to Pay the Tax First and Then Seek a Refund.

Maryland law affords two methods by which a taxpayer can raise any objection to a tax, including any State or federal constitutional challenge, and each method ensures an opportunity for hearing and judicial review.

#### 1.   Post-Deprivation Remedy

First, in what is sometimes referred to as a "post-deprivation remedy," a taxpayer can pay the disputed tax and seek a refund.  Tax-Gen. § 13-901(a) ("A claim for refund may be filed with the tax collector who collects the tax, fee, or charge by a claimant who: (1) erroneously pays to the State a greater amount of tax, fee, charge, interest, or penalty than is properly and legally payable; (2) pays to the State a tax, fee, charge, interest, or penalty that is erroneously, illegally, or

11

wrongfully assessed or collected in any manner. . . .").  The Comptroller will then "(1) investigate each claim for refund; and (2) conduct a hearing at the request of the claimant prior to a final determination on the claim," *id.* § 13-904(a), followed by the Comptroller's issuance of a notice of "the determination of the claim for refund," *id.* § 13-904(b).  If the taxpayer disagrees with the Comptroller's determination, or if the Comptroller does not issue its determination within six months after filing the claim, the taxpayer can appeal to the Maryland Tax Court.  *Id.* § 13-510(a)(6) ("[W]ithin 30 days after the date on which a notice is mailed, a person or governmental unit that is aggrieved by the action in the notice may appeal to the Tax Court from: . . . (6) a disallowance of a claim for refund under § 13-904 of this title."); *id.* § 13-510(b) ("If a tax collector does not make a determination on a claim for refund within 6 months after the claim is filed, the claimant may: (1) consider the claim as being disallowed; and (2) appeal the disallowance to the Tax Court.").

### 2.      Pre-Deprivation Remedy

The second method, or "pre-deprivation remedy," which enables the claimant to challenge a tax before paying it, becomes available if the Comptroller determines that a taxpayer did not pay tax that was due and issues an assessment.  *Id.* § 13-401 ("[I]f a tax collector examines or audits a return and determines that the tax due exceeds the amount shown on the return, the tax collector shall assess the deficiency.").  The taxpayer may choose to contest that assessment by filing an appeal directly with the Maryland Tax Court.  *Id.* § 13-510(a)(1) ("[W]ithin 30 days after the date on which a notice is mailed, a person or governmental unit that is aggrieved by the action in the notice may appeal to the Tax Court from:  (1) a final assessment of tax, interest, or penalty under this article[.]"); *see Comptroller v. Phillips*, 384 Md. 583, 589 (2005) ("§ 13–510(a)(1) of the Tax–General Article authorizes a person aggrieved by a tax assessment to appeal to the Tax Court.").

### 3. Administrative Appeal to Tax Court

Under either the pre-deprivation or post-deprivation option, the Maryland Tax Court is competent to consider all issues raised by a taxpayer. *Id.* § 13-528(a) ("(1) The Tax Court shall have full power to hear, try, determine, or remand any matter before it. (2) In exercising these powers, the Tax Court may reassess or reclassify, abate, modify, change or alter any valuation, assessment, classification, tax or final order appealed to the Tax Court."). By virtue of this statutory authorization, the Tax Court is '"fully competent to resolve issues of constitutionality and the validity of statutes or ordinances in adjudicatory administrative proceedings which are subject to judicial review.'" *Prince George's County v. Ray's Used Cars*, 398 Md. 632, 650-51 (2007) (citation omitted).

The Tax Court's powers also include the authority to abate penalties and interest on an assessment or to award interest on a refund. *Frey v. Comptroller,* 422 Md. 111, 187 (2011), *cert. denied* 566 U.S. 905 (Tax Court is authorized to abate assessed interest for "reasonable cause" or "an obvious error." ); *Comptroller v. Taylor*, 465 Md. 76, 97 (2019) (Tax Court "had broad authority to waive the late penalty" for "reasonable cause," which "may be found under a variety of circumstances to enable the waiver of late penalties," including upon a showing that the taxpayer's understanding of statute and its application, though ultimately incorrect, was reasonable.); *Comptroller v. Science Applications Internat'l Corp.*, 405 Md. 185, 195 (2008) (Tax Court had jurisdiction to consider interest claim on a refund.) The Tax Court's ability to abate interest and penalties where a taxpayer pursues unsuccessfully a pre-deprivation challenge having a "reasonable basis," and conversely to award interest on a taxpayer's successful refund claim, should help to alleviate any concern that members of the plaintiff associations will suffer financially from whatever period of time elapses during the pursuit of their administrative challenges to the digital ad tax.

13

### 4.    Judicial Review

An aggrieved party "may appeal a final order of the Tax Court to the circuit court," which is Maryland's court of general jurisdiction.  Tax-Gen. § 13-532(a)(2).  A judgment of the circuit court is then appealable of right to Maryland's Court of Special Appeals, Md. Code Ann., Cts. & Jud. Proc. §§ 12-301, 12-308, with discretionary review by the Court of Appeals available via writ of certiorari, *id.* §§ 12-201, 12-307.  And, of course, a party dissatisfied with the Court of Appeals' decision on an issue of federal law can petition the Supreme Court for a writ of certiorari.  28 U.S.C. § 1257; *see*, *e.g.*, *Comptroller of Md. v. Wynne*, 575 U.S. 542 (2015).

These procedures clearly satisfy the requirement that the state remedy provide a taxpayer a full hearing and judicial determination through which the taxpayer may raise any and all constitutional objections to the tax.  *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298, 304 (4th Cir. 2000).

### 5.    Cases Demonstrating Corporations' Use of the Pre-Deprivation Remedy

Although the plaintiffs deny the availability of the pre-deprivation remedy described above, Maryland case law offers numerous examples where corporations chose not to pay a tax, then waited for an assessment and appealed that assessment.  The plaintiffs assert that such a possibility is "startling," ECF 47 at 15, but it would not surprise their member companies' tax counsel, since pursuit of Maryland's pre-deprivation remedy is precisely how large, multi-state entities ordinarily contest the State's application of its revenue laws, and they do so without exposing themselves to criminal prosecution.  For example, in the "Delaware holding company" line of cases,[4] not a single company pre-paid the assessed tax, interest and penalty before being

---

[4] "Delaware holding company" ("DHC") is a term used to refer to a subsidiary established as part of an arrangement designed to escape liability for state taxes on corporations.  The "Delaware holding company" cases involved DHCs that pursued Maryland's pre-deprivation

assessed, and consequently none pursued a refund claim. *See NIHC, Inc. v. Comptroller*, 439 Md. 668 (2014); *Gore Enter. Holdings, Inc. v. Comptroller*, 437 Md. 492 (2014); *Comptroller v. Syl, Inc.*, 375 Md. 78 (2003); *ConAgra Foods RDM, Inc. v. Comptroller*, 241 Md. App. 547 (2019); *Classics Chi., Inc. v. Comptroller*, 189 Md. App. 695 (2010).  In each of these cases, the companies declined to pay the tax, awaited a notice of assessment, and then appealed the assessment administratively.  *See*, *e.g.*, *NIHC, Inc.*, 439 Md. at 676-77 ("During the relevant years, NIHC and N2HC filed separate income tax returns in Maryland that showed no income apportioned to Maryland from the transactions involving the Nordstrom trademarks. . . . In September 2006, the Comptroller issued Notices of Assessment against Nordstrom, NIHC, and N2HC, based on the position that income-shifting in the form of trademark royalty expenses had resulted in an underpayment of the companies' Maryland income tax. Nordstrom and its subsidiaries appealed the assessments. . . .").

Even as their challenges failed in the appellate courts, each successive company continued to pursue the pre-deprivation remedy and withhold payment of assessed taxes until after a final court ruling.  *NIHC, Inc.*, 439 Md. at 670, 679-80, 689; *Gore Enter. Holdings, Inc.*, 437 Md. at 501-502, 533; *Syl, Inc.*, 375 Md. at 81, 88-89; *ConAgra Foods RDM, Inc.*, 241 Md. App. at 558-59, 561-62; *Classics Chi., Inc.*, 189 Md. App. at 701-02, 716.  Furthermore, in nearly all those cases, the Maryland Tax Court waived penalties and partially waived interest, upon finding "reasonable cause" due to the uncertainty of applicable law and the companies' reasonable, though ultimately incorrect, position.  *NIHC, Inc.*, 439 Md. at 689; *Gore Enter. Holdings, Inc.*, 437 Md.

---

procedures to raise constitutional challenges to assessments issued by the Comptroller.  The citations are to those cases that resulted in published decisions and do not include other Delaware holding company cases that yielded unreported appellate decisions, were settled, or remain pending before the Maryland Tax Court.

at 501-02; *ConAgra Foods RDM, Inc.*, 241 Md. App. at 562, 600-03; *Classics Chi., Inc.*, 189 Md. App. at 702.  Contrary to the expressed concern of plaintiffs here that their members could be criminally charged for nonpayment of taxes while pursuing the pre-deprivation remedy, ECF 47 at 16, no companies in the Delaware holding company cases were ever criminally charged. Defendant's Exhibit 5, Affidavit of Brian Oliner ¶ 6.  Similarly, none experienced attempted seizure of its in-state assets, *id.* ¶ 7, another concern raised by the plaintiffs, ECF 47 at 16.[5]

### B.    Under Applicable Precedent, Maryland's Remedies Are "Plain, Speedy and Efficient."

The second question the Court has directed this brief to address—whether the State of Maryland has established a 'plain, speedy and efficient remedy' for TIA purposes—has been answered in the affirmative by the Fourth Circuit, in decisions that are as binding on this Court as any other Fourth Circuit precedent.  *Gwozdz v. HealthPort Tech.*, *LLC*, 846 F.3d 738, 740-42 (4th Cir. 2017); *Strescon Indus., Inc. v. Cohen*, 664 F.2d 929, 931-32 (4th Cir. 1981); *see also O'Hara v. Comptroller of Md.*, 670 F. App'x 777 (4th Cir. 2016) (affirming No. CV TDC-14-4044, 2016 WL 2760337 (D. Md. May 12, 2016)); *Herron v. Annapolis Md.*, 198 F. App'x 301 (4th Cir. 2006) (affirming 388 F. Supp. 2d 565 (D. Md. 2005)); *Kuypers v. Comptroller*, 21 F. App'x 161 (4th Cir. 2001) (affirming 173 F. Supp. 2d 393, 397 (D. Md. 2001)).

The Supreme Court has confirmed the precedential value of an appellate court decision holding a State's available remedies to be "plain, speedy and efficient" under the TIA.  In *Tully v. Griffin, Inc.*, 429 U.S. 68 (1976), when the Supreme Court was asked to consider whether New York law provided a "plain, speedy and efficient remedy" for TIA purposes, it recognized that the

---

[5] Even if the State were to attempt to seize assets, the taxpayer would be entitled to a hearing in the circuit court before any such seizure could occur.  Tax-Gen. § 13-812(g); *Comptroller v. Zorzit*, 221 Md. App. 274, 303 (2015).

"Court answered . . . that question by its summary judgment of affirmance" in a prior case arising from New York, *id.* at 74 (citing *Ammex Warehouse Co. v. Gallman*, 414 U.S. 802 (1973)), a judgment that the Court considered to be "a controlling precedent, unless and until re-examined by this Court," *id.*  Though noting that a "summary affirmance" is not "'of the same precedential value as would be an opinion of this Court treating the question on the merits,'" *id.*, the Supreme Court nonetheless "adhere[d] to [its] judgment in the *Ammex* case," *id.* at 75, and reaffirmed its holding that New York's remedy was "plain, speedy and efficient."  This Court should follow the Supreme Court's example.  The Fourth Circuit held Maryland's remedy to be "plain, speedy and efficient" in *Gwozdz* and *Strescon*, both published decisions rendered after full briefing and argument.  Each of them "is therefore a controlling precedent." *Tully*, 429 U.S. at 74.

Plaintiffs have identified no change in Maryland law in the period since those decisions that would justify a different conclusion here, nor do the particular circumstances of their situation warrant special treatment unavailable to other litigants under the TIA.  Crafting such an exception to suit the preferences of associations of large corporations would conflict with the legislative intent of Congress, who sought through the TIA to "eliminat[e] disparities between taxpayers who could seek injunctive relief in federal court—usually out-of-state corporations . . . —and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later." *Hibbs v. Winn*, 542 U.S. 88, 104 (2004) (citing S. Rep. No. 1035, 75th Cong., 1st Sess. at 1-2).

As the Fourth Circuit has explained, to satisfy the TIA's "plain, speedy and efficient remedy" provision, a State need merely provide "minimal procedural safeguards," which afford a "'certainty' that is . . . procedural in nature; the Tax Injunction Act does not guarantee that the substantive relief sought by the taxpayer be certain or even likely." *Folio v. Clarksburg, W. Va.*, 134 F.3d 1211, 1215 (4th Cir. 1998) (citations omitted).  "The essential question is whether the

state remedy 'provides the taxpayer with a 'full hearing and judicial determination' at which she may raise any and all constitutional objections to the tax,'" that is, "a meaningful opportunity to assert federal constitutional challenges to the tax in state court." *Id.* at 1214 (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 514 (1981)). "[T]hat [the taxpayer's] initial remedy is an administrative one (followed by judicial review) does not place it outside the TIA's purview. Nor does the provision of initial administrative exclusivity remove the state's collection procedures from the protection of the Act." *Gwozdz*, 846 F.3d at 741.

In both *Gwozdz* and *Strescon*, the Fourth Circuit examined Maryland law and concluded that its procedures provide the necessary procedural safeguards and certainty. Maryland's remedial scheme suffers from "no procedural inadequacy," since the State "has established administrative mechanisms for the review of assessments and the consideration of refund claims"; the "State guarantees its taxpayers the right to appeal adverse administrative determinations to a court of record," which, in turn, "are authorized to hear and resolve constitutional claims"; and Maryland statutes "authorize discretionary review by [Maryland's] highest court[]," whose decisions "the Supreme Court may review . . . if they rest upon Federal grounds." *Strescon*, 664 F.2d at 932; *see Gwozdz*, 846 F.3d at 740 ("Maryland has established just such a remedy" that is "plain, speedy and efficient.").

Plaintiffs here do not dispute the correctness of the Fourth Circuit's analysis and conclusions approving the adequacy of Maryland's remedies in *Gwozdz* and *Strescon*, and they do not contend that Maryland lacks the "minimal procedural safeguards" and procedural "certainty" that the Fourth Circuit in *Folio* held to be all that is necessary. Plaintiffs have also specified that they are not challenging whether Maryland's procedures are "plain" and "speedy," but instead are limiting their argument to a contention that the remedy is not "efficient," ECF 31-1 at 43; ECF 47

18

at 13, 15, in light of "the nature of the parties and the claims here," ECF 47 at 13, "which involves just four plaintiffs suiting" on behalf of their members, *id.* at 15 n.3. Plaintiffs have also refused to identify any provision or feature of Maryland's remedial procedures that would render them less "efficient" than the Illinois remedies the Supreme Court expressly upheld as adequately "efficient" in *Rosewell*. ECF 47 at 14-15. Plaintiffs instead attempt to evade *Rosewell* by suggesting that it addressed only the "speedy" component of "plain, speedy and efficient," but the decision flatly contradicts them. *Rosewell* examined Supreme Court precedent relevant to the meaning of "efficient" as used in the TIA, including *Georgia Railroad & Banking Co. v. Redwine*, 342 U.S. 299, 303 (1952), and then expressly held that the Court "cannot say that [Illinois' remedy] is not 'efficient.'" *Rosewell*, 450 U.S. at 517-18.

Plaintiffs' assertion of inefficiency rests on (1) their preference for bringing a "single, pre-enforcement federal lawsuit" on behalf of their many unspecified members, in lieu of what they speculate will be "potentially hundreds of refund actions in state court,"[6] ECF 31-1 at 43, and (2) their subjective and mistaken belief that the State's procedures do not permit a taxpayer to challenge a digital ad tax assessment without paying first, ECF 31-1 at 46, ECF 47 at 15-16. Plaintiffs insist that the precedent cited by defendant has nothing pertinent to say about their arguments, but they are wrong. In *Gwozdz* the Fourth Circuit examined a Maryland Court of Appeals case it deemed "similar to" that of Gwozdz, 846 F.3d at 741, who had sought to pursue his claims via "a class action complaint," *id.* at 740. As described by the Fourth Circuit, the "similar" case, *Bowman v. Goad*, 348 Md. 199 (1997), involved "a putative class action against

---

[6] Because plaintiffs' reply memorandum expressly disclaims any objection that Maryland's remedy is not "sufficiently 'speedy,'" ECF 47 at 15, the Court should take them at their word and disregard those portions of their argument predicting that state remedial procedures might take "many years" to complete, *id.* at 13.

county sheriffs to recover erroneously charged fees" assessed against "the plaintiff Bowman and the other members of the putative class." *Gwozdz*, 846 F.3d at 741 (citing *Bowman*, 348 Md. at 200, and quoting *id.* at 204). The Fourth Circuit quoted the Maryland court's statement that, under Maryland law, if exactions had been unlawfully imposed on "'plaintiff Bowman and the other members of the putative class, each one had an administrative remedy [and] that administrative remedy is exclusive.'" *Id.* at 741 (quoting *Bowman*, 348 at 204). The Fourth Circuit then held that these State procedures—requiring each taxpayer within the putative class to pursue a separate, individual remedy with "initial administrative exclusivity" "followed by judicial review"—satisfy the TIA and are entitled to "the protection of the Act" from interference by federal courts. *Gwozdz*, 846 F.3d at 741. This holding applies equally to the various potential taxpayers on whose behalf the four plaintiff associations are attempting to proceed here. Each of plaintiffs' members has available "an administrative remedy" under Maryland law; "that administrative remedy is exclusive"; and, per the holding in *Gwozdz*, that remedy is plain, speedy and efficient within "the TIA's purview." *Id.*

The Fourth Circuit's holding and analysis in *Strescon* are also pertinent to plaintiffs' arguments. Plaintiffs here rely on the "multiplicity of suits" idea, as represented by *Redwine*, 342 U.S. at 303, where available State remedies "require[d] the filing of over three hundred separate claims in fourteen different counties to protect the single federal claim asserted by appellant," *id.* ECF 31-1 at 43-44; ECF 47 at 13-14. *Strescon* recognized that a State's remedies might not be "plain, speedy and efficient" if they "require repetitive suits to protect a single Federal claim," 664 F.2d at 931-32 (citing *Redwine*, 342 U.S. at 303), but the Fourth Circuit nonetheless concluded that Maryland's remedies "are, in truth, adequate to preclude Federal interference with the States' revenue collection procedures," *Strescon*, 664 F.2d at 932. As explained previously in defendant's

20

reply, 36 at 22-23, plaintiffs' situation does not fit within *Redwine*'s conception of "multiplicity," which refers to instances where the same taxpayer is forced to undertake multiple "repetitive suits to protect a single Federal claim," *Strescon*, 664 F.2d at 931-32; instead, plaintiffs complain that some unknown number of their members will be pursuing state remedies simultaneously and that the process might take multiple tax years before ultimate judicial resolution.  In any event, plaintiffs are unable to identify any Supreme Court, Fourth Circuit, or District of Maryland case decided since *Redwine* that has permitted a challenge to a state tax to proceed in federal court based on the "multiplicity of suits" rationale.  Other courts have repeatedly rejected attempts to invoke the theory.[7]

The holdings in *Gwozdz* and *Strescon* comport with the way the Supreme Court has dealt with an instance such as this, where multiple plaintiffs join together in an attempt to challenge a State tax in federal court and seek to excuse their failure to exhaust State remedies by claiming the State's procedures are inadequate under the TIA.  Before issuing its decision in *George F. Alger Co. v. Peck*, 347 U.S. 984 (1954) (affirming three-judge district court's dismissal of Commerce Clause, due process, and equal protection challenge to Ohio highway use tax for lack of jurisdiction under the TIA where State provided "plain, speedy and efficient remedy"), the Supreme Court considered the plaintiffs' request for a temporary injunction.  Plaintiffs there were 60 motor

---

[7] *See*, *e.g.*, *ANR Pipeline Co. v. Louisiana Tax Comm'n*, 646 F.3d 940, 948 (5th Cir. 2011) (requirement that a single taxpayer, a pipeline company, pursue separate challenges in 20 parishes held to be "'not unduly burdensome'"; though it was "not the most efficient way of ultimately determining appellants' new tax liability, it [did] not rise to the level that was found inefficient in" *Redwine*); *Lowe v. Washoe County*, 627 F.3d 1151, 1156-57 (9th Cir. 2010) (rejecting plaintiffs' argument "that the state remedy is inadequate because taxpayers must file repetitive suits year after year to challenge a tax" where plaintiff could not show that the defendants had "continue[d] to collect a tax that a state court previously had declared invalid"); *Scott Air Force Base Props., LLC v. County of St. Clair, Ill.*, 548 F.3d 516, 522 (7th Cir. 2008) (reasoning that state law's requirement that taxpayer pursue "two separate proceedings" to challenge tax was "a far cry from the onerousness and inefficiency inherent in pursuing 300 claims in *Redwine*").

carriers who argued, among other things, that the State remedy was not "efficient" because "it involve[d] a multiplicity of actions."  Jurisdictional Statement, U.S. No. 714, Oct. Term, 1953, 1953 WL 78650, *3, *20.  In denying the request for relief, Justice Reed articulated principles that are pertinent here, as well.

Though plaintiffs might contend "that they" —or, rather, in this case their members—"will be put to great inconvenience and expense due to" the State's requirements "that appeals be perfected in accordance with statutes," "that such procedures cause inconvenience and expense, and that [plaintiffs] may eventually prevail are not controlling"; rather, "[i]n enacting Sec. 1341 [the TIA] Congress merely adopted the rule that where orderly procedures for litigating issues have been provided, such procedures must prevail."  *George F. Alger Co. v. Peck*, 74 S. Ct. 605, 606-07 (1954) (Reed, J., in chambers).  Thus, under the TIA, "[i]t is immaterial that . . . there are sixty parties who must take these steps," *id.* at 607—or, as in this case, four parties with untold numbers of potentially affected members.  *Accord Antosh v. College Park*, 341 F. Supp. 2d 565, 569-70 (D. Md. 2004) (finding Maryland's "remedy meets the procedural criteria required by the 'plain, speedy, and efficient' provision in the TIA" where "fifty-four Petitions for Appeal in the Maryland Tax Court" raised the same constitutional issue).  Instead, "*since they have voluntarily joined*" in a single federal suit, analysis of the multiple claimants' prayer for relief "is to be considered *as though only one movant sought an injunction*."  *Id.* (emphasis added).  If the State's procedures are adequate under the TIA to afford one claimant a "plain, speedy and efficient" remedy, then the Court should refuse injunctive relief.  *See id.* (denying injunction).  This is the result intended by Congress when it enacted the TIA and thereby "left the burden on the taxpayer to follow the required state procedure rather than to determine the federal issues primarily in the federal courts."  *Id.*

22

As for the second basis of plaintiffs' inefficiency argument, even if plaintiffs were correct in asserting their members' supposed inability to pursue a remedy before paying the digital ad tax—and they are incorrect as a matter of Maryland law, as explained in Part A above—the Supreme Court's holding in *Rosewell* forecloses their notion that a State's remedy can be deemed not efficient because it provides for refund claims to be pursued after paying the tax.   "In *Rosewell* . . ., the Supreme Court held that a statute requiring payment of a tax before the taxpayer could challenge the assessment in court constituted a 'plain, speedy and efficient remedy' within the meaning of the Tax Injunction Act.  Accordingly, the fact that a taxpayer must either pay a tax or post a bond prior to challenging the state tax assessment does not render the state's remedy outside the scope of the Tax Injunction Act."  *International Lotto Fund v. Virginia State Lottery Dep't*, 20 F.3d 589, 593 (4th Cir. 1994) (citing *Rosewell*, 450 U.S. at 528).  The Supreme Court reached this conclusion by recognizing that "[w]hen it passed the Act, Congress knew that state tax systems commonly provided for payment of taxes under protest with subsequent refund as their exclusive remedy."  *Rosewell*, 450 U.S. at 523 (1981).

With respect to plaintiffs' contention that the alleged burdensomeness of the digital ad tax renders the State's remedy inefficient, ECF 31-1 at 45, ECF 47 at 15, the financial burden of the tax can be averted entirely during the pendency of State procedures if plaintiffs' members avail themselves of the available pre-deprivation remedy described in Part A above. Other large corporations routinely take that route.  In any case, plaintiffs have made representations to the Court that cast doubt on the reliability of their burdensomeness allegations.   According to plaintiffs,

- "the plaintiff associations lack detailed knowledge of their members' (or any other potentially affected company's) finances";

- "forward-looking statements concerning the impact on companies' stock values from . . . a facial challenge to a state law like this would turn on impossibly complex micro- and macroeconomic analyses";

- "[t]he complexity of those analyses would be compounded by the fact that Maryland comprises just 0.08% of the global population, requiring the plaintiff associations to isolate the impact of revenues derived by each company from that population subset on the overall performance of each company, globally"; and

- "[b]ecause such company-by-company economic studies are not practicable, we are unable to ascertain any member of IA, NetChoice, or CCIA whose stock value could be affected substantially by the outcome of this case," and "neither can the Chamber [of Commerce] do so."

ECF 48 at 2.  Under these circumstances, since the plaintiffs have conceded that they have no way of determining whether their members will suffer unduly from a tax burden during the pendency of State remedial procedures, they cannot be deemed to have made the showing needed to support their argument.

**CONCLUSION**

The motion to dismiss should be granted and the plaintiffs' motion for summary judgment should be denied.

24

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt
_____

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us

/s/ Steven M. Sullivan
_____

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

/s/ Brian L. Oliner
_____

BRIAN L. OLINER
Federal Bar No. 05780
boliner@marylandtaxes.gov
Assistant Attorney General
80 Calvert Street, Room 303
P.O. Box 591
Annapolis, Maryland 21404
(410) 260-7808

Attorneys for Defendant