# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA, *et al.*,

        *Plaintiffs,*

v.

PETER FRANCHOT,

        *Defendant.*

No. 1:21-cv-410-LKG

## PLAINTIFFS' SUPPLEMENTAL BRIEF
## ON THE APPLICABILITY OF THE TAX INJUNCTION ACT

Michael B. Kimberly (No. 19086)
Paul W. Hughes (No. 28967)
Stephen P. Kranz*
Sarah P. Hogarth*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *mkimberly@mwe.com*
   *(202) 756-8000*

*Attorneys for All Plaintiffs*

Tara S. Morrissey*
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *tmorrissey@uschamber.com*
   *(202) 463-5337*

*Attorney for the Chamber of Commerce
of the United States of America*

*\* admitted pro hac vice*

December 13, 2021

# TABLE OF CONTENTS

Introduction and Summary of Argument ............................................................... 1

Argument ......................................................................................................... 4

I.   The Act does not assess a "tax" within the meaning of the TIA ................................. 4

     A.  *Liberty University* did not overrule or abrogate the *Valero* framework ................. 4

     B.  Under the *Valero* framework, the Act imposes a penalty, not a tax ..................... 11

     C.  The contemporary meaning of "penalty" under the INA is irrelevant ............... 14

II.  Maryland's state-court remedy is not an "efficient" alternative to this single federal pre-enforcement suit .................................................................... 15

     A.  Maryland does not provide meaningful pre-payment judicial review ................. 15

     B.  Maryland's post-deprivation scheme of judicial review is not "efficient" because it would entail a multiplicity of suits ................................................... 18

          1.  Prior cases involving different facts and lacking multiplicity-based efficiency arguments are not controlling here ........................................... 19

          2.  The multiplicity factor is an equitable consideration and not limited mechanically to suits involving the same taxpayer .................................... 21

Conclusion ....................................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

*American Trucking Associations, Inc. v. Alviti*,
   944 F.3d 45 (1st Cir. 2019) ...................................... 6, 12

*ANR Pipeline v. Louisiana Tax Commission*,
   646 F.3d 940 (5th Cir. 2011)...................................... 22

*Bailey v. Drexel Furniture Co.*,
   259 U.S. 20 (1922)........................................... 8, 9, 10

*Bidart Bros. v. California Apple Comm'n*,
   73 F.3d 925 (9th Cir. 1996) ................................ 5, 12, 13

*Bowman v. Goad*,
   703 A.2d 144 (Md. 1997) ......................................... 20

*Capitol Industries-EMI, Inc. v. Bennett*,
   681 F.2d 1107 (9th Cir. 1982) ............................... 16, 18

*CIC Services v. IRS*,
   141 S. Ct. 1582 (2021).................................... 2, 6, 18

*Classics Chicago, Inc. v. Comptroller*,
   985 A.2d 593 (Md. App. 2010) ................................... 17

*Clear Channel Outdoor v. Baltimore*,
   153 F. Supp. 3d 865 (D. Md. 2015) ........................... 2, 8, 9

*Collins Holding Corp. v. Jasper County, S.C.*,
   123 F.3d 797 (4th Cir. 1997) ............................... *passim*

*Comptroller v. Syl, Inc.*,
   825 A.2d 399 (Md. 2003).......................................... 17

*ConAgra Foods RDM, Inc. v. Comptroller*,
   211 A.3d 611 (Md. App. 2019) ................................... 17

*ConEd v. Pataki*,
   292 F.3d 338 (2d Cir. 2002)................................... 5, 13

*Denton v. City of Carrollton, Ga.*,
   235 F.2d 481 (5th Cir. 1956) ................................... 16

*Department of Labor v. Greenwich Collieries*,
   512 U.S. 267 (1994)........................................... 3, 15

*Department of Revenue of Montan v. Kurth Ranch*,
   511 U.S. 767 (1994) ........................................ 5, 8, 11

*Direct Marketing Ass'n v. Brohl*,
   575 U.S. 1 (2015) .............................................. 15

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*,
   651 F.3d 722 (7th Cir. 2011) (en banc) ......................... 7

*Garrett v. Bamford*,
   538 F.2d 63 (3d Cir. 1976) ................................. 19, 20

**Cases—continued**

*GenOn Mid-Atlantic v. Montgomery County*,
    650 F.3d 1021 (4th Cir. 2011) ................................................*passim*

*George F. Alger Co. v. Peck*,
    74 S. Ct. 605 (1954) ......................................................... 22

*Georgia Railroad & Banking Co. v. Redwine*,
    342 U.S. 299 (1952)...........................................18, 20, 21, 22

*Gonzales v. Sessions*,
    894 F.3d 131 (4th Cir. 2018) .............................................3, 14, 15

*Gore Enterprise Holdings, Inc. v. Comptroller*,
    87 A.3d 1263 (Md. 2014) ................................................. 17

*Graham v. DuPont*,
    262 U.S. 234 (1923)........................................................ 10

*In re Grand Jury Subpoena*,
    870 F.3d 312 (4th Cir. 2017) ........................................... 20

*Gwozdz v. HealthPort Tech., LLC*,
    846 F.3d 738 (4th Cir. 2017)............................................ 19, 20

*The Head Money Cases*,
    112 U.S. 580 (1884) ...................................................... 10

*Herron v. Annapolis Md.*,
    198 F. App'x 301 (4th Cir. 2006) ..................................... 21

*Hexom v. Oregon Department of Transportation*,
    177 F.3d 1134 (9th Cir. 1999) ......................................... 14

*Hill v. Wallace*,
    259 U.S. 44 (1922)........................................................ 9, 10

*Holland v. Florida*,
    560 U.S. 631 (2010)....................................................... 4, 19

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013)............................................5, 11

*Kuypers v. Comptroller*,
    21 F. App'x 161 (4th Cir. 2001) ...................................... 21

*Liberty University v. Lew*,
    733 F.3d 72 (4th Cir. 2013)...............................................*passim*

*Lipke v. Lederer*,
    259 U.S. 557 (1922)....................................................... 4, 10

*Lowe v. Washoe County*,
    627 F.3d 1151 (9th Cir. 2010) ......................................... 22

*Lynn v. West*,
    134 F.3d 582 (4th Cir. 1998)............................................ 9

*McCoy v. Court of Appeals of Wisconsin*,
    486 U.S. 429 (1988) ...................................................... 9

**Cases—continued**

*Mentavlos v. Anderson,*
249 F.3d 301 (4th Cir. 2001) ........................................... 8

*NFIB v. Sebelius,*
567 U.S. 519 (2012) .............................................. 2, 8, 11

*NIHC, Inc. v. Comptroller,*
97 A.3d 1092 (Md. 2014) ............................................ 17

*Norfolk Southern Railway Co. v. City of Roanoke,*
916 F.3d 315 (4th Cir. 2019) ...............................*passim*

*O'Hara v. Comptroller of Md.,*
670 F. App'x 777 (4th Cir. 2016) ............................ 21

*Payne v. Taslimi,*
998 F.3d 648 (4th Cir. 2021) ........................................ 8

*Pleasures of San Patricio, Inc. v. Mendez-Torres,*
596 F.3d 1 (1st Cir. 2010) ............................................ 16

*RILA v. Fielder,*
475 F.3d 180 (4th Cir. 2007) ...................... 6, 10, 13, 14

*Rosewell v. LaSalle National Bank,*
450 U.S. 503 (1981) ................................... 4, 18, 19, 22

*San Juan Cellular Telephone Co. v. Public Service Comm'n,*
967 F.2d 683 (1st Cir. 1992) ................................. 5, 10

*Scott Air Force Base Properties v. County of St. Clair,*
548 F.3d 516 (7th Cir. 2008) ....................................... 21

*Strescon Industries v. Cohen,*
664 F.2d 929 (4th Cir. 1981) .................... 18, 19, 20, 21

*Trailer Marine Transport Corp. v. Vazquez,*
977 F.2d 1 (1st Cir. 1992) ........................................... 13

*United States v. City of Huntington, W. Va.,*
999 F.2d 71 (4th Cir. 1993) .......................................... 5

*United States v. U.S. Industrial Alcohol Co.,*
103 F.2d 97 (4th Cir. 1939) ......................................... 10

*Valero Terrestrial Corp. v. Caffrey,*
205 F.3d 130 (4th Cir. 2000) ..............................*passim*

*Webster v. Fall,*
266 U.S. 507 (1925) .................................................... 20

*Wright v. Riveland,*
219 F.3d 905 (9th Cir. 2000) ...................................... 12

*Ex Parte Young,*
209 U.S. 123 (1908) .................................................... 18

**Statutes, rules and regulations**

8 U.S.C. § 1101(a)(48)(A ............................................................. 3, 14

Md. Code Ann., Tax-Gen.

    § 7.5-103 ............................................................................. 12

    § 7.5101(d) ......................................................................... 12

    § 7.5101 (g) ........................................................................ 12

    § 13-604 .............................................................................. 16

    § 13-701(a) .......................................................................... 16

    § 13-704 .............................................................................. 16

    § 13-708 .............................................................................. 16

    § 13-1001(d) ....................................................................... 16

    § 13-1022 ............................................................................ 16

Pub. L. 104-208 § 322 (Sept. 30, 1996) ................................. 3, 15

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court ordered supplemental briefing addressing the questions (1) whether the exaction at issue here is a "penalty" or a "tax" under "applicable Fourth Circuit precedent" interpreting the Tax Injunction Act; and (2) whether Maryland's scheme of judicial review is, under the circumstances of this case, a "plain, speedy and efficient" remedy for TIA purposes. The answer to both questions is *no*, and the TIA accordingly does not bar this action. *See* Opening-Response (Dkt. 31-1), at 14-29, 33-36; Reply (Dkt. 47), at 5-13.

***First,*** when the 75th Congress enacted the TIA in 1937, there was no disputing that an assessment with a principally punitive purpose, earmarked for restitutionary programs, and segregated from general government funds, was not a "tax" within the meaning of the law. *See* Opening-Response 15-17. Contemporary cases—including *Valero Terrestrial Corp. v. Caffrey*, 205 F.3d 130 (4th Cir. 2000), and its progeny—have carried that rule forward to today, establishing a multifactor analytical framework. Here, the overwhelming majority of factors within that framework point to a single conclusion: The Act's exaction is a penalty, not a "tax," within the special meaning of the TIA. In particular:

- it is tremendously burdensome, so much that it is capable of entirely wiping out a payer's profits on all in-State commercial activity;

- it is deliberately targeted at an extremely narrow population of payers—especially at the highest rate of assessment, which applies to just a small handful of companies who were expressly singled-out by name in the lawmaking process;

- it includes a pass-through prohibition, to ensure that the targeted companies cannot avoid the punitive impact of the charge by pushing it downstream;

- its proceeds are placed in a segregated fund earmarked to offset the alleged "externalities" of the payers' conduct, akin to a restitution payment; and

- the legislative history reveals an express intent to impose a penalty against large multinational companies, punishing them for allegedly harming the free flow of reliable information over the internet.

1

Perhaps appreciating that these factors convincingly indicate a penalty rather than a tax, the State continues to resist the idea that *Valero* and its multifactor analysis apply at all. In prior briefing, the State relied on *CIC Services v. IRS*, 141 S. Ct. 1582 (2021), for the propositions that *Valero* has been abrogated and that a State's exaction can never be a penalty unless it is imposed for unlawful conduct. But the Court indicated at the October 27, 2021 status conference that it did not agree with the State's reading of *CIC Services*. Undaunted, the State now relies on *Liberty University v. Lew*, 733 F.3d 72 (4th Cir. 2013), for essentially the same propositions. Although the State did not so much as cite the case in its first two briefs, it now presents *Liberty University* as a watershed decision that jettisoned the *Valero* framework in favor of a new and exclusive four-part test supposedly announced in *NFIB v. Sebelius*, 567 U.S. 519 (2012). *See* State Supp. Br. (Dkt. 56), at 2-5.

That is once again implausible. *Liberty University* did not even mention *Valero*, let alone overrule it—as both this Court and the Fourth Circuit have recognized by continuing to apply the *Valero* framework in subsequent cases. *See Norfolk Southern Railway Co. v. City of Roanoke*, 916 F.3d 315, 319 (4th Cir. 2019); *Clear Channel Outdoor v. Baltimore*, 153 F. Supp. 3d 865, 871 (D. Md. 2015). Moreover, *Liberty University* recognized that the Supreme Court continues "to distinguish taxes from penalties" for a variety of reasons, including the unusual burdensomeness of an exaction. 733 F.3d at 96-98. And the State cannot cite a single case applying the supposed *Liberty University* test for TIA purposes. Simply put, the *Valero* framework remains good law, and this Court can and should apply it here.

The State's supplemental brief next takes a puzzling turn, invoking the "contemporary" meaning of the words "punishment" and "penalty" under the Immigration and Naturalization Act. *See* State Supp. Br. 5-7. That has no relevance here. It is well settled that

the Court must interpret the language of the TIA "in light of its history," and that the Court therefore must give the word "tax" in the TIA "the meaning generally accepted in the legal community at the time of [the statute's] enactment." *Department of Labor v. Greenwich Collieries*, 512 U.S. 267, 275 (1994). The Fourth Circuit's decision in *Gonzales v. Sessions*, 894 F.3d 131 (4th Cir. 2018)—which interpreted the word "penalty" appearing in a 1996 amendment to an immigration statute having nothing to do with taxation (*see* Pub. L. 104-208 § 322 (Sept. 30, 1996) (amending 8 U.S.C. § 1101(a)(48)(A))—does not remotely speak to that question.

Nor does *Gonzales* help the State even on its own terms. It confirms that, even viewed through the lens of a contemporary language, a charge "imposed as retribution to the offender and to operate as a warning to similarly situated individuals" is a penalty. 894 F.3d at 138. That describes the exaction here precisely.

That leaves the *Valero* framework itself, which the State now dubiously calls the "pre-*Liberty University* case law." State Supp. Br. 7. On that front, the State offers just three pages of cursory analysis. *See* State Supp. Br. 8-10. But remarkably, those three pages simply parrot back *almost verbatim* pages 19-22 of the State's opening brief in support of its motion to dismiss (Dkt. 29-1)—the same three pages that this Court suggested at the October 27, 2021 status conference warranted additional briefing. The State does not offer a single new word of analysis under the *Valero* framework in response to the arguments that we made in the opening-response brief (at 14-29, 33-36) or reply (at 15-13), despite the Court's express direction to do so. The State evidently has nothing more to say on the topic.

**Second,** we showed in the opening-response brief (at 33-36) and reply (at 8-12) that countless individual refund suits spanning many years—all pending while the Act's highly

burdensome penalty is being exacted—would not be an "efficient" state-court alternative to a single, pre-enforcement federal-court challenge, within the meaning of the TIA.

As we explained in the reply (at 8), because the TIA "has its roots in equity practice" (*Rosewell v. LaSalle National Bank*, 450 U.S. 503, 525 & n.33 (1981)), the question whether a particular state-court remedy is "efficient" within the meaning of the TIA depends on the circumstances of the case; the analysis calls for "flexibility" rather than "mechanical rules," meaning that "the exercise of a court's equity powers . . . must be made on a case-by-case basis." *Holland v. Florida*, 560 U.S. 631, 649-650 (2010). Although the State does not dispute this point, it continues to ground its arguments in sweeping, mechanical rules divined from cases with no substantive resemblance to this one. And as for the circumstances presented in *this* case, the Supreme Court and other courts have long held that where, as here, the state-court remedy would result in a multiplicity of suits and impose forbidding costs, the TIA does not bar a single pre-enforcement challenge in federal court.

## ARGUMENT

### I. THE ACT DOES NOT ASSESS A "TAX" WITHIN THE MEANING OF THE TIA

#### A. *Liberty University* did not overrule or abrogate the *Valero* framework

The framework for determining whether an exaction is a tax or a penalty has been settled for a century: Courts look to the "characteristics" and "function" of the assessment (*Lipke v. Lederer*, 259 U.S. 557 (1922)) to determine whether the assessment is akin to a "classic tax" or instead a fee with "punitive purposes" (*Valero*, 205 F.3d at 134). "[T]he heart of the inquiry centers on function, requiring an analysis of the purpose and ultimate use of the assessment." *Collins Holding Corp. v. Jasper County, S.C.*, 123 F.3d 797, 800 (4th Cir. 1997). Courts must "examine all the facts and circumstances" surrounding the exaction.

*United States v. City of Huntington, W. Va.*, 999 F.2d 71, 73 (4th Cir. 1993). And if "revenue is paid into the state's (or county's) general fund and provides a general benefit to the public," the assessment is more likely to be a tax. *Collins Holding*, 123 F.3d at 800.

*Valero* identified three factors that courts should focus on when evaluating the nature of an assessment under the TIA: "(1) what entity imposes the charge; (2) what population is subject to the charge; and (3) what purposes are served by the use of the monies obtained by the charge." 205 F.3d at 134 (citing *San Juan Cellular Telephone Co. v. Public Service Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992); *Bidart Bros. v. California Apple Comm'n*, 73 F.3d 925, 931 (9th Cir. 1996)). As the court reaffirmed just two years ago, this three-factor framework "provides flexible and versatile guidance in assessing where a particular charge sits on the tax-fee continuum" and remains good law within the Fourth Circuit. *Norfolk Southern*, 916 F.3d at 319 n.2.

"If the charge falls 'somewhere in the middle' between a classic tax and a classic fee" based on a prima facie analysis, "the most important of [the three *Valero*] considerations is" the third one, concerning "the charge's purpose." *Norfolk Southern*, 916 F.3d at 319. In evaluating an assessment's purpose, courts have considered several "significant" sub-factors that "are not elevated to separate 'factors' in the three-factor framework" but nonetheless "bear significant weight in the ultimate determination." *Id.* at 327 (Wynn, J, concurring). These have included:

- whether the exaction is unusually severe or burdensome (*e.g.*, *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767 (1994) ; *Liberty University*, 733 F.3d at 98; *Korte v. Sebelius*, 735 F.3d 654, 670 (7th Cir. 2013));

- whether the charge is subject to a pass-through prohibition that prevents it from being passed on (*e.g.*, *GenOn Mid-Atlantic v. Montgomery County*, 650 F.3d 1021, 1023-1024 (4th Cir. 2011); *ConEd v. Pataki*, 292 F.3d 338, 355 (2d Cir. 2002));

- whether the proceeds are deposited in the general treasury for open-ended use or instead set aside in a separate fund and earmarked to fund programs related to the purposes of the assessment (*e.g.*, *GenOn*, 650 F.3d at 1023; *RILA v. Fielder*, 475 F.3d 180, 189 (4th Cir. 2007); *Collins Holding*, 123 F.3d at 800; *American Trucking Associations, Inc. v. Alviti,* 944 F.3d 45, 52-53 (1st Cir. 2019)); and

- whether the law's legislative history and the circumstances surrounding its enactment demonstrate a punitive purpose (*e.g.*, *GenOn*, 650 F.3d at 1025; *RILA*, 475 F.3d at 189).

We described these considerations, with additional citations, and applied them in detail to the facts of this case in the opening-response brief, at pages 20-29.

**2.** In its prior briefs, the State took the position that the *Valero* framework was abrogated by *CIC Services*, which it described as holding that every state exaction is a "tax" under the TIA unless it is a fine imposed for unlawful conduct. *See* MTD 12-19; Reply-Opposition (Dkt. 36), at 9-14. At the October 27, 2021 status conference, however, the Court indicated that it was unpersuaded by that argument.

The State now turns to *Liberty University* as support for essentially the same argument. *See* State Supp. Br. 2-5. Presenting the case as a landmark decision—albeit one that it failed to cite in its prior briefs—the State says (at 7) that the *Valero* framework is now "defunct" and should not be applied. That is plainly wrong.

*Liberty University* addressed whether the Affordable Care Act's employer mandate constituted a "tax" in two senses: the AIA sense and the Tax Clause sense. The State does not rely on the court's AIA analysis, and with good reason. On that front, the court held simply that "Congress did not intend the exaction to be treated as a tax for purposes of the AIA" because it called it an "assessment" rather than a "tax." *Id*. at 88. As we explained in earlier briefs (Opening-Response 31; Reply 6-7), that mode of reasoning is not applicable in the TIA context, where the "nomenclature" used by a state legislature is largely irrelevant.

*See, e.g.*, *GenOn*, 650 F.3d at 1023; *Collins Holding*, 123 F.3d at 800 n.3; *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722, 729 (7th Cir. 2011) (en banc) (explaining that "a tax might be so totally punitive in purpose and effect that" it "should be classified as a fine rather than a tax" under the TIA, despite "nomenclature" suggesting a tax). The State does not disagree.

Despite initially implying that Tax Clause cases are irrelevant to TIA cases (Reply-Opp. 13), the State instead focuses its supplemental brief entirely on *Liberty University*'s Tax Clause analysis. It asserts that *Liberty University* (1) recognized a new and exclusive four-part test that displaces the *Valero* framework and (2) limited the concept of a non-tax penalty only "to exactions based on unlawful acts." State Supp. Br. 3-5. Each of those assertions is based on a clear misreading of the case.

*a.* Consistent with *Valero* (and its forebears and progeny), *Liberty University* emphasized a "functional approach" to evaluating the nature of a state levy. 733 F.3d at 96. Given the particular facts of that case, the court focused on four "characteristics" of an exaction that were "indicative of a tax," including (1) the production of "at least some revenue for the Government," which is true of every state exaction; (2) "the absence of a scienter requirement"; (3) collection of the assessment "through the normal means of taxation"; and (4) "the absence of negative legal consequences beyond requiring payment." *Id.* In discussing these factors, however, the court did not purport to establish them as an all-encompassing test to the exclusion of all other considerations. On the contrary, the court explicitly acknowledged that the Supreme Court continues "to distinguish taxes from penalties" for a *variety* of reasons. *Id.* Among other things, assessment of "an exceedingly heavy financial burden" may "become so punitive" by virtue of its size that it ceases to be a "tax"

and becomes a non-tax "penalty" (733 F.3d at 97-98), which we have said all along is the case here. *See also NFIB*, 567 U.S. at 544, 566 (a "severe" or "prohibitory" "financial punishment" does not constitute a tax) (citing *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 36-37 (1922); *Kurth Ranch*, 511 U.S. at 779).

*Liberty University* is therefore entirely compatible with *Valero* and every other case we cited in our prior briefs. Like those other cases, it calls for a comprehensive, functional approach to determining whether a state levy constitutes a non-tax penalty for Tax Clause (and by extension, TIA) purposes. There is certainly no indication that the panel in *Liberty University* understood itself to be overruling or abrogating the *Valero* framework for TIA cases; *Liberty University* did not even cite *Valero*. And, in any event, one Fourth Circuit panel "cannot overrule, explicitly or implicitly, the precedent set by a prior panel." *Mentavlos v. Anderson*, 249 F.3d 301, 312 n.4 (4th Cir. 2001); accord *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). "Only the Supreme Court or this court sitting en banc can do that." *Mentavlos*, 249 F.3d at 312 n.4. *Valero* thus remains good law.

The Fourth Circuit's and this Court's respective decisions in *Norfolk Southern* and *Clear Channel*—both of which applied the *Valero* factors after *Liberty University*—prove the point. The Fourth Circuit's decision in *Norfolk Southern* is particularly notable because the Court there relied on *Valero* and *GenOn* to hold that a stormwater management fee was a "regulatory fee" and *not* a "tax." 916 F.3d at 319. Although this Court, in *Clear Channel*, held that the exaction *was* a "tax" under the *Valero* factors, it did so principally because the proceeds were paid into the general fund "to benefit the general public," without having been earmarked for any payer-related purpose. 153 F. Supp. 3d at 874-875. Here, the opposite is true (*see* Opening-Response 26-28)—a factor that the Court indicated would have changed

the outcome in *Clear Channel*. *Id.* at 875. It bears mention, also, that the State identified and discussed both of these cases in its motion to dismiss. *See* MTD 15, 22. Yet the State omits any mention of them in its supplemental brief, despite that both applied the *Valero* framework after *Liberty University*. That is a troubling omission given that *Norfolk Southern* is binding on this Court. *See McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 441 n.14 (1988) ("The duty to reveal adverse precedent is well established.").

**b.** Nor did *Liberty University* hold that an exaction cannot constitute a penalty unless it is "based on unlawful acts." State Supp. Br. 4-5. To be sure, *Liberty University* distinguished the ACA's employer mandate from the exaction in *Drexel Furniture* in part on the grounds that the mandate "[did] not punish unlawful conduct." 733 F.3d at 98. But it did so only as part of the TIA's functional analysis, under which the legality of the underlying conduct is *relevant* but not singularly determinative of the tax/penalty distinction. That holding is consistent with longstanding Fourth Circuit case law. In *Lynn v. West*, 134 F.3d 582 (4th Cir. 1998), for example, the Fourth Circuit held that an assessment was a penalty because, among other things, "the tax has no relationship to lawful [conduct]" and applied only to "[un]lawful possession" of controlled substances. *Id.* at 591-592. The court was careful to note, however, that the tax/penalty analysis is holistic, and "the features it cited were [not] meant to be exclusive." *Id.* at 592 (discussing *Kurth Ranch*).

As we noted earlier (Reply 5, 7-8), moreover, both *Drexel Furniture* and *Hill v. Wallace*, 259 U.S. 44 (1922), confirmed nearly one hundred years ago that an exaction may constitute a punitive fee even when assessed for lawful conduct. In *Drexel Furniture*, the Supreme Court concluded that a child labor tax—a charge against the income of companies (then) *lawfully* employing boys under the age of 14—was in fact a penalty for asserted

"wrongdoing," not a tax. *Id*. The Court reached that conclusion despite that "Congress d[id] *not* . . . expressly declare that the employment within the mentioned ages is illegal." 259 U.S. at 38 (emphasis added).[1] As for *Hill*, it involved an assessment against lawful sales of grain. 259 U.S. at 257. In *Graham*, the Court held that *Hill* should "be classed with *Lipke*, as [involving] a penalty in the form of a tax." *Graham v. DuPont*, 262 U.S. 234 (1923) (full case citation omitted). We made these points in earlier briefs (Opening-Response 32; Reply 5-8), but the State declines any meaningful response.

Each of these cases would have been top-of-mind for the 74th Congress when it enacted the TIA a little more than a decade later. And all support the Fourth Circuit's later decision in *GenOn*, which held that an assessment against the lawful burning of fossil fuels was a "a punitive fee rather than a tax." 650 F.3d at 1024. The State's assertion that *Liberty University* single-handedly wiped away all of this settled case law (without even acknowledging that it was doing so) is implausible.[2]

The State's continued effort to avoid the comprehensive, multifactor analysis called for by longstanding Fourth Circuit cases like *Valero*, *GenOn*, and *RILA*—to say nothing of Supreme Court precedents including *The Head Money Cases*, 112 U.S. 580 (1884), and *Drexel Furniture*, and contemporary out-of-circuit cases including *American Trucking*, *San Juan Cellular*, and *Bidart Brothers*—is inexplicable. The *Valero* framework undeniably remains good law. *Norfolk Southern*, 916 F.3d at 319 & n.2. We are unaware of a single court, before

---

[1]  To be sure, *Liberty University* appears to have misapprehended this point (733 F.3d at 98), but the facts of *Drexel Furniture* are what they are.

[2]  *United States v. U.S. Industrial Alcohol Co.*, 103 F.2d 97 (4th Cir. 1939) is not to the contrary, either. It addressed only a chronological issue: The court rejected the defendants' argument that the alleged taxes were penalties to enforce prohibition laws because the taxes were passed before the prohibition laws were passed. *Id*. at 99-100.

or after *NFIB*, that has called it into question, and there is no reason for this Court to be the first to eschew such well-established precedent.

**B.      Under the *Valero* framework, the Act imposes a penalty, not a tax**

Evaluated within the prevailing multifactor framework, the Act is a punitive fee not covered by the TIA. *See* Opening-Response 21-29. To summarize:

**1.**  The "sheer size" of the Act's assessment here "screams 'penalty.'" *Korte*, 735 F.3d at 670; *see Kurth Ranch*, 511 U.S. at 780 (an unusually "high rate of taxation" is "consistent with a punitive character"). As we have explained, assessments against gross receipts are capable of erasing all of a company's profits. That is why, in condemning a similar charge imposed by the French Government on digital advertising, the Office of the U.S. Trade Representative stated that "gross revenue" is not "a usual [or] appropriate basis for taxation." Compl. ¶ 60 (quoting USTR Report, at 55). Unlike the charge associated with the employers' mandate in *Liberty University*, it thus cannot be said that the assessment here is "proportionate rather than punitive." 733 F.3d at 98. We have made this point repeatedly; in response, the State has never denied that the Act's assessment is extraordinarily burden-some, or that its staggeringly "severe and disproportionate" size indicates a purpose that is "punitive rather than revenue raising." *Korte*, 735 F.3d at 670.

**2.**  Far from a tax that is a "burden generally borne" (*GenOn*, 650 F.3d at 1024), or assessed "upon a large segment of society" (*Valero*, 205 F.3d at 134), the Act imposes a penalty that is deliberately and extremely narrowly targeted.  The Act's architects were clear on this point: the Act was focused with laser-like precision on large, multinational tech com-panies whose business models lawmakers dislike. The Act's tiered structure, in particular, ensures that just a handful of expressly singled-out firms—those few with global annual

gross revenues of $15 billion or more—pay the highest, most burdensome rate. Tax Gen. § 7.5-103; Opening-Response 6-7. Notably, the in-state revenues of those firms are subject to this crushing rate solely because they have greater *out-of-state* sales, a feature that can only be explained by an intent to punish out-of-state conduct. The extreme narrowness of the Act's targeting is confirmed further by S.B. 787, which winnowed the population subject to the charge by exempting all "broadcast" and "news media" entities, despite that those entities are among the largest sellers of digital advertising services. Tax-Gen. § 7.5101(d), (g).

The State brushes this consideration aside as a "relatively minor" one. State Supp. Br. 9. But in *GenOn*, the Fourth Circuit found it to be the "chief problem" indicating a penalty there. 650 F.3d at 1024. While the assessment here applies to more than one company (even if only a few companies at the highest rate), the point is that "an assessment imposed upon a narrow class is less likely to be a tax than an assessment imposed upon a broad class of parties." *Id.* That is the case here.[3]

**3.** Related, the companies targeted by the Act are forbidden from passing on the cost of the charge to customers. The Fourth Circuit found this factor highly pertinent to the tax/penalty distinction in *GenOn*. *See* 650 F.3d at 1024 ("Our conclusion that Bill 29-10 imposes a punitive fee is strengthened by the fact that GenOn will likely be unable to pass the cost of the charge on to its customers."). In *Valero*, the court explained why: When "the cost of the charge [can be] passed" to downstream market participants, it ensures the payers can

---

[3]  Cases from other circuits have similarly recognized that a charge on a narrow segment of the population weighs against finding that the charge is a tax. *See, e.g., Wright v. Riveland*, 219 F.3d 905, 911 (9th Cir. 2000) (charge was "only imposed on a select group of people," indicating that it was not a tax); *Bidart Bros.*, 73 F.3d at 932 (a "narrow imposition" is less likely to be a tax); *American Trucking*, 944 F.3d at 56 (fact that toll fell "only on truckers" weighed against finding the toll a tax).

"spread the cost to a significantly wider proportion of the population." 205 F.3d at 134. A legislature's decision to forbid the spreading of the charge, in contrast, ensures that it is borne only by those whom the legislature intends to punish. That is why the Second Circuit has held that pass-through prohibitions of this sort are "unavoidably punitive in operation" and that nothing "other than punishment can justify . . . preventing [payers] from passing" an exaction along to subsequent customers. *ConEd*, 292 F.3d at 353-355.

**4.** The proceeds of the digital advertising charge are not deposited into the general treasury for open-ended use. They are instead used to pay for administration of the Act and otherwise deposited in a strictly segregated special fund, which is earmarked for spending to help combat the "negative externalities" created by "massive technology corporations" by educating future generations to be "technology literate." Testimony of Senate President Bill Ferguson Before the Budget and Taxation Committee (Jan. 29, 2020), perma.cc/N975-TAXK; *see also* Compl. ¶ 39. As the First Circuit has said, a prospective federal-court injunction "poses no threat to the central stream of tax revenue," and is therefore less likely to qualify as a traditional tax, when "the fees paid are held separately from general state funds" and "dedicated exclusively to" paying for the fee's administration and otherwise remediating "the specific damages resulting from [the assessed] activity." *Trailer Marine Transport Corp. v. Vazquez*, 977 F.2d 1, 6 (1st Cir. 1992); *accord Bidart Brothers*, 73 F.3d at 932 (citing *The Head Money Cases*); *GenOn*, 650 F.3d at 1023; *RILA*, 475 F.3d at 189; *Collins Holding Corp.*, 123 F.3d at 800. Precisely so here.

**5.** Finally, the "circumstances surrounding the Act's enactment" and its legislative history demonstrate that the charge bears a plainly punitive purpose. *RILA*, 475 F.3d at 189; *accord GenOn*, 650 F.3d at 1025. Legislators designed the Act to follow the model proposed

by Professor Paul Romer, who denounced large digital advertising companies and invited States like Maryland to impose a "charge" or "penalty" on those companies because of their perceived misconduct. Compl. ¶ 43; *see also id.* ¶ 48. That is just what Maryland did: It designed the Act to ensure that the "externalities created" by that perceived misconduct would "be borne by [those] actor[s]." *Id.* ¶ 45. We have repeatedly made this point (Opening-Response 21-29; Reply 2-4), and the State never once has denied it.

True enough, the "assessment [is] imposed directly by [the Maryland] legislature" and "responsibility for administering and collecting the assessment lies with the general tax assessor" (*Collins Holding*, 123 F.3d at 800), as was also true in *GenOn* and *RILA*. But the *Valero* framework calls for a "'practical and sensible approach'" resembling "a totality-of-the-facts-and-circumstances test," not application of "'rigid rules.'" *Norfolk Southern*, 916 F.3d at 327 (Wynn, J., concurring) (quoting *Hexom v. Oregon Department of Transportation*, 177 F.3d 1134, 1137 (9th Cir. 1999)). Under the comprehensive analysis required by Fourth Circuit precedent, technicalities concerning the source and collection of the assessment cannot "disguise what is in substance a punitive [fee]" according to every other relevant consideration. *GenOn*, 650 F.3d at 1024.

### C. The contemporary meaning of "penalty" under the INA is irrelevant

The State argues that the Court should look to *Gonzales v. Sessions*, 894 F.3d 131 (4th Cir. 2018)—a case construing the Immigration and Nationalization Act—to interpret the concept of a penalty. Supp. Br. 5-7. *Gonzales* does not help the State for two reasons.

*First*, *Gonzales* did not involve the meaning of the term "tax," much less the special meaning of the term "tax" in the TIA. The issue before the court in *Gonzales* was the meaning of "'punishment' and 'penalty' as those terms are used in 8 U.S.C. § 1101-

(a)(48)(A)." 894 F.3d at 137. That provision was added to the INA in 1996. *See* Pub. L. 104-208 § 322 (Sept. 30, 1996). The question whether a measure is a "punishment" or "penalty" under a mid-90s amendment to an immigration statute obviously has no bearing on the meaning of a "tax" under the TIA. That is especially because, in interpreting the TIA, courts must look to what the word "tax" meant "at the time the TIA was enacted" in 1937. *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 8 (2015); *see also Greenwich Collieries*, 512 U.S. at 275 (what is relevant is "the meaning generally accepted in the legal community at the time of [the statute's] enactment").

*Second*, even if *Gonzales*'s interpretation of the "penalty" and "punishment" in the INA were relevant to the meaning of the term "tax" in the TIA (it is not), it does not support the State. *Gonzales* in fact identified several definitions of "penalty" and "punishment" that are not predicated on a violation of the law. *E.g.,* 894 F.3d at 137 (quoting the definition of "penalty" in Black's Law Dictionary as "[p]unishment imposed on a wrongdoer"); *id.* at 137-38 (a "penalty" is sought "for the purpose of punishment, and to deter others from offending in like manner"). In the end, the court held that, "if [a] sanction is imposed as retribution to the offender and to operate as a warning to similarly situated individuals, then the sanction is a punishment or penalty due to its punitive character." *Id.* at 138 (cleaned up). Even if it were relevant to the TIA question, that definition is no help to the State.

## II. MARYLAND'S STATE-COURT REMEDY IS NOT AN "EFFICIENT" ALTERNATIVE TO THIS SINGLE FEDERAL PRE-ENFORCEMENT SUIT

### A. Maryland does not provide meaningful pre-payment judicial review

We explained in the opening-response brief (at 35) that "requiring a taxpayer to pay an exorbitant or effectively punitive tax in order to challenge it may present 'such a heavy

burden'" that it becomes infeasible and thus inefficient. *Pleasures of San Patricio, Inc. v. Mendez-Torres*, 596 F.3d 1, 9 (1st Cir. 2010) (quoting *Denton v. City of Carrollton, Ga.*, 235 F.2d 481, 485 (5th Cir. 1956)); *see also Capitol Industries-EMI, Inc. v. Bennett*, 681 F.2d 1107, 1114 n.20 (9th Cir. 1982) (similar).

The State asserts in its supplemental brief (at 23) that, to the extent that the extreme burdensomeness of the Act's charge makes a post-deprivation refund action entirely impracticable (a point it does not refute on its own terms), "the financial burden . . . can be averted entirely during the pendency of State procedures if plaintiffs' members avail themselves of [a] pre-deprivation remedy." And the State insists that such a pre-deprivation remedy *is* available here: Companies subject to the Act's exaction can, under threat of additional penalties, interest, and potential criminal liability, "withhold payment" of amounts that are clearly owed on the face of the Act, await an assessment, and appeal from the assessment. State Supp. Br. 14-15. That is no answer at all.

As an initial matter, a company that refuses to file a return bears potential criminal liability.[4] The State's reassurance (Supp. Br. 16) that "no companies in the Delaware holding company cases were ever criminally charged" is cold comfort to any business that rationally fears criminal prosecution. Even setting that aside, the penalties and interest accruing during an administrative challenge would be enormous in their own right—penalties would add anywhere from 10% to 100% to the already massive exaction (Tax-Gen. §§ 13-701(a), 13-704, 13-708), and interest, at 9% per year (Tax Gen. § 13-604), would add much more.

---

[4]    We previously cited Tax-Gen. § 13-602(g) for the proposition that a company not filing a return would be exposed to criminal penalties. *See* Reply 11. The correct citation is Tax-Gen. §§ 13-1001(d) (willful failure "to file the return as required under Title 10 of this article"), 13-1022 (willful failure "to take any action that the Comptroller requires"), and 13-1204(a) (willful failure "to provide information as required under this article").

The State insists that "[t]he Tax Court's ability to abate interest and penalties . . . should help to alleviate any concern" that plaintiffs' members may have about the consequences of failing to comply with the law. *Id.* at 13. It claims that there are "numerous examples where corporations chose not to pay a tax" before pursuing an assessment-based appeal. *Id.* at 14. And "in nearly all of those cases," the State asserts, "the Maryland Tax Court waived penalties and partially waived interest." *Id.* at 15 (emphasis added).

That is wholly misleading. For starters, the State has not made an affirmative commitment that it will not seek penalties or interest or that the Tax Court will abate any such impositions; it promises only to consider abatement requests when the arise. But abatement is *not* the common practice the State holds it out to be. In two of the five cases it cites, no abatement of penalties or interest is apparent at all. *Comptroller v. Syl, Inc.*, 825 A.2d 399 (Md. 2003); *NIHC, Inc. v. Comptroller*, 97 A.3d 1092 (Md. 2014). In a third case, the Tax Court "reduced the amount of the penalty" and left the years-long assessment of interest in place. *Classics Chicago, Inc. v. Comptroller*, 985 A.2d 593, 597 (Md. App. 2010). In a fourth case, the Tax Court abated the taxpayer's penalties, but not the interest. *See Gore Enterprise Holdings, Inc. v. Comptroller*, 87 A.3d 1263 (Md. 2014). And in the fifth and final case, the Tax Court abated penalties and "interest accrued from the date of the appeal to that court to the date of its decision," but not during prior lengthy proceedings before the Comptroller. *ConAgra Foods RDM, Inc. v. Comptroller*, 211 A.3d 611, 618 (Md. App. 2019).

What's more, in each of the State's five cases, the taxpayer's position was that it had accurately reported its tax liability and paid all that it owed under the applicable regulations at the time; the disputes were over the *meaning* of those regulations. Not one involved a taxpayer who (1) acknowledged that it bore liability under a duly enacted statute but

17

(2) refused to pay the amount owed on the ground that the law was unenforceable. It is not at all clear that the Tax Court would abate penalties and interest in a case like that.

It is bedrock that placing oneself "in peril of large loss" and at "great risk of fines and imprisonment" is a "risk the company ought not be required to take" before obtaining judicial review. *Ex Parte Young*, 209 U.S. 123, 165 (1908). The whole point is that the Act's exaction is crushingly large and is likely to drive companies out of the Maryland market altogether. Forcing companies onto a path of state-court judicial review that threatens to dramatically *increase* their liability under the Act, with potential criminal sanctions to boot, is hardly a solution. As the Supreme Court said in *CIC Services*, a state-court remedy that commences "with law-breaking at the start" is "not the kind of thing an ordinary person risks, even to contest the most burdensome" charge. 141 S. Ct. at 1592. "Special circumstances" like these render a remedy of "doubtful efficiency," and "jurisdiction in federal courts is [thus] not excluded." *Capitol Industries-EMI*, 681 F.2d at 1114 n.20.

## B. Maryland's post-deprivation scheme of judicial review is not "efficient" because it would entail a multiplicity of suits

Maryland's scheme of judicial review is inefficient for the additional reason that it would necessitate a multiplicity of nearly identical refund actions (or assessment challenges) in state court over what is certain to be many years given the lengthy administrative and judicial processes. Each payer will have to bring an action for each of those years. *See* Opening-Response 33-35; Reply 8-10. The State does not disagree.

When a state-court remedy "would require a multiplicity of suits" like this, it is not "efficient" within the meaning of the TIA. *Rosewell*, 450 U.S. at 517-18 (citing *Georgia Railroad & Banking Co. v. Redwine*, 342 U.S. 299, 303 (1952)); *see also Strescon Industries v.*

*Cohen*, 664 F.2d 929, 931-932 (4th Cir. 1981) (where state procedures "require repetitive suits to protect a single Federal claim, the State remedies cannot be characterized as 'plain, speedy, or efficient'"); *Garrett v. Bamford*, 538 F.2d 63, 72 (3d Cir. 1976) ("Where a state remedy for an allegedly unlawful tax requires repetitive suits year after year, resort may be had to equity to avoid the multiplicity of suits.") (cleaned up).

The State offers two responses: *First*, it says our argument is foreclosed by prior Fourth Circuit cases involving different facts and lacking multiplicity-based efficiency arguments. *Second*, it says that the multiplicity problem in TIA cases is implicated only with respect to suits involving the same taxpayer, to protect a single federal claim. Neither assertion holds water.

### 1. Prior cases involving different facts and lacking multiplicity-based efficiency arguments are not controlling here

The State begins by repeating its prior argument that "[t]he Fourth Circuit held Maryland's remedy to be 'plain, speedy and efficient' in *Gwozdz* and *Strescon*," describing those cases as "controlling." State Supp. Br. 17 (referring to *Gwozdz v. HealthPort Tech., LLC*, 846 F.3d 738 (4th Cir. 2017)). It charges that we "have identified no change in Maryland law in the period since" those cases were decided. *Id.*

But as we noted in the reply (at 8)—without rejoinder from the State—the TIA "has its roots in equity practice," and general equity principles are "instructive on whether a state remedy is 'plain, speedy and efficient.'" *Rosewell*, 450 U.S. at 525 & n.33. Thus, the question whether a remedy is "efficient" must be resolved in light of the unique circumstances presented in each case. *See Holland*, 560 U.S. at 649-650 (explaining that equity demands "flexibility" rather than "mechanical rules," meaning that "the exercise of a court's equity

powers must be made on a case-by-case basis"). In *Redwine*, for example, the Supreme Court did not hold that Georgia's state remedies were categorically inefficient in all cases. Rather, the Court held that the remedies were inefficient in that specific case, because under its unique facts, the plaintiff would have had to file hundreds of claims to protect its federal claim. 342 U.S. at 303; *see also Garrett v. Bamford*, 538 F.2d 63, 71 (3d Cir. 1976) (finding Pennsylvania's state remedy for the claims raised by plaintiffs in light of the nature of those claims and the identity of the plaintiffs).

Against this background, *Gwozdz* and *Strescon* are plainly inapposite. Neither involved circumstances that would have necessitated a multiplicity of lawsuits resolving identical issues. And neither involved such a massive exaction that the cost of seeking post-payment relief was impracticable. Neither even involved a TIA challenge on efficiency grounds. Thus neither can be understood as authoritatively resolving whether Maryland's procedures are "efficient" within the meaning of the TIA in this case.

The State persists in its assertion that, because *Gwozdz* was a putative class action, it implicitly rejected any and all multiplicity arguments that might ever be raised. State Supp. Br. 19. It finds new support for this proposition in the fact that *Gwozdz* cited *Bowman v. Goad*, 703 A.2d 144 (Md. 1997), which also involved a putative class action. But, again, the plaintiff in *Gwozdz* did not raise an efficiency argument, the district court did not certify a class, and the Fourth Circuit did not consider the putative class-based nature of the plaintiff's case in rejecting his TIA arguments. "Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *In re Grand Jury Subpoena*, 870 F.3d 312, 318-319 (4th Cir. 2017) (quoting *Webster v. Fall*, 266 U.S. 507, 511 (1925)). That is all we have here.

The question whether—under the particular circumstances of this case—Maryland's state-court remedies are an "efficient" alternative to a single, pre-enforcement federal suit challenging the Act is an open one.[5]

### 2. The multiplicity factor is an equitable consideration and not limited mechanically to suits involving the same taxpayer

The State does not dispute that its judicial review scheme will spawn a multiplicity of duplicative suits spanning many years—a fact that points inextricably to unacceptable inefficiency. Looking once more to dodge the facts with a newfound categorical rule, it argues that the multiplicity rationale adopted in *Redwine* applies only if the state-court remedy results in a multiplicity of suits involving the *same* taxpayer. State Supp. Br. 20-21. But the case that the State cites for this proposition—*Strescon*—says nothing of the sort. Rather, it acknowledges that state procedures that "require repetitive suits to protect a single Federal claim" are not "plain, speedy, or efficient," full stop. 664 F.2d at 931-932. Here, the federal challenges to the Act are facial and thus common across all taxpayers in all tax years. Accordingly, the myriad suits by plaintiffs' members would raise identical claims and issues, in just the way that *Strescon* suggests creates a multiplicity problem.

That distinguishes this case from all other cases cited by the State. For example, *Scott Air Force Base Properties v. County of St. Clair*, 548 F.3d 516 (7th Cir. 2008) involved "only two separate proceedings," a number hardly amounting to a "multiplicity." *Id.* at 522. In

---

[5]   Each of the other cases cited by the State on this point likewise involved single taxpayers challenging individualized determinations. None is on point. *See O'Hara v. Comptroller of Md.*, 670 F. App'x 777 (4th Cir. 2016) (individual seeking release of state tax liens against him, removal of database entries relating to his individual tax liability, and bar on Comptroller informing other state agencies that he has an uncontested tax liability); *Herron v. Annapolis Md.*, 198 F. App'x 301 (4th Cir. 2006) (single taxpayer seeking refund of school impact fee paid in connection with development of property); *Kuypers v. Comptroller*, 21 F. App'x 161 (4th Cir. 2001) (individual taxpayer challenging his residence status).

*Lowe v. Washoe County*, 627 F.3d 1151 (9th Cir. 2010), the state-court and federal-court challenges "d[id] not involve the same issues of law [or] fact." *Id.* at 1157. And in *ANR Pipeline v. Louisiana Tax Commission*, 646 F.3d 940 (5th Cir. 2011), the claimed multiplicity of suits were twenty case-specific, fact-dependent appeals of revaluations of three different companies' properties (*id.* at 945, 948)—they did not involve facial claims with common issues across all taxpayers and all cases.

Much the same was true of *Rosewell* itself. The only issue there was the question whether Illinois's scheme was sufficiently "speedy" (450 U.S. at 522-524), which is not an element of Maryland's scheme we have challenged. And unlike this case, *Rosewell* did not involve a state-court remedy that entailed a sprawling multiplicity of suits. The court thus held, unremarkably, that "[b]ecause the Illinois remedy imposes no unusual hardship on respondent requiring ineffectual activity or an unnecessary expenditure of time or energy, we cannot say that it is not 'efficient.'" *Id.* at 518. In contrast, that is exactly what Maryland's remedy would do here, requiring massive and unnecessary expenditures of time and money by every payer of the Act's assessment—hardship that is easily avoided by permitting this single, pre-enforcement challenge to resolve discrete federal claims common to each of the refund actions that otherwise would be needed, just like in *Redwine*.

The State also relies on the nonbinding, in-chambers opinion in *George F. Alger Co. v. Peck*, 74 S. Ct. 605 (1954) (Reed, J., in chambers). Supp. Br. 21-22. But so far as the multiplicity question was concerned, Justice Reed held only that an injunction pending appeal was not warranted because the prospect of a multitude of state court suits did not constitute an irreparable injury. *Id.* at 607. The TIA does not require proof of irreparable injury, so that holding has no relevance here.

**CONCLUSION**

The Court should deny the State's motion to dismiss and grant plaintiffs' cross-motion for summary judgment on the merits.

Dated: December 13, 2021

Respectfully submitted,

/s/ *Michael B. Kimberly*

Michael B. Kimberly (No. 19086)
Paul W. Hughes (No. 28967)
Stephen P. Kranz*
Sarah P. Hogarth*
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *mkimberly@mwe.com*
   *(202) 756-8000*

*Attorneys for All Plaintiffs*

Tara S. Morrissey*
   *U.S. Chamber Litigation Center*
   *1615 H Street NW*
   *Washington, DC 20062*
   *tmorrissey@uschamber.com*
   *(202) 463-5337*

*Attorney for the Chamber of Commerce of the United States of America*

*\* admitted pro hac vice*