# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CHAMBER OF COMMERCE OF THE \*
UNITED STATES OF AMERICA, *et al.*,
\*
    *Plaintiffs*,

        \*

    v.                     No. 1:21-cv-00410-LKG

        \*

PETER FRANCHOT,
        \*
    *Defendant*.
        \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DEFENDANT'S SUPPLEMENTAL BRIEF
## REGARDING COMMERCIAL SPEECH ANALYSIS

BRIAN E. FROSH
Attorney General of Maryland

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us
STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

August 12, 2022                 Attorneys for Defendant

# TABLE OF CONTENTS

Page

SUPPLEMENTAL ARGUMENT ................................................................................................1

I.   THE DIRECT PASS-THROUGH PROHIBITION IN TAX-GENERAL § 7.5-102(**c**) SURVIVES UNDER THE FIRST *CENTRAL HUDSON* PRONG BECAUSE THE STATUTE DOES NOT AFFECT ANY SPEECH UNLESS IT IS INTEGRAL TO THE UNLAWFUL ACTIVITY OF "DIRECTLY PASS[ING] ON THE COST OF THE TAX." ................................................1

II.  THE PASS-THROUGH PROHIBITION IS SUPPORTED BY A SUBSTANTIAL GOVERNMENT INTEREST. ........................................................................................................5

III. THE PASS-THROUGH PROHIBITION DIRECTLY ADVANCES A SUBSTANTIAL GOVERNMENT INTEREST. ...................................................................................11

IV.  THE PASS-THROUGH PROHIBITION IS NOT MORE EXTENSIVE THAN NECESSARY TO SERVE THE GOVERNMENT'S INTEREST. ..............................................................14

CONCLUSION ............................................................................................................................15

# SUPPLEMENTAL ARGUMENT

As agreed by the parties, ECF 79 at 2 ¶ 3, this brief will address the second set of questions posed in the Court's July 13, 2022 scheduling order. ECF 78 ("Should the Court determine that the pass-through prohibition, either in whole or in part, regulates commercial speech, whether the pass-through prohibition satisfies intermediate scrutiny" under *Educational Media Co. at Va. Tech. Inc. v. Insley*, 731 F.3d 291, 298 (4th Cir. 2013) (citing *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980))).

**I.   THE DIRECT PASS-THROUGH PROHIBITION IN TAX-GENERAL § 7.5-102(c) SURVIVES UNDER THE FIRST *CENTRAL HUDSON* PRONG BECAUSE THE STATUTE DOES NOT AFFECT ANY SPEECH UNLESS IT IS INTEGRAL TO THE UNLAWFUL ACTIVITY OF "DIRECTLY PASS[ING] ON THE COST OF THE TAX."**

Plaintiffs' challenge to the pass-through prohibition cannot overcome the first part of *Central Hudson*'s test, which recognizes that "[t]he government may ban . . . commercial speech related to illegal activity" and insists that, to be protected by the First Amendment, commercial speech "must concern lawful activity." 447 U.S. at 563-64. Section 7.5-102(c) prohibits the commercial conduct of "directly pass[ing] on the cost of the [digital ad] tax" by charging "a separate fee, surcharge, or line-item," and thereby renders that specific conduct unlawful. When firms "dictate the terms" of transactions, as they do when they directly impose a cost on a customer, they engage in commercial "practices which both state and national legislation can and do prohibit" in certain circumstances, even if the "course of conduct . . . were as in most instances brought about through speaking or writing." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 495 (1949) (citing cases). Thus, directly imposing a charge by billing it constitutes commercial conduct that may be regulated, and even punished criminally, without implicating the First Amendment.

For example, in *United States v. De Leon*, 728 F.3d 500 (5th Cir. 2013), the Fifth Circuit affirmed health-care-fraud convictions under 28 U.S.C. §§ 1347 and 1349, where "[t]he *conduct* charged" in the indictment "related only to (1) *billing* before delivery, (2) *billing* for new [powered wheelchairs] but delivering cheaper substitutes, and (3) *billing* for diabetes supplies that were not delivered." *Id.* at 507 (emphasis added). *See United States v. McLean*, 715 F.3d 129, 138 (4th Cir. 2013) (affirming health-care-fraud conviction based on "billing for medically unnecessary procedures"); *United States v. Vivit*, 214 F.3d 908, 911 (7th Cir. 2000) (affirming mail-fraud conviction where the offending "conduct" included "*billing* insurers for patient visits that did not occur" and "*billing* for physical therapy that was not performed" (emphasis added)).

Such restrictions on commercial conduct do not implicate First Amendment protections, where "the law's effect on speech would be only incidental to its primary effect on conduct."[1] *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 137 S. Ct. 1144, 1151 (2017); *see National Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373 (2018) ("'[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech.'" (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011)). It is not "'an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S.

---

[1] The Supreme Court in *Expressions Hair Design* reaffirmed this principle but found it inapplicable there because the Court deemed the challenged statute an anomaly that was "different" from other regulations, 137 S. Ct. at 1151, for reasons that do not pertain to Maryland's Act. Whereas New York's provision on credit surcharges did not establish or limit the permissible amount of surcharges and said "nothing about the amount [merchants] are allowed to collect," *id.*, the Act challenged here establishes the applicable tax rates, and the pass-through prohibition effectively specifies "zero" as the amount of tax cost that a taxpayer may directly charge to a customer.

47, 62 (2006) (quoting *Giboney*, 336 U.S. at 502). Drawing on this line of cases, the Supreme Court has identified "speech integral to criminal conduct" as among "'the classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem,'" *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (citing *Giboney,* 336 U.S. at 498; other citation omitted). But the Court has applied this same principle to speech integral to unlawful conduct in a civil setting, as well. *See National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978) (applying *Giboney* in rejecting First Amendment challenge to injunction issued in civil antitrust action).

Applying this principle here confirms that Maryland's pass-through provision validly renders unlawful the conduct of "directly pass[ing] on the cost" of the digital ad tax, notwithstanding its impact on incidental speech that would otherwise be used by a firm in the process of "directly pass[ing] on the cost." The language of Tax-General § 7.5-102(c) ensures that the statute constrains a taxpayer's speech only if and to the extent it is "integral to," *Stevens*, 559 U.S. at 468, the unlawful conduct of direct pass-through. That is, the statute does not apply to a "separate fee, surcharge, or line-item" unless it is the "means" "by" which a taxpayer "directly pass[es] on the cost" of the digital ad tax, § 7.5-102(c), and, therefore, whatever speech the "separate fee, surcharge, or line-item" contains is "integral to" the commercial conduct proscribed by the statute, *Stevens*, 559 U.S. at 468. Aside from this incidental effect on speech used to effectuate the direct pass-through, nothing in the statute would even arguably restrict speech, whether or not speech appears on an invoice and whether or not it is stated in the form of a separate fee, surcharge, or line-item. The statute would have no effect on any "separate fee, surcharge, or line-item" imposed for a purpose other than directly passing on the billing firm's digital ad tax cost. The statute would not prevent a taxpayer from including on an invoice whatever message it

3

wished to convey about the digital ad tax, including the amount of the taxpayer's annual digital ad gross revenue tax estimated to be attributable to the invoiced transaction, or, indeed, any other subject.

Because the direct pass-through of a taxpayer's digital ad tax cost via separate fee, surcharge, or line-item is unlawful under Maryland law, any "communication" integral to the direct pass-through is "related to unlawful activity," *Central Hudson*, 447 U.S. at 564, and, therefore, plaintiffs' challenge founders on the threshold inquiry of intermediate scrutiny. This conclusion does not conflict with the analysis of *Central Hudson*'s first prong in *BellSouth Telecommunications, Inc. v. Farris*, 542 F.3d 499, 506 (6th Cir. 2008), which hinged on the very different wording of the Kentucky statute at issue there: "The provider shall not collect the tax directly from the purchaser or separately state the tax on the bill to the purchaser." *Id.* at 501 (quoting Ky. Rev. Stat. § 136.616(3)). Since that statute used the disjunctive "or" to separate its two clauses, the court construed the statute to "bar two separate things: The first bars direct collection of the tax (regardless of how it is stated), and the second bars separately stating the tax (regardless of how it is collected)." *BellSouth*, 542 F.3d at 511. Thus, the taxpayer could violate the statute by merely "stating the tax" on an invoice, even if the taxpayer did not engage in the conduct of "direct collection of the tax." The court upheld the no-direct-collection clause as a valid regulation of "non-expressive conduct, not speech," *id.*, at 510, but concluded that "the no-stating-the-tax clause by its terms restricts speech," *id.* at 504, and proceeded to subject only the no-stating-the-tax clause to *Central Hudson* analysis, *id.* at 505-10. Consequently, when *BellSouth* states that "[t]he lawfulness of the activity does not turn on the existence of the speech ban itself," *id.* at 506, it refers only to a provision that "by its terms restricts speech" (as in no "stating the tax") and operates as a "separate" stand-alone prohibition independent of conduct regulation. Due

4

to its reading of Kentucky's statute, *BellSouth* had no occasion to address the line of Supreme Court decisions that apply when speech is "integral to" regulated commercial conduct.

The language of Maryland's pass-through prohibition is not susceptible to the construction *BellSouth* gave Kentucky's statute. Rather than use disjunctive phrasing, the General Assembly in Tax-General § 7.5-102(c) chose to use the phrase "by means of" to limit its applicability, so that it is violated only if a "separate fee, surcharge, or line-item" is integral to the prohibited conduct of "directly pass[ing] on" a taxpayer's digital ad tax cost. Therefore, the first *Central Hudson* prong warrants rejection of plaintiffs' First Amendment challenge.

## II. THE PASS-THROUGH PROHIBITION IS SUPPORTED BY A SUBSTANTIAL GOVERNMENT INTEREST.

If this Court proceeds to consider the remaining *Central Hudson* factors, *see Recht v. Morrisey*, 32 F.4th 398, 412 (4th Cir. 2022) (where commercial speech does not concern lawful activity or is misleading, a court's analysis "likely need proceed no further"), the pass-through prohibition is unquestionably "supported by a substantial government interest," *Educational Media Co.*, 731 F.3d at 298. As defendant has previously noted, the State has a substantial interest in exercising its police powers by enacting a tax to fund improvements of public education and regulating tax incidence so that the burden of the tax is borne by the digital ad services providers the General Assembly intended to tax. ECF 72 at 14. This portion of the brief will elaborate on how the Act as amended to include the pass-through prohibition addresses concerns expressed in the legislative record while seeking to advance the Act's purposes and objectives.

The power to regulate tax incidence is inherent in the power to tax, *Helvering v. National Grocery Co.*, 304 U.S. 282, 286-87 (1938), and the Supreme Court has long recognized that nothing in the Constitution prevents a state from exercising the power through tax legislation, *see, e.g.*, *International Harvester Co. v. Wisconsin Dep't of Taxation*, 322 U.S. 435, 441 (1944) ("Nor

do we perceive any constitutional obstacle . . . to the state's distributing the burden of the tax ratably among the stockholders . . . . In taxing such distributions, Wisconsin may impose the burden of the tax either upon the corporation or upon the stockholders who derive the ultimate benefit from the corporation's Wisconsin activities."). By adopting the pass-through provision, Maryland has elected to deploy its power to determine tax incidence to advance important purposes of the Act.

Unquestionably the main motivation that prompted the legislature to create the digital ad tax was the need to "provide much needed additional funding for education reform in Maryland."[2] But in addressing this funding need, the legislature sought to achieve other objectives, as well. Chief among these were greater equity and fairness in taxation and the modernization of Maryland tax laws, not only to adapt to changes in the State's economy but also to encourage taxed entities to change for the better. Each of these aims tended to underscore the need for the tax to be borne by large digital ad services companies, and not by others. Ultimately, the legislature determined that the realization of these other objectives would be jeopardized unless it adopted the pass-through prohibition.

---

[2] Del. Alonzo T. Washington testimony supporting H.B. 695, available at https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_112837-422.pdf.

House Bill 695 and Senate Bill 2, each proposing adoption of the digital ad tax, were cross-filed in the 2020 Session and were the subject of public hearings before committees in the respective chambers. But, in anticipation of an early adjournment due to the increasing threat of the COVID-19 pandemic, the legislature resorted to combining some legislative measures to save time. (The 2020 Session ended nearly three weeks early due to the declared State of Emergency.) The adoption of the digital ad tax ultimately occurred by way of amendments to House Bill 732 after it passed the House. *See* Budget & Taxation Comm., Amendments to H.B. 732, available at https://mgaleg.maryland.gov/2020RS/amds/bil_0002/HB0732_54903701.pdf. House Bill 695 did not progress beyond committee, but Senate Bill 2 passed Second Reader with Amendments on the Senate Floor prior to passage of House Bill 732. Testimony presented at the hearings on House Bill 695 and Senate Bill 2 nevertheless serves as part of the Act's legislative record.

As to the need for a more equitable sharing of the responsibility to help fund state initiatives, the legislature received testimony from multiple witnesses urging adoption of the digital ad tax to "create a more level playing field with respect to the tax code and allow undertaxed digital corporations to finally pay their fair share,"[3] where the current state tax "burden lays heavily on the middle class and lower income residents."[4] "Families, individuals, and small businesses all across our state contribute to our children's future by helping to fund our public schools," legislators were told, "while online advertisers go untaxed."[5] Citizens asked that the "search for additional revenue for public education . . . not be achieved through enactment of legislation that is regressive, harming those most with limited financial resources," when digital advertising services companies "are earning hundreds of billions of dollars . . . from utilizing personal data which they are acquiring for free from purchasers of their products or those accessing their websites."[6]

The digital ad tax, legislators heard, "tailors a modern solution to this growing inequity."[7] The Maryland Center on Economic Policy advised that "Maryland needs an effective, 21st century tax code," because "[o]perating a 20th century tax code in a 21st century economy has caused Maryland's revenue growth to stagnate," and "taxing advertising revenues of the largest

---

[3] American Federation of Teachers-Maryland ("AFT-Maryland") testimony supporting S.B. 2, https://mgaleg.maryland.gov/cmte_testimony/2020/bat/1541_01292020_112512-40.pdf.

[4] AFT-Maryland testimony supporting H.B. 695, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_11164-616.pdf.

[5] Service Employees Int'l Union, Local 500 testimony supporting H.B. 695, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_103936-473.pdf.

[6] DoTheMostGood-Maryland testimony supporting H.B. 695, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_9332-949.pdf.

[7] Strong Schools Maryland testimony supporting H.B. 695 at 2, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_105948-91.pdf

corporations—across all platforms—is an important step in the right direction."[8] The Maryland State Education Association recommended that, "[a]s the state looks to fund the schools of the future, it is prudent to . . . modernize our tax code like the sponsors of this legislation aim to do."[9] The Maryland Fair Funding Coalition concurred that adopting the digital ad tax "is a necessary step towards modernizing our tax code" to progress beyond "archaic principles of business" in response to the "digital age of advertising," which "has brought profits for large, multi-state corporations who regularly avoid their state tax responsibilities."[10]

Finally, a third, more ambitious set of objectives placed even greater emphasis on the need for the largest digital ad services companies to "bear the brunt of the tax."[11] As explained by Senate President Ferguson, "[m]assive technology corporations have ballooned in influence over the last two decades" through "their ability to monetize personal data targeted advertising."[12] "[T]he growth of these companies has resulted in negative externalities[13] socialized and borne by the public," and "for a more efficient and fair marketplace to exist in this new media environment,

---

[8] MDCEP testimony supporting H.B. 695 with amendment, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_10385-814.pdf.

[9] MSEA testimony supporting H.B. 695, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_10713-192.pdf.

[10] Maryland Fair Funding Coalition testimony supporting H.B. 695, https://mgaleg.maryland.gov/cmte_testimony/2020/wam/3141_02282020_103824-502.pdf.

[11] Paul Romer, "A Tax That Could Fix Big Tech," *New York Times* (May 6, 2019), https://mgaleg.maryland.gov/cmte_testimony/2020/bat/1541_01292020_114630-149.pdf.

[12] Sen. Ferguson testimony supporting S.B. 2, https://mgaleg.maryland.gov/cmte_testimony/2020/bat/1541_01292020_114620-118.pdf.

[13] "Negative externalities occur when the private costs of some activity are less than the total costs to society of that activity," resulting in "more of the activity than is optimal because private parties engaging in that activity essentially shift some of their costs onto society as a whole." *McCloud v. Testa*, 97 F.3d 1536, 1551 n.21 (6th Cir. 1996).

externalities created by private actors' actions must be borne by that actor."[14]  "Forcing any industry or citizen to internalize their externalities is of course entirely reasonable as a policy matter," and "[m]any taxes are designed with precisely this goal in mind." *Trafigura Trading LLC v. United States*, 29 F.4th 286, 293-94 (5th Cir. 2022) (citing as examples "gasoline taxes designed to pay for road and infrastructure repair, mass transit, or air pollution mitigation" and "'sin taxes' on alcohol or gambling that are used to cover the cost of the social consequences of alcoholism or gambling addiction").

Senator Ferguson went on to explain that the "basis" of his proposed "solution is . . . a model originally built by Paul Romer, a Nobel Prize winner in Economics,"[15] namely, "to levy a progressive tax on the currently untaxed revenues of companies' revenue from digital ad revenue."[16] According to Dr. Romer's concept, a digital ad tax will help remedy negative externalities because it "will encourage more digital service providers to rely on subscriptions" as a source of revenue rather than digital advertising "and to be transparent about whose interests they promote," and it "will undermine monopolies that rely on information about us and help restore competition."[17] Dr. Romer sees "advantages to using tax legislation, rather than antitrust law or regulation" to address the threat the "dominant digital platform companies" pose to the "shared values and norms on which democracy depends."[18] First, because "companies are incredibly clever about avoiding taxes," the digital ad tax will "spur their activity" by tempting

---

[14] *Id.*

[15] Dr. Romer, University Professor in Economics at New York University, was formerly Chief Economist at the World Bank. https://paulromer.net/about/

[16] *Id.*

[17] Paul Romer testimony supporting S.B. 2 at 2, https://mgaleg.maryland.gov/cmte_testimony/2020/bat/1541_01292020_114643-233.pdf.

[18] Paul Romer, "A Tax That Could Fix Big Tech," *New York Times* (May 6, 2019).

9

them with the prospect that "[a]d-driven platform companies could avoid the tax entirely by switching to the business model that many digital companies already offer: an ad-free subscription."[19] Second, for those corporations that "persist with the targeted ad model . . . even after paying the tax," making the tax "progressive, with higher rates for larger companies" can "limit the size of those businesses," and even "create[e] a corporate version of a marriage penalty," so that "[w]hen two companies combine, their total tax bill would go up."[20] "A large company might reduce its tax bill by breaking itself into several smaller companies."[21] To have such potential influence on the digital ad services companies, though, it is "important" in Dr. Romer's view that the "brunt" of the digital ad tax burden be borne by them.[22]

Meanwhile, opponents of digital ad tax legislation warned that "the economic burden" of the tax would not be borne by the intended taxpayers but instead would "be borne by Maryland businesses and consumers" because "advertising service providers <u>will</u> pass through the increased costs to their customers."[23] (Emphasis in original.) To address this concern, the legislature passed Senate Bill 787 in the 2021 Session to amend the Act by adding the direct pass-through prohibition, "to make explicitly clear" the legislature's intent that the digital advertising services companies taxed will be "responsible for their own costs" and will not directly "pass the cost of the Digital Ad Tax onto small business consumers."[24] In so doing, the pass-through prohibition serves the

---

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Maryland Chamber of Commerce testimony opposing S.B. 2, https://mgaleg.maryland.gov/cmte_testimony/2020/bat/1541_01292020_104423-380.pdf.

[24] Sen. Ferguson testimony supporting S.B. 787, https://mgaleg.maryland.gov/cmte_testimony/2021/bat/1spAw8qBNXQ0GDCM_hGDN2oGdQwWLf4hE.pdf.

State's substantial interest in determining who shall bear a tax obligation, as a means to advance equity and fairness, and the Act's other objectives, as explained above.

## III. THE PASS-THROUGH PROHIBITION DIRECTLY ADVANCES A SUBSTANTIAL GOVERNMENT INTEREST.

The direct pass-through prohibition "directly advances," *Educational Media Co.*, 731 F.3d at 298, the substantial government interest in determining who bears a tax burden and who does not, by making it more likely that more of a taxpayer's digital ad tax cost will be borne by that taxpayer and not passed on to its customers. There is no question that "the harms" the pass-through prohibition addresses—those that will be suffered if the tax is passed on to small businesses—"are real," *id.* at 299 (citation omitted), because, as one of plaintiffs' member organizations assured the legislature, "advertising service providers will pass through the increased costs to their customers."[25] Moreover, the pass-through prohibition "will in fact alleviate them to a material degree," *id.*, for the following reasons.

First, by prohibiting a taxpayer from "directly pass[ing] on" the digital ad tax to a customer, the provision serves to ensure that, at least in the first instance, large digital advertising services companies will bear the cost of the tax, as the legislature intended. Second, the express prohibition "make[s] explicitly clear" the legislature's intent that the digital advertising services companies taxed will be "responsible for their own costs,"[26] and thereby helps to prevent their customers from drawing the false impression that the Act intends for those customers to bear the tax or that the billing firm has no choice but to bill them for the cost of the tax. Third, while it is true that the

---

[25] Maryland Chamber of Commerce testimony opposing S.B. 2, https://mgaleg.maryland.gov/cmte_testimony/2020/bat/1541_01292020_104423-380.pdf (emphasis in original).

[26] Sen. Ferguson testimony supporting S.B. 787, https://mgaleg.maryland.gov/cmte_testimony/2021/bat/1spAw8qBNXQ0GDCM_hGDN2oGdQwWLf4hE.pdf.

11

direct pass-through prohibition in Tax-General § 7.5-102(c) does not prevent a taxpayer from "factoring such cost into its customer pricing," ECF 68 at 1, the prohibition nonetheless materially alleviates the harms of digital ad tax cost pass-through, because economic theory and empirical evidence suggest that such factoring into pricing, when compared to direct pass-through, is less likely to result in customers bearing all, or even most, of taxpayers' digital ad tax costs.

Although multiple factors affect whether and to what extent a firm's pricing reflects a tax increase, including elasticity of demand and supply, among others, empirical studies have concluded that "[s]imply assuming full pass through of" a new or increased tax is "a significant mistake."[27] When, as in this case, a tax targets a niche industry rather than a broad swath of the economy as measured by overall consumption, tax "pass through is relatively small" as a component of pricing.[28] Indeed, "pass through is not significantly different from zero" when a tax applies to firms accounting for "a consumption share less than 10 percent" of total consumption.[29] Though one should not underestimate the ability of monopolies to distort prices through mark-ups unrelated to taxes or other costs, economists have shown that even for monopolies, when the tax rate is 10% or lower, as it is for the digital ad tax, the pass-through rate reflected in prices can be

---

[27] International Monetary Fund Working Paper, "Estimating VAT Pass Through" (Sept. 2015) at 16, https://www.imf.org/en/Publications/WP/Issues/2016/12/31/Estimating-VAT-Pass-Through-43322.

[28] *Id.* at 23.

[29] *Id.*

as low as 10% of the tax cost or less, as illustrated in this chart created by economics professor Werner Antweiler:[30]



Of course, depending on the specific individual circumstances of a given firm, which could not be known or accurately predicted by the legislature, there might be instances where prices reflect a higher percentage of the firm's digital ad tax cost, and perhaps much higher. But the economics literature provides ample reason to believe that by prohibiting taxpayers from directly passing on the digital ad tax while permitting them to factor the cost into pricing, the Act, with the

---

[30] Werner Antweiler, Ph.D., "Tax Pass-through for Beginners," (Sept. 29, 2018), https://wernerantweiler.ca/blog.php?item=2018-09-29 (relying on analysis in E. Glen Weyl and Michael Fabinger, "Pass-Through as an Economic Tool: Principles of Incidence Under Imperfect Competition," *Journal of Political Economy* 121(3) (June 2013) at 528-83).

aid of well-documented market forces, will directly and materially advance the State's substantial interest in having the tax borne, to the extent possible, by large digital advertising services companies and not their customers.

IV. **THE PASS-THROUGH PROHIBITION IS NOT MORE EXTENSIVE THAN NECESSARY TO SERVE THE GOVERNMENT'S INTEREST.**

As demonstrated by the above explanation of the substantial interest served by the pass-through prohibition and how it directly advances that interest, the Act achieves "a fit that is . . . reasonable . . . in proportion to the interest served," which is all that is necessary to satisfy *Central Hudson*'s fourth prong. *Educational Media*, 731 F.3d at 300 (citation omitted). The "regulation is not more extensive than necessary to serve the government's interest," *id.* at 298; indeed, it is difficult to imagine how it could be less "extensive" and still serve its purpose of helping to ensure that the digital ad tax is borne by the intended taxpayers, who are large digital advertising services companies.

On the other hand, it is easy to imagine a more extensive regulation. As plaintiffs themselves have pointed out, the legislature could have, but did not, "prohibit the passing on of the tax 'indirectly' to customers," ECF 70 at 7, though plaintiffs have previously maintained that such a ban on indirect collection would violate the dormant Commerce Clause, ECF 25 ¶ 95. Even if that argument were ultimately held to be incorrect, the legislature could reasonably prefer to avoid adopting such a prohibition that would invite a court challenge. The legislature could have, but did not, establish a comprehensive regulatory regime to monitor regulated companies' compliance with the pass-through prohibition, such as the regulatory schemes administered by Maryland's Public Service Commission and Health Services Cost Review Commission, but such a regime would be costly to administer and thereby conflict with the Act's primary purpose of generating revenue. Not only would that approach squander some of the advantages and

efficiencies of relying on taxes and market forces to influence business behavior; it would undoubtedly prompt objections from the plaintiffs and their members even more vociferous than those they have voiced in this case.

Therefore, the pass-through prohibition passes muster under the *Central Hudson* test, and the Court should dismiss plaintiffs' remaining First Amendment challenge.

## CONCLUSION

For the reasons stated above and in defendant's previous briefing, the Court should dismiss plaintiffs' only remaining claim, and plaintiffs' motion for summary judgment should be denied.

Respectfully submitted,

BRIAN E. FROSH
Attorney General of Maryland

/s/ Julia Doyle Bernhardt
_____

JULIA DOYLE BERNHARDT
Federal Bar No. 25300
jbernhardt@oag.state.md.us

/s/ Steven M. Sullivan
_____

STEVEN M. SULLIVAN
Federal Bar No. 24930
ssullivan@oag.state.md.us
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
(410) 576-7291
(410) 576-6955 (facsimile)

Attorneys for Defendant